**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Amb. Gration, Maj. Gen., USAF (Ret.), et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) Civil Action No. 1:21-cv-01859-BAH |
| | ) |
| The Islamic Republic of Iran, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF MOTION TO TAKE JUDICIAL NOTICE FOR DEFAULT JUDGMENT AS TO LIABILITY AND DAMAGES AND TO SUBMIT DOCUMENTARY EVIDENCE UNDER SEAL

Plaintiffs, Amb. Gration Maj. Gen., USAF (Ret.), et al. ("Plaintiffs"), respectfully submit this Memorandum in support of their Motion to Take Judicial Notice of Evidence in Related Prior Cases pursuant to Federal Rule of Evidence 201.

Additionally, Plaintiffs move for entry of Default Judgment as to Liability against Defendants, the Islamic Republic of Iran, the Iranian Ministry of Intelligence and Security, and the Iranian Islamic Revolutionary Guard Corps (collectively "Iranian Defendants") pursuant to Federal Rules of Civil Procedure 55(b), 28 U.S.C. § 1608 (e), and LCvR 7. Plaintiffs have complied with all the technical and procedural requirements for service on the Iranian Defendants under 28 U.S.C. § 1608 and request this Court find that Plaintiffs have established their "claims or right to relief by evidence satisfactory to the court," and that this Court takes judicial notice and enter default judgment on liability.

Further, Plaintiffs submit this Memorandum in support of their Motion for Judgment as to Damages, and respectfully request permission to submit directly to the Court documentary evidence as to the damages, as well as present their evidence under seal pursuant to D.D.C. Local

1

Civil Rule 5.4(f), which requires redaction of any personally identifiable information, medical documents, and other sensitive personal information that will affect the privacy and security of these Plaintiffs.

## I.      BACKGROUND

This cause arises out of the June 25, 1996, terrorist attack on the United States Air Force housing complex, Khobar Towers, in Dhahran, Saudi Arabia ("the Attack").  The Attack was one of the deadliest attacks on United States Forces abroad, killing 19 U.S. Airmen and wounding nearly 500 others.  A tanker truck, loaded with 20,000 pounds of explosives, was detonated by terrorists next to Khobar Towers Building 131.  The blast blew off much of the eight-story building and left a crater 50 feet wide and 16 feet deep and shattered windows more than half a mile away. The blast killed 19 Air Force servicemembers and injured many others.

At the time of the Attack, the Khobar Towers complex was housing United States Air Force and other servicemembers who were assigned to Dhahran Air Base in Dhahran, Saudi Arabia, as part of Operation Southern Watch, to enforce a no-fly zone over southern Iraq.

Plaintiffs are twenty-six (26) servicemembers of the armed forces who suffered physical and/or psychological injuries from the Attack, forty-one (41) of their immediate family members or the functional equivalent thereof, and twelve (12) immediate family members or the functional equivalent of servicemembers who received judgments in *Christie, et al., v. Islamic Republic of Iran, et al.,* No. 19-cv-1289, 2020 WL 3606273, at *15 (D.D.C. July 2, 2020) (Howell, C.J.).

Injured servicemember Plaintiffs employed by the United States Armed Forces who suffered serious physical and/or psychological injuries as a result of the Attack include Amb. Jonathan Scott Gration, Maj. Gen., USAF (Ret), Barry Gordon Brown, MSgt, USAF (Ret), Angela Mashel Brown, Steven Lee Byers, Timothy Gerard Fermanis, Kevin Richard Mall, TSgt, USAF

(Ret), John Charles Orlando, Jr., TSgt, USAF (Ret), Kenneth David Weaver, Ronald Scott Gering, Aubree Brooke Staricka, Brent Alan Mullings, Sy William Yost, Joey Laurier Morrissette, Nathan Elliott Wheat, Vincent Gene Oliver, TSgt, USAF (Ret), Steven Lee Brodt, MSgt, USAF (Ret), Lt. Co. Steven Peter Goff, M.D. deceased, through his Estate by Personal Representative Shirley Ann Goff, James Michael Silvi, CMSgt, USAF (Ret), David Anthony Toole, Franko James Ferguson, Michael Harrington Weems, Brian Christopher Stoneburner, Scott Patrick Hill, Christopher Brian Lauderback, MSgt, USAF (Ret), Jason Allen Bratton, and Kenneth Michael Kowalczyk (collectively "Injured Servicemember Plaintiffs").

Immediate family members or the functional equivalents of the Injured Servicemember Plaintiffs, who suffered severe emotional distress as a result of the Attack on their loved ones include Judith E. Gration, Jonathan Scott Gration, Jr., Eva Ranee Graham, Corey Thomas Brown, Alexis Nichole Wingate, Donna Lee Byers, Rodney Lee Byers, Joseph Eugene Byers, Ursula Leona Orlando, Susan Pauline Pomoransky, Vickie Rena Anthony, Clinton Edward Weaver, Donald Lee Heikes, Roger Dayle Heikes, Tina Marie Mullings, Gloria Ann Mullings, Vernon Oscar Mullings, Heather Maureen Hector, Maria Star Yost, Diane Theresa Morrissette, Natasha Kami Morrissette, Donald Allen Wheat, Tamara Lee Oliver, Un Suk Brodt, Steven Han Brodt, Samuel John Brodt, Shirley Ann Goff, Antoinette Marie Hovel, Kathryn Mary Ableidinger, Jo Ann Silvi, Angela Christine Silvi, Alison Elizabeth Silvi, Michele Ann Canchola, Timothy Louis Canchola, Nancy Pearl Robertson Weems, John Harold Weems, Richard Lawrence Weems, Kimberlee Jo Hill, Patricia Mary Kowalczyk, Kenneth Dale Kowalczyk, and Aaron Charles Kowalczyk. Immediate family members or the functional equivalent of servicemembers who received judgments in *Christie,* include Serena Elizabeth Douglass, Sarah Grace Douglass, Steven Millard Douglass, Christina Marie Schomaker, Paula Gail Nott, Preston Wade Nott, Kristine

3

Lynnette Schomaker, Tanya Lea Nott, Rebecca Lamae Thurman, Jacqueline Archuleta Quintana, Susan Lynn White, Jerry White (collectively "Immediate Family Member Plaintiffs").

The defendants are the Islamic Republic of Iran ("Iran"), a foreign sovereign state, and its political subdivisions, the Iranian Ministry of Intelligence and Security ("MOIS") and the Iranian Islamic Revolutionary Guard Corps ("IRGC") (collectively "Iranian Defendants"). These Iranian Defendants have previously been held liable for providing material support and resources to the terrorists who carried out the bombing on the Khobar Towers complex. *E.g.*, *Christie,* 2020 WL 3606273, at *15; *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376, 2019 WL 2717888, at *69 (D.D.C. June 27, 2019) (Howell, C.J.); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10 (D.D.C. 2018) (Howell, C.J.); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp.2d 163, 167 (D.D.C. 2010) (Lamberth, J.); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 46-51 (D.D.C. 2006) (Lamberth, J.); *Estate of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229, 248 (D.D.C. 2006) (Lamberth, J.).

Pursuant to the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, victims of terrorism are permitted to file suit against foreign sovereign state-sponsors of terrorism. Plaintiffs have brought suit under this FSIA exception.

## II.   PROCEDURAL HISTORY

The Complaint on behalf of all Plaintiffs and against all Iranian Defendants was filed on July 12, 2021, alleging claims for damages under 28 U.S.C. § 1605A(c) including claims for personal injury, solatium damages, punitive damages, and prejudgment and post-judgment interest. (ECF No. 1). On August 12, 2021, Plaintiffs filed their Amended Complaint against all Iranian Defendants. (ECF No. 12). On January 13, 2022, Plaintiffs filed their Second Amended Complaint against all Iranian Defendants realleging their claims for damages. (ECF No. 23). On

June 15, 2022, service was completed on all Iranian Defendants.  (ECF No. 34).  On August 15, 2022, Plaintiffs filed a Motion for Entry of Default pursuant to Rule 55(a).  (ECF No. 35).  The Motion provided details of Plaintiffs' compliance with all the service requirements on defendants Iran, IRGC, and MOIS under 28 U.S.C Section 1608.  On September 1, 2022, this Court granted an order for the Entry of Default under Federal Rule of Civil Procedure 55(a). (ECF 38). Accordingly, Plaintiffs now respectfully request Default Judgment as to Liability and Damages under Federal Rule of Civil Procedure 55(b).

### III.   PLAINTIFFS ARE ENTITLED TO A FINAL JUDGMENT ON LIABILITY AGAINST ALL DEFENDANTS

#### A.  LEGAL STANDARD

The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611, provides the sole basis for obtaining jurisdiction over a foreign state in the United States.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

Pursuant to FSIA § 1608(e), LCvR 7, and Federal Rule of Civil Procedure 55(b)(2), the court may enter a default judgment upon application by a party seeking that relief and where (1) the court has subject matter jurisdiction over the claims; (2) personal jurisdiction is properly exercised over defendant; and (3) plaintiff has presented satisfactory evidence to establish its claim against defendant.  *Thuneibat v. Syrian Arab Republic*, 167 F.Supp.3d 22, 33 (D.D.C. 2016).

#### 1.  Subject Matter Jurisdiction

Under the FSIA, subject matter jurisdiction exists where the defendant's conduct falls within one of the specific statutory exceptions to immunity.  See *Owens v. Republic of Sudan,* 882 F. Supp. 2d 128, 143 (D.D.C. 2012) and 28 U.S.C. §§ 1330(a) and 1604.

Senior Judge Lamberth has explained that the defendant's conduct falls within the "state sponsor of terrorism" exception to immunity where the following elements are satisfied:

> (1) money damages are sought (2) against that state for (3) personal injury or death that (4) was "caused by" (5) an act of torture, extrajudicial killing . . . or the provision of material support of resources for such an act if such act or provision of material support or resources is engaged in by an official, employee or agent of such foreign state while acting within the scope of his or her office, employment or agency.  Furthermore, the FSIA provides that courts "shall hear a claim" under § 1605A of the FSIA if (1) the foreign state was designated as a state sponsor of terrorism at the time the act occurred; (2) the claimant was a United States national, a member of the armed forces, or otherwise, an employee or contractor of the Government of the United States, acting within the scope of her employment and (3) the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim, provided that the act occurred in the foreign state against which the claim is brought.

*Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 28 (D.D.C. 2012) (quoting 28 U.S.C. § 1605A(a)(1) and (a)(2)).

Here, the elements have been met, and therefore, the Court has subject matter jurisdiction and should hear this claim for the foregoing reasons.  First, it is well established that Iran is now, and has continuously been since 1984, a state sponsor of terrorism.  Iran was designated on January 23, 1984, in accordance with the Export Administration Act of 1979, as a "country which has repeatedly provided support for acts of international terrorism."  49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Sec of St Schultz).  This designation meets § 1605A's definition of a "state sponsor of terrorism."  28 U.S.C. § 1605A(h)(6).  Iran continues to be designated as a state sponsor of terrorism to this day.  *State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/ (last visited October. 15, 2022).

Similarly, "[B]oth MOIS and [IRGC]" must be treated as the foreign state for purposes of § 1608(a))."  *Azadeh v. Gov't of the Islamic Republic of Iran*, No. 16-cv-1467, 2018 WL 4232913, at *39 n.6 (D.D.C. Sept. 5, 2018).  The MOIS and IRGC are both "so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather

than a separate 'agency or instrumentality' of the state." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994).

Second, Plaintiffs have brought a civil action against Iran and its political subdivisions, MOIS and IRGC, for money damages for their material support of the Khobar Towers attack, an act of terrorism, for which the Iranian Defendants are not immune.  In fact, the same defendants have already been found to have provided material support for the Attack.  *Blais,* 459 F. Supp. 2d at 48 (see also *Christie,* 2020 WL 3606273; *Schooley,* 2019 WL 2717888; *Akins,* 332 F. Supp. 3d 1; *Rimkus,* 750 F. Supp.2d 163; *Heiser I,* 466 F. Supp. 2d 229).

Moreover, "[T]he defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity."  *Harrison,* 882 F. Supp. 2d at 50. Here, where the Iranian Defendants have defaulted, they have forfeited any affirmative defenses including the statute of limitations defense, which has been determined to be not jurisdictional. *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1115 (D.C. Cir. 2019) (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

Third, all Plaintiffs are U.S. servicemembers and their immediate family members who are all United States citizens as required by § 1605A(a)(2)(A)(ii)[1].

Fourth, the Khobar Towers bombing carried out by Saudi Hezbollah, which killed 19 American servicemembers and caused the "personal injur[ies]" suffered by the Plaintiffs, was manifestly an extrajudicial killing for which the Iranian Defendants provided material support, and for which the Iranian Defendants can be subject to the jurisdiction of this Court.  See *Owens, et*

---

[1] All the Plaintiffs will provide a declaration and exhibits corroborating their citizenship in their submission of documentary evidence in support of their claims for damages.

*al., v. Republic of Sudan, et al.*, 864 F.3d 751, 778 (D.C. Cir. 2017). ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors.").

Finally, Plaintiffs were not required to extend an offer to arbitrate under § 1605A(a)(2)(A)(iii) because the FSIA's arbitration requirement only applies when the alleged terrorist act occurred in the foreign state against which the claim is brought, which is not the case here. *Harrison,* 882 F. Supp. 2d at 50.

Therefore, the Iranian Defendants' conduct falls within the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A and accordingly, the Court has subject matter jurisdiction.

### 2.   Personal Jurisdiction

A court may exercise personal jurisdiction over a defendant if the state is properly served in accordance with the FSIA requirements stated in 28 U.S.C. § 1608(a). *See* 28 U.S.C. § 1330(b); *Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 298 (D.D.C. 2003).

As noted above, service, in this case, was properly affected on Iran, IRGC, and MOIS pursuant to the procedures set forth in 28 U.S.C. § 1608(a)(4). (ECF Nos. 29-38).  Accordingly, Iranian Defendants were properly served in accordance with 28 U.S.C. § 1608 and this Court has personal jurisdiction over them.

### 3.   Evidence Satisfactory To The Court

To obtain a default judgment against a foreign sovereign, the FSIA requires that plaintiffs demonstrate the right to relief "by evidence satisfactory to the court."  *Owens*, 864 F.3d at 785 (quoting 28 U.S.C. § 1608(e)).  This standard may be satisfied through uncontroverted factual allegations supported by documentary and affidavit evidence.  *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 59 (D.D.C. 2010).  Further, the "court may accept as true plaintiffs'

uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258, 268 (D.D.C. 2003).  Additionally, a court may take judicial notice of related proceedings and records in cases before the same court.

Here, the Plaintiffs submit that prior related cases established overwhelmingly that the Iranian Defendants are liable for their conduct that caused the Attack and ask that this Court take judicial notice of those proceedings.

## B. JUDICIAL NOTICE OF RELATED PRIOR CASES FINDING LIABILITY AGAINST IRANIAN DEFENDANTS

This Court should take judicial notice of the records and proceedings from prior related cases before the District Court for the District of Columbia, wherein the same Iranian Defendants were held liable for providing material support and resources to support the Attack. *Blais*, 459 F. Supp. 2d at 48; see also *Christie,* 2020 WL 3606273; *Schooley,* 2019 WL 2717888; *Akins,* 332 F. Supp. 3d 1; *Rimkus,* 750 F. Supp. 2d 163; *Heiser I,* 466 F. Supp. 2d 229.

Rule 201 of the Federal Rules of Evidence permits this Court to take judicial notice of facts previously adjudicated in the records and proceedings from prior related cases. Specifically, this rule authorizes a court to adjudicate facts that are not subject to reasonable dispute because they can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.  Fed. R. Evid. 201(a)-(c).

It is settled law that "the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties*." Veg-Mix Inc. v. US Dept. of Agriculture*, 832 F. 2d 601 (D.C. Cir. 1987).  Previously, this Court has found in a case involving the same attack as the instant matter, that "judicial notice is warranted where the validity of judicial record is generally 'not subject to reasonable dispute,' and such records are capable of establishing the type and substance of evidence that was presented to earlier courts. The objective

issue of what that evidence was — rather than the subjective determination of what that evidence means — is thus a proper exercise of judicial notice." *Rimkus,* 750 F. Supp. 2d at 172.  This Court has also held that "the FSIA does not require this Court to re-litigate issues that have already been settled in previous decisions." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010).

Further, this Court heard extensive evidence and witness testimony in both the cases of *Blais* and *Heiser I*.  See *Blais*, 459 F. Supp. 2d at 46 n.4; *Heiser I*, 466 F. Supp. 2d at 250.  In *Heiser I*, the court proceedings lasted 17 days and included testimony by seven expert witnesses. *Heiser I*, 466 F. Supp. 2d at 250.  Specifically, the courts in *Blais* and *Heiser I* found that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran, the IRGC had the responsibility of working with Saudi Hezbollah to execute the plan, and the MOIS participated in the planning and funding of the attack." *Heiser I*, 466 F. Supp. 2d at 265; see also *Blais*, 459 F. Supp. 2d at 48. In these cases, liability for the Attack was firmly established by expert testimony and evidentiary evidence.  The FBI Director at the time of the Attack, Louis Freeh, and the FBI agent in charge of the five-year investigation into the Attack, Dale Watson, along with Middle East expert, Dr. Patrick Clawson, presented conclusive evidence that the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the Attack under their direction. *Heiser I*, Ex. 9 at 67–68.[2]  The facts of the Attack were also clearly proven in the record and proceedings of those cases.  Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces assigned to Operation Southern Watch, charged with monitoring compliance with U.N. Security Council resolutions after the end of the Gulf War. *Blais*, Tr. 41.

---

[2] References to the transcripts of the hearings held in *Blais* and *Heiser* will be abbreviated throughout as "Tr." References to exhibits admitted into evidence in those hearings will be abbreviated "Ex."

At approximately 10 minutes before 10 pm on June 25, 1996, a large gasoline tanker truck pulled up alongside the perimeter wall of the Khobar Towers complex.  The driver jumped out, ran into a waiting car that had pulled up near the truck, and sped off.  *Blais,* Tr. 9-10.  Although security guards on top of Building 131 started to give warnings about the unusual vehicle location, the truck exploded with great force within about 15 minutes.  The investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT and that it was the largest non-nuclear explosion ever up to that time. *Blais,* Tr. 10.  The explosion sheared off the face of Building 131, which housed members of the U.S Air Force 4404th Wing (Provisional) and damaged every other building in the complex.  19 United States Air Force personnel were killed in the explosion, and hundreds of others were injured.  *Blais*, Tr. 11; Ex. 2.

Moreover, courts concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate in the cases of *Rimkus, Akins, Schooley,* and *Christie*. *See Christie*, 2020 WL 3606273, at *2; *Schooley,* 2019 WL 2717888, at *2; *Akins,* 332 F. Supp. 3d at 9; and *Rimkus*, 750 F. Supp. 2d at 167.

Therefore, judicial notice of prior proceedings is warranted here, where prior findings of fact and supporting evidence have established the Iranian Defendants' liability under § 1605A (and its predecessor § 1605(a)(7)) for providing material support and resources that caused the attack on the Khobar Towers housing complex on June 25, 1996, and resulted in Plaintiffs' injuries.

### C. SUBMISSION OF DOCUMENTARY EVIDENCE AS TO PLAINTIFFS' INJURIES AND DAMAGES UNDER SEAL

All named plaintiffs have suffered physical and/or psychological injuries, including emotional distress, entitling them to damages from the Iranian Defendants under FSIA § 1605A(c).

Section 1605A(c) provides a federal private right of action against designated state sponsors of terrorism for enumerated categories of persons, including "a national of the United

States" or her "legal representative," for "personal injury or death caused by that foreign state . . . for which the courts of the United States may maintain jurisdiction . . . for money damages."  28 U.S.C. § 1605A(c).  Successful plaintiffs may recover damages that "include economic damages, solatium, pain and suffering, and punitive damages."  *Id*.

Although this Section provides a private right of action, it does not specify the substantive law to be applied.  This Court has therefore applied "general principles of tort law," looking to authoritative sources such as the Restatement (Second) of Torts.  See, e.g., *Worley v. Islamic Republic of Iran,* 75 F. Supp. 3d 311, 335 (D.D.C. 2014); *Roth v. Islamic Republic of Iran,* 78 F. Supp. 3d 379, 399 (citing *Oveissi v. Islamic Republic of Iran,* 879 F. Supp. 2d 44, 54 (D.D.C. 2012)); *Estate of Heiser II v. Islamic Republic of Iran,* 659 F. Supp. 2d 20, 24 (D.D.C. 2009).  These cases have repeatedly held that, under any possible interpretation of these general principles, a state sponsor of terrorism which is shown to have provided material resources and support to a terrorist organization for an attack that causes an "extra-judicial killing" and/or "personal injury" is also responsible for intentional infliction of emotional distress and the pain and suffering of the immediate family of the injured as well as loss of consortium and solatium.  "Under the FSIA, a solatium claim is indistinguishable from" a claim for intentional infliction of emotional distress.  *Valore,* 700 F. Supp. 2d at 85.

Here, the twenty-six (26) Injured Servicemember Plaintiffs have brought their claims under the torts of assault and battery, and intentional infliction of emotional distress.  The fifty-three (53) Immediate Family Member Plaintiffs have brought their claims under the torts of intentional infliction of emotional distress, and solatium.  The Plaintiffs request damages expressly mentioned in Section 1605A(c), including pain and suffering, solatium, and punitive damages, as well as pre- and post-judgment interest.

12

**1.   Request to Submit Documentary Evidence Directly to the Court**

Plaintiffs request to present evidence in support of their claims for damages directly to the Court through documentary evidence in the form of Declarations and Exhibits for each Plaintiff, as the court has permitted in similar Khobar Towers cases brought under the FSIA.  See, e.g., *Christie,*19-cv-1289-BAH, D.D.C. Min. Order of January 24, 2020; *Aceto v. Iran*, Civil Case No. 19-cv-464-BAH ECF Nos. 23-24; *Schooley,*17-cv-1376-BAH, D.D.C. Min. Order of June 18, 2018, and ECF No. 18; *Akins*,17-cv-675-BAH, ECF Nos. 22-1, 24.[3]

**2.    Request to Submit Documentary Evidence Under Seal and Redacted**

Pursuant to D.D.C. Local Civil Rule 5.4(f), Plaintiffs request to present documentary evidence under seal as well as file a redacted version to prevent the disclosure of any medical and other sensitive personal information that will affect the privacy and security of these Plaintiffs.

The Declarations and Exhibits contain identity documents, protected health information, and other sensitive information that Plaintiffs believe will be detrimental should they be disclosed to the general public in their current form.  Specifically, these documents and information include medical records, the Department of Veterans Affairs ("VA") disability files, military records, statements containing sensitive and personal information of injured Plaintiffs, driver's licenses, birth certificates, naturalization certificates, marriage and divorce certificates, all in support of their claims here.

First, as victims of terrorism, Plaintiffs are especially vulnerable to reprisal from Iranian Defendants or identity theft from having their private information on the public record. Placing

---

[3] In *Akins*, the court provided plaintiffs with the option of submitting documentary evidence to the Court directly, and the Plaintiffs elected to do so.  Similarly, in *Schooley* the plaintiffs moved to present evidence through an evidentiary hearing; the Court provided plaintiffs the opportunity to submit documentary evidence directly to the Court and the plaintiffs elected this option.  In *Aceto,* plaintiffs submitted documentary evidence directly to the Court without objection. Further in *Christie*, plaintiffs moved the court to submit documentary evidence directly to the court both under seal and redacted and the Court granted plaintiffs' request.

their driver's licenses, birth certificates, and marriage certificates online, which contain their pictures and other identifying information, including social security numbers, puts them at risk of harm.

Second, Plaintiffs' medical records, declarations, and VA disability files contain protected health information including details of Plaintiffs' physical and mental injuries and their medical, psychological, and psychiatric treatments. These records would disclose protected medical and health information and other sensitive personal information, which would subject Plaintiffs, many of whom struggle with post-traumatic stress disorder, to stress and public exposure.

For the above reasons, the Plaintiffs respectfully seek the Court's approval to file the evidence as to Plaintiffs' injuries and damages under seal, and to file a separate redacted version of Plaintiffs' evidence as to injuries and damages on the public docket, without Plaintiffs' personally identifiable information (including, but not limited to, social security number, minor children's names, dates of birth, financial account information, photographs, and addresses).[4]

## IV. ALL PLAINTIFFS HAVE SUFFERED INJURIES COVERED BY SECTION 1605A ENTITLING THEM TO DAMAGES AGAINST ALL DEFENDANTS

### A. STANDARDS OF PROOF

While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court,'" courts must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the "aim to prevent state sponsors of terrorism – entities particularly unlikely to submit to this

---

[4] See *Christie v. Iran*, No. 19-cv-1289-BAH, January 24, 2020, Minute Order granting the plaintiffs' Request to Submit Documentary Evidence under Seal and directing the plaintiffs to file their declarations and exhibits under seal and to file on the public docket a version of those documents with personally identifiable information see D.D.C. Local Civil Rule 5.4(f), and any medical and other sensitive personal information redacted.

country's laws – from  escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)).

In an FSIA default proceeding, uncontroverted factual allegations that are supported by admissible evidence are taken as true. *Roth,* 78 F. Supp. 3d at 386 ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (Citing *Rimkus*, 750 F. Supp. 2d at 171)); see also *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011) (quoting *Estate of Botvin v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103  (D.D.C. 2007)). See Fed. R. Civ. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when an adverse party "fails to properly address another party's assertion of fact").

Plaintiffs are prepared to submit as documentary evidence in support of this memorandum sworn declarations and exhibits in support of their request for damages.  This Court has held that sworn declarations and exhibits are sufficient to satisfy the requirement of the FSIA, 28 U.S.C. § 1608(e), that a claimant must establish their claim or right to relief by evidence satisfactory to the court. See *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016); *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012); and *Weinstein v. Islamic Republic of Iran,* 184 F. Supp. 2d 13, 19 (D.D.C. 2002). In fact, in the prior Khobar Towers cases of *Akins, Schooley,* and *Christie*, this Court allowed such presentment.[5]  It has also been held that section 1608(e) "does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens*, 864 F.3d at 785.

---

[5] Discussed supra *Akins v. Iran,* Civil Case No. 1:17-cv-00675-BAH*,* ECF Nos. 22-1, 24; *Schooley v Iran*, 17-1376 (D.D.C. Minute Order of June 18, 2018, and ECF No. 18) (BAH); *Aceto v Iran*, Civil Case No. 19- 00464 (D.D.C. June 27, 2019) (BAH)*,* ECF Nos. 23-24. *Christie, et al., v. Islamic Republic of Iran, et al.,* 19-1289 (D.D.C. January 24, 2020, Minute Order) (BAH).

### B.  PLAINTIFFS RIGHT OF ACTION FOR DAMAGES UNDER SECTION 1605A(C)

In the U.S. Code Section 1605A(c), Congress created a comprehensive statutory scheme that provides a federal private right of action for terrorism-related injuries:

(c) PRIVATE RIGHT OF ACTION.—A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—

(1) a national of the United States,

(2) a member of the armed forces,

(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. § 1605A(c).

Under Section 1605A(c), a foreign state that meets subsection (a)(2)(A)(i)'s requirements of "state sponsors of terrorism" is liable "for personal injury or death" caused by the foreign state or its agents. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. *Id.*   Iran is a foreign state within the meaning of 28 U.S.C. § 1391(f) and 1603(a).  The Islamic Republic of Iran has been designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, (50 U.S.C. § 2405(j)) continuously since January 19, 1984.  *State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/ (last visited November 6, 2022).

16

Although Section 1605A(c) provides a private right of action, it does not itself specify the substantive law to be applied.  The court, however, "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018).

In prior cases, this Court has applied "general principles of tort law," looking to authoritative sources such as the Restatement (Second) of Torts. *See, e.g.*, *Heiser II,* 659 F. Supp. 2d at 24; *Roth,* 78 F. Supp. 3d at 399 (citing *Oveissi,* 879 F. Supp. 2d at 54); *Worley,* 75 F. Supp. 3d at 335.  These cases have repeatedly and correctly held that, under any possible interpretation of these general principles, a state sponsor of terrorism which is shown to have provided material resources and support to a terrorist organization for an attack that causes an "extra-judicial killing" and/or "personal injury" is responsible for intentional infliction of emotional distress and the pain and suffering as well as loss of consortium and solatium of the immediate family.

Moreover, this Court has previously held that Iranian Defendants were liable to the servicemembers who were injured by the Khobar Towers attack for the torts of assault, battery, and intentional infliction of distress.  *E.g*., *Christie,* 2020 WL 3606273, at *17-18; Schooley,* 2019 WL 2717888, at *71-72; *Akins,* 332 F. Supp. 3d at 1. This Court also held Iranian Defendants were liable to the immediate family members of those injured, for intentional infliction of emotional distress, with rights to solatium damages. *E.g*., *Christie,* 2020 WL 3606273, at *19; Schooley,* 2019 WL 2717888, at *73; *Akins,* 332 F. Supp. 3d at 1.

Plaintiffs are comprised of two groups of claimants, U.S. servicemembers who are United States' nationals, and were serving in the United States military and suffered injuries as a result of the Attack, and immediate family members of those servicemembers, who are United States'

nationals, and who suffered severe emotional distress and loss of solatium as a result of the attack on their loved ones. Under 1605A(c) both groups of Plaintiffs are entitled to bring claims for damages against the Iranian Defendants.[6]

## C.  PLAINTIFFS' CLAIMS

All seventy-nine (79) Plaintiffs have brought claims under 28 U.S.C. § 1605A(c) for compensatory damages. Second Am. Compl. Count I. Twenty-six (26) Injured Servicemember Plaintiffs bring claims for intentional infliction of emotional distress. Second Am. Compl. Count III.  Twenty-five (25) Injured Servicemember Plaintiffs who were present at the Khobar Towers complex at the time of Attack bring compensatory damages claims for assault.  Second Am. Compl. Count II.  Twenty-four (24) Injured Servicemember Plaintiffs who were physically injured by the Attack bring compensatory damages claims for battery.  Second Am. Compl. Count II. [7] The fifty-three (53) Immediate Family Member Plaintiffs bring a claim for loss of solatium and intentional infliction of emotional distress.[8]  Second Am. Compl. Count IV and V.

Plaintiffs respectfully withdraw their claims for economic loss including medical expenses, lost income, and loss of earning capacity.  Second Am. Compl. Count I, II, III, IV, V.

Injured Servicemember Plaintiff the Estate of Lt. Col. Steven Peter Goff, M.D. by Shirley Goff Personal Representative of the estate, hereby respectfully withdraws the claims for wrongful

---

[6] The Estate of Lt. Col. Steven P. Goff, M.D. by Shirley Goff the Personal Administrator of the estate, has jurisdiction under 28 U.S.C. § 1605A(c)(4) as the legal representative of a member of the armed forces.

[7] Although Injured Servicemember Plaintiffs bring damages claims under the theories of assault, battery, and IIED, it is understood that Plaintiffs may recover under only one theory.  *See Christie* Memorandum Judgment at 36 citing EEOC Waffle House Inc., 534 U.S. 279, 297 (2002).

[8] Immediate Family Member Plaintiffs bring damages claims under the theories of IIED and loss of solatium, it is understood that Plaintiffs may recover under only one theory.  *See Christie* Memorandum Judgment at 36 citing EEOC Waffle House Inc., 534 U.S. 279, 297 (2002).

death and survival but maintains the claims for pain and suffering under the theories of assault, battery, and IIED.[9]  See Second Am. Compl. Count I, II, III, VI, and VII.

Plaintiffs are ready to file their sworn declarations attesting to their individual injuries.

### 1. Assault and Battery

The Iranian Defendants are liable for assault on each of the twenty-five (25) servicemembers who were located in the Khobar Towers complex on June 25, 1996, if, the court finds that the Iranian Defendants provided material support and resources for the Attack and acted "intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact" with those attacked, and those attacked were "thereby put in such imminent apprehension." Restatement (Second) of Torts § 21(1) (Am. Law Inst. 1977);  *Murphy*, 740 F. Supp. 2d at 73 (since "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs asserted "that they did, in fact, fear such harm because of the attack," Iran may be held liable for assault); *see also Valore*, 700 F. Supp. 2d at 76 (determining that just as terrorist acts are designed to harm others physically, they are also designed to inflict psychological terror by instilling fear of future harm into the victims).  Here, the elements of assault have been met by twenty-five (25) Injured Servicemember Plaintiffs who were located in the Khobar Towers complex because they were in "striking distance" of the explosion, and as such had an imminent apprehension of harm.  See *Ackley, et al. v. Islamic Republic of Iran,* No. 20-cv-621, 2022 WL 3354720 *47 (D.D.C. Aug. 12, 2022) (quoting Restatement (Second) Of Torts § 29 cmt. 2 defining imminence as so close to striking distance

---

[9] Here, Plaintiff the Estate of Lt. Col. Steven P. Goff, M.D. by the Personal Representative Shirley Ann Goff, is pursuing damages arising out of claims under the theories of assault, battery, and IIED.  This Court has previously held in a case arising out of the same attack, that an award of pain and suffering damages is appropriate where similarly a plaintiff passed away after the attack based upon jurisdiction under 28 U.S.C. § 1605A(c)(4) for the legal representative of a member of the armed forces.  *Ackley v. Islamic Republic of Iran,* 2022 WL 3354720, *52 (D.D.C. 2022).

that he can reach the other almost at once.)  Twenty-five (25) Injured Servicemember Plaintiffs attest, in their sworn declarations, that they were all at the Khobar Towers complex at the time of the Attack and in imminent apprehension of harm due to the Iranian Defendants' actions.  They each corroborate the psychological impact that the Attack had upon them through their evidentiary submissions such as VA letters, medical records, certificates of release from active duty, Commendations, and/or declarations from friends or family members.[10]  Therefore, the Iranian Defendants are liable to the Injured Servicemember Plaintiffs for assault.

Similarly, the Iranian Defendants are liable for battery to the Injured Servicemember Plaintiffs injured in the Attack, if, when they provided material support and resources for the Attack, they acted "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact" against those attacked, and "a harmful contact with [those attacked] directly or indirectly results." Restatement (Second) Of Torts § 13.  "Harmful contact" has occurred where "any physical impairment of the condition of another's body, or physical pain or illness" results. *Id*. § 15.

---

[10] See Gration Decl. ¶ 7 ("5th Fl of Bld 101 in Khobar complex") and ¶ 8 (helped evacuate bld. because of danger from Attack); Barry Brown Decl. ¶ 7 ("in Khobar complex fitness center) and ¶¶8,9 (took evasive action because of attack); Angela Brown Decl. ¶ 7 (Garage 14 in Khobar complex) and ¶¶7,8 (crouched in fear and felt like I was going to die); Byers Decl. ¶7 (4th Fl. Bld 130 in Khobar complex) and ¶8 (took cover due to attack); Fermanis Decl. ¶ 6 (1st Fl. Bld 102 in Khobar complex) and ¶11 (ran for safety from Attack); Mall Decl. ¶ 6 (3rd Fl. Bld 104 in Khobar complex) and ¶ 10 (scared); Orlando Decl. ¶ 7 (1st Fl. Bld 129 in Khobar complex) and ¶ 8 (yelling in fear); Weaver Decl. ¶10 (lobby of Bld in Khobar complex) and ¶12 (feared and panicked); Gering Decl. ¶6 (dorm in Bld 101 in Khobar complex) and ¶9 (sought cover); Mullings Decl. ¶7 (security post in Khobar complex) and ¶9 ("feared for my life"); Yost Decl. ¶7 (6th Fl. Bld 133) and ¶8 ("knew I had to exit building); Morrissette Decl. ¶7 (5th Fl. Bld. 128 in Khobar complex) and ¶8 ("instantly frightened"); Wheat Decl. ¶7 (Grd Fl. Bld. 129 in Khobar complex) and ¶8 (jumped off balcony to escape); Oliver Decl. ¶7 (Bld. 117 in Khobar complex) and ¶7 (in shock); Brodt Decl. ¶7 (3rd Fl. Bld. 107 in Khobar complex) and ¶8 (distraught); Goff Decl. Ex M Witness Statement of Bryan Brock ¶5 (Bld. 101 in Khobar complex) and ¶7 ("close to death"); Silvi Decl. ¶7 (Bld. 103 in Khobar complex) and ¶9 (escaped due to danger from attack); Toole Decl. ¶7 (Bld. 127 in Khobar complex) and ¶9 (frantically escaped); Ferguson Decl. ¶6 (in dorm in Khobar complex) and ¶8 (ran from attack); Weems Decl. ¶7 (Bld. 101 in Khobar complex) and ¶8 (panicked); Stoneburner Decl. ¶6 (Bld. 133 in Khobar complex) and ¶8 (was terrified); Hill Decl. ¶8 (Bld. 128 in Khobar complex) and ¶9 (shocked and stunned); Lauderback Decl. ¶6 (Bld. 121 in Khobar complex) and ¶7 (ran for cover); Bratton Decl. ¶6 (Bld. 130 in Khobar complex) and ¶8 (escaped because of attack); Kowalczyk Decl. ¶7 (Bld. 124 in Khobar complex) and ¶9 (evacuated the building due to urgent injuries from the Attack).

Here, the elements of battery have been established for the twenty-four (24) Injured Servicemember Plaintiffs who were injured in the Attack.  As this Court has found in prior related cases (e.g., *Heiser I*, *Blaise*, *Rimkus, Akins*, *Schooley, Christie supra*), the Iranian Defendants, in providing Saudi Hezbollah with the materials, training, and money necessary to detonate a significant explosion near a military residence facility, acted with an intent to harm the Plaintiffs and inflict emotional and/or physical injuries on the servicemembers and their families.

Here, twenty-four (24) Injured Servicemember Plaintiffs who suffered physical injury as a result of the Attack have, through their sworn declarations and exhibits, demonstrated the physical harm the bombing had on them, which is corroborated by their evidentiary submission such as VA letters, medical records, certificates of release from active duty, Commendations, and/or declarations from family members and friends, corroborating their claims of battery.[11]

Accordingly, the Iranian Defendants are liable for battery to these twenty-four (24) Injured Servicemember Plaintiffs who were physically harmed by the Attack.

Several of the Injured Servicemember Plaintiffs did not seek treatment for the physical injuries at the time of the Attack or minimized their injuries so as not to detract from treating the more seriously wounded and assisting in the search and rescue efforts.  However, even the ones who suffered minor cuts and abrasions from the Attack were impacted by the force of the blast

---

[11] See Gration Decl. ¶¶ 7, 22 (shrapnel injuries and ears ringing later diagnosed with hearing damage); Barry Brown Decl. ¶ 12 (injured rotator cuff); Angela Brown Decl. ¶¶ 7, 22 (ears began ringing and later diagnosed with tinnitus); Byers Decl. ¶10 (injured left knee tendon and shrapnel injuries); Fermanis Decl. ¶ 6 (shrapnel injuries and knocked unconscious); Mall Decl. ¶ 6 (thrown into wall); Orlando Decl. ¶ 8 (left leg deeply lacerated); Weaver Decl. ¶10 (knocked off feet and shrapnel lacerations); Gering Decl. ¶6 (knocked down); Yost Decl. ¶¶7,10 (shrapnel injuries requiring stitches); Morrissette Decl. ¶9 (feet shredded by shrapnel); Wheat Decl. ¶7 (back seriously injured and shrapnel injuries); Oliver Decl. ¶7 (glass punctured legs from knee down); Brodt Decl. ¶7 (bleeding profusely from lacerations); Goff Decl. Ex M Witness Statement of Bryan Brock ¶7 (glass punctured chest); Silvi Decl. ¶7 (slammed into concrete wall and lacerations); Toole Decl. ¶8 (lacerations to head and back); Ferguson Decl. ¶7 (covered in glass and bleeding); Weems Decl. ¶7 (hit in the head and knocked unconscious); Stoneburner Decl. ¶7 (arms and legs covered in lacerations); Hill Decl. ¶10 (numerous cuts to feet); Lauderback Decl. ¶6 (thrown into concrete wall and glass lacerated entire body); Bratton Decl. ¶¶6,7 (blown out of bed, right finger tendon cut); Kowalczyk Decl. ¶7 (knocked unconscious).

wave of the bomb.  Many had serious cuts and shrapnel wounds from the shattered glass and flying debris that became embedded in their bodies, for which some sought and received medical treatment. Others had permanent damage to their backs, shoulders, necks, arms, and legs and suffered from head trauma because of the impact of being propelled against a wall or other objects falling on top of them. Many have suffered loss or decreased hearing as a result and suffer from permanent and debilitating ringing in their ears and have been diagnosed with tinnitus.

### 2.  Intentional Infliction of Emotional Distress

Under general principles of law, the Iranian Defendants are liable for intentional infliction of emotional distress if they, "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to" the Plaintiffs. Restatement (Second) Of Torts § 46(1); see also *Roth*, 78 F. Supp. 3d at 400 (quoting *Heiser II*, 659 F. Supp. 2d at 26.)  Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress. *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).

Where the claimants were not the direct recipient of the "extreme and outrageous conduct," the Restatement permits recovery if (1) they are members of a victim's immediate family; and (2) they are present at the time, or "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting Dan B. Dobbs, *The Law Of Torts* § 307, at 834 (2000)); *see also* Restatement (Second) Of Torts § 46, cmt. l (leaving "open the possibility of situations in which presence at the time may not be required").  The "physical presence" requirement has been almost universally waived for solatium claims arising under the FSIA's terrorism provisions. This is because "[c]ourt's have uniformly held that a terrorist attack – by its nature – is directed not only at the

victims but also at the victims' families." *Salazar v Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n. 12 (D.D.C. 2005); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d. 27, 35 (D.D.C. 2001).

The Iranian Defendants engaged in conduct that was extreme and outrageous by providing material support and resources to a known terrorist organization. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77.  This Court has previously recognized in *Schooley* that the Iranian Defendants' actions constitute the very definition of the term 'terrorism' which means "the systematic use of terror especially as a means of coercion."  *Schooley*, 2019 WL 2717888, at *71 (quoting Terrorism, Merriam-Webster Dictionary online, https://www.merriam-webster.com/dictionary/terrorism (last visited Oct. 28, 2022).

All seventy-nine (79) Plaintiffs have suffered severe and serious repercussions of the extreme and outrageous conduct of the Iranian Defendants. The Injured Servicemember Plaintiffs demonstrate through their sworn declarations and exhibits, that they suffered severe emotional and psychological distress as a result of the Attack.[12]

Similarly, some of the Injured Servicemember Plaintiffs suffered substantial psychological injuries but did not seek treatment or put off diagnosis for many years due to the stigma attached to being labeled with mental health issues or for other personal reasons such as its potential effect on career advancement.  These grounds do not minimize their claims for pain and suffering.

---

[12] See Gration Decl. ¶ 25 (painful memories and emotional scars); Barry Brown Decl. ¶ 20 (diagnosed with PTSD); Angela Brown Decl. ¶¶ 14, 17 (diagnosed with PTSD); Byers Decl. ¶¶ 14, 19 (diagnosed with PTSD); Fermanis Decl. ¶ 19, 21 (diagnosed with PTSD); Mall Decl. ¶ 15 (diagnosed with PTSD); Orlando Decl. ¶ 21 (constantly worries and stresses); Weaver Decl. ¶27 (PTSD symptomatic); Gering Decl. ¶17 (diagnosed with PTSD); Staricka Decl. ¶¶ 19, 20 (diagnosed with PTSD); Mullings Decl. ¶ 24 (diagnosed with PTSD); Yost Decl. ¶¶22, 23 (diagnosed with PTSD); Morrissette Decl. ¶24 (diagnosed with PTSD); Wheat Decl. ¶ 22 (psychological injuries); Oliver Decl. ¶18 (PTSD symptomatic); Brodt Decl. ¶16 (PTSD symptomatic); Goff Decl. ¶23 (extreme emotional distress); Silvi Decl. ¶ 21 (diagnosed with PTSD); Toole Decl. ¶ 29 (diagnosed with PTSD); Ferguson Decl. ¶ 21 (diagnosed with PTSD); Weems Decl. ¶ 18 (diagnosed with PTSD); Stoneburner Decl. ¶ 22 (diagnosed with PTSD); Hill Decl. ¶19 (diagnosed with PTSD); Lauderback Decl. ¶ 16 (diagnosed with PTSD); Bratton Decl. ¶¶ 21, 22 (diagnosed with PTSD); Kowalczyk Decl. ¶ 27 (diagnosed with PTSD).

Further, the Iranian Defendants' conduct was sufficiently outrageous and intended to inflict severe emotional harm upon the family members who were not present at the Attack.  *See Heiser II*, 659 F. Supp. 2d at 27; *see also Roth*, 78 F. Supp. 3d at 401; *Worley*, 75 F. Supp. 3d at 336–37; *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 231 (D.D.C. 2012).  As attested to in the sworn declarations and exhibits of the Immediate Family Member Plaintiffs, each suffered extreme emotional distress upon learning, through a news report, or from a neighbor, other family members, or military personnel, of the bombing and not knowing whether their loved one was alive or dead and/or in the years following the Attack, watching their loved ones suffer significant emotional consequences from the Attack, which resulted in loss of society and companionship.[13]

Consequently, the Iranian Defendants are liable to all Plaintiffs for intentional infliction of emotional distress caused by their extreme and outrageous conduct in materially supporting the Khobar Towers attack.

---

[13]Judith E. Gration Decl. ¶¶ 6, 15, 18 (attesting to emotional distress stemming from loved one's experience in the bombing); Jonathan Gration Jr Decl. ¶¶ 6, 8-9, 15-16 (same); Eva Graham Decl. ¶¶ 9-10,13, 16-17 (same); Corey Brown Decl. ¶¶ 8, 12 (same); Alexis Wingate Decl. ¶¶ 8, 10, 13-14 (same); Donna Byers Decl. ¶¶ 6-7,14-15 (same); Rodney Byers Decl. ¶¶ 6-7,14 (same); Joseph Byers Decl. ¶¶ 6, 13-14 (same); Ursula Orlando Decl. ¶¶ 6-7, 12,14 (same); Susan Pomoransky Decl. ¶¶ 6-7,15-16 (same); Vickie Anthony Decl. ¶¶ 6, 9, 12 (same); Clinton Weaver Decl. ¶¶ 6,7, 16 (same); Donald Heikes Decl. ¶¶ 6,8,9,15 (same); Roger Heikes Decl. ¶¶ 7,14 (same); Tina Mullings Decl. ¶¶ 6, 11, 13-14 (same); Gloria Mullings Decl. ¶¶ 6-8, 15 (same); Vernon Mullings Decl. ¶¶ 6-7, 12 (same); Heather Hector Decl. ¶¶ 6-7,16-17 (same); Maria Yost Decl. ¶¶ 6, 18 (same); Serena Douglass Decl. ¶¶ 6, 12-14 (same); Sarah Douglass Decl. ¶¶ 6-7, 11-14 (same); Steven Douglass Decl. ¶¶ 8-10 (same); Diane Morrissette Decl. ¶¶ 6, 12, 13 (same); Natasha Morrissette Decl. ¶¶ 6,7, 11-13 (same); Donald Wheat Decl. ¶¶ 6, 7, 9, 18 (same); Tamara Oliver Decl. ¶¶ 10-11,13,16-17 (same); Un Suk Brodt Decl. ¶¶ 6,7,9,13,15 (same); Steven Brodt Decl. ¶¶ 12-16 (same); Samuel Brodt Decl. ¶¶ 6,15 (same); Shirley Goff Decl. ¶¶ 8-12, 17, 19, 23, 26 (same); Antoinette Hovel Decl. ¶¶ 6,- 8, 11-12, 17 (same); Kathryn Ableidinger Decl. ¶¶ 6-7,11-11,14,16 (same); Jo Ann Silvi Decl. ¶¶ 6,16, 18 (same); Angela Silvi Decl. ¶¶ 8-9, 12-14 (same); Alison Silvi Decl. ¶¶ 6, 9, 12-15 (same); Timothy Canchola Decl. ¶¶ 6,9-10, 16-17 (same); Michele Canchola Decl. ¶¶ 6,8,17-20 (same); Christina Schomaker Decl. ¶¶ 9, 13-15 (same); Kristine Schomaker Decl. ¶¶ 6-7, 9,12-14 (same); Paula Nott Decl. ¶¶ 6,-7,11-12 (same); Preston Nott Decl. ¶¶ 6,8-9,13-15 (same); Tanya Nott Decl. ¶¶ 6, 11, 13 (same); Rebecca Thurman Decl. ¶¶ 6, 10-11, 14 (same); John Weems Decl. ¶¶ 6-7, 9, 15-16 (same); Nancy Weems Decl. ¶¶ 6-8, 10,12-15 (same); Richard Weems Decl. ¶¶ 6, 10, 13-14 (same); Kimberlee Hill Decl. ¶¶ 8, 10, 12-15 (same); Jacqueline Quintana Decl. ¶¶ 7-8, 16-18 (same); Susan White Decl. ¶¶ 6-7, 9, 16-19 (same); Jerry White Decl. ¶¶ 6-7, 13-14 (same); Patricia Kowalczyk Decl. ¶¶ 6-8, 12-13, 16-17 (same); Kenneth Dale Kowalczyk Decl. ¶¶ 6-7, 10, 15-16 (same); Aaron Kowalczyk Decl. ¶¶ 7-9, 13-14,16-17 (same).

## V.   LEGAL STANDARDS FOR DAMAGES AND FRAMEWORK FOR AWARDING DAMAGES

Congress, in creating a private right of action in Section 1605A(c) for victims of state-sponsored terrorism, also provided, in the same subsection, that such foreign states are liable for money damages, including "economic damages, solatium, pain and suffering and punitive damages." 28 U.S.C. § 1605A(c).

To recover damages against defendants in an FSIA action, "the plaintiff must prove that the consequences of the defendants' conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate." *Salazar*, 370 F. Supp. 2d at 115-16 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)).  In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injury.  *Reed,* 845 F. Supp. 2d at 214; *Acosta v. Islamic Republic of Iran,* 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

The evidence presented in *Blais* and *Heiser I supra,* of which the Plaintiffs have requested this Court take Judicial Notice, has established with reasonable certainty that the Plaintiffs' injuries were the intended consequences of the Iranian Defendants' material support of the Attack. Consequently, the Iranian Defendants' conduct was likely to result in injury to the servicemembers residing in the Khobar Towers complex and their families.

Here, the Plaintiffs seek to recover pain and suffering, solatium damages, punitive damages, and pre- and post-judgment interest to compensate for their losses. As noted above, Plaintiffs have voluntarily withdrawn their demand for economic losses as well as wrongful death and survival claims.[14]

---

[14] Here, Plaintiff the Estate of Lt. Col. Steven P. Goff, M.D. is pursuing only an award for pain and suffering damages arising out of his claims under the theories of assault, battery, and IIED.  This Court has previously held in a case

### A.  PAIN AND SUFFERING AWARDS FOR INJURED SERVICEMEMBER PLAINTIFFS

Each of the Injured Servicemember Plaintiffs has sought pain and suffering awards associated with their claims for intentional infliction of emotional distress, assault and/or battery.[15]

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including solatium, pain and suffering, and punitive damages.  28 U.S.C. 1605A(c).  To recover, the plaintiffs must prove that the consequences of the foreign state's conduct were reasonably certain to occur and must prove the amount of damages by a reasonable estimate.  *Roth,* 78 Supp. 3d at 402.  Courts may look to prior awards in determining whether the amount of damages has been proven by a reasonable estimate.  *Reed*, 845 F. Supp. 2nd at 214.  *See Schooley,* 2019 WL 2717888, at *74.

*Blais* and *Heiser I*, of which the Plaintiffs have requested this Court take Judicial Notice, proved that the injuries of those present at Khobar Towers were reasonably certain and were the intended consequences of the Iranian Defendants' material support of Saudi Hezbollah.

Here, the Injured Servicemember Plaintiffs present a reasonable estimate of their damages through their uncontroverted evidence of physical and emotional injuries in the form of declarations, medical records, medals and awards, VA disability ratings, affidavits of friends and family, and other supporting personal documents such as news clippings and photographs.

"[W]hen assessing damages for surviving victims of terrorist hostilities[,] the baseline assumption is that persons suffering injuries in terrorist attacks are entitled to $5 million in damages."  *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012). This baseline

---

arising out of the same attack, that an award of pain and suffering damages is appropriate where similarly a plaintiff passed away after the attack.  *Ackley,* 2022 WL 3354720 at *52.

[15]As previously stated in this motion, although Injured Servicemember Plaintiffs bring damages claims under the theories of assault, battery, and IIED, it is understood that Plaintiffs may recover under only one theory.  *See Christie* Memorandum Judgment at 36 citing EEOC Waffle House Inc., 534 U.S. 279, 297 (2002).

may be adjusted upward "in the presence of 'severe instances of physical and psychological pain.'" *Id*. at 35–36 (quoting *Valore*, 700 F. Supp. 2d at 84). Because pain and suffering damages are by their nature difficult to quantify, this Court has previously used the VA disability rating as an objective metric for determining the relative degree of injury suffered by each servicemember plaintiff. *See Schooley,* 2019 WL 2717888, at *75. The VA disability rating constitutes a specialized agency's official determination regarding the extent of disabling injury sustained by servicemembers "in connection with military service." *Id.* at *74. This approach provides an effective way of comparing injuries to ensure that similar injuries yield similar awards. *See Id.*; *Cf., e.g., Valore,* 700 F. Supp. 2d at 85. Additionally, this methodology treats mental and physical injuries as equally capable of causing disability, and therefore equally deserving of compensatory damages, and is preferable to discounting a damage award merely because a service member suffered 'only' mental, but not physical, injuries. *See Id.*; *Cf., e.g., Valore,* 700 F. Supp. 2d at 85.

The VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides a relatively objective measure of awarding damages. *Schooley,* 2019 WL 2717888, at *74.

In *Schooley*, this Court applied the following framework, which was also adopted by this Court in *Christie,* for awarding damages to servicemembers injured by the attack on Khobar Towers:

- No rating, however, corroboration of mental or physical injuries, or a combination of both, received a baseline award of $5,000,000 each;

- Rated up to 30% disabled by the VA received a baseline award of $5,000,000

- Rated 40–60% disabled by the VA received an upward departure, for a total award of $6,000,000 each;

- Rated 70–100% disabled by the VA, received an upward departure, for a total of $7,000,000 each;

*Schooley,* 2019 WL 2717888, at *75, and *Christie*, 2020 WL 3606273, at *23.

In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards. *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007)).

In the present case, the Injured Servicemember Plaintiffs seek this Court to utilize the framework it established for the calculation of damages in *Schooley* and *Christie,* beginning with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in compensatory damages and adjusting upward or downward to reflect the severity of the injuries based upon the VA disability rating. *See Schooley,* 2019 WL 2717888, at *75. As apparent through the declarations of the Injured Servicemember Plaintiffs, all the Plaintiffs have suffered substantial and permanent injuries, which have impacted their lives until today.

## B.  SOLATIUM DAMAGES

Here, Immediate Family Member Plaintiffs seek solatium damages.[16] This Court has found claims for solatium to be nearly indistinguishable from claims for intentional infliction of emotional distress. *Flanagan v Islamic Republic of Iran,* 87 F. Supp. 3d. 93, 115 (D.D.C. 2015). Solatium damages compensate for the mental anguish, bereavement, and grief that those with a close personal relationship to an injured or killed family member experience as the result of that

---

[16] As previously stated in this motion, although Immediate Family Member Plaintiffs bring damages claims under the theories of IIED and solatium, it is understood that Plaintiffs may recover under only one theory.  *See Christie* Memorandum Judgment at 36 citing EEOC Waffle House Inc., 534 U.S. 279, 297 (2002).

person's injury or death, as well as the harm caused by the loss of that person's society and comfort. *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 88 (D.D.C. 2011).  Mental anguish, bereavement, and grief resulting from an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium."  *Fraenkel,* 892 F. 3d at 356-57.

In determining the amount of compensatory damages awards to family members of a surviving victim, courts have held that these awards are determined by the "nature of the relationship" between the family member and victim, and "the severity of the pain suffered by the family member." *Haim v. Islamic Republic of Iran,* 425 F. Supp. 2d 56, 75 (D.D.C. 2006).  The Court may also look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium.  *Acosta,* 574 F. Supp. 2d at 29.

In *Schooley*, this Court applied the *Heiser* framework, which was also adopted by this Court in *Christie,* for awarding solatium damages to family members of servicemembers injured by the attack on Khobar Towers.  This framework includes a baseline damage structure for family members of surviving servicemembers who received the baseline of $5 million in compensatory damages as follows:

- Spouse $4,000,000;

- Parents $2,500,000 each;

- Children $1,500,00 each; and

- Sibling $1,250,000 each.

*Heiser I,* 466 F. Supp. 2d at 269*; Schooley*, 2019 WL 2717888, at *75, and *Christie*, 2020 WL 3606273, at *25.

In the present case, the Immediate Family Member Plaintiffs seek this Court to utilize the damages framework established in *Heiser,* and accordingly, enter such baseline awards.  All

Immediate Family Member Plaintiffs establish through sworn declarations and corroborating exhibits that they are entitled to recover damages for their claims for solatium and intentional infliction of emotional distress.  They all attest to having suffered emotional distress in the days and hours spent waiting for the news of their injured family members and in the years following the Attack watching their loved ones suffer significant, emotional consequences as a result of the Attack, which resulted in loss of society and companionship.  Forty (40) of the Immediate Family Member Plaintiffs are plainly immediate family members – biological parents, spouses, children, and siblings.  Thirteen (13) of the Immediate Family Member Plaintiffs are the functional equivalent of immediate family members.

### 1.    Functional Equivalent of Immediate Family Members

An immediate family member has been generally (but not always) recognized "as one's spouse, parents, siblings, and children." *Heiser II*, 659 F. Supp. 2d at 28.  However, courts have found that certain circumstances warrant viewing a non-immediate relative of a terrorist victim as the functional equivalent of an immediate family member, and thus entitled to the same damages. *See Valore*, 700 F. Supp. 2d at 86.  This analysis is highly fact-intensive and dependent on the actual relationship between the relative and the victim.  *Id*. at 79-80.  In past FSIA cases, courts in this district have recognized that the lack of a formal legal relationship at the time of the injury is not necessarily a bar to recovery for solatium damages. Rather, in such instances, the Court's inquiry turns on whether these family members were "members of the victim's household" such that they were "viewed as the functional equivalents of family members." *Id*.

### 2.  Half-siblings Presumed to Recover

Here, three (3) of the Immediate Family Member Plaintiffs fall into the category of half-siblings, where they share a biological parent. These plaintiffs include Susan Pauline Pomaransky,

Donald Lee Heikes, and Roger Dayle Heikes.  These plaintiffs share their biological mother with Injured Servicemember Plaintiff Kenneth David Weaver.  In instances such as these, the courts have recognized where there is a close relationship, half-siblings are "presumed to recover" as full siblings would.  *Peterson,* 515 F. Supp. 2d at 52; *Christie,* 2020 WL 3606273, at *18.  These Plaintiffs attest to their close relationship with their half-sibling, Kenneth David Weaver.

Susan Pauline Pomoransky states in her declaration that she "was like a mother to [Kenneth and] . . . took care of Kenny daily from the day he was born until I [Susan] got married. . . All of us kids were very close and loved to be together. . . We stayed in touch with letters while [Kenneth] was deployed. We wrote to each other monthly, and sometimes twice a month. [Kenneth] called monthly, and always called me on holidays and my birthday." Pomaransky Decl. ¶¶ 3, 13-14.[17]

Donald Lee Heikes states in his declaration that growing up, "Kenny and I were very close. We went everywhere and did everything together. We lived in the same household and shared a bedroom for six years, so we were truly together all the time. I taught Kenny how to fish, hunt, swim, hike, and play football, along with many other things. We were adventurous and tried new things together . . . Even while I was away and well into adulthood, Kenny and I stayed close." *See* Donald Lee Heikes Decl. ¶¶ 3, 10-11.

Roger Dayle Heikes states in his declaration that growing up, "Kenny and I were very close. We played sports together and we often went fishing while we talked about just about everything. Even while I was in Vietnam, we had great communication and a strong bond." *See* Roger Dayle Heikes Decl. ¶¶ 3, 13.

---

[17] All references to declarations in this Memorandum refer to documents ready to be filed once the court rules on Plaintiffs Motion to Submit Declaratory Evidence Under Seal.

Therefore, the uncontroverted evidence presented supports the presumption that Immediate Family Members Susan Pauline Pomaransky, Donald Lee Heikes, and Roger Dayle Heikes should be treated like full siblings.

### 3.   Functional Equivalent Spouses

This Court in *Christie* held that a fiancé at the time of the Attack who became the injured servicemember's wife was the functional equivalent of a spouse where there was a bond that was the functional equivalent of marriage, which was recognized and attested to by others.  *See Christie,* 2020 WL 3606273, at *19 (citing *Surette v Islamic Republic of Iran,* 231 F. Supp. 2d 260, 270 (D.D.C. 2022)).  (Awarding damages for intentional infliction of emotional distress to a woman who lived with the victim and had a bond that was the "functional equivalent of marriage").

In the instant case, at the time of the Attack, two of the Immediate Family Member Plaintiffs were not legally related to the Injured Servicemember Plaintiff but were the functional equivalent of spouses – Plaintiffs Maria Star Yost and Christina Marie Schomaker.

In her declaration, Plaintiff Maria Star Yost attests to the fact that she and Injured Servicemember Plaintiff, Sy William Yost, "At the time of the Attack . . . were engaged to be married . . . had been together for almost two years . . . living together . . . [and] planned to marry upon [Sy's] return home from Saudi Arabia, which [they] did, on February 22, 1997."  Maria Star Yost Decl*.* ¶ 6 and Ex. C Marriage Certificate.  A witness statement of a close friend and roommate of the Plaintiffs corroborated this information, "I have personal knowledge that Sy and Maria were engaged to be married and lived together at the time of the June 25, 1996, attack on Khobar Towers.  Specifically, we [all] lived together as roommates after Sy and Maria's engagement."  Maria Star Yost Decl*.,* Ex. D, Witness Statement of Jason Alex Swanson ¶ 3.

Plaintiff Christina Marie Schomaker, who is now the wife of Timothy Schomaker, who was injured in the Attack and received a judgment in *Christie*[18], attests in her declaration to the fact that, "Prior to the Attack, [Tim and I] were exclusively dating . . . I was assigned a separate dorm on base, however, in May of 1996, I moved my belongings to and resided in Tim's dorm. We lived in the dorm together until Tim deployed to Saudi Arabia. We both felt like we were the functional equivalent of spouses . . . [When Tim returned from Khobar] [w]e immediately resumed living together." Christina Marie Schomaker Decl. ¶¶ 6, 12. A witness statement from the injured servicemember's mother, Paula Gail Nott, corroborated this information stating, "I have personal knowledge that Tim and Tina were exclusively dating at the time of the June 25, 1996, attack on Khobar Towers . . . Before Tim deployed to Saudi Arabia, he and Tina were both living in the Robins AFB dorms. They had separate dorms, but they essentially lived together in Tim's dorm." Christina Marie Schomaker Decl. Ex. D Witness Statement of Paula Gail Nott ¶¶ 5, 7. Less than a year after the Attack, in May 1997, they wed. Christina Marie Schomaker Decl. Ex. C Marriage Certificate.

Thus, here, the uncontroverted evidence supports that Immediate Family Member Plaintiffs Maria Star Yost and Christina Marie Schomaker should be found to be the functional equivalent of spouses.

### 4. Stepfamily Members

Courts have also awarded compensation to stepfamily members where there was not a formal adoption but there was evidence of close relationships and cohabitation. In *Heiser II*, the court emphasized the importance of cohabitation, noting that "in those rare cases in which the parties at issue had lived in the victim's immediate household and had been in other important

---

[18] *See Christie,* 2020 WL 3606273, at *25.

respects like a spouse, parent, sibling, or child to the victim, circumstances may require a slight stretching of the immediate-family requirement." *Heiser II,* 659 F. Supp. 2d at 29.

Specifically, the court in *Heiser II* found that two non-adoptive stepparents and a non-adoptive stepchild were entitled to damages because they were the functional equivalent of immediate family members. *Id.* Because the non-adoptive stepfather lived with the victims while the victims were minors and treated them as sons "in every sense," the court found that they were "functional equivalents of fathers." *Id.* The court further found a non-adopted stepson to be the "functional equivalent of a son" because the victim treated him as if he were his biological son. *Id.*

Courts in other jurisdictions have come to similar conclusions regarding non-immediate family members seeking solatium damages. The U.S. District Court for the Southern District of New York found two factors relevant to consider when determining functional equivalent familial relationships: "long-term residence or co-habitation" and the existence of a "guardian or custodian-like role" between the victim and the relative. *In re Terrorist Attacks on September 11, 2001,* No. 03-MDL-1570, 2016 WL 8711419, at *5 (S.D.N.Y. Oct. 14, 2016). There, the court held that a stepdaughter was the "functional equivalent of a daughter," because of the "financial, emotional, and moral support" the victim provided this stepdaughter "despite the lack of formal family ties by blood or adoption" and the profound impact his death had on her. *Id.* at 8. The court made similar determinations regarding many other non-immediate family members, including stepmothers, stepsiblings, a grandmother, a fiancée, and a domestic partner. *Id.* at *8–13.

Here, eight (8) of the Immediate Family Member Plaintiffs fall into the category of stepfamily members – Serena Elizabeth Douglass, Sarah Grace Douglass, Steven Millard

Douglass, Preston Wade Nott, Tanya Lea Nott, Rebecca Lamae Thurman, Michele Ann Canchola, and Timothy Louis Canchola.

### 1. Injured Servicemember Clayton Zook's Stepfamily Members

In her declaration, Plaintiff Serena Elizabeth Douglass attests to the fact that she is the stepsister of servicemember Clayton Zook, who was injured in the Attack and received a judgment in *Christie*[19], as her biological father married Clayton Zook's biological mother.  Serena Elizabeth Douglass Decl. ¶ 3 and Ex. D Marriage Certificate.  She states that she and Clayton Zook lived together for a period of about three years between 1990 and 1993.  Serena Elizabeth Douglass Decl. ¶¶ 8.  Further, Serena Elizabeth Douglass attests that her relationship with Clayton Zook was similar to biological brother and sister relationship.  "I was thrilled to have an older brother, especially someone as cool as Clayton. Clayton was always so patient and kind, and I felt so lucky to have gained a brother like him . . . He had a way of making you feel special when he talked to you. I looked up to Clayton and I was always so proud of him. I bragged about him to all my friends . . . Clayton is nine years older than me but, growing up, he did not mind spending time with me. I specifically remember playing video games with him and sitting together listening to music. My favorite memories of Clayton are when he and I would just talk, which we did often. We talked about deep topics, like religion, open-mindedness, and life choices."  Serena Elizabeth Douglass Decl. ¶ 9-10.

In her declaration, Plaintiff Sarah Grace Douglass states that she is the stepsister of servicemember Clayton Zook, who was injured in the Attack and received a judgment in *Christie*, and that they had a relationship similar to a biological brother and sister.  Sarah Grace Douglass Decl. ¶¶ 3, 8-9.  She attests to the fact that she and Clayton Zook lived together for a period of

---

[19] *See, Christie,* 2020 WL 3606273, at *25.

about three years between 1990 and 1993, when Sarah Grace Douglass's biological father moved in with Clayton Zook's biological mother.   Sarah Grace Douglass Decl. ¶ 8. Further, Plaintiff Sarah Grace Douglass states that she had a close relationship with Clayton Zook, "Clayton was a wonderful older brother. He let me hang out in his room, bother him and his friends, and always gave me and my sister his coins. He spoiled me with love, and it felt like he had been my brother forever. Sometimes, when you grow up in a blended household, you can often feel like an outsider, but it was not like that with Clayton. We had a natural familial bond. He adored me and I admired and loved him deeply. Until the Attack, Clayton was a consistent source of fun, stability, and love in my life." Sarah Grace Douglass Decl. ¶ 9.

In his declaration, Plaintiff Steven Millard Douglass attests to the fact that he is the stepfather of servicemember Clayton Zook, who was injured in the Attack and received a judgment in *Christie*, as he married Clayton Zook's biological mother.  Steven Millard Douglass Decl. ¶ 3 and Ex. D Marriage Certificate.  Steven Millard Douglass also attests to the fact that he lived with Clayton Zook for a period of about three years between 1990 and 1993.  Steven Millard Douglass Decl. ¶ 6.  Further, Steven Millard Douglass stated that he and Clayton Zook had a "strong bond" and that their relationship was similar to a biological father and son, "Clayton and I quickly got close . . . Clayton was really easy to talk to and friendly, so he was a pleasure to be around . . . Since I only had daughters and Clayton's father had passed away years earlier, it was really nice for me to finally have a son with whom to bond, and Clayton to have a father figure. We worked on cars together, did remodeling projects together, and at other times, we would just sit and talk about many things, like girls, his relationship with his mother, and life in general . . . We were as close as any biological family."  Steven Millard Douglass Decl. ¶ 6.

### 2. Injured Servicemember Timothy Schomaker's Stepfamily Members

Plaintiff Preston Wade Nott attests to the fact that he is the stepfather of servicemember Timothy Schomaker, who was injured in the Attack and received a judgment in *Christie*, as he married Timothy's biological mother.  Preston Wade Nott ¶ 3 and Ex. D Marriage Certificate. Preston Wade Nott and Timothy Schomaker "lived together in the same household as a family for eight years" from 1985-1993.  Preston Wade Nott Decl. ¶ 10.  Preston Wade Nott attests that his relationship with Timothy Schomaker was "very close" like a biological father and son, "I took pleasure in bonding with my new son, and we engaged in father-son activities such as camping, off-roading, and attending baseball games. I was very proud to call Tim my son."  Preston Wade Nott Decl. ¶ 11.

In her declaration, Plaintiff Tanya Lea Nott attests that she is the stepsister of servicemember Timothy Schomaker, who was injured in the Attack and received a judgment in *Christie*, and that her biological father married the biological mother of Timothy Schomaker. Tanya Lea Nott Decl. ¶¶ 3, 4 and Ex. D Marriage Certificate.  Tanya Lea Nott attests that she lived with Timothy Schomaker for a period of eight years in a schedule that consisted of every other weekend and summers for three years between 1985 and 1988, and then full-time for two years from 1988 to 1990, when she resumed the schedule of every other weekend and summer for about two years between 1990 and 1993.  Tanya Lea Nott Decl. ¶ 7.  Further, Plaintiff Tanya Lea Nott states that she had a close relationship with Timothy Schomaker that was similar to a biological brother and sister, "Before the Attack, Tim and I were great siblings. I was the youngest child in our family, and Tim watched out for me. My father married Tim's mother when I was six years old, and Tim was 10 years old. Our young age allowed us to still have shared interests and plenty of years to grow and bond together. Tim and I played together as siblings do. We especially loved

to play Nintendo together, ride three-wheelers, and walk to the ice cream store. My father often took us to the lake to fish. I was a tomboy and I always wanted to hang out with Tim, and he always let me. Tim and I never argued. He was my cool older brother." Tanya Lea Nott Decl. ¶ 8.

Plaintiff Rebecca Lamae Thurman attests in her declaration that she is the stepsister of servicemember Timothy Schomaker, who was injured in the Attack and received a judgment in *Christie*, and that her biological father married the biological mother of Timothy Schomaker. Rebecca Lamae Thurman Decl. ¶¶ 3, 4 and Ex. D Marriage Certificate.  Rebecca Lamae Thurman attests that she lived with Timothy Schomaker for a period of eight years in a schedule similar to her sister Tanya Lea Nott, every other weekend and summers for three years between 1985 and 1988, and then full-time for two years from 1988 to 1990 when she resumed the schedule of every other weekend and summers for about two years between 1990 and 1993.  Rebecca Lamae Thurman Decl. ¶ 7.  Plaintiff Rebecca Lamae Thurman states that she had a "good relationship" that was similar to a biological brother and sister with Timothy Schomaker, "My father married [Tim's] mother when we were young. I was seven and Tim was 10. Growing up, Tim and I played together and bonded over various activities. This continued even as we grew older, and Tim was a teenager. Although at that point we were in different age groups and phases in our lives, Tim was so kind to me. He was very protective of me and always had my back. I felt safe around him." Rebecca Lamae Thurman Decl. ¶ 8.

### 3. Injured Servicemember Plaintiff David Anthony Toole's Stepfamily Members

In her declaration, Plaintiff Michele Ann Canchola attests to the fact that she is the stepmother of Injured Servicemember Plaintiff David Anthony Toole, as she married his biological father, Michael Toole, and they lived together as a family for ten years from 1977 to 1987.  Michele Ann Canchola Decl. ¶¶ 3, 9, 12. and Ex. D Marriage Certificate.  Michele Ann Canchola attests

that she raised David from the time he was two years old "as if he were my biological son," that she "never used the term 'step' in reference to David," and "loved him as my own." Michele Ann Canchola Decl. ¶¶ 9-10.   Michele Ann Canchola further attests that she, "happily and wholeheartedly took on the role of [David's] mother. I took David shopping for clothing and his haircuts, I helped him with his homework, I played games and sports with him, I read to him, and we saw movies together. I never thought to file for legal guardianship because I just always saw him as my own son."  Michele Ann Canchola Decl. ¶ 10.  In 1987, Michele Ann Canchola and Michael Toole divorced, but she states that, "Michael and I agreed that David would live with me every other weekend and he would spend every Christmas with me. My relationship with David persevered . . . I did not divorce David." Michele Ann Canchola Decl. ¶ 12.  Michele Ann Canchola further attests to the fact that she married Timothy Louis Canchola on November 7, 1987, and that David Anthony Toole lived with them as a family for six years "every other weekend" and Christmas until David Anthony Toole turned 18 in 1993, at which time he "moved into my home and lived with Timothy and me full-time."  Michele Ann Canchola Decl. ¶¶ 12-13.  During this two-year period, until David Anthony Toole enlisted in the Air Force in 1995, Michele and Timothy Canchola enjoyed a close relationship with David, "We enjoyed sitting down together every night for a home-cooked meal. It was our favorite time of day, filled with conversation and laughter. We enjoyed game nights and trips to the movie theater."  Michele Ann Canchola Decl. ¶ 14.

Plaintiff Timothy Louis Canchola attests to the fact that he is the stepfather of Injured Servicemember Plaintiff David Anthony Toole, due to marrying David's stepmother Michele Ann Canchola. Timothy Louis Canchola Decl. ¶ 3 and Ex. D Marriage Certificate.  He attests to the fact that he had a close relationship with David Anthony Toole similar to a biological father and

son.  "From the beginning, I thought of David as my own biological son . . . I felt truly blessed to have him in my life and have our father-son relationship."  Timothy Louis Canchola Decl. ¶¶11-12.  Timothy Louis Canchola attests that he lived with David Anthony Toole as a family starting in 1987 "every other weekend and spent every Christmas with us until 1993 . . . [when] David moved in with Michele and me full-time and lived with us full-time for two years until he enlisted in 1995."  Timothy Louis Canchola Decl. ¶ 11.  Timothy Louis Canchola stated that he and David Anthony Toole "spent a lot of time together . . . David [was] a part of our everyday lives . . . We had dinner together as a family every night, watched weekly TV shows as they aired, and enjoyed normal family activities whenever we wanted."  Timothy Louis Canchola Decl. ¶¶ 12, 14.

Therefore, based upon the uncontroverted evidence of functional equivalent familial relationships including "long-term residence or co-habitation," the existence of "guardian or custodian-like roles" between the victim and their relatives, and relationships where the parties treated each other as family "in every sense," Plaintiffs respectfully request that this Court find that there are functional equivalent relationships between the injured servicemembers and the eight Immediate Family Member Plaintiffs who fall into the category of stepfamily members – Serena Elizabeth Douglass, Sarah Grace Douglass, Steven Millard Douglass, Preston Wade Nott, Tanya Lea Nott, Rebecca Lamae Thurman, Michele Ann Canchola, and Timothy Louis Canchola.

## C.  PRE- AND POST-JUDGMENT INTEREST

### 1. Prejudgment Interest

"Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi*, 879 F. Supp. 2d at 58.  With the authority to decide whether to award prejudgment interest, the courts in this district have conflicting conclusions of whether prejudgment interest is warranted in this type of case.

This Court has previously awarded prejudgment interest in *Christie,* which arose out of the same attack as the instant case.  To reach this decision, this Court followed "relevant equitable principles" and reasoned that "an award of prejudgment interest will 'place plaintiffs in the same position they would have been in had they received (and invested) their damages awards in' 1996." *Christie,* 2020 WL 3606273, at *19 (*quoting Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 261 (D.D.C. 2014). Further, this Court also reasoned that "[f]ailing to award prejudgment interest would place plaintiffs at a disadvantage relative to plaintiffs in earlier litigation." *Christie,* 2020 WL 3606273, at *19 (*citing Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n. 1 (D.D.C. 2013).

Moreover, in its holding in *Christie*, this Court took into consideration the opposing viewpoint in the district that prejudgment interest should not be awarded in these types of cases because "compensatory awards under the *Heiser* framework already 'represent the appropriate level of compensation, regardless of the time of the attack." *Christie,* 2020 WL 3606273, at *20 (quoting *Oveissi,* 879 F. Supp. 2d at 56). This language mirrors the reasoning of other courts in this district when declining to award prejudgment interest. *See Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (reasoning that "pain and suffering and solatium damages are both designed to be fully compensatory") (quoting *Wyatt*, 908 F. Supp. 2d at 232). See also See *Ackley,* WL 3354720.

However, despite the difference in opinions regarding prejudgment interest, the holding in *Christie* seems more in line with the Supreme Court's reasoning for determining that "prejudgment interest is an element of complete compensation."  *West Virginia v. United States*, 479 U.S. 305, 310 (1987). This is because "prejudgment interest serves to compensate for the *loss of use of money due as damages from the time the claim accrues*." *See West Virginia*, 479 U.S. at 310 n. 2

(emphasis added), (*citing Comment, Prejudgment Interest: Survey and Suggestion*, 77 N.W.U.L.Rev. 192 (1982)). Therefore, while the *Heiser* framework is sufficient to provide compensation for injuries, it does not compensate plaintiffs for *the use of the money* between the date of the injury and date of the judgment, which, as suggested by the Supreme Court, is also a necessary element of complete compensation to injured victims. See *Christie,* 2020 WL 3606273, at *19 *(Quoting Opati v. Republic of Sudan,* 60 F. Supp. 3d 68,83 (D.D.C. 2014) (finding that awarding prejudgment interest "reimburses plaintiffs for the time value of money, treating the awards as if they were awarded promptly and invested by plaintiffs"). See *Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2022 WL 1567358, *6 (D.D.C. May 18, 2022) (quoting *Oldham v. Korean Air Lines Co.,* 127 F.3d 43, 54 (D.C. Cir. 1997) "prejudgment interest is necessary to 'compensate[ ] for the time value of money and thus is often necessary for full compensation,'"). See also *Estate of Doe*, 943 F. Supp. 2d at 184 n.1 ($5 million baseline award for pain and suffering calibrated to compensate for their "physical injuries and emotional distress without considering the length of time elapsed since the attack; the Court would use a $5 million baseline without adding interest had this litigation taken place in the months after the attacks. But plaintiffs were unable to bring their claims immediately after the attacks, and have hence *lost use of the money* to which they were entitled upon incurring their injuries.") (emphasis added).  See also *Kar, et al., v. Islamic Republic of Iran, et al.,* No. 19-cv-2070, 2022 WL 4598671 (D.D.C. Sept. 30, 2022); *Force, et al. v. Iran, et al.,* No. 16-cv-1468, 2022 WL 2965635 (D.D.C. July 27, 2022); *Cabrera, et al., v. Islamic Republic of Iran, et al.,* No. 19-cv-3835, 2022 WL 2817730 (D.D.C. July 19, 2022); *Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1 (D.D.C. 2020); *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236 (D.D.C. 2020); *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255 (D.D.C. 2020); *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, (D.D.C. 2018); *Fritz v.*

*Islamic Republic of Iran*, 60 F. Supp. 3d 54 (D.D.C. 2018)*; Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84 (D.D.C. 2014); *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36 (D.D.C. 2014); *Opati*, 60 F. Supp. 3d 68;*Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42 (D.D.C. 2014); *Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144 (D.D.C. 2014); *Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29 (D.D.C. 2014); *Belkin*, 667 F. Supp. 2d 8; and *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216 (D.D.C. 2008).

In awarding prejudgment interest, courts have also considered the equitable principal that failing to award prejudgment interest, in effect, unjustly enriches defendants with the use of funds theoretically due to their victims, the plaintiffs.  See *Estate of Doe*, 943 F. Supp. 2d 180, 184 n.1 ("denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last three decades."). See also *Baker*, 775 F. Supp. 2d at 86 ("Prejudgment interest is entirely appropriate in this case . . . and prevent Syria from profiting from its terrorist attacks.")

Therefore, Plaintiffs respectfully request this Court rule consistent with equitable principals and its holding in *Christie*, to which this case is related, and grant prejudgment interest to Plaintiffs in order to disgorge the benefits Iranian Defendants derived from their inequitable detention of funds due to the injured plaintiffs for the last 26 years, as well as put Plaintiffs in the position they would have been in had they had *use* of their damages awards in 1996.

## 2. Prejudgment Interest Calculation

When awarding prejudgment interest in *Christie,* this Court employed the framework established in the case *Forman v. Korean Air Lines Co.,* which utilizes "the prime rate for each year between the accident and the entry of judgment." *Christie,* 2020 WL 3606273, at*20* (quoting *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996)).  Then, this Court used the

formula established in *Owens v. Sudan*, which calculated a multiplier using the Federal Reserve's historical prime rate data. See *Christie,* 2020 WL 3606273, at *20, n. 15 (citing the data used in *Owens*, 71 F. Supp. 3d at 262 n.6-8) (Bd. of Governors of the Fed. Reserve Sys. Historical Data, available at https://www.federalreserve.gov/releases/h15/data.htm).

Plaintiffs have followed the precise method for calculating the interest rate multiplier described in detail in the *Christie* and *Owens* decisions. Additionally, Plaintiffs have used the same average annual prime rate data set as used in *Owens* – the Federal Reserve Historical Data – for the years from the Attack – 1996 – to the potential date of entry of Judgment – 2023 – and have determined the multiplier to be 3.63.  *See* Plaintiffs full calculations spreadsheet used to reach a multiplier of 3.63 attached in Exhibit A.

Accordingly, Plaintiffs respectfully request this Court award prejudgment interest on the pain and suffering award for each Injured Servicemember Plaintiff, and each solatium or intentional infliction of emotional distress award for each Immediate Family Member Plaintiff in the amount set forth in the proposed table to follow later in this Memorandum.

### 3. Post-Judgment Interest

Post-judgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152 (D.D.C. 2013).

By federal statute, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court[,]" and that "[s]uch interest shall be calculated from the date of the entry of judgment . . ." 28 U.S.C. § 1961(a). See *Cont'l Transfer Technique Ltd. v. Fed. Gov't of*

*Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs. LLC,* 962 F. Supp. 2d at 165.

Therefore, Plaintiffs respectfully request this Court award post-judgment interest at the statutory rate.

### D. PUNITIVE DAMAGES

All seventy-nine (79) Plaintiffs seek to recover punitive damages.  Punitive damages may be awarded against a foreign sovereign where the FSIA provides jurisdiction.  *Opati v. Republic of Sudan*, 590 U.S. 1, 2 (2020). The purpose of punitive damages is to "punish outrageous behavior and deter such outrageous conduct in the future." *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015) (quoting *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012)); see also Restatement (Second) Of Torts § 908(1). In calculating an award of punitive damages under FSIA §1605A(c), courts evaluate four factors: (1) the character of the defendants' act; (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause; (3) the need for deterrence; and (4) the wealth of the defendants. *Id*. (quoting *Acosta*, 574 F. Supp. 2d at 30) (additional citations omitted).

All four factors above support a substantial award of punitive damages in this case. The Attack was against U.S. interests, politically motivated, and designed to instill maximum fear  and terror in opponents of Iran. The nature of the Attack was brutal, the suffering imposed on the victims and their families substantial, and the victims were  specifically targeted because of their service to the United States.  As detailed  during the Khobar Towers bombing trial in the case of *Rimkus v. Iran,* the court found that the terror attack on the site which housed U.S. servicemembers was horrific, outrageous,  and  "a deliberate strike at U.S. personnel designed to inflict maximum damages and massive fatalities." *Rimkus*, 750 F. Supp. 2d. at 184-85; *see e.g. Bodoff v. Islamic*

*Republic of Iran*, 424 F. Supp. 2d 74, 88-89 (D.D.C. 2006) (noting that "[t]he defendants' demonstrated policy of encouraging, supporting and directing a campaign of deadly terrorism is evidence of the monstrous character of the bombing that inflicted maximum pain and suffering on innocent,") (citation and quotation marks omitted).   The Attack killed 19 servicemembers and seriously and permanently injured hundreds more and their families were devastated by  the conduct.  As courts of this district have held repeatedly, "only a large amount of punitive damages can serve as an effective deterrent against future terrorist acts."  *Bodoff*, 424 F. Supp. 2d at 88 (quoting *Campuzano*, 281 F. Supp. 2d at 278) (quotation marks omitted). Finally, "Iran is a sovereign and has substantial wealth." *Bluth*, 203 F. Supp. 3d at 25 (citing *Weinstein*, 184 F. Supp. 2d at 25 (additional citations omitted).

This Court has previously held that a punitive damage award equal to compensatory damages is appropriate in Khobar attack cases because the "defendants' conduct was incredibly reprehensible – 'the result of intentional malice,' not 'mere accident.'  *Christie,* 2020 WL 3606273, at *28 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003) and *Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 25 (D.D.C. 2011) ("Terrorism, along with atrocities such as genocide, occupies a unique place in the pantheon of human conduct as an activity devoid of value that observes no respect for life and no hint of compassion")*.*

Therefore, Plaintiffs respectfully request punitive damages equal to the compensatory damages.  For the Court's convenience, Plaintiffs have included a table in this Memorandum, which incorporates their proposed compensatory and punitive damage awards.

## VI.   INDIVIDUAL PLAINTIFFS' REQUESTS FOR DAMAGES

1.   **Injured Servicemember Plaintiff Amb. Jonathan Scott Gration, Maj Gen, USAF(Ret) and Two Immediate Family Members Plaintiffs**

   a.  **Injured Servicemember Plaintiff Amb. Jonathan Scott Gration, Maj Gen, USAF (Ret)**

Injured Servicemember Plaintiff Amb. Jonathan Scott Gration, Maj Gen, USAF (Ret) was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Amb. Jonathan Gration, Maj Gen, USAF (Ret) Declaration and Exhibits, ("Gration Decl.").

On June 25, 1996, Amb. Gration Maj Gen, USAF (Ret) was in his dorm room when the force of the blast shattered his windows. Gration Decl. ¶ 7. Glass shards flew at Amb. Gration Maj Gen, USAF (Ret), cutting the left side of his body and legs, causing them to bleed profusely, and his ears were ringing. *Id.* ¶ 7. He grabbed whatever clothing he could find in the dark to absorb the blood and wipe away the glass from his side. *Id.* ¶ 8.  The room was significantly damaged and covered in debris. *Id.* ¶ 8. He ran out of the room and down the stairs, banging on doors along the way looking for others who needed help, and instructing those who could help get injured people out of the building. *Id.* ¶ 8. He carried one Airman who was so severely injured that Amb. Gration Maj Gen, USAF (Ret) is left with this everlasting traumatic image. *Id.* ¶ 9.

Amb. Gration Maj Gen, USAF (Ret) went to the triage center, exhausted, in pain, and emotionally overwhelmed, but felt that he had a duty to help, so he assisted in getting wounded personnel transported to Landstuhl Medical Center, in Ramstein, Germany. *Id.* ¶ 12. He then sought medical treatment for the injuries he sustained, including sutures for the lacerations. *Id.* ¶ 12. For his injuries from the Attack, he was awarded a Purple Heart. *Id.* ¶ 12. Even after treatment, he continued to pick out pieces of glass from his body throughout the night and into the next day. *Id.* ¶ 13.

As the sun came up, Amb. Gration Maj Gen, USAF (Ret) returned to his room, and among other destruction, he saw spikes of glass embedded in the concrete wall opposite his blown-out window, the aluminum window frame lay twisted on the floor, and the air conditioner had been blown out of its casing and was lying on the floor. *Id*. ¶ 15. He returned to the blast site and toured the heavily damaged facilities and began the daunting task of accounting for every person at the complex. *Id*. ¶¶ 16-17. In doing so, Amb. Gration Maj Gen, USAF (Ret) was devastated to discover that 18 of the 19 men that died were under his command. *Id*. ¶ 17.

Amb. Gration Maj Gen, USAF (Ret) organized a memorial service for all the deceased servicemembers and gave eulogies to honor them. *Id*. ¶ 19. This was one of the hardest things he has ever done. *Id*. ¶ 19. For the next few weeks, he continued to oversee flight operations and reestablish ground operations. *Id*. ¶ 20. He also assisted those under his command to cope with the bombing and he tried to motivate them to continue with the mission. *Id*. ¶ 20. For his actions following the Attack, he was awarded the Air Force Commendation Medal with Valor Device and Meritorious Service Medal Fifth Oak Leaf Cluster. *Id*. ¶¶ 17 and 20.

For years after the Khobar Towers bombing, Amb. Gration Maj Gen, USAF (Ret) suppressed the emotion of the trauma that he had experienced, but the images of wounded and dying people are seared in his brain. *Id*. ¶ 24. He carries painful memories and emotional scars from the Khobar Towers bombing with him every day and continues to suffer from permanent injuries from the Attack, including tinnitus and hearing loss which requires the use of hearing aids. *Id*. ¶¶ 25-26. He suffers from hypertension with the onset being from the Attack, which progressed to congestive heart failure and related symptoms. *Id*. ¶ 26. The Department of Veterans Affairs ("VA") has rated him 100% disabled, including 100% for congestive heart failure with hypertension. *Id*. ¶ 27.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Amb. Jonathan Scott Gration, Maj Gen, USAF (Ret) is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 100%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### b. Immediate Family Member Plaintiff Judith E. Gration - Spouse

Immediate Family Member Plaintiff Judith E. Gration is the spouse of Injured Servicemember Plaintiff Amb. Jonathan Scott Gration, Maj Gen, USAF (Ret).  She learned about the Attack while watching television and the damage to the building looked so terrible that it caused her to be extremely frightened and assume the worst.  Judith E. Gration Declaration and Exhibits, ("Judith Gration Decl.") ¶ 6.  She waited for hours to hear from her husband, but he finally called in the middle of the night, and she was so upset to learn that he had been injured.  Judith Gration Decl. ¶ 7.  Following the Attack, Mrs. Gration shared her husband's emotional pain as she witnessed him struggle with his injuries from the Attack.  *Id.* ¶ 15.  Her quality of life changed after the Attack as well since she had to keep the family functioning while her husband dealt with his responsibilities and health issues.  *Id.* ¶ 18.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Judith E. Gration, the spouse of Injured Service Member Plaintiff Amb. Jonathan Scott Gration, Maj Gen, USAF (Ret), is seeking a solatium damages award in the amount of $4,000,000.  See *Schooley*, 2019 WL 2717888, at *77

(adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### c. Immediate Family Member Plaintiff Jonathan Scott Gration, Jr. - Child

Immediate Family Member Plaintiff Jonathan Scott Gration, Jr. is the child of Injured Servicemember Plaintiff Amb. Jonathan Scott Gration, Maj Gen, USAF (Ret).   Jonathan Scott Gration, Jr. Declaration and Exhibits ("Jonathan Gration Decl.").  He learned about the Attack when he was in boot camp for Basic Cadet training at the Air Force Academy and he received a phone call from his father telling him that there had been a terrorist attack on his base.  Jonathan Gration Decl. ¶¶ 6 and 8.  Mr. Gration was in shock and continued to think about the Attack every day and it caused him a lot of stress. *Id.* ¶¶ 8 and 9.  After the Attack, Mr. Gration's relationship with his father was not the way it was before, and he lost his father as he knew him.  *Id.* ¶¶ 15 and 16.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Jonathan Scott Gration Jr., the child of Injured Servicemember Plaintiff Amb. Jonathan Scott Gration, Maj Gen, USAF (Ret), is seeking a solatium damages award in the amount of $1,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### 2. Injured Servicemember Plaintiff Barry Gordon Brown MSgt, USAF (Ret) and Two Immediate Family Member Plaintiffs

### a. Injured Servicemember Plaintiff Barry Gordon Brown MSgt, USAF (Ret)

Injured Servicemember Plaintiff Barry Gordon Brown MSgt, USAF (Ret) was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Barry Gordon Brown MSgt, USAF (Ret) Declaration and Exhibits, ("Barry Brown Decl.").

On June 25, 1996, the explosion shattered the mirrors that lined the walls of the gym in which Mr. Brown was exercising, spraying glass shards all around. Barry Brown Decl. ¶¶ 7 and 8. Mr. Brown took cover in a nearby garage before he escaped to the triage center where he observed countless injured people and endured the threat of an additional attack. *Id*. ¶ 9 and 10. Upon returning to his dorm and seeing the destruction therein, Mr. Brown realized that he would have been killed if he was in his room at the time of the Attack. *Id*. ¶ 11. While assisting in search and recovery efforts, Mr. Brown sustained a severe injury to his rotator cuff which required surgery to relieve the excruciating pain and limited mobility. *Id*. ¶ 12. He also recovered the bodies of Airmen that he personally knew, leaving him with overwhelming grief. *Id*. ¶ 13. Mr. Brown remained at Khobar Towers for three and half months after the Attack, cleaning gruesome human remains and blood stains, which exacerbated Mr. Brown's emotional distress from the Attack itself and led to avoidance of crowds, hypervigilance, stress, anxiety, and post-traumatic stress disorder ("PTSD") that manifested into irritable bowel syndrome ("IBS") and hypertension with heart disease. *Id*. ¶¶ 15, 20, and 21.

Mr. Brown continues to suffer from the physical injuries he sustained in the Attack and because of them, he is rated 100% disabled by the VA. *Id*. ¶ 22. He has a ringing in his ears, which was diagnosed as tinnitus, and is rated 10% disabled. *Id*. ¶ 22. He still suffers from significant pain in his right shoulder that originated from the search and recovery effort and is rated 20% disabled. *Id*. ¶ 22. For PTSD and panic attacks, he is rated 50% disabled, with an additional 10% for IBS and another 10% for hypertension, both residual results of PTSD. *Id*. ¶ 22. Finally, he is rated 50% disabled for sleep apnea due to the recurring nightmares and interrupted sleep he experiences because of the Attack. *Id*. ¶ 22. For his actions following the Attack, Mr. Brown was awarded the Air Force Commendation Medal with Valor. *Id*. ¶ 15.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Barry Gordon Brown, MSgt, USAF (Ret) is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 100%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

**b.  Immediate Family Member Plaintiff Eva Ranee Graham - Spouse**

Immediate Family Member Plaintiff Eva Ranee Graham was, at the time of the Attack, the spouse of Injured Servicemember Plaintiff Barry Gordon Brown, MSgt, USAF (Ret).  Eva Ranee Graham Declaration and Exhibits ("Eva Graham Decl.").  She learned of the Attack from a phone call from her husband and a feeling of doom overtook her and she was an emotional wreck.  Eva Graham Decl. ¶ 9.  Several hours later, the commander of her husband's local unit called stating that he did not know if her husband was dead or alive, which caused her to be confused and feel like she was getting the shock of her life twice in one day.  *Id.* ¶ 10.  She grew very emotional and panicked thinking that her husband may have been involved in another attack. *Id.* ¶ 10.  In the weeks that followed the Attack, she experienced feelings of intense fear, anger, and sorrow, and began having frequent nightmares. *Id.* ¶ 13.  When her husband came home, the Attack had a profound effect on him, and his injuries caused the family extreme grief and distress.  *Id.* ¶ 17.  Ms. Brown held on to her marriage for as long as she could but the emotional anguish she suffered became too much and 10 years after the Attack, in 2006, Ms. Brown and her husband divorced. *Id.* ¶ 16.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Eva Ranee Graham, the spouse of Injured Servicemember Plaintiff Barry Gordon Brown, MSgt, USAF (Ret) at the time of the Attack, is seeking a solatium damages award in the amount of $4,000,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). Although Plaintiff Eva Ranee Graham is now divorced from Injured Servicemember Barry Gordon Brown, MSgt, USAF (Ret), where, as is the case here, evidence indicates that a couple eventually divorced but remained married for years following the Attack and the spouse "suffered compensable emotional trauma," the *Heiser* solatium framework may still be applied. *Spencer* v. *Islamic Republic of Iran*, 71 F.Supp.3d 23, 28-29 (D.D.C. 2014).

### c. Immediate Family Member Plaintiff Corey Thomas Brown - Child

Immediate Family Member Plaintiff Corey Thomas Brown is the child of Injured Servicemember Plaintiff Barry Gordon Brown, MSgt, USAF (Ret).  Corey Thomas Brown Declaration and Exhibits ("Corey Brown Decl.").  Although Mr. Brown was only four years old at the time of the Attack, his relationship with his father was negatively affected by the Attack, causing Mr. Brown to suffer hardships.  Corey Brown Decl. ¶¶ 8 and 12.  The Attack prevented Mr. Brown from forming a healthy relationship with his father, which resulted in him suffering from low self-esteem and difficulty with relationships. *Id.* ¶ 12.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Corey Thomas Brown, the child of Injured Servicemember Plaintiff Barry Gordon Brown, MSgt, USAF (Ret), is seeking a solatium damages award in the amount of $1,500,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting

the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). Although Corey Thomas Brown was only four years old at the time of the Attack, his reduced awareness of the Attack did not lessen the distress he experienced growing up with a father suffering from psychological injuries from the Attack.  See *Ackley*, 2022 WL 3354720 at *77.

### 4.  Injured Servicemember Plaintiff Angela Mashel Brown and One Immediate Family Member Plaintiff

#### a.  Injured Servicemember Plaintiff Angela Mashel Brown

Injured Servicemember Plaintiff Angela Mashel Brown was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Angela Mashel Brown Declaration and Exhibits, ("Angela Brown Decl.").

On June 25, 1996, the blast of pressure from the blaring explosion engulfed Ms. Brown as she worked in the recreation center at the Khobar Towers complex. Angela Brown Decl. ¶ 7. She dove under a counter for cover and crouched there in fear. *Id*. ¶ 7. Her ears were ringing but she could hear the harrowing sounds of people crying and moaning. *Id*. ¶ 7. When she arose from her cover, Ms. Brown witnessed the horrific sight of frantic people running amidst dust, smoke, and shattered debris. *Id*. ¶ 8. She struggled to breathe and inhaled toxic fumes. *Id*. ¶ 8. She rushed to the triage center where she froze in fear from the gruesome injuries and casualties, she saw. *Id*. ¶ 9. Ms. Brown was then ordered to help with search and rescue where she waded through the overwhelming devastation of blood, body parts, and mangled people for several traumatizing hours. *Id*. ¶ 10. Ms. Brown later returned to her own room only to find blood-splattered stairs and her balcony caved in. *Id*. ¶ 11. For two more months, Ms. Brown remained at Khobar Towers, performing mortuary services and care for her fellow injured servicemembers during their recovery. *Id*. ¶ 13. For her actions following the Attack, Ms. Brown was awarded the Air Force

Achievement Medal. *Id*. ¶ 13.  Ms. Brown was reminded of the horrors of the Attack daily and lived in constant fear. *Id*. ¶ 14.

Ms. Brown immediately began to have symptoms of PTSD and had numerous major anxiety and panic attacks. *Id*. ¶ 14. She did not sleep at night during the rest of her time at Khobar Towers and she developed severe PTSD from the Attack, forcing her to eventually switch to the Reserves, until she ultimately separated from the military because of triggers and anxiety. *Id*. ¶¶ 14 and 17. Ms. Brown thereafter also suffered from depression. *Id*. ¶ 18.

Due to the prevalence and invasiveness of her PTSD, the VA rated Ms. Brown 50% disabled for PTSD. *Id*. ¶ 20. She is also rated as 50% disabled for obstructive sleep apnea related to the Attack. *Id*. ¶ 21. Ms. Brown still suffers from constant ringing in her ears that is a result of the blast wave and began the night of the Attack, which has since been diagnosed as tinnitus and rated 10% disabled. *Id*. ¶ 22. Ms. Brown is rated as 80% disabled overall, and 100% unemployable. *Id*. ¶ 23.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Angela Mashel Brown is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of her injuries and her VA rating of 80%, and 100% unemployable.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

**b. Immediate Family Member Plaintiff Alexis Nichole Wingate - Child**

Immediate Family Member Plaintiff Alexis Nichole Wingate is the child of Injured Servicemember Plaintiff Angela Mashel Brown.  Alexis Nichole Wingate Declaration and

Exhibits ("Alexis Wingate Decl.").  Ms. Wingate was horrified when she learned about the Attack from her mother when she returned home from Saudi Arabia.  Alexis Wingate Decl. ¶ 8.   After the Attack, her mother's entire demeanor had changed, which caused Ms. Wingate to struggle.  *Id.* ¶ 10.  Many times over the years following the Attack, Ms. Wingate had to take on the parental role, and she became depressed and developed low self-esteem from her mother's emotional unavailability. *Id.* ¶¶ 13 and 14.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Alexis Nichole Wingate, the child of Injured Servicemember Plaintiff Angela Mashel Brown, is seeking a solatium damages award in the amount of $1,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). Although Ms. Wingate was only a child at the time of the Attack, her lessened awareness of the Attack did not lessen the distress she experienced growing up with a mother suffering from psychological injuries from the Attack.  See *Ackley*, 2022 WL 3354720 at *77.

### 4. Injured Servicemember Plaintiff Steven Lee Byers and Three Immediate Family Member Plaintiffs

#### a. Injured Service Member Plaintiff Steven Lee Byers

Injured Servicemember Plaintiff Steven Lee Byers was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Steven Lee Byers Declaration and Exhibits, ("Byers Decl.").

On June 25, 1996, the explosion blasted through a glass patio door in front of Mr. Byers, throwing him into the air, slamming him against a wall across the room, and then dropping him to the ground where he landed on his head and neck. Byers Decl. ¶ 7. Despite the excruciating pain, Mr. Byers made his way into the bedroom to take cover under a bed mattress. *Id.* ¶ 8. When he

emerged from his cover, he was assisted out of the building, bloodied, and injured. *Id*. ¶ 8.   His ears were ringing, the tendon of his left knee was exposed, and glass fragments were embedded in both knees. *Id*. ¶ 10. He saw severely wounded servicemembers, sights he will never forget. *Id*. ¶ 9. He collapsed in exhaustion and was taken to the hospital where his injuries were treated. *Id*. ¶ 10. The glass fragments were removed from both of his knees, open wounds were sutured, and the exposed tendon was manually reattached. *Id*. ¶ 11. His leg was completely immobilized, and he suffered intense pain in his legs and back. *Id*. ¶ 13. The pain was so severe that only eight months after the Attack, he was forced to separate from the Air Force. *Id*. ¶ 20. To this day, Mr. Byers cannot sit in certain positions for very long or he will lose feeling in his legs, and he still experiences agonizing pain in his back, legs, and knees. *Id*. ¶ 20.   For his injuries from the Attack, Mr. Byers was awarded a Purple Heart. *Id*. ¶ 11.

Immediately following the Attack, Mr. Byers started to experience intense symptoms of PTSD. *Id*. ¶ 14. He was not sleeping and had to take prescription sedatives to help him sleep. *Id*. ¶ 14. He suffered acute hypervigilance, avoided crowds, and developed a short temper and uncontrollable mood swings. *Id*. ¶¶ 15 and 16. Due to his new behavior, his personal relationships dissipate. *Id*. ¶16.

Due to his injuries, Mr. Byers is rated 80% disabled by the VA. *Id*. ¶ 18. He was diagnosed with and is rated 50% disabled for PTSD. *Id*. ¶ 19. He is rated 10% disabled for the injury to his left leg. *Id*. ¶ 20. He began to experience migraine headaches and learned that he suffered a traumatic brain injury ("TBI") in the Attack. *Id*. ¶ 21. He is rated 10% disabled for this injury. *Id*. ¶ 21. He continues to experience ringing in his ears, which was diagnosed as tinnitus and is rated 10% disabled. *Id*. ¶ 22.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Steven Lee Byers is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 80%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### b. Immediate Family Member Plaintiff Donna Lee Byers - Parent

Immediate Family Member Plaintiff Donna Lee Byers is the parent of Injured Servicemember Plaintiff Steven Lee Byers.  Donna Lee Byers Declaration and Exhibits ("Donna Byers Decl.")  Mrs. Byers was shocked and terrified when she learned about the Attack from her husband.  Donna Byers Decl. ¶ 6.  It was torturous waiting for information on her son's condition.  *Id.* ¶ 7.  Since the Attack, Ms. Byers stresses about the well-being of her son.  *Id.* ¶ 14.  She is extremely sad to see her son suffer so greatly because of the Attack.  *Id.* ¶¶ 14 and 15.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Donna Lee Byers, the parent of Injured Servicemember Plaintiff Steven Lee Byers, is seeking a solatium damages award in the amount of $2,500,000.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### c. Immediate Family Member Plaintiff Rodney Lee Byers - Parent

Immediate Family Member Plaintiff Rodney Lee Byers is the parent of Injured Servicemember Plaintiff Steven Lee Byers.  Rodney Lee Byers Declaration and Exhibits ("Rodney Byers Decl.")  Mr. Byers learned about the Attack on the radio and immediately his heart sank.

Rodney Byers Decl. ¶ 6.  For hours he waited anxiously for an update on his son's condition, and he was consumed with worry and concern.  *Id.* ¶ 7.  Watching his son suffer following the Attack has taken its toll on Mr. Byers.  *Id.* ¶ 15.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Rodney Lee Byers, the parent of Injured Servicemember Plaintiff Steven Lee Byers, is seeking a solatium damages award in the amount of $2,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

**d. Immediate Family Member Plaintiff Joseph Eugene Byers - Sibling**

Immediate Family Member Plaintiff Joseph Eugene Byers is the sibling of Injured Servicemember Plaintiff Steven Lee Byers.  Joseph Eugene Byers Declaration and Exhibits ("Joseph Byers Decl.")  Mr. Byers learned about the Attack from his mother, and he was in shock and disbelief.  Joseph Byers Decl. ¶ 6.  Seeing his brother suffer after the Attack caused Mr. Byers to be overly cautious and paranoid, which led to difficulty with relationships in his own life.  *Id.* ¶ 13.  Additionally, the Attack destroyed the close relationship that Mr. Byers enjoyed with his brother.  *Id.* ¶ 14.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Joseph Eugene Byers, the sibling of Injured Servicemember Plaintiff Steven Lee Byers, is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

**5. Injured Servicemember Plaintiff Timothy Gerard Fermanis**

Injured Servicemember Plaintiff Timothy Gerard Fermanis was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Timothy Gerard Fermanis Declaration and Exhibits, ("Fermanis Decl.").

On June 25, 1996, the explosion shattered the window at which Mr. Fermanis was standing, peppering glass shards into his body. Fermanis Decl. ¶ 6. The force of the blast wave hurled him across the room into a wall, knocking him unconscious. *Id.* ¶ 6. He awoke to excruciating pain in his head and shoulder, countless shrapnel wounds, and blood gushing from the tops of his feet, legs, and right knee. *Id.* ¶ 7. He used pillows as shoes to get across the room to his boots. *Id.* ¶ 8. Mr. Fermanis tried to wrap his wounds and escape the building. *Id.* ¶¶ 8 and 9. The air was filled with dust, making it hard for him to see and move. *Id.* ¶ 9. As he hobbled outside to the triage center, he saw many people covered in blood. *Id.* ¶ 10. At triage, he tried to help others who had severe injuries, including sliced limbs and large shards of glass protruding out of their bodies. *Id.* ¶¶ 11 and 12. The threat of another attack caused people to run and take cover, but Mr. Fermanis could not move well due to his injuries, and he struggled to get himself to a safe place. *Id.* ¶ 13.

Due to the intense demand at the triage center, Mr. Fermanis did not receive treatment for his injuries until the next day when he had the glass removed from his knees, toes and legs.  He was also treated for lacerations on his left arm. *Id.* ¶ 15. For his injuries from the Attack, Mr. Fermanis was awarded a Purple Heart. *Id.* ¶ 15.

Mr. Fermanis remained at Khobar Towers for a few weeks after the Attack, working to restore internet service, but always on high alert and watching over his shoulder. *Id.* ¶ 18. For his actions following the Attack, he was awarded the Air Force Achievement Medal Third Oak Leaf Cluster. *Id.* ¶ 16.

Mr. Fermanis continues to suffer from the physical injuries he sustained in the Attack and still has glass shrapnel in his right knee that causes him residual pain. *Id*. ¶ 22. He has osteoarthritis in both knees as a result of the Attack, for which he is rated 10% disabled on each knee by the VA. *Id*. ¶ 22. He also suffers from constant ringing in his ears diagnosed as tinnitus, for which he is rated 10% disabled by the VA. *Id*. ¶ 22.

After the Attack, Mr. Fermanis quickly began experiencing symptoms of PTSD and is triggered by loud noises. *Id*. ¶ 19. He developed anxiety in crowds and thus avoids them. *Id*. ¶ 20. He became introverted, which negatively impacted his personal relationships. *Id*. ¶ 20. He is hyper aware of his surroundings and focuses on exits and escape routes. *Id*. ¶ 21. For his PTSD and related symptoms, Mr. Fermanis is rated 30% disabled by the VA. *Id*. ¶ 21. Due to the physical and psychological injuries he sustained in the Attack, Mr. Fermanis has a combined disability rating of 60% disabled. *Id*. ¶ 22.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Timothy Gerard Fermanis is seeking a compensatory damages award in the amount of $6,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 60%. See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### 6. Injured Servicemember Plaintiff Kevin Richard Mall TSgt, USAF (Ret)

Injured Servicemember Plaintiff Kevin Richard Mall TSgt, USAF (Ret) was severely and permanently injured both physically and psychologically from the Attack on Khobar Towers. Kevin Richard Mall Declaration and Exhibits, ("Mall Decl.").

On June 25, 1996, the explosion threw Mr. Mall from his bed into wall lockers across the room and then dropped him to the ground. Mall Decl. ¶ 6. A wall-mounted air conditioning unit shot out from the wall and fell on top of him, knocking him unconscious. *Id*. ¶ 6. Mr. Mall awoke to a large throbbing headache and a bump on his head. *Id*. ¶ 7. Dust filled his eyes, mouth, and throat. *Id*. ¶ 7. Mr. Mall dug himself out of debris and glass from blown-out windows using his bare hands to escape, sustaining abrasions to his hands and feet in the process. *Id*. ¶ 8. He put his boots on, not noticing that they were filled with glass shards, which then cut his feet. *Id*. ¶ 8. Despite his own injuries, Mr. Mall helped others escape the building and carried them to triage. *Id*. ¶ 9. At triage, he witnessed an overwhelming amount of injured personnel and mayhem. *Id*. ¶ 10.  He treated his own injuries by pulling glass out of his feet, and cleaning and bandaging his wounds. *Id*. ¶ 11. He spent the next several hours assisting in rescue operations and providing medical attention to wounded personnel. *Id*. ¶ 11. For his actions following the Attack, he was awarded the Air Force Achievement Medal. *Id*. ¶ 11.

Mr. Mall remained at Khobar Towers for eight weeks after the Attack, during which time he witnessed the remnants of the Attack every day and endured threats of additional attacks. *Id*. ¶ 14. It was the worst two months of his life. *Id*. ¶ 16. He also retrieved the bodies and body parts of fellow Airmen, prepared caskets for the fallen, and loaded them onto an aircraft to return to the United States for burial. *Id*. ¶ 14. For these actions, he was awarded the Air Force Achievement Medal First Oak Leaf Cluster. *Id*. ¶ 14.

Doing these tasks caused Mr. Mall severe emotional distress, horrifying nightmares, and paranoia. *Id*. ¶ 15. He was diagnosed with PTSD from the Attack. *Id*. ¶ 15. He avoids crowds and developed deep depression and severe anxiety. *Id*. ¶ 21. He had trouble sleeping and became withdrawn. *Id*. ¶ 21. Mr. Mall also felt vengeful, causing him to be verbally and emotionally

abusive to his friends and family, and resulted in his divorce from his wife. *Id.* ¶ 22. He was also forced to retire from the Air Force. *Id.* ¶ 22. The VA rated Mr. Mall 100% disabled due to the injuries sustained in the Attack. *Id.* ¶ 23. Specifically, he is rated 100% disabled for PTSD and 50% disabled for sleep apnea. *Id.* ¶ 24. In making its determination, the VA noted that Mr. Mall is homebound because of his anxiety. *Id.* ¶ 24. The years of anxiety and stress Mr. Mall endured following the Attack led to difficulty controlling his bladder and the VA rated him 30% disabled for irritable colon. *Id.* ¶ 24.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Kevin Richard Mall TSgt, USAF (Ret) is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 100%.  See *Schooley*, 2019 WL 2717888, at \*75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at \*23-24 (adopting the *Schooley* "basic rubric").

### 7. Injured Servicemember Plaintiff John Charles Orlando, Jr. TSgt, USAF (Ret) and One Immediate Family Member Plaintiff

#### a. Injured Servicemember Plaintiff John Charles Orlando, Jr., TSgt, USAF (Ret)

Injured Servicemember Plaintiff John Charles Orlando, Jr., TSgt, USAF (Ret) was severely and permanently injured both physically and psychologically from the Attack on Khobar Towers. John Charles Orlando, Jr. Declaration and Exhibits, ("Orlando Decl.").

On June 25, 1996, the force of the explosion blew out the glass doors across from where Mr. Orlando was sitting, and he was thrown to the floor. Orlando Decl. ¶ 7. When he gathered himself and stood up, his ears were ringing. *Id.* ¶ 8. Debris, dust, broken glass, and people were everywhere. *Id.* ¶ 8. Glass shrapnel had deeply lacerated Mr. Orlando's leg. *Id.* ¶ 8. Once outside

his building, he witnessed chaos and felt great fear when he thought the complex was under attack again. *Id*. ¶ 9. When he got to triage, Mr. Orlando endured excruciating pain while the medic dug out the glass shrapnel, leaving him with numbness and tingling down his leg. *Id*. ¶ 10. For his injuries from the Attack, Mr. Orlando was awarded a Purple Heart. *Id*. ¶ 10.

Mr. Orlando was tasked with consoling other servicemembers with words of comfort, which caused him feelings of immense grief. *Id*. ¶¶ 11 and 12. For his actions following the Attack, Mr. Orlando was awarded the Air Force Commendation Medal First Oak Leaf Cluster. *Id*. ¶ 12. He spent his remaining deployment at Khobar Towers remembering the servicemembers who were killed that night, many of whom he knew personally. *Id*. ¶ 14. Once home in the States, Mr. Orlando could not stop thinking about the devastation at Khobar Towers. *Id*. ¶ 17. Since the Attack, he has frequent, vivid flashbacks of the wounded people, broken items, shattered glass, and the desperation on everyone's faces that night and he continues to feel the same grief that he felt that day. *Id*. ¶ 17. He is overreactive to loud noises and is suspicious of his surroundings and people around him. *Id*. ¶ 21.

Mr. Orlando continues to suffer from nerve damage in his leg and glass fragments remain embedded in his skin. *Id*. ¶ 22. When the side of his left calf is touched by anyone or anything, he experiences a painful tingling sensation that travels down to the top of his foot. *Id*. ¶ 22. Any incidental contact causes pain. *Id*. ¶ 22. The VA rated Mr. Orlando 10% disabled due to this injury from the Attack. *Id*. ¶ 22.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff John Charles Orlando, Jr., TSgt, USAF (Ret) is seeking a compensatory damages award in the amount of $5,000,000, which is commensurate with a baseline award based upon the severity of his injuries and his VA rating of

10%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric")

### b. Immediate Family Member Plaintiff Ursula Leona Orlando

Immediate Family Member Plaintiff Ursula Leona Orlando is the spouse of Injured Servicemember Plaintiff John Charles Orlando, Jr., TSgt, USAF (Ret).  Ursula Leona Orlando Declaration and Exhibits ("Ursula Orlando Decl.").  Mrs. Orlando learned about the Attack on the news and a flood of emotions, including shock and worry, overcame her.  Ursula Orlando Decl. ¶ 6.  When Mrs. Orlando received a call informing her that her husband's whereabouts were unknown, she became distraught. *Id*. ¶ 7.  After the Attack, Mrs. Orlando experienced grief due to her husband's experience and loss.  *Id*. ¶ 12.  The Attack has negatively impacted Mrs. Orlando and her husband's lives together.  *Id*. ¶ 14.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn Declarations, Immediate Family Member Plaintiff Ursula Leona Orlando, the spouse of Injured Servicemember Plaintiff John Charles Orlando, Jr., TSgt, USAF (Ret) is seeking a solatium damages award in the amount of $4,000,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### 8. Injured Servicemember Plaintiff Kenneth David Weaver and Five Immediate Family Member Plaintiffs

### a. Injured Servicemember Plaintiff Kenneth David Weaver

Injured Servicemember Plaintiff Kenneth David Weaver was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Kenneth David Weaver Declaration and Exhibits, ("Weaver Decl.").

On June 25, 1996, Mr. Weaver was in the process of evacuating his building when the force of the explosion knocked Mr. Weaver to the ground, injuring his back and head. Weaver Decl. ¶10. Shards of glass, concrete, and metal shrapnel lacerated his body. *Id*. ¶ 10. Debris and dust filled the air, causing a gritty substance to fill his mouth. *Id*. ¶ 10. He was in a haze and could only hear a high-pitched ring. *Id*. ¶ 11. Mr. Weaver ran to the bus that was later scheduled to transport him to his next ship, where he anxiously waited for the bus driver. *Id*. ¶ 12. He feared he would be hit by another bomb, but all he could do was stand there and wait in the specified area. *Id*. ¶ 12. The bus driver finally arrived, and Mr. Weaver boarded the bus without any of his belongings and escaped the complex, shaking and trembling the entire ride to the ship. *Id*. ¶ 13. When he got on his ship, he was placed on medical watch and given pain medication. *Id*. ¶ 14. Mr. Weaver was not allowed to sleep that night because the medics presumed, he had suffered a concussion from the Attack. *Id*. ¶ 14. He struggled laying on his bed the next day due to the open lacerations on his back and right shoulder. *Id*. ¶ 15. Mr. Weaver was also suffering from severe back pain, which started immediately following the explosion and became more intense each day thereafter, and from which he still suffers to this day. *Id*. ¶ 15. Mr. Weaver was diagnosed with a disc protrusion that traversed a nerve in his spine, and doctors believe that he likely suffered from a mild traumatic brain injury ("TBI").  *Id*. ¶¶ 25 and 26. The VA rated him 40% disabled due to degenerative arthritis in his spine and is continuing to evaluate him for a rating for a TBI. *Id*. ¶ 29.

Immediately after the Attack, Mr. Weaver began having sleep issues and nightmares of the bombing. *Id*. ¶ 16. He was anxious and tense and struggled to perform his work duties. *Id*. ¶ 20. He became introverted, which prevented him from forming and continuing relationships with his shipmates, both professionally and socially. *Id*. ¶ 21. The Navy eventually discharged  Mr. Weaver due to the ongoing decline of his performance and discord with his shipmates, ending his career

just three years short of retirement. *Id*. ¶ 23. Mr. Weaver was subsequently admitted into the infirmary for an evaluation of his psychological injuries from the Attack. *Id*. ¶ 23. He still suffers from the trauma that has plagued him since the day of the Attack. *Id*. ¶ 27. He is constantly hypervigilant, short-tempered, tired from lack of sleep, and moody. *Id*. ¶ 27. He does not socialize or interact with others, he avoids crowds and keeps the exit door in sight wherever he goes, he gets easily startled by loud sounds, and has isolated himself from family and friends, all of which are symptomatic of PTSD. *Id*. ¶ 27.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Kenneth David Weaver is seeking a compensatory damages award in the amount of $6,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 40%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### b. Immediate Family Member Plaintiff Susan Pauline Pomoransky - Half-Sibling

Immediate Family Member Plaintiff Susan Pauline Pomoransky is the half-sibling of Injured Servicemember Plaintiff Kenneth David Weaver. Susan Pauline Pomoransky Declaration and Exhibits ("Susan Pomoransky Decl.").  Ms. Pomoransky learned about the Attack from her brother, who heard it on the news. Susan Pomoransky Decl. ¶ 6. She grew very upset and worried. *Id.* ¶ 6. She waited anxiously for a few days for more information about her brother, and eventually learned that he was injured, but alive and on his ship. *Id.* ¶ 7. After the Attack, Ms. Pomoransky noticed that her brother's communication with her dramatically decreased. *Id.* ¶ 9. When she saw him in person, he was easily agitated and very jumpy. *Id.* ¶ 10. Loud noises bothered him, and she had to be very careful what she said and did around him. *Id.* ¶ 10. Due to her brother's reclusiveness

following the Attack, they grew apart from one another and their relationship suffered, which saddens her deeply.  *Id.* ¶ 15.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Susan Pauline Pomoransky, half-sibling of Injured Servicemember Plaintiff Kenneth David Weaver, is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). See also *Christie,* 2020 WL 3606273, at *18 (recognizing where there is a close relationship, half-siblings are "presumed to recover" as full siblings would.)  See *supra* regarding further argument in section V of this memorandum.

### c. Immediate Family Member Plaintiff Vickie Rena Anthony - Sibling

Immediate Family Plaintiff Vickie Rena Anthony is the sibling of Injured Servicemember Plaintiff Kenneth David Weaver. Vickie Rena Anthony Declaration and Exhibits ("Vickie Anthony Decl.") Ms. Anthony learned about the Attack from her sister. Vickie Anthony Decl. ¶ 6. She was shocked and feared for her brother upon hearing the news. *Id.* ¶ 6. A few days later, she learned her brother was alive but injured, which was terrifying for her. *Id.* ¶ 8. After the Attack, Ms. Anthony recognized changes in her brother. *Id.* ¶ 10. He was not approachable, and she rarely felt able to talk to him and ask him questions. *Id.* ¶ 12. She felt as if he was a stranger and the distance between them made her very sad. *Id.* ¶ 12. Their relationship is very different than what it used to be due to her brother's injuries. *Id.* ¶ 17.

For the reasons set forth herein and in her accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Vickie Rena Anthony, sibling of Injured Servicemember Plaintiff Kenneth David Weaver, is seeking a solatium damages award in the amount of

$1,250,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### d. Immediate Family Member Plaintiff Clinton Edward Weaver - Sibling

Immediate Family Member Plaintiff Clinton Edward Weaver is the sibling of Injured Servicemember Plaintiff Kenneth David Weaver Declaration and Exhibits ("Clinton Weaver Decl.") Mr. Weaver learned about the Attack from his sister, leaving him very upset and worried. Clinton Weaver Decl. ¶ 6. A few days later, he learned that his brother had been injured, but he did not know the severity and he anxiously awaited more information confirming his brother's well-being. *Id*. ¶ 7. After finally talking to his brother, Mr. Weaver felt relief, but he continued to be concerned for his brother. *Id*. ¶ 8. When Mr. Weaver saw his brother, he noticed he had changed, which made Mr. Weaver upset. *Id*. ¶ 11. His brother was quick to anger, impatient, and difficult to be around, and their relationship deteriorated. *Id*. ¶ 14. Mr. Weaver feels great sadness watching his brother suffer emotionally and mentally and has lost sleep just worrying about his well-being. *Id*. ¶ 15.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Clinton Edward Weaver, sibling of Injured Servicemember Plaintiff Kenneth David Weaver, is seeking a solatium damages award in the amount of $1,250,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### e. Immediate Family Member Plaintiff Donald Lee Heikes - Half-Sibling

Immediate Family Member Plaintiff Donald Lee Heikes is the half-sibling of Injured Servicemember Plaintiff Kenneth David Weaver. Donald Lee Heikes Declaration and Exhibits ("Donald Heikes Decl.") Mr. Heikes learned about the Attack from his sister, but she did not have

many details and that left Mr. Heikes feeling very unsettled.  Donald Heikes Decl. ¶ 6. He was angry, anxious, and worried while awaiting more information. *Id.* ¶ 8. Even after hearing his brother's voice, Mr. Heikes' continued to worry about his brother continued.  *Id.* ¶ 9. After the Attack, his brother moved in with Mr. Heikes, who eventually had to quit his job to take care of his brother due to the psychological injuries his brother sustained in the Attack. *Id.* ¶ 15.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Donald Lee Heikes, half-sibling of Injured Servicemember Plaintiff Kenneth David Weaver, is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). See also *Christie,* 2020 WL 3606273, at *18 (recognizing where there is a close relationship, half-siblings are "presumed to recover" as full siblings would.)  See *supra* regarding further argument in section V of this memorandum.

### f. Immediate Family Member Plaintiff Roger Dayle Heikes - Half-Sibling

Immediate Family Member Plaintiff Roger Dayle Heikes is the half-sibling of Injured Servicemember Plaintiff Kenneth David Weaver. Roger Dayle Heikes Declaration and Exhibits ("Roger Heikes Decl.") Mr. Heikes learned about the Attack from his sister. Roger Heikes Decl. ¶ 6. Mr. Heikes felt enraged and feared for his brother's safety. *Id.* ¶ 7. Mr. Heikes was relieved once his brother was home, but he also noticed negative changes in him. *Id.* ¶¶ 8, 9. His brother was very reserved, constantly on edge, and overreactive to loud noises, which would cause him to hunker down in a corner in fear. *Id.* ¶ 9.  Overall, his brother's return home was disheartening and disappointing. *Id.* ¶ 13. Now, Mr. Heikes and his brother speak less than before the Attack and he is saddened to see what the Attack has done to his brother.  *Id.* ¶ 14.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Roger Dayle Heikes, half-sibling of Injured Servicemember Plaintiff Kenneth David Weaver, is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at \*77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at \*25-27 (same). See also *Christie,* 2020 WL 3606273, at \*18 (recognizing where there is a close relationship, half-siblings are "presumed to recover" as full siblings would.)  See *supra* regarding further argument in section V of this memorandum.

### 9.    Injured Servicemember Plaintiff Ronald Scott Gering

Injured Servicemember Plaintiff Ronald Scott Gering was severely and permanently injured both physically and psychologically from the Attack on Khobar Towers. Ronald Scott Gering Declaration and Exhibits, ("Gering Decl.").

On June 25, 1996, the blast of the explosion knocked Mr. Gering to his knees. Gering Decl. ¶ 6. He rushed to evacuate the building, but the prevalence of broken glass on the floor forced him to return to his room to get boots for his bare feet. *Id*. ¶ 7. He had a high-pitched ringing in his ears, which was later diagnosed as tinnitus, and continues to this day. *Id*. ¶ 8. Mr. Gering is rated 10% disabled for tinnitus by the VA. *Id*. ¶ 8.

Mr. Gering took cover in an underground garage in anticipation of another bomb and while there, he witnessed numerous servicemembers come in with devastating and gruesome injuries. *Id*. ¶ 9. Mr. Gering was later tasked with restoring the complex's computer system because the hospital was urgently in need of supplies. *Id*. ¶ 11. The work center and equipment were damaged in the Attack, so Mr. Gering had to rummage through debris, equipment, and other materials to find parts to repair the systems. *Id*. ¶ 11. He tripped many times in the process. *Id*. ¶ 11. Mr.

Gering's adrenaline kept him from realizing that he had injured his back and ankle during the Attack and the aftermath, but later noticed a persistent pain in his back. *Id*. ¶ 12. He is rated 10% disabled for the injury to his back. *Id*. ¶ 12.

Mr. Gering continued working at Khobar Towers after the Attack, rebuilding computers to get the complex back online. *Id*. ¶ 13. For his actions following the Attack, Mr. Gering was awarded the Air Force Achievement Medal with Valor. *Id*. ¶ 13. His work was exhausting, and he slept poorly because he was consumed with panic and fear of another attack. *Id*. ¶ 14. He also started to experience symptoms of PTSD that continue to impact him to this day. *Id*. ¶ 17. He was diagnosed with PTSD inflicted by the Attack and is rated 30% disabled for PTSD. *Id*. ¶ 17. Mr. Gering is hyper-vigilant and overly aware of his surroundings. *Id*. ¶ 18. He no longer trusts others, he avoids crowded rooms, and he always sits with his back to the wall so he can keep an eye out for suspicious activity. *Id*. ¶ 18. He fears the smallest of things. *Id*. ¶ 19. Loud noises trigger his memory of the night of the Attack, and he takes cover. *Id*. ¶ 19. His sleep issues remain, and he continues to have nightmares centered around the Attack. *Id*. ¶ 19. The guilt of his survival consumes his daily thoughts. *Id*. ¶ 20. He is less social and keeps to himself and his dissociative behavior led to two divorces. *Id*. ¶ 21. Mr. Gering's anxiety makes it difficult for him to focus. *Id*. ¶ 22. He is rated a combined disability rating of 40% due to the injuries he sustained in the Attack including 10% for tinnitus, 10% for back injury, and 30% for PTSD. *Id*. ¶¶ 8, 12, 17, 25.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Ronald Scott Gering is seeking a compensatory damages award in the amount of $6,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 40%. See *Schooley*,

2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### 10.    Injured Servicemember Plaintiff Aubree Brooke Staricka

Injured Servicemember Plaintiff Aubree Brooke Staricka was severely and permanently injured psychologically from the attack on Khobar Towers. Aubree Brooke Staricka Declaration and Exhibits, ("Staricka Decl.").

On June 25, 1996, as she returned to the complex and neared the front gate, Ms. Staricka felt the powerful blast wave from the bomb pummel through her body. Staricka Decl. ¶ 6. She parked the truck and sprinted into the chaos to search for her suitemates.  *Id*. ¶ 7.  Her heart sank as she approached her building because every single window was shattered, and every door was blown off its hinges. *Id*. ¶ 7. Her heart skipped a beat when she learned that the bomb had detonated closest to Building 131, which housed her ex-boyfriend, JR, with whom she maintained a very close and loving relationship after the split. *Id*. ¶ 8 She ran to Building 131 to find him. *Id*. ¶ 8. On her way, Ms. Staricka saw seriously injured personnel, debris, shattered glass from blown-out doors and windows, and pools of blood everywhere. *Id*. ¶ 9. The condition of Building 131 gave her little hope that her friend was alive, and at the same time she realized that she had narrowly escaped death herself given that she was headed to that building at the time of the Attack. *Id*. ¶¶ 9 and 10. She was overcome with fear and grief. *Id*. ¶ 10.

Ms. Staricka sobbed uncontrollably that entire night. *Id*. ¶ 12. The next day, she learned that her dear friend had died in the Attack, along with ten other friends and close colleagues. *Id*. ¶ 14. She was heartbroken and inconsolable. *Id*. ¶ 14. She felt helpless and unsafe. *Id*. ¶ 14. Her sense of trust and security was gone, and she was in an extreme state of shock and depression that caused her to cry uncontrollably during her entire flight home. *Id*. ¶ 14.

Now, Ms. Staricka worries about everything, keeps her head on a swivel, and is always in fight-or-flight mode. *Id*. ¶ 19. She startles easily and always has an escape plan. *Id*. ¶ 19. She feels helpless and is constantly worried and paranoid. *Id*. ¶ 19. She is numb, emotionally distant, yet cries all the time. *Id*. ¶ 19. She feels guilty for surviving that day when so many of her friends died. *Id*. ¶ 19. She was diagnosed with PTSD as a direct result of the Attack, and the VA rated her as 30% disabled for PTSD. *Id*. ¶¶ 19 and 20. She was also diagnosed with sleep apnea which is directly linked to her PTSD from the Attack. *Id*. ¶ 21. She suffers from debilitating insomnia, constant anxiety, polarizing highs and lows, uncontrollable paranoia, relentless survivor's guilt, and depression, which have caused her to lose both relationships and employment. *Id*. ¶ 20.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Aubree Brooke Staricka is seeking a compensatory damages award in the amount of $5,000,000, which is commensurate with a baseline award based upon the severity of her injuries and her VA rating of 30%. See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### 11. Injured Servicemember Plaintiff Brent Alan Mullings and Four Immediate Family Member Plaintiffs

#### a. Injured Servicemember Plaintiff Brent Alan Mullings

Injured Servicemember Plaintiff Brent Alan Mullings was severely and permanently injured psychologically from the attack on Khobar Towers. Brent Alan Mullings Declaration and Exhibits, ("Mullings Decl.").

On June 25, 1996, moments before the Attack, Mr. Mullings was working at a security post in the Khobar Towers complex.  Mullings Decl. ¶ 7. He heard a report come over the radio from the Observation Post at Building 131 that an unauthorized large truck had entered the parking lot

adjacent to the perimeter fence and the driver was seen running from the truck to a white sedan, which then fled out of the lot. *Id.* ¶ 7. The Observation Post began preparations to evacuate Building 131, and Mr. Mullings began following security protocol in fear of an imminent terrorist attack. *Id.* ¶ 7.

The loud explosion of the bomb interrupted the silence of Mr. Mullings' security post, along with a bright flash and a powerful blast wave that he could feel surge through his body. *Id.* ¶ 8.  Mr. Mullings feared for his life as he heard the frantic scene play out over his radio. *Id.* ¶ 9. The complex was under massive attack, and Mr. Mullings knew there was limited armed personnel on duty that night and he was not far from the bomb site. *Id.* ¶ 9. At one point, he heard someone scream, "They're coming over the fences!" *Id.* ¶ 9.  Reports with people screaming in the background flooded the net and Mr. Mullings felt intense fear, helplessness, and horror as the Attack ensued around him.  *Id.* ¶ 9.  These terror-filled memories still haunt him to this day.  *Id.* ¶ 9.

Mr. Mullings was in a constant state of high alert, anxiety, and stress, preparing to defend against the Attack pursuant to protocol.  *Id*. ¶ 10.  While alone in the dark at his post, a bearded man dressed in a traditional white thawb emerged from the brush about 50 yards away and yelled something in Arabic at him.  *Id*. ¶ 10. It was a horrifying few moments for Mr. Mullings as he thought he was under attack from a terrorist.  *Id*. ¶ 10. He was terrified for the remainder of his shift. *Id*. ¶ 10.

Once his shift ended, Mr. Mullings returned to his dorm and experienced the destruction caused by the Attack, including blown-out windows, broken glass, bloody footprints along the sidewalk, and a range of emotions on the faces of fellow Airmen, from sobbing to blank stares. *Id*. ¶ 11. He felt so much guilt that he had to stay at his post and was not able to help. *Id*. ¶ 11. Inside

his dorm room building, furniture was covered in blood, and bloody handprints painted the walls. *Id*. ¶ 12. Not one window remained intact and door jambs were blown from the walls. *Id*. ¶ 12. Mr. Mullings discovered the gruesome remains of a man on a couch who suffered what appeared to be a grotesque head injury from the explosion. *Id*. ¶ 12. The entire area had the smell of rotting flesh. *Id*. ¶ 12. For the first several nights after the Attack, Mr. Mullings worked foot patrol around the bomb site where he was met with constant visuals of death and carnage, and the sickening smell of burnt and rotting flesh. *Id*. ¶ 13. Over the next two months, Mr. Mullings continued to work around the bomb site. *Id*. ¶ 15. He did not sleep for days. *Id*. ¶ 15. For his actions following the Attack, he received the Armed Forces Expeditionary Medal. *Id*. ¶ 14.

After the Attack, Mr. Mullings became leery and distrustful of people. *Id*. ¶ 18. He is tense, hypervigilant, detached, he isolates himself, and generally avoids crowded areas. *Id*. ¶ 18. His head is always on a swivel, and he sits in corners with his back to the wall or near exits to plan escape routes. *Id*. ¶ 18. He has chronic sleep issues due to distressing dreams and recurring nightmares and flashbacks of the Attack. *Id*. ¶ 18. His patience is thin, and he snaps at the smallest of things. *Id*. ¶ 18. He is very quick to anger, and he startles easily at loud noises. *Id*. ¶ 18. He lives with a tremendous amount of survivor's guilt, and constantly relives the sounds, sights, and smells of the Attack and its aftermath. *Id*. ¶ 19.  He struggles to stay employed and maintain personal relationships. *Id*. ¶¶ 22 and 23. He also suffers from anxiety, depression, and short-term memory issues. *Id*. ¶ 24. He was diagnosed with PTSD with major depressive disorder. *Id*. ¶ 24. His days are now spent mostly at home, staying inside as much as possible due to the prevalence of PTSD triggers. *Id*. ¶ 26. He is rated 100% disabled by the VA. *Id*. ¶ 26.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Brent Alan Mullings is seeking a

compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 100%. See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### b. Immediate Family Member Plaintiff Tina Marie Mullings - Spouse

Immediate Family Member Tina Marie Mullings is the spouse of Injured Servicemember Plaintiff Brent Alan Mullings. Tina Marie Mullings Declaration and Exhibits, ("Tina Mullings Decl."). Mrs. Mullings learned about the Attack from her parents who saw a news report on television. Tina Mullings Decl. ¶ 6. She was instantly scared, shocked, and numb. She excruciatingly waited for hours to hear from her husband. *Id*. ¶ 6. When he finally called, she was relieved to hear his voice but was an emotional wreck. *Id*. ¶ 7. After the Attack, Mrs. Mullings was relieved to have her husband home, but due to his changed demeanor and psychological injuries, they stopped socializing with others. *Id*. ¶ 10. Mrs. Mulling struggled psychologically due to the impact of the Attack on Mr. Mullings. *Id*. ¶ 13. She had to adapt her expectations of him and their relationship. *Id*. ¶ 13. She must be mindful of what she says around him, they are no longer adventurous and keep their lifestyle as calm and steady as possible, and she took on employment to build income due to Mr. Mullings' struggle to maintain employment. *Id*. ¶ 13. She anticipates that she will continue to face the daily challenges of navigating Brent's injuries for the rest of her life. *Id*. ¶ 14.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declarations and exhibits, Immediate Plaintiff Tina Marie Mullings, the spouse of Injured Servicemember Plaintiff Brent Mullings, is seeking a solatium damages award in the amount of

$4,000,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### c. Immediate Family Member Plaintiff Gloria Ann Mullings - Parent

Immediate Family Member Gloria Ann Mullings is the parent of Injured Servicemember Plaintiff Brent Alan Mullings. Gloria Ann Mullings Declaration and Exhibits, ("Gloria Mullings Decl."). Mrs. Mullings learned about the Attack from her husband when he unexpectedly visited her at work to share the news of the Attack. Gloria Mullings Decl. ¶ 6. She was shocked and terribly frightened for her son. *Id*. ¶¶ 6-7. Several hours later, her son called his wife, Tina, and Mrs. Mullings was so happy to know her son was alive, but she was also heartbroken that he was experiencing such a horrible situation. *Id*. ¶ 8. After her son came home, she had to be careful not to do or say anything that could trigger his emotions. *Id*. ¶ 13. She was overcome with the stress and worry regularly making sure her family was all okay, and she continues to balance the emotional needs of her son and her husband, which is a daily strain on her physically and psychologically. *Id*. ¶ 15.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Gloria Ann Mullings, the parent of Injured Servicemember Plaintiff Brent Alan Mullings, is seeking a solatium damages award in the amount of $2,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### d. Immediate Family Member Plaintiff Vernon Oscar Mullings - Parent

Immediate Family Member Vernon Oscar Mullings is the parent of Injured Servicemember Plaintiff Brent Alan Mullings. Vernon Oscar Mullings Declaration and Exhibits, ("Vernon Mullings Decl."). Mr. Mullings learned about the Attack from his daughter. Vernon Mullings Decl.

¶ 6. Upon hearing the new, he was shaking, scared and devastated by the news. *Id.* ¶ 6. He immediately rushed to his wife's workplace to tell her and then watched television to get more information about the Attack and his son, which only added to his concern. *Id*. ¶ 6. He learned his son was alive from his daughter-in-law, but had very little information otherwise, so he continued to stress about his son's well-being. *Id*. ¶ 7. Once his son finally returned home, Mr. Mullings noticed his son was different and suffering, and this had a significant impact on Mr. Mullings. *Id*. ¶ 12. Watching his son suffer triggered his own PTSD from his service in Vietnam. *Id*. ¶ 12. It was unbearable for him, and he was confined to his bed for a month. *Id*. ¶ 12. He eventually had to quit his job and own life was derailed by the Attack.  *Id*. ¶ 12. It saddens him to know that his son could have recurring spells of PTSD throughout his life. *Id*. ¶ 13.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Vernon Oscar Mullings, the parent of Injured Servicemember Plaintiff Brent Alan Mullings, is seeking a solatium damages award in the amount of $2,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### e. Immediate Family Member Plaintiff Heather Maureen Hector - Sibling

Immediate Family Member Heather Maureen Hector is the sibling of Injured Servicemember Plaintiff Brent Alan Mullings. Heather Maureen Hector Declaration and Exhibits, ("Heather Hector Decl."). Ms. Hector learned about the Attack from a friend and immediately rushed to tell her father, and it was awful for her to see her father's face when she told him. Heather Hector Decl. ¶ 6. Later, when her father called her to tell her brother was alive, she gut-wrenchingly listened to him crying while also stressing herself about her brother's well-being. *Id*. ¶ 7. Following the Attack, her brother's  injuries continued to have a lasting effect on her. *Id*. ¶ 17. She treads

lightly and watches what she says around her brother and always feels the need to make sure her family members are safe. *Id*. ¶ 17. She has had to watch her father struggle through a resurgence of his own PTSD. *Id*. ¶ 18. She grieves over the fact that her brother has had to carry the sights, memories, and weight of what happened during and after the Attack. *Id*. ¶ 19.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Heather Maureen Hector, the sibling of Injured Servicemember Plaintiff Brent Alan Mullings, is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### 12. Injured Servicemember Plaintiff Sy William Yost and One Immediate Family Member Plaintiff

#### a. Injured Servicemember Plaintiff Sy William Yost

Injured Servicemember Plaintiff Sy William Yost was severely and permanently injured both physically and psychologically from the Attack on Khobar Towers. Sy William Yost Declaration and Exhibits, ("Yost Decl.").

On June 25, 1996, the force of the blast wave surged through the building where Mr. Yost was located, throwing him out of his chair and knocking him unconscious. Yost Decl. ¶ 7. When he awoke, he was covered in shattered glass, bleeding from his head and arm, , and he had a ringing in his ears. *Id*. ¶ 7. He had to climb over furniture, debris, and shattered glass to get out of the building. *Id*. ¶ 8. Blood covered the walls and floors. *Id*. ¶ 8. Outside, he saw dust everywhere, people running around, and total chaos. *Id*. ¶ 9. He searched for survivors in Building 131 and provided first aid and buddy care as needed. *Id*. ¶ 9. He tried to help an acquaintance who was pinned to a wall by a large shard of glass through his chest, but he died in Mr. Yost's arms during the rescue, a horrific experience that is forever seared in Mr. Yost's brain. *Id*. ¶ 9. For his actions

following the Attack, Mr. Yost was awarded the Air Force Commendation Medal with Valor. *Id*. ¶ 9.

After a couple of hours, Mr. Yost finally got treatment for his own injuries. *Id*. ¶ 10. He was covered in blood and received stitches in his elbow where a piece of molten metal cut him, and on the top of his nose and chin where pieces of glass sliced him. *Id*. ¶ 10. Numerous scrapes and bruises covered his body, including a laceration on his scalp from a flying piece of glass. *Id*. ¶ 10. For his injuries from the Attack, he was awarded a Purple Heart. *Id*. ¶ 10.

Due to the immediate effects of PTSD that he experienced following the Attack, Mr. Yost resorted to physically exhausting himself each evening in order to induce sleep. *Id*. ¶¶ 11 and 14. He was paranoid for the remainder of his time at the Khobar Towers complex and built makeshift barriers to protect himself from flying glass and shrapnel in the event there was another attack. *Id*. ¶ 14. He felt vulnerable and scared on his plane back to the U.S. from Saudi Arabia because there was a rumor that the terrorists were going to shoot down aircraft. *Id*. ¶ 15. Even when safe at home, Mr. Yost felt constantly on edge and unsettled. *Id*. ¶ 19. He had frequent nightmares that left him sweaty and breathless. *Id*. ¶ 19. He felt numb and indifferent about everything he was doing and felt generally checked out. *Id*. ¶ 20. Eventually, Mr. Yost sought treatment through the VA. As a result of the Attack, he is rated disabled by the VA, including a rating of 30% disabled due to PTSD, 50% disabled due to sleep apnea, and 10% disabled due to tinnitus, which make up 90% of the 100% VA disability rating. *Id*. ¶¶ 22, 23.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Sy William Yost is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 90% attributable to

the Attack.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### a. Immediate Family Member Plaintiff Maria Star Yost – Subsequent Spouse

Immediate Family Member Plaintiff Maria Star Yost is the spouse of Injured Servicemember Plaintiff Sy William Yost. Maria Star Yost Declarations and Exhibits ("Maria Yost Decl.").  Mrs. Yost learned about the Attack while watching the news and was distraught and crying because she did not know if her husband was alive or injured.  Maria Yost Decl. ¶ 7. Although they were not married at the time of the attack, Mrs. Yost was engaged to Injured Servicemember Plaintiff Sy William Yost, and had been living with him for almost two years. *Id.* ¶ 6.  When her fiancé returned from Saudi Arabia, they married a few months later on February 22, 1997.  *Id.* ¶ 6 and Ex. C Marriage Certificate.  As a result of her husband's injuries and sleep issues from the Attack, Mrs. Yost is unable to get a full night of sleep.  *Id.* ¶ 18.  She constantly worries and experiences fatigue and emotional stress in her marriage.  *Id.* ¶ 18.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Plaintiff Maria Star Yost, spouse of Injured Servicemember Plaintiff Sy William Yost, is seeking a solatium damages award in the amount of $4,000,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).  See also *Christie,* 2020 WL 3606273, at *19 (holding that a fiancé at the time of the Attack who became the injured servicemember's wife was the functional equivalent of a spouse where there was a bond that was the functional equivalent of marriage).  See *supra* regarding further argument in section V of this memorandum.

### 13. *Christie* Judgment Holder Clayton Omar Zook's Three Immediate Family Member Plaintiffs

#### a. *Christie* Judgment Holder – Clayton Omar Zoom

*Christie* judgment holder Clayton Omar Zook was serving in the United States Air Force when he was severely and permanently injured both physically and psychologically from the Attack on Khobar Towers. On July 2, 2020, this Court entered final judgment on liability and damages in favor of injured victim, Clayton Omar Zook, for the June 25, 1996, Khobar Towers attack, for the amount of $7,000,000. *Christie,* 2020 WL 3606273, at *24. Clayton Omar Zook has been rated 90% disabled by the VA. *Id.* at *24.

#### b. Immediate Family Member Plaintiff Serena Elizabeth Douglass – Stepsibling

Immediate Family Member Plaintiff Serena Elizabeth Douglass is the stepsibling of *Christie* judgment holder Clayton Omar Zook. Serena Elizabeth Douglass Declarations and Exhibits ("Serena Douglass Decl."). Ms. Douglass was overcome with fear, anxiety and worry when she learned about the Attack from her parents. Serena Douglass Decl. ¶ 6. She was only fourteen years old at the time of the attack and did not know how to handle such a traumatic event and the thought of losing her big brother left her feeling completely distraught. *Id.* ¶ 6. When her brother returned from Saudi Arabia, Ms. Douglass immediately noticed that he had changed and that he felt like a stranger. *Id.* ¶ 12. As a result of the Attack, Ms. Douglass feels unsettled and unsafe in her life and has to seek professional help to cope with the depression and anxiety she experiences. *Id.* ¶ 12.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Plaintiff Serena Elizabeth Douglass, stepsister of *Christie* judgment holder Clayton Omar Zook, is seeking a solatium damages award in the amount of $1,250,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for

awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).  See *Valore*, 700 F. Supp. 2d at 86 (holding that circumstances warrant viewing a non-immediate relative of a terrorist victim as the functional equivalent of an immediate family member, and thus entitled to the same damages).  See *supra* regarding further argument in section V of this memorandum.  See additionally *Ackley*, 2022 WL 3354720 at *77 (holding that young age at the time of an attack may lessen awareness but did not lessen distress growing up with the victim suffering from injuries).

### c.  Immediate Family Member Plaintiff Sarah Grace Douglass - Stepsibling

Immediate Family Member Plaintiff Sarah Grace Douglass is the stepsibling of *Christie* judgment holder Clayton Omar Zook. Sarah Grace Douglass Declarations and Exhibits ("Sarah Douglass Decl.").  Although Ms. Douglass was only twelve years old at the time of the Attack, her parents sat her down and informed her that there had been an attack on the base where her brother was stationed.  Sarah Douglass Decl. ¶ 6.  She was so frightened for her brother's safety, and she remained in a constant state of fear for days.  *Id.* ¶ 6-7.  After the Attack, the connection between Ms. Douglass and her brother was strained and she began to feel anxious not knowing his distance was the result of his injuries.  *Id.* ¶ 11.  Ms. Douglass was deeply impacted by the perceived rejection from her brother and the effect her brother's injuries had upon her whole family that she began experiencing severe depression requiring professional help. *Id.* ¶ 13.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Plaintiff Sarah Grace Douglass, stepsister of *Christie* judgment holder Clayton Omar Zook, is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).  See *Valore*, 700 F. Supp. 2d at 86 (holding that circumstances warrant viewing a non-immediate relative of a

terrorist victim as the functional equivalent of an immediate family member, and thus entitled to the same damages). See *supra* regarding further argument in section V of this memorandum. See additionally *Ackley*, 2022 WL 3354720 at *77 (holding that young age at the time of an attack may lessen awareness but did not lessen distress growing up with the victim suffering from injuries).

### d. Immediate Family Member Plaintiff Steven Millard Douglass - Stepparent

Immediate Family Member Plaintiff Steven Millard Douglass is the stepparent of *Christie* judgment holder Clayton Omar Zook. Steven Millard Douglass Declarations and Exhibits ("Steven Douglass Decl."). Mr. Douglass was awoken in the middle of the night by a phone call from his son informing him of the Attack. Steven Douglass Decl. ¶ 6. It was horrifying hearing the details of the Attack and Mr. Douglass was very distraught. *Id.* ¶ 6. When his son returned home a few months after the Attack, he was not the same person as he was when he left, and Mr. Douglass felt helpless watching him suffer. *Id.* ¶ 9. In an attempt to be a strong support system for his son, Mr. Douglass relocated several times to live near him. *Id.* ¶ 10. He grieves that his son still suffers with injuries and that the Attack still has such a negative effect upon his entire family. *Id.* ¶ 11.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Plaintiff Steven Millard Douglass, stepparent of *Christie* judgment holder Clayton Omar Zook, is seeking a solatium damages award in the amount of $2,500,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). See also *Heiser II,* 659 F. Supp. 2d at 29 (holding that non-adoptive stepparents were entitled to damages because they were the functional equivalent of immediate family members.). See *supra* regarding further argument in section V of this memorandum.

14. **Injured Servicemember Plaintiff Joey Laurier Morrissette and Two Immediate Family Member Plaintiffs**

   a.  **Injured Servicemember Plaintiff Joey Laurier Morrissette**

Injured Servicemember Plaintiff Joey Laurier Morrissette was severely and permanently injured both physically and psychologically from the Attack on Khobar Towers. Joey Laurier Morrissette Declaration and Exhibits, ("Morrissette Decl.").

On June 25, 1996, the rumble and pressure of the explosion caused Mr. Morrissette to jump from his bed, narrowly avoiding being hit by a door that had been blown off its hinges. Morrissette Decl. ¶ 7. He was frightened and it felt like everything was moving in slow motion. *Id.* ¶¶ 7 and 8. Heavy dust filled the air around him irritating his eyes. *Id.* ¶ 8. Mr. Morrissette scrambled to the door and went into the hallway where he found his suitemates bloodied and injured, and he followed them as they ran to escape the building. *Id.* ¶¶ 8 and 9. In the stairwell, Mr. Morrissette saw blood covering the walls and he helped carry an injured man to safety.  He realized that his bare feet had been severely lacerated by the shards of shattered glass that covered the floor, so he made his way to get treatment. *Id.* ¶¶ 9 and 10. At triage, there was a threat of another attack, and Mr. Morrissette was trampled by people frantically trying to find safety. *Id.* ¶ 11. Eventually, Mr. Morrissette was carried to an underground area where he could sit down, rest, and gather information, and he discovered how close he was to the bomb site just moments before the Attack. *Id.* ¶ 12. He was in shock, confused, tense, unsettled, worried, concerned, and nervous. *Id.* ¶ 12. He was so anxious, and he felt like something tragic could happen again at any moment. *Id.* ¶ 12. Mr. Morrissette's feet were throbbing, pain radiated throughout his body, and he had numerous lacerations from pieces of glass and debris, for which he performed first-aid.  *Id.* ¶ 13.  He did not seek medical treatment that evening because he did not want to take away help from others who he felt needed it more. *Id.* ¶ 13. For his injuries from the Attack, he was offered a Purple Heart,

but he did not think that he was deserving of such a medal compared to what others suffered, so he declined it. *Id.* ¶ 13.

During the days following the bombing, Mr. Morrissette was tasked with cleaning up glass and debris, wiping down the bloodstains, and loading the injured onto planes heading to Germany for treatment. *Id.* ¶ 17. He also searched for remnants from the explosion. *Id.* ¶ 17. For his actions following the Attack, he was awarded the Air Force Achievement Medal, the Armed Forces Expeditionary Medal, and the Certificate of Appreciation. *Id.* ¶ 17.

The chaotic and horrific scenes Mr. Morrissette observed during and immediately after the Attack, and the devastation and loss he witnessed in the days after, caused him severe emotional distress that continues to haunt him today. *Id.* ¶ 18. Mr. Morrissette suffered significant permanent injuries including severe cuts to his feet which resulted in scarring and other residual effects. *Id.* ¶ 24. He suffers from debilitating PTSD and associated symptoms, including chronic sleep impairment, recurring panic attacks, and severe depression. *Id.* ¶ 24. For PTSD, he is rated by VA as 100% disabled and unemployable due to his injuries from the Attack. *Id.* ¶ 24.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Joey Laurier Morrissette is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 100%. See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### b. Immediate Family Member Plaintiff Diane Theresa Morrissette - Parent

Immediate Family Member Plaintiff Diane Theresa Morrissette is the parent of Injured Servicemember Plaintiff Joey Laurier Morrissette.  Diane Theresa Morrissette Declaration and

Exhibits ("Diane Morrissette Decl.").  Mrs. Morrisette had no idea if her son was alive, dead, injured, or safe when she first heard the message on her answering machine informing her of the Attack.  Diane Morrisette Decl. ¶ 6.  Following the Attack, Mrs. Morrissette noticed an obvious shift in her son's personality, and she could immediately tell that he was struggling emotionally and psychologically.  *Id.* ¶ 11.  Mrs. Morrissette took care of her son for six years after the Attack because he needed constant care.  *Id.* ¶ 11.  It was gut-wrenching for Mrs. Morrissette to listen to what her son went through because of the Attack. *Id.* ¶ 12.  Mrs. Morrissette is still consumed with worry and anxiety about her son all the time and she hurts for him and the injuries that he sustained from the Attack.  *Id.* ¶ 13.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Plaintiff Diane Theresa Morrissette, parent of Injured Servicemember Plaintiff Joey Laurier Morrissette, is seeking a solatium damages award in the amount of $2,500,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### c. Immediate Family Member Plaintiff Natasha Kami Morrissette - Sibling

Immediate Family Member Natasha Kami Morrissette is the sibling of Injured Servicemember Plaintiff Joey Laurier Morrissette.  Natasha Kami Morrissette Declaration and Exhibits ("Natasha Morrissette Decl.").  Ms. Morrisette first learned of the Attack when her mother called her while she was babysitting and she will never forget the horrible feelings that came over her, which made her sick to her stomach.  Natasha Morrissette Decl. ¶ 6.  She cried and went straight home to be with her parents as they anxiously waited for more information.  *Id*. ¶ 7.  Ms. Morrissette was so scared when her brother returned home and was not acting like himself, and she found it very upsetting to see her brother change so much for the worse.  *Id*. ¶ 7.  In the years

following the Attack, Ms. Morrissette needed to take time off from work and caring for her own family in order to watch after and care for her brother because he needed constant care and assistance, causing her a significant amount of anxiety and sleep issues. *Id*. ¶ 12.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Plaintiff Natasha Kami Morrissette, the sibling of Injured Servicemember Plaintiff Joey Laurier Morrissette, is seeking a solatium damages award in the amount of $1,250,000.   See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). See also *Ackley*, 2022 WL 3354720 at *77 (holding that young age at the time of an attack may lessen awareness but did not lessen distress growing up with the victim suffering from injuries).

### 15.   Injured Servicemember Plaintiff Nathan Elliot Wheat and One Immediate Family Member Plaintiff

#### a. Injured Servicemember Plaintiff Nathan Elliott Wheat

Injured Servicemember Plaintiff Nathan Elliott Wheat was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Nathan Elliott Wheat Declaration and Exhibits, ("Wheat Decl.").

On June 25, 1996, the blast force of the explosion launched Mr. Wheat into the air. Wheat Decl. ¶ 7.  A coffee table was blown into the air and knocked Mr. Wheat to the floor. *Id.* ¶ 7. Mr. Wheat's back was seriously injured, and he was dazed. *Id.* ¶ 7. A glass door behind him had exploded and sprayed shards of glass directly at him, deeply penetrating the skin on his left arm and his head near the scalp. *Id.* ¶ 7. After Mr. Wheat gathered his senses, he had to feel his way through glass and debris out of the room since it was dark, and he had lost his glasses in the explosion. *Id.* ¶ 8. He jumped off an elevated ground-floor balcony to escape, and instantly felt severe pain in his knee when he landed. *Id.* ¶ 8. Nonetheless, he assisted with search and rescue at

the blast site by following the voices calling for help, an experience that is unforgettable. *Id.* ¶ 9. He found one man whose legs had been blown off. *Id.* ¶ 9. Mr. Wheat held the man's intestines in his own hands as he carried him out of the building. *Id.* ¶ 9. Mr. Wheat's fear was exacerbated when there was a threat of another enemy attack amid it all. *Id.* ¶ 10.

The severe pain in Mr. Wheat's knee and back eventually overtook him, and he was forced to stop assisting others and seek treatment for himself. *Id.* ¶ 11. At triage, Mr. Wheat's wounds from the glass shards in his left arm and hairline were cleaned and treated. *Id.* ¶ 11. For his injuries from the Attack, Mr. Wheat was awarded a Purple Heart. *Id.* ¶ 11. Despite the pain remaining in his back, he continued to assist in the search and rescue that night into the next day, and he continued to work at the Khobar Towers complex for about three more months after the Attack. *Id.* ¶¶ 12, 16. For his actions following the Attack, he was awarded a Certificate of Appreciation and the Armed Forces Expeditionary Medal. *Id.* ¶¶ 12, 15. The injury to his knee persisted and he acquired a limp, and excruciating back pain set in. *Id.* ¶ 15. He barely slept more than two hours at a time. *Id.* ¶ 16. Mr. Wheat worked the night shift, and there were often unexpected sounds, like a vehicle backfiring, that caused him to take cover. *Id.* ¶ 16. He was anxious for the remainder of his time at the complex, always anticipating another attack. *Id.* ¶ 16.

Due to his injuries from the Attack, Mr. Wheat received a medical waiver, so he did not deploy again. *Id.* ¶ 18. Three years later, he planned to re-enlist in the Air Force, but his back pain was too much to bear, and he was medically discharged from the Air Force. *Id.* ¶ 18. Mr. Wheat no longer engages in many of his favorite physical activities because he suffered an L4-L5 compression fracture in the Attack. *Id.* ¶ 21. The VA rated him 40% disabled due to his back injury. *Id.* ¶ 21. The Attack also left Mr. Wheat with psychological injuries. *Id.* ¶ 22. He jumps at loud noises and cannot attend any event that involves fireworks. *Id.* ¶ 22. He is hypervigilant, less

personable, and shuts down to avoid things rather than dealing with them. *Id.* ¶ 22. His avoidance puts a lot of tension on his personal relationships. *Id.* ¶ 22. He still has scars on his arm from the glass shrapnel wounds, his back injury required prolonged therapy and medication and he continues to see a chiropractor, and every year around the anniversary of the Attack, he finds himself very emotional and distressed. *Id.* ¶ 23.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Nathan Elliott Wheat is seeking a compensatory damages award in the amount of $6,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 40%. See *Schooley*, 2019 WL 2717888, at \*75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at \*23-24 (adopting the *Schooley* "basic rubric").

### b. Immediate Family Member Plaintiff Donald Allen What - Parent

Immediate Family Member Plaintiff Donald Allen Wheat is the parent of Injured Servicemember Plaintiff Nathan Elliott Wheat. Donald Elliott Wheat Declaration and Exhibits ("Donald Wheat Decl.").  Mr. Wheat first learned of the Attack on the radio news, and he became scared and worried as he did not know if his son was even alive.  Donald Wheat Decl. ¶ 10.  When Mr. Wheat finally received confirmation that his son was alive but injured, the pain, anguish, and helplessness that he felt was almost impossible to describe. *Id.* ¶ 17.  Knowing that his son had to stay at Khobar Towers for several weeks after the Attack was very distressing as he feared another attack could happen.  *Id.* ¶ 9.  After the Attack, Mr. Wheat realized that his son was noticeably different, and Mr. Wheat felt as if he had lost his companion. *Id.* ¶ 18.  Watching his son suffer and struggle has taken a toll on Mr. Wheat.  *Id.* ¶ 18.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declarations and exhibits, Plaintiff Donald Allen Wheat, the parent of Injured Servicemember Plaintiff Nathan Elliott Wheat, is seeking a solatium damages award in the amount of $2,500,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### 16.  Injured Servicemember Plaintiff Vincent Gene Oliver TSgt, USAF (Ret) and One Immediate Family Member Plaintiff

#### a. Injured Servicemember Plaintiff Vincent Gene Oliver TSgt, USAF (Ret)

Injured Servicemember Plaintiff Vincent Gene Oliver TSgt, USAF (Ret) was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Vincent Gene Oliver Declaration and Exhibits, ("Oliver Decl.").

On June 25, 1996, the loud, sudden explosion jolted Mr. Oliver awake and he felt a wall of high-pressure air hit him. Oliver Decl. ¶ 7. The glass doors nearby shattered, sending shards of glass directly at him, puncturing  his leg. *Id.* ¶ 7. When he got his wits about him, Mr. Oliver saw that the lower half of his body was bloody. *Id.* ¶ 7. He was in shock, and although barefoot, he rushed out of his room. *Id.* ¶¶ 7-8. Three flights down the stairway, a friend saw Mr. Oliver and his bloodied feet, threw him over his shoulders, and carried him down the remaining two flights of stairs and out of the building. *Id.* ¶ 8. Mr. Oliver sat on the ground outside and watched his fellow Airmen run around, covered in blood and dirt. *Id.* ¶ 8. Mr. Oliver eventually got up and hobbled barefoot through the complex to the makeshift triage center where he was put on a table and had both legs cleaned and stitched.  *Id.* ¶ 8. Due to the injuries in his legs and feet, Mr. Oliver was unable to walk without experiencing severe pain, which left him bedridden for several days. *Id.* ¶ 10. He still has scars on his legs where the glass tore his skin. *Id.* ¶ 10. *Id.* ¶ 8. For his injuries from the Attack, Mr. Oliver was awarded a Purple Heart. *Id.* ¶ 8.

Once the initial shock of what happened settled, Mr. Oliver realized his ears were hurting and ringing, and he could not hear well. *Id.* ¶ 9. The ringing continues today. *Id.* ¶ 9. The VA rated Mr. Oliver as 10% disabled, attributable to the tinnitus he sustained in the Attack. *Id.* ¶ 9.

Right after the Attack, Mr. Oliver began to have trouble sleeping. *Id.* ¶ 12. He could not stop thinking about the Attack. *Id.* ¶ 12. He was paranoid and hypervigilant. *Id.* ¶ 12. He constantly feared another attack. *Id.* ¶ 12. Mr. Oliver attended therapy sessions which provided him enough relief to finish his deployment, but he was never at peace again, even once back in the States. *Id.* ¶ 13. Mr. Oliver stopped trusting people and developed a fear of public places and large crowds. *Id.* ¶ 16.

Mr. Oliver also struggled professionally, having lost all interest in his work. *Id.* ¶ 17. When he went for his next medical clearance, he was determined to be psychologically incapable of another deployment. *Id.* ¶ 17. He later retired from the Air Force and sought other employment, but he struggled there as well. *Id.* ¶ 17. He could not tolerate being around so many people and his avoidance of large groups of people, coupled with his overwhelming anxiety and distrust, made it difficult for him to work team jobs. *Id.* ¶ 17. Mr. Oliver continued to treat through a therapist for his  severe symptoms of post-traumatic stress disorder caused by the Attack. *Id.* ¶ 18.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Vincent Gene Oliver TSgt, USAF (Ret) is seeking a compensatory damages award in the amount of $5,000,000, which is commensurate with a baseline award based upon the severity of his injuries and his VA rating of 10%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie*, 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### b. Immediate Family Plaintiff Tamara Lee Oliver - Spouse

Immediate Family Member Plaintiff Tamara Lee Oliver is the spouse of Injured Servicemember Plaintiff Vincent Gene Oliver TSgt, USAF (Ret).  Tamara Oliver Declaration and Exhibits ("Tamara Oliver Decl.").  Mrs. Oliver first learned of the Attack on the television news. Tamara Oliver Decl. ¶ 10. She was so scared that she fell to her knees crying hysterically and praying. *Id.* ¶ 10.  She cried all night as she waited to hear whether her husband was alive or dead. *Id.* ¶ 11.   After the Attack, Mrs. Oliver realized that her husband was not the same.  *Id.* ¶ 14. Because of her husband's injuries, he struggled to maintain gainful employment, and Mrs. Oliver had to become the sole provider for the family, which was psychologically and emotionally draining for her.  *Id.* ¶ 17.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Plaintiff Tamara Lee Oliver, the spouse of Injured Servicemember Plaintiff Vincent Gene Oliver, TSgt, USAF (Ret) is seeking a solatium damages award in the amount of $4,000,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### 17.  Injured Servicemember Plaintiff Steven Lee Brodt MSgt, USAF (Ret) and Three Immediate Family Member Plaintiffs

### a.  Injured Servicemember Plaintiff Steven Lee Brodt MSgt, USAF (Ret)

Injured Servicemember Plaintiff Steven Lee Brodt MSgt, USAF (Ret) was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Steven Lee Brodt Declaration and Exhibits, ("Brodt Decl.").

On June 25, 1996, the huge explosion shook the building in which Mr. Brodt was watching television, blowing glass shards from a nearby window at him, lacerating  his body. Brodt Decl. ¶ 7. He was barefoot and his right foot was bleeding profusely from a laceration. *Id.* ¶ 7. He put on

his shoes and began his escape from the building. *Id.* ¶ 8. The power was out, so the hallways and stairwells were dark, and it was hard to see the way out. *Id.* ¶ 8. He was distraught and afraid. *Id.* ¶ 8. Mr. Brodt struggled to exit the building due to the injury to his foot. *Id.* ¶ 9. Outside, he saw glass everywhere and people running. *Id.* ¶ 9. Mr. Brodt tried to help others evacuate the destroyed buildings, but the pain in his foot forced him to stop. *Id.* ¶ 10. He self-treated his injuries because he did not want to take medical attention away from others, but the cut on his foot was so deep that it should have been treated properly. *Id.* ¶ 10. As a result, the deep laceration on his foot kept reopening and he was left with a scar. *Id.* ¶ 10. For his injuries from the Attack, Mr. Brodt was awarded a Purple Heart. *Id.* ¶ 10.

The day after the Attack, Mr. Brodt assisted in the cleanup of the damaged buildings, which left him with vivid images of the horrors of the bombing. *Id.* ¶ 13. He saw bloody stairways and walls. *Id.* ¶ 13. He helped build temporary walls made from wood and plastic to cover the awful sights until proper repairs could be made. *Id.* ¶ 13. Mr. Brodt remained at Khobar Towers for a few weeks after the Attack, and while he tried to return to some normalcy, he spent much of his time talking about the Attack and experiencing nightmares which interfered with him getting restful sleep. *Id.* ¶¶ 12 and 14.

Once back home in the U.S., Mr. Brodt continued to struggle sleeping, he was hyper-vigilant, and became overprotective of his family. *Id.* ¶ 15. He was so determined to keep everyone safe that it was difficult for him to enjoy spending quality time with them. *Id.* ¶ 15. He became withdrawn and lost the ability to connect with others. *Id.* ¶ 15. When he eventually began talking about the Attack with his family, he would cry as he reflected on all the men who died and those who were severely injured. *Id.* ¶ 15. Mr. Brodt's doctors determined these were all symptoms of PTSD attributable to the Attack. *Id.* ¶ 16.

For the reasons set forth herein and the uncontroverted factual allegations in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Steven Lee Brodt MSgt, USAF (Ret) is seeking a compensatory damages award in the amount of $5,000,000, which is commensurate with an award where no VA disability rating is available but the person suffered the type of "severe physical injuries, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain," that warrant a baseline award of $5,000,000. *Schooley* 2717888 at *75 (quoting *Khaliq,* 33 F. Supp. 3d at 33).

**b. Immediate Family Member Plaintiff Un Suk Brodt - Spouse**

Immediate Family Member Plaintiff Un Suk Brodt is the spouse of Injured Servicemember Plaintiff Steven Lee Brodt. Un Suk Brodt Declaration and Exhibits ("Un Suk Brodt Decl."). Mrs. Brodt first learned of the Attack directly from Steven when he called her. She had not heard of the Attack before he called, so she was very confused and worried. Un Suk Brodt Decl. ¶ 16. As she developed a greater understanding of what happened, she was struck with so many emotions. *Id.* ¶ 7. When her husband came home after the Attack, Mrs. Brodt could see the severity of his injuries and she was shocked, and her heart ached for her husband. *Id.* ¶ 9. Her husband became overprotective of her and their children, to the extent that it was overbearing. *Id.* ¶ 12. Her husband was also more reserved and quieter, insulating their activities and time spent together. *Id.* ¶ 12. It was very hard for Mrs. Brodt to see such significant changes in her husband, and his pain became her pain. *Id.* ¶ 13. Since the Attack, Mrs. Brodt feels as though she has suffered the emotional loss of her husband. *Id.* ¶ 15.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Un Suk Brodt, the spouse of Injured Servicemember Plaintiff Steven Lee Brodt, is seeking a solatium damages award in the amount of

$4,000,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### c. Immediate Family Member Plaintiff Steven Han Brodt - Child

Immediate Family Member Plaintiff Steven Han Brodt is the child of Injured Servicemember Plaintiff Steven Lee Brodt. Steven Han Brodt Declaration and Exhibits ("Steven Han Brodt Decl."). Mr. Brodt first learned of the Attack from his father when he called, but he was so young and shielded from the details. Steven Han Brodt Decl. ¶ 6. As he got older, Mr. Brodt learned more about the Attack and came to realize how lucky his dad was to be alive. *Id.* ¶ 7. After the Attack, Mr. Brodt's father became very protective over Mr. Brodt and his brother, causing Mr. Brodt  frustration, and sometimes anger, with his father . *Id.* ¶ 12. The home environment became stressful for him, with his father always on high alert and his mother increasingly tense over time. *Id.* ¶ 12. At times, Mr. Brodt felt like the parent caring for the injured child, his father. *Id.* ¶ 13. Now, Mr. Brodt oftentimes feels guilty for being upset with his father's over-protective nature, because he now realizes it was a result of the Attack and everything that his father endured. *Id.* ¶ 13. When thinking about his father's experience at Khobar Towers, Mr. Brodt feels profound sadness. *Id.* ¶ 14. Mr. Brodt often takes time off from work to be with his father to ensure that he has a good life, given what he has been through. *Id.* ¶ 15.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Steven Han Brodt, the child of Injured Servicemember Plaintiff Steven Lee Brodt, is seeking a solatium damages award in the amount of $1,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium

damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).  See additionally *Ackley*, 2022 WL 3354720 at *77 (holding that young age at the time of an attack may lessen awareness but did not lessen distress growing up with the victim suffering from injuries).

### d. Immediate Family Member Plaintiff Samuel John Brodt - Child

Immediate Family Member Plaintiff Samuel John Brodt is the child of Injured Servicemember Plaintiff Steven Lee Brodt. Samuel John Brodt Declaration and Exhibits ("Samuel John Brodt Decl."). Mr. Brodt was so young at the time of the Attack and therefore not given many details, but he knew his father was injured which caused him to be scared and worried. Samuel John Brodt Decl. ¶ 6. When his father came home from Khobar Towers after the Attack, his father was strict and overprotective, which made Mr. Brodt angry and frustrated with his father.  *Id.* ¶ 13. Now, as he has matured and learned more about the Attack and what his father went through as a result, Mr. Brodt feels guilty for his frustrations with his father. *Id.* ¶ 15.  Mr. Brodt  is grateful that his father has persevered despite experiencing such a devastating ordeal, however, Mr. Brodt somberly reflects on how much of his father he lost to the Attack. *Id.* ¶ 15.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Plaintiff Samuel John Brodt, the child of Steven Lee Brodt, is seeking a solatium damages award in the amount of $1,5000,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). See additionally *Ackley*, 2022 WL 3354720 at *77 (holding that young age at the time of an attack may lessen awareness but did not lessen distress growing up with the victim suffering from injuries).

**18. Injured Servicemember Plaintiff Lt. Co. Steven Peter Goff, M.D., deceased, through His Estate by Personal Representative Shirley Ann Goff and Three Immediate Family Member Plaintiffs**

**a.   Injured Servicemember Plaintiff Estate of Lt. Co. Steven Peter Goff, M.D., deceased through his Estate by Personal Representative Shirley Ann Goff**

Injured Servicemember Plaintiff Lt. Co. Steven Peter Goff, M.D. was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Shirley Ann Goff, Personal Representative of the Estate of Lt. Co. Steven Peter Goff M.D. Declaration and Exhibits, ("Goff Decl.").

On June 25, 1996, the force of the explosion sprayed glass with so much power that a large shard of glass gored deep into Lt. Co. Goff's chest, transecting his aorta, a life-threatening injury. Goff Decl. ¶¶ 11 and 12. For his injuries from the Attack, Lt. Co. Goff was awarded a Purple Heart. *Id.* ¶ 12.

Despite his serious injuries, Lt. Co. Goff provided life-saving medical care to his fellow Airmen. *Id.* ¶ 13. For hours after the Attack, he tirelessly helped treat over 200 injured personnel until he was physically pulled off a patient to receive his own life-saving treatment. *Id.* ¶ 13. For his extraordinary heroism following the Attack, Lt. Co. Goff was awarded the Airman's Medal, the highest honor given by the Air Force, and the Meritorious Service Medal. *Id.* ¶ 13.

Lt. Co. Goff returned home to the U.S. in August. *Id.* ¶ 18. Physically, he did not have full range of motion with his left arm due to the severe injury from the Attack, and his recovery was painful and slow. *Id.* ¶ 18. He became very reserved, quiet, and withdrawn, and  he did not want to talk about the Attack or his injuries. *Id.* ¶ 18. He was not the same happy, outgoing man he was before the Attack. *Id.* ¶ 18. He was not interested in visiting or spending time with his family or friends as he used to enjoy.  *Id.* ¶ 19.

Ten years after the Attack, Lt. Co. Goff finally acknowledged that he was struggling and suffering from extreme emotional distress because of the Attack. *Id.* ¶ 23. He began treatment for his psychological injuries, but he was not able to overcome them. *Id.* ¶ 23. Unfortunately, the Attack impacted Lt. Co. Goff so severely that he succumbed to the mental anguish and extreme emotional pain that he suffered as a result. *Id.* ¶ 24.  On September 4, 2006, he died as a result of suicide. *Id.* ¶ 5.

For the reasons set forth herein and the uncontroverted factual allegations in the sworn declaration and exhibits of Shirley Ann Goff, Personal Representative for the Estate of Lt. Co. Steven Peter Goff, M.D., a baseline award of $5,000,000 is warranted where there is no VA rating available, but the person suffered "severe physical injuries, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain."  See *Schooley* 2717888 at *75 (quoting *Khaliq,* 33 F. Supp. 3d at 33).  See also *Ackley,* 2022 WL 3354720 at *52 (finding that based upon jurisdiction under 28 U.S.C. § 1605AI(4) it is appropriate for the legal representative of an estate of a member of the armed forces to be awarded pain and suffering damages for an injured servicemember who passed away).

**b.  Immediate Family Member Plaintiff Shirley Ann Goff – Parent**

Immediate Family Member Plaintiff Shirley Ann Goff is the parent of Injured Servicemember Plaintiff Lt. Co. Steven Peter Goff, M.D. Shirley Ann Goff Declaration and Exhibits ("Shirley Goff Decl."). Mrs. Goff first learned of the Attack on the radio. Shirley Goff Decl. ¶  8. She was so stressed and panicked. *Id.* ¶ 8. She felt helpless not being able to obtain information about her son, and the waiting was excruciating. *Id.* ¶ 9. Over the next few days, she received calls from various military officials, and her heart stopped every time. *Id.* ¶ 10. Finally, she heard from her son, and while she was relieved to know he was alive, but it pained her that she

was not able to take care of him. *Id.* ¶¶ 11, 12. When her son finally came home, Mrs. Goff was so happy to see him, but he closed himself off and it became difficult for Mrs. Goff to maintain a relationship with him. *Id.* ¶¶ 18, 19.  Mrs. Goff became depressed from worrying about her son so much, and she even sought treatment and took medication for her emotional distress. *Id.* ¶ 19. Her son finally confided in her that he was depressed and suffering from extreme emotional distress because of the Attack. *Id.* ¶ 23. Mrs. Goff prayed for his healing, but she lost her son to suicide shortly thereafter. *Id.* ¶ 23. Since then, Mrs. Goff has experienced an overwhelming amount of emotions and she attests that she will never be the same after losing her son.  *Id.* ¶ 26.

For the reasons set forth herein and the uncontroverted facts in her uncontroverted factual allegations accompanying sworn declaration and exhibits, Plaintiff Shirley Ann Goff, the parent of Lt. Co. Steven Peter Goff, M.D. deceased, is seeking a solatium damages award in the amount of $2,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### c.  Immediate Family Member Plaintiff Antoinette Marie Hovel – Sibling

Immediate Family Member Plaintiff Antoinette Marie Hovel is the sister of Injured Servicemember Plaintiff Lt. Co. Steven Peter Goff, M.D. Antoinette Marie Hovel Declaration and Exhibits ("Antoinette Hovel Decl."). Ms. Hovel first learned of the Attack from her parents, and she became shocked and worried, and she feared for her brother's life. Antoinette Hovel Decl. ¶ 6. She waited two excruciatingly long days until her brother finally called home and confirmed he was alive, but had a serious chest wound, which heightened Ms. Hovel's concern for her brother's well-being. *Id.* ¶ 8. Following the Attack, Ms. Hovel's brother seemed depressed and quiet, and it hurt her terribly to watch him suffer. *Id.* ¶ 11. Due to his sunken persona, their communication dwindled over time and their relationship suffered.  *Id.* ¶ 12. Looking back on her brother's

behavioral changes, Ms. Hovel realizes how much he was struggling. *Id.* ¶ 17. She feels guilty as a result of not recognizing it sooner, and she mourns the loss of her brother because of the Attack. *Id.* ¶ 17.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Plaintiff Antoinette Marie Hovel, the sibling of Lt. Co. Steven Peter Goff, M.D., is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### D. Immediate Family Member Plaintiff Kathryn Mary Ableidinger – Sibling

Immediate Family Member Plaintiff Kathryn Mary Ableidinger is the sibling of Injured Servicemember Plaintiff Lt. Co. Steven Peter Goff, M.D. Kathryn Mary Ableidinger Declaration and Exhibits ("Kathryn Ableidinger Decl."). Ms. Ableidinger first learned of the Attack from the television news, and she became very worried and panicked. Kathryn Ableidinger Decl. ¶ 6. She did not learn the status of her brother for two long days, and it was a difficult time waiting. *Id.* ¶ 7. After the Attack, Ms. Ableidinger saw her brother's chest wound and was shocked and sad at the thought of what he endured. *Id.* ¶ 10. Thereafter, their communication decreased as her brother had become withdrawn and quiet. *Id.* ¶ 11. Ms. Ableidinger missed her brother tremendously. *Id.* ¶ 14. Ms. Ableidinger feels that, although her brother physically came home from Khobar Towers, she lost her brother because of the Attack, and she is devastated by the thought of the extreme mental distress he must have been experiencing. *Id.* ¶ 16. She experiences guilt and sadness every day for being unable to help her brother with the pain that he endured for all those years after the Attack. *Id.* ¶ 16.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Plaintiff Kathryn Mary Ableidinger, the sibling of Lt. Co. Steven Peter Goff, M.D., is seeking a solatium damages award in the amount of $1,250,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### 19. Injured Servicemember Plaintiff James Michael Silvi CMSgt, USAF (Ret) and Three Immediate Family Member Plaintiffs

### a.   Injured Servicemember Plaintiff James Michael Silvi CMSgt, USAF (Ret)

Injured Servicemember Plaintiff James Michael Silvi CMSgt, USAF (Ret) was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. James Michael Silvi Declaration and Exhibits, ("Silvi Decl.").

On June 25, 1996, the explosion catapulted Mr. Silvi from a couch into a concrete wall. Silvi Decl. ¶7. Flying shrapnel and shards of glass lacerated his head and body. *Id.* ¶ 7. He heard an ear-piercing boom, and he was stunned. *Id.* ¶ 7. His head was pounding, pain radiated throughout his body, and his hearing was muffled. *Id.* ¶¶ 8-9. He was bleeding from his right foot due to a shrapnel wound, and blood dripped down his face from another shrapnel wound on his forehead. *Id.* ¶ 8. During his escape, he walked through broken glass, which lacerated the bottom of his bare feet. *Id.* ¶ 9. Since Mr. Silvi was in a position of leadership, he wanted to ensure everyone within his squadron was accounted for and receiving medical attention before he took care of himself, but his injuries forced him to stop, and he had to be carried out of the building. *Id.* ¶¶ 9-10.

Mr. Silvi sat outside the destroyed building and directed the evacuated personnel to a designated safe collection area. *Id.* ¶ 10.  He persistently coughed due to the dust and debris in the air until he was carried to triage where he helplessly awaited treatment. *Id.* ¶¶ 10-11. At one point,

there was a false alarm that the complex was under attack again and he was almost crushed by a stampede of people. *Id.* ¶ 11. Mr. Silvi finally received treatment for his wounds, which included stitches to the lacerations on his head and feet, and flushing out the dust and shrapnel from his eyes. *Id.* ¶ 12. For his injuries from the Attack, he was awarded a Purple Heart. *Id.* ¶ 12.

Mr. Silvi later learned that all nine men in his unit were severely injured, which caused him a great deal of emotional distress. *Id.* ¶ 13. He worked through the night to account for personnel and to make sure they were able to contact their families at home. *Id.* ¶ 14. When Mr. Silvi returned to his building, he was shocked by the damage and worked tirelessly to ensure personnel had suitable living quarters. *Id.* ¶ 14. For his actions following the Attack, he was awarded the Air Force Achievement Medal Third Oak Leaf Cluster with Valor. *Id.* ¶ 14.

For weeks after the Attack, Mr. Silvi worked 18–20-hour shifts dealing with the aftermath of the bomb. *Id.* ¶ 16. Since the Attack happened at night, nighttime was especially unsettling for him. *Id.* ¶ 17. Many nights, Mr. Silvi went room to room conducting wellness checks on Airmen. *Id.* ¶ 17. For his actions following the Attack, he was awarded the Air Force Commendation Medal First Oak Leaf Cluster. *Id.* ¶ 17.

After the Attack, Mr. Silvi became much more serious and guarded. *Id.* ¶ 18. He no longer had a go-getter mentality, and he did not want to go anywhere or do anything. *Id.* ¶ 18. He isolated himself, became very reclusive, and stopped spending time with anyone outside of his family. *Id.* ¶ 18. Mr. Silvi felt like a shell of himself and could not share what he was thinking and feeling. *Id.* ¶ 18. He got very stressed in leadership positions, which made it difficult for him to accept more demanding roles and progress professionally. *Id.* ¶ 19. He felt severe anxiety when in large groups and became hypervigilant, and his mind became focused on the safety of his family and himself. *Id.* ¶ 19. These symptoms of PTSD still plague him today. *Id.* ¶ 19.

He sought treatment for his injuries, both physical and psychological, and is rated a total combined disability rating of 90% for his injuries from the Attack, including residual scarring on his head with permanent nerve damage for which he is rated 10% disabled, plantar fasciitis in his right foot from the deep shrapnel wound for which he is rated 10% disabled, tinnitus for which he is rated 10% disabled, and PTSD with sleep disturbances and sleep apnea for which he is rated, respectively, 30% and 50%. *Id.* ¶ 21.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff James Michael Silvi CMSgt, USAF (Ret) is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 90%. See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### A. Immediate Family Member Plaintiffs Jo Ann Silvi - Spouse

Immediate Family Member Plaintiffs Jo Ann Silvi is the spouse of Injured Servicemember Plaintiff James Michael Silvi CMSgt, USAF (Ret).   Declaration and Exhibits ("Jo Ann Silvi Decl."). Mrs. Silvi first learned of the Attack from her daughter, who saw a report of the Attack on the news.   Jo Ann Silvi Decl. ¶ 6.   When Mrs. Silvi listened to the news report, she was convinced that she had just lost her husband and became hysterical. *Id.* ¶ 6. Mrs. Silvi experiences great sadness due to the impact the Attack has had on her husband and the residual effects the Attack has had on her marriage. *Id.* ¶18.   The joyous emotions that Mrs. Silvi should have been able to share with her husband and have been replaced with feelings of sorrow. *Id.* ¶18.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Jo Ann Silvi, the spouse of Injured Servicemember Plaintiff James Michael Silvi CMSgt, USAF (Ret), is seeking a solatium damages award in the amount of $4,000,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### b. Immediate Family Member Plaintiff Angela Christine Silvi – Child

Immediate Family Member Plaintiffs Angela Christine Silvi is the child of Injured Servicemember Plaintiff James Michael Silvi CMSgt, USAF (Ret).  Declaration and Exhibits ("Angela Silvi Decl.").  Ms. Silvi first learned of the Attack when she saw a news report on the television. Angela Silvi Decl. ¶ 6. She became extremely upset and worried that her father had been killed. *Id*. ¶ 6. Although she was only 16 at the time of the Attack, she realized that her father was different when he came home. *Id.* ¶ 6, 12.  Ms. Silvi feels like even though her father physically survived the Attack, an emotional part of him died.  *Id.* ¶14.  As a result of the Attack, Ms. Silvi believes that her father is forever changed, and she has been robbed of the close relationship that she used to have with him. *Id.* ¶14.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Plaintiff Angela Christine Silvi, the child of Injured Servicemember Plaintiff James Michael Silvi CMSgt, USAF (Ret), is seeking a solatium damages award in the amount of $1,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).  See additionally *Ackley*, 2022 WL 3354720 at *77 (holding that young age at the time of an attack may lessen awareness but did not lessen distress growing up with the victim suffering from injuries).

### c. Immediate Family Member Plaintiff Alison Elizabeth Silvi - Child

Immediate Family Member Plaintiffs Alison Elizabeth Silvi is the child of Injured Servicemember Plaintiff James Michael Silvi CMSgt, USAF (Ret).  Declaration and Exhibits ("Alison Silvi Decl.").  Ms. Silvi first learned of the Attack when she was watching television and a reporter announced that there was a bombing in Saudi Arabia where she knew her father was stationed.  Alison Silvi Decl. ¶ 6.  The images of the complex on the television scared her, and when Ms. Silvi told her mom about the Attack, her mother's reaction frightened her even more and made her feel very unsafe and frozen in fear believing that something horrible had happened to her father.  *Id.* ¶¶ 6-7.  Shortly after her father's return home from Saudi Arabia, Ms. Silvi noticed that something was different about him and he seemed constantly frustrated, which saddened her and made her feel scared.  *Id.* ¶¶ 13-14.  The Attack caused a lot of confusion, fear, and stress in her family growing up.  *Id.* ¶ 15.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Alison Elizabeth Silvi, the child of Injured Service Member Plaintiff James Michael Silvi CMSgt, USAF (Ret), is seeking a solatium damages award in the amount of $1,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). See additionally *Ackley*, 2022 WL 3354720 at *77 (holding that young age at the time of an attack may lessen awareness but did not lessen distress growing up with the victim suffering from injuries).

20. **Injured Servicemember Plaintiff David Anthony Toole and Two Immediate Family Member Plaintiffs**

a. **Injured Servicemember Plaintiff David Anthony Toole**

Injured Servicemember Plaintiff David Anthony Toole was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. David Anthony Toole Declaration and Exhibits, ("Toole Decl.").

On June 25, 1996, the explosion threw Mr. Toole across the room. Toole Decl. ¶ 7. The doors of his room were blown off their hinges and furniture was hurled about. *Id.* ¶ 7. When he gathered his senses and opened his eyes, he was laying on the floor alongside a metal locker that used to stand across the room. *Id.* ¶ 8. Glass and debris covered the floor. *Id.* ¶ 8. His shirt was covered in blood, his head ached, his ears were ringing, and he had severe lacerations to his head and back. *Id.* ¶ 8. He frantically crawled over furniture, glass, and debris to escape the room. *Id.* ¶ 8. The air outside the building was filled with smoke and smelled of burning chemicals. *Id.* ¶ 9. He saw people coming through the smoking building, injured people administering buddy aid to other injured people, and the Saudi civilians running to help, which initially looked like the enemy coming to attack. *Id.* ¶ 9. He feared that they were going to get hit by a second bomb. *Id.* ¶ 9.

At triage, Mr. Toole had lost so much blood from the lacerations that it was dangerous for him to move. *Id.* ¶ 10. At the triage center he witnessed countless servicemembers stumble, crawl, or be carried in for lifesaving treatment. *Id.* ¶ 10. He will never forget the things he saw in the triage center that night. *Id.* ¶ 10. The shards of glass in his back were removed and the laceration on his head was sutured. *Id.* ¶ 11. For his injuries from the Attack, he was awarded a Purple Heart. *Id.* ¶ 11. For many days to follow, Mr. Toole could not stop wondering why he survived, and others did not, and it devastated him. *Id.* ¶ 12.

Mr. Toole was scheduled to leave Khobar Towers a few days after the Attack, but mechanical issues with the plane forced him to return to the complex overnight, which induced his first of many panic attacks. *Id.* ¶ 13. He became very distressed and did not sleep that entire night due to anxiety and fear. *Id.* ¶ 13. Once back home in the U.S., Mr. Toole quickly began experiencing terrible nightmares that left him panicked. *Id.* ¶ 14. He mourned the loss of his friends and became severely depressed. *Id.* ¶ 14. Bombings and explosions dominated his thoughts. *Id.* ¶ 14. His inability to forget about the Attack and process what he had experienced began to affect his home life. *Id.* ¶ 15. He could not find peace and he lost his patience and grew angry easily. *Id.* ¶ 26. He avoided social situations and became significantly less outgoing. *Id.* ¶ 26. He withdrew from others, including his family, to deal with his trauma alone. *Id.* ¶ 26. Mr. Toole was terrified of being deployed to the Middle East again, so he resigned from the Air Force not long after the Attack. *Id.* ¶ 27. Additionally, due to his anxiety, he cannot tolerate flying and has had to decline opportunities to travel overseas. *Id.* ¶ 27. Due to his new preference for privacy and solitude, he lost touch with his military friends and struggled to maintain romantic relationships. *Id.* ¶ 27. He continues to suffer from severe anxiety, memory loss, and sleep impairment, which cause him to become stressed easily, shut down emotionally, or grow frustrated towards others. *Id.* ¶ 28. Mr. Toole is reminded of the sound of the truck bomb with every loud noise, and he is paranoid that the worst can happen even in the most mundane of circumstances. *Id.* ¶ 28. He fears that he will not be as lucky to escape or be spared should something happen again, so he always stays near an exit with a clear escape path. *Id.* ¶ 28.

Mr. Toole finally sought treatment for his injuries and was determined to be suffering from PTSD and tinnitus, both caused by the Attack. *Id.* ¶ 29. The VA rated him with 60% total combined disability, 50% for PTSD and 10% for tinnitus. *Id.* ¶ 29. He also still has a scar on his head from

the deep glass laceration and sutures, and he suffers from periodic migraines that can be debilitating. *Id.* ¶ 29. He continues to struggle with feelings of guilt and remorse because of the loss of his friends and his own survival. *Id.* ¶ 30. He continues to treat at the VA for his psychological injuries, and probably will continue to do so for a long time to come as he still carries the emotional scars of both the terror that he experienced and the horror that he witnessed. *Id.* ¶ 30.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff David Anthony Toole is seeking a compensatory damages award in the amount of $6,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 60%. See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### a.  Immediate Family Member Plaintiff Michele Ann Canchola – Stepparent

Immediate Family Member Plaintiff Michele Ann Canchola is the stepparent of Injured Servicemember Plaintiff David Anthony Toole.  Michele Ann Canchola declaration and exhibits ("Michele Canchola Decl.").  Mrs. Canchola first learned of the Attack when her son called her to inform her that he was alive.  Michele Canchola Decl. ¶ 5. She was instantly startled and shaken to hear how scared he sounded. *Id.* ¶ 5.  She grew very scared for her son's safety and felt completely helpless and heartbroken over the situation.  *Id.* ¶ 5.  Once her son returned home after the Attack, Mrs. Canchola began to worry about her son because he was so emotionally distant, which was unlike him.  *Id.* ¶ 17.  It was unbearable for Mrs. Canchola to watch her child suffer and she began feeling depressed and anxious as she was unsure how to help her son.  *Id.* ¶ 17.  It

is hard for Mrs. Canchola to bear the grief that her son has endured these 26 years since the Attack, and her family's quality of life has been severely diminished since the Attack. *Id.* ¶ 20.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Michele Ann Canchola, the stepparent of Injured Servicemember Plaintiff David Anthony Toole's stepparent, is seeking a solatium damages award in the amount of $2,500,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). See also *Heiser II,* 659 F. Supp. 2d at 29 (holding that non-adoptive stepparents were entitled to damages because they were the functional equivalent of immediate family members.). See *supra* regarding further argument in section V of this memorandum.

### b. Immediate Family Member Plaintiff Timothy Louis Canchola - Stepparent

Immediate Family Member Plaintiff Timothy Louis Canchola is the stepparent of Injured Servicemember Plaintiff David Anthony Toole.   Timothy Louis Canchola Declaration and Exhibits ("Timothy Canchola Decl.").  Mr. Canchola first learned of the Attack when his son called in the middle of the night to tell him about the Attack.  Timothy Canchola Decl. ¶ 6. They spoke for only a few minutes, which left Mr. Canchola feeling in the dark and very scared, nervous and helpless. *Id.* ¶ 6.  It would be three excruciatingly long days before Mr. Canchola learned any further information about the status of his son, which then exacerbated his anxieties. *Id.* ¶ 7.  When his son returned from Saudi Arabia, he was acting drastically different than how he did before he deployed. *Id.* ¶ 9.  He and his son always had a close and loving relationship and it hurt Mr. Canchola greatly to have his son so emotionally distant. *Id.*  ¶ 9. It has been difficult for Mr. Canchola to witness his son's pain and not be able to help him over the years. *Id.* ¶ 9.  Mr. Canchola

111

has since been filled with anxiety, depression and internal conflict knowing that the pain his son suffers from the Attack will never leave him.  *Id.* ¶ 17.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Timothy Louis Canchola, the stepparent of Injured Servicemember Plaintiff David Anthony Toole, is seeking a solatium damages award in the amount of $2,500,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).  See also *Heiser II,* 659 F. Supp. 2d at 29 (holding that non-adoptive stepparents were entitled to damages because they were the functional equivalent of immediate family members.). See *supra* regarding further argument in section V of this memorandum.

### 21.   Injured Servicemember Plaintiff Franko James Ferguson

Injured Servicemember Plaintiff Franko James Ferguson was severely and permanently injured psychologically from the Attack on Khobar Towers. Franko James Ferguson Declaration and Exhibits, ("Ferguson Decl.").

On June 25, 1996, the shockwave of the explosion shattered the window above Mr. Ferguson's bed, causing shards of glass to rain down upon Mr. Ferguson. Ferguson Decl. ¶ 6. Everything went dark and dust filled the room. *Id.* ¶ 6. Mr. Ferguson's ears were ringing with a piercing tone, and everything sounded muffled. *Id.* ¶ 6. He was stunned and disoriented. *Id.* ¶ 7. Mr. Ferguson was covered in glass and bleeding from lacerations. *Id.* ¶ 7. He sprang out of bed and started running towards the door. *Id.* ¶ 8. His feet stung as he ran through the sharp trails of glass, stopping only briefly to pick out the larger pieces of glass embedded in the bottom of his bloodied feet and knees. *Id.* ¶ 8. Outside the building, Mr. Ferguson saw countless people bleeding from various parts of their bodies as they ran to safety, and others being carried to the triage center.

*Id.* ¶ 9. Through the chaos, he saw his buddy, Joey, struggling to walk, so he picked him up and carried him on his back to the triage center. *Id.* ¶ 10.

At the triage center, Mr. Ferguson feared for his life when people rushed in screaming that there was another attack coming. *Id.* ¶ 11. Mr. Ferguson did not want to take the medics' attention away from those with life-threatening injuries, so he treated his own injuries, irrigating the deep cuts on his knees with a bottle of water and bandaging them with paper towels. *Id.* ¶ 13. He did not seek any further treatment for his shrapnel injuries, so the laceration on his knee left a permanent scar. *Id.* ¶ 13. For his injuries from the Attack, he was eligible for a Purple Heart award, but he declined it because he felt that others deserved it more than he did. *Id.* ¶ 13.

Mr. Ferguson stayed at Khobar Towers for two months after the Attack, which was a very uncomfortable time for him. *Id.* ¶ 16. Living quarters were tight, and he worked excessively long shifts for several days straight. *Id.* ¶ 16. It was mentally exhausting and did not allow him time to decompress. *Id.* ¶ 16. Every night he was reminded of the Attack and his vulnerability. *Id.* ¶ 16. Even after Mr. Ferguson returned home, he felt anxious and depressed. *Id.* ¶ 18. He could no longer tolerate social events and became introverted. *Id.* ¶ 18. He lost interest in things he used to love doing. *Id.* ¶ 18. He did not want to talk about Khobar and relive that horrific time, so he declined any suggestion to seek professional help for his psychological injuries. *Id.* ¶¶ 18-19. This led him to become emotionally and mentally unavailable, which led to the breakdown of his marriage. *Id.* ¶ 19. Further, Mr. Ferguson separated from the military, feeling neglected, betrayed, and disregarded. *Id.* ¶ 20.

Mr. Ferguson eventually came to accept that he needed help and entered counseling. *Id.* ¶ 21. He was diagnosed with PTSD and rated 30% disabled by the VA. *Id.* ¶ 21. He has even applied for a retroactive Purple Heart in recognition of the injuries he sustained in the Attack. *Id.* ¶ 21.

Nonetheless, he continues to lack interest in  any hobby, finds social interactions extremely difficult, and is withdrawn most of the time. *Id.* ¶ 22.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Franko James Ferguson is seeking a compensatory damages award in the amount of $5,000,000, which is commensurate with a baseline award based upon the severity of his injuries and his VA rating of 30%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### 22. *Christie* Judgment Holder Timothy Michael Schomaker and Six Immediate Family Member Plaintiffs

#### a. *Christie* Judgement Holder Timothy Michael Schomaker

*Christie* judgment holder Timothy Michael Schomaker was serving in the United States Air Force when he was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. On July 2, 2020, this Court entered final judgment on liability and damages in the amount of $6,000,000 in favor of injured victim, Timothy Michael Schomaker, for the June 25, 1996, Khobar Towers attack.  *Christie,* 2020 WL 3606273, at *24.  As a result of the Attack, Timothy Michael Schomaker has been rated 60% disabled by the VA.  *Id.*

#### b. Immediate Family Member Plaintiff Christina Marie Schomaker - Subsequent Spouse

Immediate Family Member Plaintiff Christina Marie Schomaker is the spouse of *Christie* judgment holder Timothy Michael Schomaker.   Christina Marie Schomaker Declaration and Exhibits ("Christina Schomaker Decl.").  Mrs. Schomaker first learned of the Attack when she received a phone call from Mr. Schomaker, telling her about the Attack.  Christina Schomaker Decl. ¶ 9.  It was horrific for her to hear the details of the Attack, and Mrs. Schomaker grew very

distressed and saddened.  *Id.* ¶ 9.  Before the Attack, although not yet married, Mr. Schomaker and Mrs. Schomaker lived together, which they resumed as soon as Mr. Schomaker came back from Saudi Arabia.  *Id.* ¶ 12.  They got married less than a year later, in May 1997.  *Id.* ¶ 13 and Ex. C Marriage Certificate.  Mrs. Schomaker's life and marriage were and continue to be stressful due to constant demands of her husband's debilitating PTSD caused by the Attack.  *Id.* ¶ 13.  Even with treatment, they have struggled to maintain a normal lifestyle.  *Id.* ¶ 13.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibit, Immediate Family Member Plaintiff Christina Marie Schomaker, spouse of *Christie* judgment holder Timothy Michael Schomaker, is seeking a solatium damages award in the amount of $4,000,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). See also *Christie,* 2020 WL 3606273, at *19 (holding that a fiancé at the time of the Attack who became the injured servicemember's wife was the functional equivalent of a spouse where there was a bond that was the functional equivalent of marriage). See *supra* regarding further argument in section V of this memorandum.

### c. Immediate Family Member Plaintiff Paula Gail Nott - Parent

Immediate Family Member Plaintiff Paula Gail Nott is the parent of *Christie* judgment holder Timothy Michael Schomaker.  Paula Gail Nott Declaration and Exhibits ("Paula Nott Decl.").  Mrs. Nott became frantic after her mother called her to inform her about the Attack. Paula Nott Decl. ¶ 6.  Waiting to hear details regarding her son was agonizing and Mrs. Nott was in a state of shock and worried sick.  *Id.* ¶ 6-7.  Once her son came home, Mrs. Nott was saddened to hear about the injuries affecting her son.  *Id.* ¶ 12.  Now, she constantly thinks of her son and his

struggles, which causes her anxiety, panic attacks, sleep issues, and depression for which she has sought treatment and taken medication. *Id.* 12.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Christina Marie Schomaker, parent of *Christie* judgment holder Timothy Michael Schomaker, is seeking a solatium damages award in the amount of $2,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### d. Immediate Family Member Plaintiff Preston Wade Nott - Stepparent

Immediate Family Member Plaintiff Preston Wade Nott is the stepparent of *Christie* judgment holder Timothy Michael Schomaker.  Preston Wade Nott Declaration and Exhibits ("Preston Nott Decl.").  Mr. Nott learned of the Attack from his wife, and grew worried about his son's safety as he did not know if he was alive or dead, if there were more attacks, or if the enemy was within their complex.  Preston Nott Decl. ¶ 6.  When his son came home from Saudi Arabia, it hurt Mr. Nott to see his son struggling and be unable to help him.  *Id.* ¶ 8.  Mr. Nott spent a lot of time trying to figure out how to help his son which left him feeling saddened and anxious.  *Id.* ¶ 9.  It is devastating to Mr. Nott that his son experienced such a traumatic event, and suffers with such severe emotional injuries.  *Id.* ¶¶ 14-15.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Preston Nott, the stepparent of *Christie* judgment holder Timothy Michael Schomaker, is seeking a solatium damages award in the amount of $2,500,000.   See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). See also *Heiser II,* 659 F. Supp. 2d at 29 (holding that non-adoptive stepparents were entitled to

damages because they were the functional equivalent of immediate family members).  See *supra* regarding further argument in section V of this memorandum.

### e. Immediate Family Member Plaintiff Kristine Lynnette Schomaker - Sibling

Immediate Family Member Plaintiff Kristine Lynnette Schomaker is the sibling of *Christie* judgment holder Timothy Michael Schomaker.  Kristine Lynnette Schomaker Declaration and Exhibits ("Kristine Schomaker Decl.").  Ms. Schomaker became very upset and worried for the safety and well-being of her brother after she received a phone call from her mother informing her about the Attack on her brother's barracks. Kristine Schomaker Decl. ¶ 6. The thought of losing her brother made her feel horrible and left Ms. Schomaker very distraught.  *Id.* ¶ 6.  Ms. Schomaker was heartbroken when her brother returned from Saudi Arabia and he wanted nothing to do with her, when they had previously been so close. *Id.* 9.  She did not understand that his actions were due to his injuries.  *Id.* 9.  The breakdown of her relationship with her brother caused Ms. Schomaker a great deal of emotional distress.  *Id.* 12.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Kristine Lynnette Schomaker, sibling of *Christie* judgment holder Timothy Michael Schomaker, is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### f. Immediate Family Member Plaintiff Tanya Lea Nott - Stepsibling

Immediate Family Member Plaintiff Tanya Lea Nott is the stepsibling of *Christie* judgment holder Timothy Michael Schomaker.  Tanya Lea Nott Declaration and Exhibits ("Tanya Nott Decl.").  Ms. Nott was 17-years old at the time of the Attack and was shocked to learn that her brother's barracks had been bombed.  Tanya Nott Decl. ¶ 6.  At the time, Ms. Nott was unaware

of her brother's injuries from the Attack, and she thought that his change in attitude toward her was personal. *Id.* ¶ 11  As a result, she lost self-esteem and blamed herself for the breakdown of their relationship.  *Id.* ¶ 11.  Every day, Ms. Nott wishes she could take away the pain of her brother's injuries and that the relationship they formed by growing up and living together for 10 years could go back to the way it used to be.  *Id.* ¶ 13.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Tanya Lea Nott, stepsibling of *Christie* judgment holder Timothy Michael Schomaker, is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same). See *Valore*, 700 F. Supp. 2d at 86 (holding that circumstances warrant viewing a non-immediate relative of a terrorist victim as the functional equivalent of an immediate family member, and thus entitled to the same damages).  See *supra* regarding further argument in section V of this memorandum.  See additionally *Ackley*, 2022 WL 3354720 at *77 (holding that young age at the time of an attack may lessen awareness but did not lessen distress growing up with the victim suffering from injuries).

**g. Immediate Family Member Plaintiff Rebecca Lamae Thurman - Stepsibling**

Immediate Family Member Plaintiff Rebecca Lamae Thurman is the stepsibling of *Christie* judgment holder Timothy Michael Schomaker.  Rebecca Lamae Thurman Declaration and Exhibits ("Rebecca Thurman Decl.").  Ms. Thurman first learned of the Attack when she was in high school. Rebecca Thurman Decl. ¶ 6.  Due to her age, she did not learn about her brother's injuries until later in life.  *Id.* ¶ 6.  When Ms. Thurman saw her brother after the Attack, he was distant and because she was unaware of his psychological injuries at the time, she felt as if she had

done something to offend him.  *Id.* ¶ 11.  She blamed herself for their disconnect.  *Id.* ¶ 11.  Ms. Thurman feels sorrow knowing that her brother has suffered with his trauma for so many years and that their once-close relationship has become strained.  *Id.* 14.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Rebecca Lamae Thurman, stepsibling of *Christie* judgment holder Timothy Michael Schomaker, is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).  See *Valore*, 700 F. Supp. 2d at 86 (holding that circumstances warrant viewing a non-immediate relative of a terrorist victim as the functional equivalent of an immediate family member, and thus entitled to the same damages).  See *supra* regarding further argument in section V of this memorandum.  See additionally *Ackley*, 2022 WL 3354720 at *77 (holding that young age at the time of an attack may lessen awareness but did not lessen distress growing up with the victim suffering from injuries).

### 23. Injured Servicemember Plaintiff Michael Harrington Weems and Three Immediate Family Member Plaintiffs

#### a. Injured Servicemember Plaintiff Michael Harrington Weems

Injured Servicemember Plaintiff Michael Harrington Weems was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Michael Harrington Weems Declaration and Exhibits, ("Weems Decl.").

On June 25, 1996, the explosion shook the building in which Mr. Weems was located and caused a piece of plywood to whip across the room, strike him in the head, and knock him unconscious. Weems Decl. ¶ 7.  Mr. Weems' head was bleeding, his ears were ringing, and  his left eye was clogged with blood from a deep laceration above his eye. *Id.* ¶ 8. Since the room was

dark and clouded with dust, along with the blood in his eye, Mr. Weems thought that he lost his vision and began to panic. *Id.* ¶ 8. He frantically threw debris off his body, and put on a nearby flight suit and boots and ran out of the room to escape. *Id.* ¶ 8. He could smell the intense fumes from the explosion. *Id.* ¶ 9. He tried his best to help fellow Airmen evacuate the building. *Id.* ¶ 9. He suffered deep cuts on the bottom of his feet from glass shards that were extremely painful and caused severe blood blisters. *Id.* ¶ 9.

Outside, the complex was a disaster and glass, shrapnel, dust, and debris filled the air and covered the ground. *Id.* ¶ 10. He was coughing and trying to spit out debris that filled his lungs and mouth. *Id.* ¶ 10. Mr. Weems made his way to triage, where he, for three consecutive days, conducted triage and assisted with medical aid wherever he could. *Id.* ¶ 11. While there, he witnessed intensely grotesque and horrifying images – excruciating amputations, erratic surgeries, and fatal wounds that caused fellow Airmen to bleed out.  *Id.* ¶ 11. By the end of the third day, he had bagged the bodies of three of his fellow Airmen. *Id.* ¶ 11. The laceration above his eye was stitched and he was diagnosed with a concussion, which was later determined to be a traumatic brain injury ("TBI"). *Id.* ¶ 12. The ringing in his ears continued, and he was later diagnosed with tinnitus. *Id.* ¶ 12. For his injuries from the Attack, he was awarded a Purple Heart. *Id.* ¶ 12.

Mr. Weems stayed at Khobar Towers for four weeks after the Attack. *Id.* ¶ 15. During this time, he endured the pervasive smell of explosive residue in the complex, shrapnel scattered throughout, trails of blood in stairways, and putrid pools of blood on floors. *Id.* ¶ 15. He struggled to sleep, and he started having migraines. *Id.* ¶ 13. He spent his time working on compiling casualty reports. *Id.* ¶ 13. Despite all this, the worst part for him was passing, on a daily basis, the room where he laid the bodies of three of his fellow Airmen who lost their lives in the Attack. *Id.* ¶ 15.

For his actions following the Attack, he was awarded the Air Force Commendation Medal with Valor Device. *Id.* ¶ 15.

Even after Mr. Weems returned home to the U.S., he continued to suffer from his injuries and his condition quickly deteriorated, forcing him to medically retire from the Air Force. *Id.* ¶¶ 16-17. He experienced chronic migraines from post-concussion syndrome and TBI. *Id.* ¶ 18. He also suffers from debilitating symptoms of PTSD, including difficulty integrating with groups of people, nervousness around and isolation from social situations, irrational fears of loud noises, and intense anger. *Id.* ¶ 18. The VA determined that he is 80% disabled and 100% unemployable, including 10% disabled due to TBI, 50% disabled due to chronic post-concussion migraines, and 30% disabled for PTSD. *Id.* ¶ 18. The TBI and post-concussion syndrome made concentrating very difficult for Mr. Weems and he struggled to focus on his job. *Id.* ¶ 20. He developed paranoia because of his inability to focus on even the simplest of tasks and he has been unable to work since 2002. *Id.* ¶ 20. His isolation and anger destroyed his marriage and resulted in his wife leaving him. *Id.* ¶ 20. He is homebound and avoids doing anything outside of the house. *Id.* ¶ 21. He still receives treatment for both his physical and psychological injuries and he also had to undergo surgery to reduce the scar above his eye. *Id.* ¶ 21.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Michael Harrington Weems is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 80%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

**b. Immediate Family Member Plaintiff Nancy Pearl Robertson Weems - Parent**

Immediate Family Member Plaintiff Nancy Pearl Robertson Weems is the parent of Injured Servicemember Plaintiff Michael Harrington Weems.  Nancy Pearl Robertson Weems Declaration and Exhibits ("Nancy Weems Decl.").  When Mrs. Weems first learned about the Attack, she was devastated and very concerned for her son's safety.  Nancy Weems Decl. ¶ 6.  She was incredibly frightened to hear that her son was wounded, and it was dreadful waiting for him to call.  *Id.* ¶ 7. Upon her son's return home following the Attack, it was very difficult for Mrs. Weems to see her son injured and not know how to help him. *Id.* ¶ 10.  She is sad at what the Attack has done to her son, and she feels terrible about what he had to go through that night and what he continues to go through every day.  *Id.* ¶ 13.  The constant worrying has caused considerable stress, which negatively impacts her health. *Id.* 15

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declarations and exhibits, Immediate Family Member Plaintiff Nancy Pearl Robertson Weems, parent of Injured Servicemember Plaintiff Michael Harrington Weems, is seeking a solatium damages award in the amount of $2,500,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

**c. Immediate Family Member Plaintiff John Harold Weems - Parent**

Immediate Family Member Plaintiff John Harold Weems is the parent of Injured Servicemember Plaintiff Michael Harrington Weems.   John Harold Weems Declaration and Exhibits ("John Weems Decl.").  When Mr. Weems first learned about the Attack, he began to think the worst. John Weems Decl. ¶ 6.  When he spoke with his son, while he was relieved to know his son was alive, Mr. Weems remained worried about his son due to his injuries and the

122

dreadful conditions of the complex following the Attack. *Id.* ¶ 9.  After the Attack, Mr. Weems'
relationship with his son changed due to the physical and psychological injuries his son suffered
in the Attack.  *Id.* ¶ 14.  Over the years, it has been devastating for Mr. Weems to watch his son
suffer from his injuries and Mr. Weems worries about his son constantly.  *Id.* ¶ 6.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn
declaration and exhibits, Immediate Family Member Plaintiff John Harold Weems, parent of
Injured Servicemember Plaintiff Michael Harrington Weems, is seeking a solatium damages award
in the amount of $2,500,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser*
framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### d. Immediate Family Member Plaintiff Richard Lawrence Weems - Sibling

Immediate Family Member Plaintiff Richard Lawrence Weems is the sibling of Injured
Servicemember Plaintiff Michael Harrington Weems.  Richard Lawrence Weems Declaration and
Exhibits ("Richard Weems Decl.") Mr. Weems first learned about the Attack through a news report
on the television, and he became so nervous for his brother. Richard Weems Decl. ¶ 6.  Due to his
brother's disabling injuries from the Attack, Mr. Weems feels like he lost his brother.  *Id.* ¶ 14.
Since the Attack, Mr. Weems and his brother are unable to do many of the things they used to
enjoy doing together before the Attack, and Mr. Weems greatly misses the closely bonded
relationship they had before.  *Id.* ¶ 14.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn
declaration and exhibits, Immediate Family Member Plaintiff Richard Lawrence Weems, sibling
of Injured Servicemember Plaintiff Michael Harrington Weems, is seeking a solatium damages
award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser*
framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### 24.  Injured Servicemember Plaintiff Brian Christopher Stoneburner

Injured Servicemember Plaintiff Brian Christopher Stoneburner was severely and permanently injured psychologically from the attack on Khobar Towers. Brian Christopher Stoneburner Declaration and Exhibits, ("Stoneburner Decl.").

On June 25, 1996, the thunderous boom of the explosion shook Mr. Stoneburner awake, seconds before he lost consciousness. Stoneburner Decl. ¶ 6. He awoke with a painful headache and ringing in his ears. *Id.* ¶ 7.  His arms and legs were covered in lacerations from flying glass shards and debris. *Id.* ¶ 7. He quickly realized how close to death he was as he looked at a metal slat that impaled his wall locker nearby.  *Id.* ¶ 7. He grabbed his boots, rescued his roommate from a fallen wall locker, and began his escape from the building.  *Id.* ¶ 8. In the hall, dust and putrid odors filled the air, and there was glass, debris, and blood everywhere. *Id.* ¶ 8. Mr. Stoneburner will never forget seeing the shards of glass that embedded into the concrete walls. *Id.* ¶ 8. He was terrified. *Id.* ¶ 8. Through the night, Mr. Stoneburner helped rescue and carry a severely wounded Airmen to safety and administer first aid buddy-care where he could. *Id.* ¶¶9-10.  For his actions following the Attack, he was awarded the Air Force Commendation Medal with Valor. *Id.* ¶ 10.

Later, Mr. Stoneburner was tasked with guarding the underground garage where he had just been working a couple of hours before the Attack. *Id.* ¶ 11. It was now destroyed and for a second time, he realized he had again been close to death.  *Id.* ¶ 11. He cleared out an area to put down mattresses so servicemembers could sleep, but in doing so, he got an unidentifiable grime on his hands that induced  an itchy rash. *Id.* ¶¶ 13, 15. He later learned that the grime was burning his hands, from which he has permanent scars.  *Id.* ¶ 15. He sought medical treatment for his hands, the lacerations all over his body, and the headache that began after the blast. *Id.* ¶ 15. For his injuries from the Attack, he was awarded a Purple Heart. *Id.* ¶ 15.

Mr. Stoneburner stayed at Khobar Towers for 47 days after the Attack. *Id.* ¶ 16. It was a stressful and fearful time for him. *Id.* ¶ 16. Every day, he worried that there would be another attack. *Id.* ¶ 16. He kept to himself and slept with a high-powered flashlight in case of an emergency. *Id.* ¶ 16. He worked the night shift in the garage, which made him feel like he was repeatedly reliving the night of the Attack and it caused him great psychological distress. *Id.* ¶ 17. In recognition of his time and efforts following the Attack, Mr. Stoneburner was awarded the Armed Forces Expeditionary Medal. *Id.* ¶ 17.

Back home in the U.S., Mr. Stoneburner tried to forget about the Attack, but every sudden noise startled him and put him right back in the complex. *Id.* ¶ 18. He also began having nightmares and flashbacks of the Attack. *Id.* ¶ 19. He grew depressed and did not know how to cope with everyday life. *Id.* ¶ 19. He eventually sought treatment for his ongoing psychological injuries and was diagnosed with PTSD. *Id.* ¶ 19.

Mr. Stoneburner was unable to return to his normal life. *Id.* ¶ 20. He was uncomfortable and uneasy in his surroundings which resulted in him spending more time alone in his room. *Id.* ¶ 20. At one point, the Air Force conducted a medical board meeting to determine if he should be discharged from the military. *Id.* ¶ 21. He was increasingly overwhelmed with feelings of anxiety, anger, and sadness, and continued to experience nightmares and flashbacks of the Attack. *Id.* ¶ 22. The symptoms of PTSD became overbearing, so he separated from the military, and sought treatment at the VA where he was determined to be 30% disabled, with 20% attributable to the Attack, including 10% disabled for tinnitus, and 10% disabled due to PTSD following the Attack. *Id.* ¶ 22.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Brian Christopher Stoneburner is

seeking a compensatory damages award in the amount of $5,000,000, which is commensurate with a baseline award based upon the severity of his injuries and his VA rating of which 20% is attributable to the Attack.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### 25. Injured Servicemember Plaintiff Scott Patrick Hill and One Immediate Family Member Plaintiff

#### a. Injured Servicemember Plaintiff Scott Patrick Hill

Injured Servicemember Plaintiff Scott Patrick Hill was severely and permanently injured psychologically from the attack on Khobar Towers. Scott Patrick Hill Declaration and Exhibits, ("Hill Decl.").

On June 25, 1996, the huge explosion of the truck bomb woke up Mr. Hill. Hill Decl. ¶ 8. He looked around, unsure of what had just happened, and saw his suitemate with shards of glass all over him. *Id.* ¶ 9. He sprang to his feet, ran towards the hallway, and discovered debris, shattered glass, and dust. *Id.* ¶ 9. He was stunned, in a state of complete shock, and speechless. *Id.* ¶ 9. He heard a high-pitched ringing in his ears and heard people shouting and running through the building. *Id.* ¶ 10. He scrambled over shattered glass and overturned furniture to escape the building. *Id.* ¶ 10. Dust filled his eyes and mouth. *Id.* ¶ 10. He could not avoid the incredulous amount of glass shards blanketing the ground and sustained numerous cuts to his feet as a result. *Id.* ¶ 10.

Outside, Mr. Hill witnessed countless Airmen suffering from devastating injuries from the Attack. *Id.* ¶ 11. He tried to administer any medical aid that he could. *Id.* ¶ 11. He guided people in various directions to mitigate the chaos and to get the injured to triage. *Id.* ¶ 11. At one point, it appeared that the enemy was coming to attack again, and more similar unfounded bomb threats

continued throughout the night. *Id.* ¶ 12. Mr. Hill was unarmed and had no way to defend himself, leading him to believe that he might never see his family again. *Id.* ¶ 12. He felt completely helpless and feared for his life. *Id.* ¶ 12.

Mr. Hill remained at Khobar Towers for several months after the Attack, which was very uncomfortable for him *Id.* ¶¶ 13,15. He participated in the debris and structural cleanup, filled sandbags for additional security precautions, and assisted the FBI in searching for any evidence from the truck bomb. *Id.* ¶ 15. He also helped carry and load several of his fellow Airmen who were severely injured onto an aircraft to be flown to Germany for more intense care. *Id.* ¶ 15. For his actions following the Attack, Mr. Hill was awarded the Air Force Achievement Medal First Oak Leaf Cluster, the Armed Forces Expeditionary Medal, and a Southwest Asia Service Medal. *Id.* ¶ 15.

Mr. Hill was anxious for the remainder of his time at the complex after the Attack. *Id.* ¶ 16. Sudden, loud, explosive sounds were unnerving to him. *Id.* ¶ 16. He anticipated his leave date, however, even after he was given orders to return to the States, he was fearful to leave as he heard rumors that his aircraft could be shot down by insurgents with ground missiles just off base. *Id.* ¶ 17. Now, even out of the complex, he is hypervigilant, suspicious, and distrustful of others. *Id.* ¶ 19. He is quick to anger and is often depressed. *Id.* ¶ 19. Mr. Hill sought treatment for his psychological injuries at the VA and was diagnosed with PTSD, a direct result of the Attack. *Id.* ¶ 19. Due to the severity of his PTSD and associated symptoms including stress-induced migraines, sleep apnea, and nightmares, he was prescribed medication and provided a CPAP machine. *Id.* ¶ 19. He also meets with a psychiatrist bi-monthly. *Id.* ¶ 19.  Mr. Hill Continues to suffer from ringing in his ears, which was diagnosed as tinnitus. *Id.* ¶ 22. As a result of his injuries from the

Attack, Mr. Hill is rated 100% disabled by the VA, with 10% being due to tinnitus, 50% for migraine headaches, 70% for PTSD, and 50% for sleep apnea. *Id.* ¶ 22.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Scott Patrick Hill is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 100%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### b. Immediate Family Member Plaintiff Kimberlee Jo Hill

Immediate Family Member Plaintiff Kimberlee Jo Hill is the spouse of Injured Servicemember Plaintiff Scott Patrick Hill.   Kimberlee Jo Hill Declarations and Exhibits ("Kimberlee Hill Decl.") Mrs. Hill learned about the Attack from a family member and although she was informed that her husband was alive, she instantly became worried and was extremely anxious until speaking with him two days later.   Kimberlee Hill Decl. ¶ 8.  Mrs. Hill spent the next few months desperately praying that her husband would come home from Saudi Arabia alive. *Id.* ¶ 10.  Since her husband's return from Khobar Towers, Mrs. Hill's life with her husband has not been easy.  *Id.* ¶ 15.  It has been very difficult for Mrs. Hill to watch the person that she loves suffer so much and it has taken a significant toll on her emotionally, leaving her feeling depressed. *Id.* ¶ 15.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Kimberlee Jo Hill, spouse of Injured Servicemember Plaintiff Scott Patrick Hill, is seeking a solatium damages award in the amount of

$4,000,000.   See *Schooley*, 2019 WL 2717888, at \*77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at \*25-27 (same).

### 26. Injured Servicemember Plaintiff Christopher Brian Lauderback MSgt, USAF (Ret)

Injured Servicemember Plaintiff Christopher Brian Lauderback MSgt, USAF (Ret) was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Christopher Brian Lauderback Declaration and Exhibits, ("Lauderback Decl.").

On June 25, 1996, the explosion shattered a glass balcony window in Mr. Lauderback's room, sending shards of glass at Mr. Lauderback that lacerated his whole body. Lauderback Decl. ¶ 6. The force of the blast wave blew Mr. Lauderback across the room into a concrete wall, injuring his head, shoulder, and back. *Id.* ¶ 6. His ears were ringing, dust filled his mouth and eyes, and it was hard to breathe. *Id.* ¶ 7. Mr. Lauderback was barefoot as he ran through the broken glass and debris on the floor to exit, resulting in severe lacerations and profuse bleeding to his feet. *Id.* ¶ 8. In order to escape the building, Mr. Lauderback had to push furniture out of his pathway, exacerbating the injury to his back and shoulder. *Id.* ¶ 8. Outside, Mr. Lauderback saw mass panic and pools of blood all over the ground. *Id.* ¶ 9. He made his way to triage, where he witnessed gruesome injuries that will forever remain in his memory. *Id.* ¶ 9.

Since triage was overwhelmed with life-threatening injuries, Mr. Lauderback tended to his own injuries, and he provided first-aid buddy care where he could. *Id.* ¶ 10.  Flocks of injured personnel continued pouring into triage all night and he continued to help well into the next morning.  *Id.* ¶ 10.  In a state of exhaustion, he went to his workplace and slept on the couch. *Id.* ¶ 11.

After a few short hours of rest, he went to help with the cleanup and look for evidence left by the bomb. *Id.* ¶ 11. Mr. Lauderback was also tasked with inspecting vehicles to ensure they

were safe for entry into the complex. *Id.* ¶ 11. Seeing tank trucks like the one involved in the bombing was jarring for him. *Id.* ¶ 11. He still has recurring nightmares about dying in the truck during the explosion. *Id.* ¶ 11. Mr. Lauderback also assisted in the search and recovery of Building 131, working to remove the glass and hazardous debris from the area. *Id.* ¶ 12. For days, he cleaned blood, pieces of flesh, and clothing of his fellow Airmen off the floors and walls around the site. *Id.* ¶ 12. The images remain with him. *Id.* ¶ 12. For his actions following the Attack, Mr. Lauderback was awarded the Air Force Achievement Medal. *Id.* ¶ 12.

Mr. Lauderback struggled to readjust to life after the Attack. *Id.* ¶ 15. He became hypervigilant and angry, and found it difficult to socialize and trust people. *Id.* ¶ 15. He started to experience night terrors, including one where he is sitting in the tank truck with the bomb. *Id.* ¶ 15. The lack of sleep added to his anger. *Id.* ¶ 15.  The psychological injuries Mr. Lauderback suffered impacted every aspect of his life. *Id.* ¶ 17. His marriage became strained and ultimately ended in divorce, his reclusive tendencies and emotional instability led Mr. Lauderback and his daughter to grow apart, and he has difficulty maintaining a job. *Id.* ¶¶ 18-19. Mr. Lauderback continues to be consumed with fear, tension, and stress. *Id.* ¶ 19.

His physical injuries from the Attack also continued to plague him and he suffers impairment to this day. *Id.* ¶ 15. He is rated 100% disabled by the VA. *Id.* ¶ 15. He suffers terrible migraines from being slammed into a concrete wall by the blast wave, for which he is rated 50% disabled. *Id.* ¶ 16. He has chronic bicep tendonitis and cubital tunnel syndrome in his left shoulder, which required surgery, and is rated by the VA, respectively, at 10% and 20% disabled. *Id.* ¶ 16. He was diagnosed with PTSD and rated 30% disabled. *Id.* ¶ 16. The ringing in his ears continues to this day, and he was diagnosed with tinnitus and is rated 10% disabled for it. *Id.* ¶ 16.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Christopher Brian Lauderback MSgt, USAF (Ret) is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 100%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### 27. *Christie* Judgment Holder Christopher Pius Nagel and One Immediate Family Member Plaintiff

#### a. *Christie* Judgment Holder Christopher Pius Nagel

*Christie* judgment holder Christopher Pius Nagel was serving in the United States Air Force when he was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. On July 2, 2020, this Court entered final judgment on liability and awarded damages in the amount of $7,000,000 in favor of injured victim, Christopher Pius Nagel, for the June 25, 1996, Khobar Towers attack. *Christie,* 2020 WL 3606273, at *24.  As a result of the Attack, Mr. Nagel was rated 100% disabled by the VA.  *Id*.

#### b. Immediate Family Member Plaintiff Jacqueline Archuleta Quintana

Immediate Family Member Jacqueline Quintana was, at the time of the Attack, the spouse of *Christie* judgment holder Christopher Pius Nagel.  Jacqueline Archuleta Quintana Declaration and Exhibits ("Jacqueline Quintana Decl.").  Ms. Quintana  first learned about the Attack when she was called to her supervisor's office and informed of the tragic news,  that Mr. Nagel's whereabouts were unknown, and it could not be confirmed whether he was alive or dead. Jacqueline Quintana Decl. ¶¶ 7 and 8.  Ms. Quintana became extremely upset and desperate as she waited for over 30 hours without any information on her husband. *Id.* ¶¶ 8 and 9.  A few months

later, when they finally reunited, Ms. Quintana found Mr. Nagel was noticeably different and it impacted their relationship in the worst way. *Id.* ¶ 11. Over the next three years, their marriage deteriorated due to Mr. Nagel's psychological injuries. *Id.* ¶ 16. After failed attempts to get Mr. Nagel help, Ms. Quintana and Mr. Nagel divorced in 1999. *Id.* ¶ 16. The breakdown of her marriage, as well as the deterioration of the relationship between Mr. Nagel and their shared daughter, has had an insufferable impact on Ms. Quintana. *Id.* ¶ 16.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Jacqueline Archuleta Quintana, spouse of *Christie* judgment holder Christopher Pius Nagle at the time of the Attack, is seeking a solatium damages award in the amount of $4,000,000. Although Immediate Family Member Plaintiff Jacqueline Archuleta Quintana is now divorced from *Christie* judgment holder Christopher Nagel, where, as is the case here, evidence indicates that a couple eventually divorced but remained married for years following the attack and the spouse suffered compensable emotional trauma, the Heiser solatium framework may still be applied. *Spencer* v. *Islamic Republic of Iran*, 71 F.Supp.3d 23, 28-29 (D.D.C. 2014).

### 28. *Christie* Judgment Holder Bryant Keith White and Two Immediate Family Member Plaintiffs

#### a. *Christie* Judgment Holder Bryant Keith White

*Christie* judgment holder Bryant Keith White was serving in the United States Air Force when he was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. On July 2, 2020, this Court entered final judgment on liability and awarded damages in the amount of $7,000,000 in favor of injured victim, Bryant Keith White, for the June 25, 1996, Khobar Towers Attack. *Christie,* 2020 WL 3606273, at *24. He received a 70% VA disability rating as a result of his injuries from the Attack. *Id.*

### b. Immediate Family Member Plaintiff Susan Lynn White - Parent

Immediate Family Member Plaintiff Susan Lynn White is the parent of *Christie* judgment holder Bryant Keith White.  Susan Lynn White Declaration and Exhibits ("Susan White Decl."). Mrs. White first learned about the Attack while watching the news. Susan White Decl. ¶ 6.  Her heart sank and she started to shake. *Id.* ¶ 6.  She waited over 24 excruciating hours for news about her son's condition. *Id.* ¶ 7.  Following the Attack, her son came home physically but Mrs. White felt like she had lost her son and she started experiencing depression, stress, and migraines as a result. *Id.* ¶ 17.  Even after 26 years, she is pained by the struggles with which her son continues to deal. *Id.* ¶ 18.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Susan Lynn White, parent of *Christie* judgment holder Bryant Keith White, is seeking a solatium damages award in the amount of $2,500,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### c. Immediate Family Member Plaintiff Jerry White - Parent

Immediate Family Member Plaintiff Jerry White is the parent of *Christie* judgment holder Bryant Keith White.  Jerry White Declaration and Exhibits ("Jerry White Decl.").  Mr. White first learned about the Attack when watching the news and he was mortified at what he saw. Jerry White Decl. ¶ 6.  He could not stop thinking about what could have happened to his son. *Id.* ¶ 6. He states that it was one of the most terrifying moments of his life.  *Id.* ¶ 6.  Mr. White was so distressed over what may have happened to his son that he needed to take time off from work. *Id.* ¶ 6.  Since the Attack, it has been difficult for Mr. White to watch his son suffer with his injuries he sustained

in the Attack.  *Id.* ¶ 13. It pains Mr. White a great deal that his son has to live the rest of his life suffering from PTSD, anxiety, and depression. *Id.* ¶ 13.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Immediate Family Plaintiff Jerry White, parent of *Christie* judgment holder Bryant Keith White, is seeking a solatium damages award in the amount of $2,500,000. See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### 29.   Injured Servicemember Plaintiff Jason Allen Bratton

Injured Servicemember Plaintiff Jason Allen Bratton was severely and permanently injured physically and psychologically from the attack on Khobar Towers. Jason Allen Bratton Declaration and Exhibits, ("Bratton Decl.").

On June 25, 1996, the huge tremor of the explosion blew Mr. Bratton out of his bed and smacked him down onto the floor.  Bratton Decl. ¶¶ 6-7.  Mr. Bratton felt a stinging sensation throughout his body and had lacerations all over him from flying shards of glass and debris that exploded from the blast. *Id.* ¶ 7. His right finger was bleeding profusely as the tendon had been cut by flying shrapnel. *Id.* ¶ 7. Mr. Bratton grabbed a pair of shoes and began his escape, but it was an obstacle course to the exit, forcing him to climb over the destruction and weave through piles of shattered glass and pools of blood. *Id.* ¶ 8. His ears were ringing, and his mouth was dry and gritty from breathing in the dust that filled the air. *Id.* ¶ 8.

Once outside, his adrenaline kicked in and he rushed to get armed and help evacuate any survivors. *Id.* ¶ 9. At the armory, he found gauze and quickly wrapped his bleeding finger just enough to keep it attached. *Id.* ¶ 10. His amateur attempt at saving the finger was the only treatment that he got for it, which resulted in its permanent deformation. *Id.* ¶ 10. Mr. Bratton raced to the

134

bomb site where he rescued and transported survivors to triage. *Id.* ¶ 11. He carried people with blood dripping off their bodies, broken bones, and even some with lost limbs. *Id.* ¶ 11. After all the survivors had been rescued and evacuated, he helped search for the deceased. *Id.* ¶ 12. By the end of his effort, he had pulled and bagged the bodies of 11 of his fellow Airmen. *Id.* ¶ 12. For his efforts following the Attack, he was awarded the Air Force Commendation Medal with Valor Device. *Id.* ¶ 12.

Mr. Bratton remained at Khobar until August, on-edge and extremely stressed. *Id.* ¶ 14. It was the longest time period of his life, and during which he thought about how he could have died and never met his eight-week-old daughter baby girl. *Id.* ¶ 12. When he was deployed back to the Middle East later in his career, he was extremely anxious and in constant fear of another terrorist attack. *Id.* ¶ 16. He realized he could no longer stay in the military and be susceptible to that type of environment, since his enlistment requirement was up, he separated from the Air Force. *Id.* ¶ 16.

Since the Attack, Mr. Bratton no longer attends gatherings and has lost interest in socializing with others. *Id.* ¶ 18. He is quiet and reserved and prefers his solitude. *Id.* ¶ 18. He experiences symptoms of PTSD, has difficulty getting restful sleep, and is sensitive to loud noises. *Id.* ¶ 19. He is no longer carefree, and lives a life of caution flooded with anxiety. *Id.* ¶ 19. Reference to or images of the military trigger Mr. Bratton's PTSD, which has forced him to avoid many areas in his hometown. *Id.* ¶ 19. His avoidance of all military things included his refusal to seek treatment at the VA, which allowed his injuries to worsen over time. *Id.* ¶ 20. He developed hypertension, and stress-induced ulcerative colitis which required a colostomy. *Id.* ¶ 20. When he finally sought treatment, he was diagnosed with PTSD and persistent depressive disorder with anxious distress,

both due to the Attack. *Id.* ¶ 21. The VA determined that he is 70% disabled due to PTSD with major depressive disorder as a result of the Attack. *Id.* ¶ 22.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Jason Allen Bratton is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an upward departure based upon the severity of his injuries and his VA rating of 70%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### 30. Injured Servicemember Plaintiff Kenneth Michael Kowalczyk and Three Immediate Family Member Plaintiffs

#### a. Injured Servicemember Plaintiff Kenneth Michael Kowalczyk

Injured Servicemember Plaintiff Kenneth Michael Kowalczyk was severely and permanently injured both physically and psychologically from the attack on Khobar Towers. Kenneth Michael Kowalczyk Declaration and Exhibits, ("Kowalczyk Decl.").

The tremendous blast of the explosion ejected Mr. Kowalczyk from a couch into a concrete wall and knocked him unconscious. Kowalczyk Decl. ¶ 7. When he came to, he was dazed and disoriented, and could feel lacerations covering his body from flying glass window shards. *Id.* ¶ 8. He had a deep laceration to his left thumb, and his left pinky finger was partially severed and dangling from his hand by a thin piece of skin. *Id.* ¶ 8. He was bleeding profusely from numerous lacerations on his legs and upper torso, and fluid was pouring out of his ears. *Id.* ¶ 8. He had an excruciating headache, and his hearing was muffled. *Id.* ¶ 8. Mr. Kowalczyk crawled to the nearby bathroom and grabbed a towel to stop the bleeding and hopefully save his fingers from permanent damage.  *Id.* ¶ 9.  Then he grabbed his boots and began to evacuate from the building. *Id.* ¶ 9.

On his way out of the building, Mr. Kowalczyk witnessed the abundance of destruction caused by the bombing. *Id.* ¶ 10. The rooms were completely disheveled and destroyed, concrete walls were cracked and pierced with pieces of glass and debris, and the air was filled with heavy dust, debris, and smoke. *Id.* ¶ 10. His eyes watered, and he coughed from all the dirt in the air. *Id.* ¶ 10. Outside the building, amongst the chaos and darkness, it seemed like the Attack was not yet over. *Id.* ¶ 11.

Despite his own injuries, Mr. Kowalczyk was fueled by adrenaline and tried to focus on getting to the damaged buildings to provide buddy-care. *Id.* ¶ 12. He recalls the acrid scent of blood and burning debris. *Id.* ¶ 13. Walls were smeared with blood from people trying to navigate the stairs in the dark, and blood coated the floors, causing him to slip several times. *Id.* ¶ 13. He witnessed a myriad of severe injuries, including head wounds, chest wounds, deep lacerations, and glass impalements. *Id.* ¶ 14. He had to perform CPR on a fellow Airman and assisted with his extrication from the building. *Id.* ¶ 14. He spent that night carrying severely injured personnel out of the building to triage. *Id.* ¶ 14. He felt like he was in a nightmare. *Id.* ¶ 14. For his actions following the Attack, Mr. Kowalczyk was awarded the Airman's Medal, which is the highest honor given by the Air Force. *Id.* ¶ 14.

After several hours of helping others, Mr. Kowalczyk was treated for his own injuries, which included having his eyes flushed out to remove dust and particles, extracting shards of glass from his arms and legs, sewing the ligaments and tendons in his left-hand pinky finger, and stitching his thumb. *Id.* ¶ 15. The rest of his wounds were cleaned and bandaged *Id.* ¶ 16. For his injuries from the Attack, Mr. Kowalczyk was awarded a Purple Heart. *Id.* ¶ 16.

Mr. Kowalczyk remained at Khobar Towers for approximately eight weeks after the Attack, despite the poor conditions of the complex. *Id.* ¶ 18. During the remainder of this time at

the complex, Mr. Kowalczyk had difficulty continuing with his duties. *Id.* ¶ 19.   He felt emotionally numb yet was extremely irritable. *Id.* ¶ 19. He felt vulnerable at the complex, fearing another attack. *Id.* ¶ 20. He did not get a night of restful sleep for the remainder of his time at the complex, which added to his eagerness to leave. *Id.* ¶ 20.

As a result of the Attack, Mr. Kowalczyk lost his free-spirit nature and instead feels stressed at all times. *Id.* ¶ 25. He is apprehensive and cautious about everything, and therefore does not socialize with friends or partake in large social gatherings. *Id.* ¶ 25. He is often depressed and quick to anger. *Id.* ¶ 25. Sudden explosive noises ignite his anxiety, which makes common day sounds potential triggers. *Id.* ¶ 25.   The change in Mr. Bratton's demeanor and inability to participate and enjoy life as he did before the Attack, took a toll on his marriage, and ultimately led to a divorce between him and his wife. *Id.* ¶ 26. His PTSD and other related symptoms also negatively affected his relationships with his parents and his brother. *Id.* ¶ 26.

Mr. Kowalczyk still has scars throughout his body from the lacerations, which are constant reminders of that night. *Id.* ¶ 27. He has permanent nerve damage in his left thumb and in his left-hand pinky due to the shrapnel wounds he sustained. *Id.* ¶ 27. The fluid leaking from his ears stopped a few days after the Attack, but he still experiences a high-pitched ringing in his ears, which was diagnosed as tinnitus and hearing loss. *Id.* ¶ 27. The VA rated him as 70% disabled, all of which is attributable to the Attack, including disability ratings of 10% for his left thumb injury, 10% for the injury to his left pinky, 10% for tinnitus, 10% due to hearing loss, and 30% for PTSD. *Id.* ¶ 27.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Injured Servicemember Plaintiff Kenneth Michael Kowalczyk is seeking a compensatory damages award in the amount of $7,000,000, which is commensurate with an

upward departure based upon the severity of his injuries and his VA rating of 70%.  See *Schooley*, 2019 WL 2717888, at *75 (using "basic rubric" of VA disability ratings to calculate damages awards); and *Christie,* 2020 WL 3606273, at *23-24 (adopting the *Schooley* "basic rubric").

### b. Immediate Family Member Plaintiff Patricia Mary Kowalczyk - Parent

Immediate Family Member Plaintiff Patricia Mary Kowalczyk is the parent of Injured Servicemember Plaintiff Kenneth Michael Kowalczyk. Patricia Mary Kowalczyk Declaration and Exhibits ("Patricia Kowalczyk Decl."). Mrs. Kowalczyk first learned of the Attack from her husband and the stress and fear that came over her is indescribable. Patricia Kowalczyk Decl. ¶ 6. Not knowing her son's whereabouts and safety made her mentally and physically ill, so much so that she had to leave work that day. *Id.* ¶ 6. She was left in agony for days until her son called her. *Id.* ¶¶ 7, 8. Knowing that her son was alive and that his injuries were not life-threatening was a relief, but anxiety and fear for his well-being caused her so much stress over the subsequent weeks. *Id.* ¶ 9. Mrs. Kowalczyk was filled with anxiety and could not function as she had before. *Id.* ¶ 9. Life became extremely stressful for her and eventually, the constant worrying overtook her, and she had a minor breakdown. *Id.* ¶ 16. The attack on Khobar Towers left her terrified of what could happen to her son, and she continued to worry about her son's safety during every subsequent deployment. *Id.* ¶16. Mrs. Kowalczyk's heart aches knowing the details of what her son had to endure that night, what he must be going through because of it, and not knowing how to help him. *Id.* ¶ 12.

For the reasons set forth herein and the uncontroverted facts in her accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Patricia Mary Kowalczyk, parent of Injured Servicemember Plaintiff Kenneth Michael Kowalczyk, is seeking a solatium damages

award in the amount of $2,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### c. Immediate Family Member Plaintiff Kenneth Dale Kowalczyk - Parent

Immediate Family Member Plaintiff Kenneth Dale Kowalczyk is the parent of Injured Service Member Plaintiff Kenneth Michael Kowalczyk. Kenneth Dale Kowalczyk Declaration and Exhibits ("Kenneth Dale Kowalczyk Decl."). Mr. Kowalczyk first learned of the Attack from his mother, and he instantly grew fearful. Kenneth Dale Kowalczyk Decl. ¶ 6. It was a painfully stressful couple of days just waiting for information regarding the status of his son. *Id.* ¶ 7. When his son finally called him and confirmed his survival, Mr. Kowalczyk felt a great sense of relief. *Id.* ¶ 8. When his son returned home, Mr. Kowalczyk painstakingly listened as his son told him the details of the Attack. *Id.* ¶ 10.  Knowing that his child had to endure such trauma caused Mr. Kowalczyk much discomfort.  *Id.*  ¶ 10. The changes in his son's demeanor after the Attack were difficult for Mr. Kowalczyk to observe, and it took a toll on him. *Id.* ¶ 16. The pain he feels for his son is never-ending. *Id.* ¶ 16.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Kenneth Dale Kowalczyk, parent of Injured Service Member Plaintiff Kenneth Michael Kowalczyk, is seeking a solatium damages award in the amount of $2,500,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

### d. Immediate Family Member Plaintiff Aaron Charles Kowalczyk - Sibling

Immediate Family Member Plaintiff Aaron Charles Kowalczyk is the sibling of Injured Service Member Plaintiff Kenneth Michael Kowalczyk. Aaron Charles Kowalczyk Declaration and Exhibits ("Aaron Kowalczyk Decl."). Mr. Kowalczyk was devastated to hear about the Attack

on his brother's base. Aaron Kowalczyk Decl. ¶ 7. When his brother finally returned home, Mr. Kowalczyk felt joyful, but he was also in disbelief about what happened and that it could have been his brother who was killed in the Attack. *Id.* ¶ 9. Following the Attack, Mr. Kowalczyk's relationship with his brother began to diminish due to the psychological injuries his brother sustained in the Attack. *Id.* ¶ 13. Mr. Kowalczyk felt as if his brother resented him and subsequently started to lose interest in him. *Id.* ¶ 14. Their relationship woes put added stress on their parents, which made Mr. Kowalczyk feel terrible. *Id.* ¶ 16. The Attack took his brother away from him, not physically, but emotionally. *Id.* ¶ 17. Mr. Kowalczyk lost the love, trust, and support of his brother, which he still grieves to this day. *Id.* ¶ 17.

For the reasons set forth herein and the uncontroverted facts in his accompanying sworn declaration and exhibits, Immediate Family Member Plaintiff Aaron Charles Kowalczyk, sibling of Injured Servicemember Plaintiff Kenneth Michael Kowalczyk, is seeking a solatium damages award in the amount of $1,250,000.  See *Schooley*, 2019 WL 2717888, at *77 (adopting the *Heiser* framework for awarding solatium damages); and *Christie,* 2020 WL 3606273, at *25-27 (same).

| Plaintiff | Relationship | Proposed Pain & Suffering /Solatium Award | Proposed Punitive Award | Proposed Pain & Suffering /Solatium with Prejudgment Interest[i] |
|---|---|---|---|---|
| Amb. Jonathan Scott Gration, Maj Gen, USAF (Ret) | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Judith E. Gration | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Jonathan Scott Gration, Jr. | Child | $1,500,000 | $1,500,000 | $5,445,000.00 |
| Barry Gordon Brown | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Eva Ranee Graham | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Corey Thomas Brown | Child | $1,500,000 | $1,500,000 | $5,445,000.00 |
| Angela Mashel Brown | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Alexis Nichole Wingate | Child | $1,500,000 | $1,500,000 | $5,445,000.00 |
| Steven Lee Byers | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Donna Lee Byers | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Rodney Lee Byers | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Joseph Eugene Byers | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Timothy Gerard Fermanis | Injured | $6,000,000 | $6,000,000 | $21,780,000.00 |
| Kevin Richard Mall | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| John Charles Orlando, Jr. | Injured | $5,000,000 | $5,000,000 | $18,150,000.00 |
| Ursula Leona Orlando | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Kenneth David Weaver | Injured | $6,000,000 | $6,000,000 | $21,780,000.00 |
| Susan Pauline Pomoransky | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Vickie Rena Anthony | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Clinton Edward Weaver | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Donald Lee Heikes | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Roger Dayle Heikes | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Ronald Scott Gering | Injured | $6,000,000 | $6,000,000 | $21,780,000.00 |
| Aubree Brooke Staricka | Injured | $5,000,000 | $5,000,000 | $18,150,000.00 |
| Brent Alan Mullings | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Tina Marie Mullings | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Gloria Ann Mullings | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Vernon Oscar Mullings | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Heather Maureen Hector | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Sy William Yost | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Maria Star Yost | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Serena Elizabeth Douglass | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Sarah Grace Douglass | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Steven Millard Douglass | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Joey Laurier Morrissette | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Diane Theresa Morrissette | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Natasha Kami Morrissette | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Steven Millard Douglass | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Joey Laurier Morrissette | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Diane Theresa Morrissette | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Natasha Kami Morrissette | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |

| Plaintiff | Relationship | Proposed Pain & Suffering /Solatium Award | Proposed Punitive Award | Proposed Pain & Suffering /Solatium with Prejudgment Interest |
|---|---|---|---|---|
| Nathan Elliott Wheat | Injured | $6,000,000 | $6,000,000 | $21,780,000.00 |
| Donald Allen Wheat | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Vincent Gene Oliver, TSgt, USAF (Ret) | Injured | $5,000,000 | $5,000,000 | $18,150,000.00 |
| Tamara Lee Oliver | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Steven Lee Brodt, MSgt, USAF (Ret) | Injured | $5,000,000 | $5,000,000 | $18,150,000.00 |
| Un Suk Brodt | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Steven Han Brodt | Child | $1,500,000 | $1,500,000 | $5,445,000.00 |
| Samuel John Brodt | Child | $1,500,000 | $1,500,000 | $5,445,000.00 |
| Estate of Lt. Col. Steven Goff, M.D. | Injured | $5,000,000 | $5,000,000 | $18,150,000.00 |
| Shirley Ann Goff | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Antoinette Marie Hovel | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Kathryn Mary Ableidinger | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| James Michael Silvi, CMSgt, USAF (Ret) | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Jo Ann Silvi | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Angela Christine Silvi | Child | $1,500,000 | $1,500,000 | $5,445,000.00 |
| Alison Elizabeth Silvi | Child | $1,500,000 | $1,500,000 | $5,445,000.00 |
| David Anthony Toole | Injured | $6,000,000 | $6,000,000 | $21,780,000.00 |
| Michele Ann Canchola | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Timothy Louis Canchola | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Franko James Ferguson | Injured | $5,000,000 | $5,000,000 | $18,150,000.00 |
| Christina Marie Schomaker | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Paula Gail Nott | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Preston Wade Nott | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Kristine Lynnette Schomaker | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Tanya Lea Nott | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Rebecca Lamae Thurman | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Michael Harrington Weems | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Nancy Pearl Robertson Weems | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| John Harold Weems | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Richard Lawrence Weems | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |
| Brian Christopher Stoneburner | Injured | $5,000,000 | $5,000,000 | $18,150,000.00 |
| Scott Patrick Hill | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Kimberlee Jo Hill | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Christopher Brian Lauderback, MSgt, USAF (Ret) | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Jacqueline Archuleta Quintana | Spouse | $4,000,000 | $4,000,000 | $14,520,000.00 |
| Susan Lynn White | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Jerry White | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Jason Allen Bratton | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |

| Plaintiff | Relationship | Proposed Pain & Suffering /Solatium Award | Proposed Punitive Award | Proposed Pain & Suffering /Solatium with Prejudgment Interest |
|---|---|---|---|---|
| Kenneth Michael Kowalczyk | Injured | $7,000,000 | $7,000,000 | $25,410,000.00 |
| Patricia Mary Kowalczyk | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Kenneth Dale Kowalczyk | Parent | $2,500,000 | $2,500,000 | $9,075,000.00 |
| Aaron Charles Kowalczyk | Sibling | $1,250,000 | $1,250,000 | $4,537,500.00 |

## CONCLUSION

WHEREFORE, for the reasons stated herein, Plaintiffs respectfully request this Honorable Court grant their Motion for Default on Damages and Entry of a Final Judgment against All Defendants, and in favor of each Plaintiff in the standard baseline amounts entered in numerous similar cases, with such upward or downward departures from the baseline as the Court deems appropriate in each case.

Dated:   November 16, 2022                    Respectfully submitted,

                                              /s/ Gavriel Mairone
                                              MM~LAW, LLC
                                              Gavriel Mairone, Esq
                                              Bar No. 156461
                                              Adora Sauer, Esq (Admitted *pro hac vice*)
                                              Illinois Bar No. 6256703
                                              980 North Michigan Avenue, Suite 1400
                                              Chicago, IL 60611
                                              Tel: (312) 253-7444
                                              Fax: (312) 275-8590
                                              ctlaw@mm-law.com;
                                              adora@mm-law.com

                                              *Counsel for Plaintiffs*

---

[i] In the instant case, the proposed prejudgment interest awards are calculated following the precise formula detailed in *Owens,* "To calculate the multiplier, the Court multiplied $1.00 by the prime rate [from the date of attack] in 1999 (8%) and added that amount to $1.00, yielding $1.08. Then, the Court took that amount and multiplied it by the prime rate in 2000 (9.23%) and added that amount to $1.08, yielding $1.17968. Continuing this iterative process through 2014 yields a multiplier of 2.26185." *Owens v. Republic of Sudan,* 71 F. Supp. 3d at 262 & n.6,7,8 (D.C. Cir. 2014). The *Owens* court calculated the multiplier using the Federal Reserve's historical data for the average annual prime rate for the year of the attack to the present, found at Bd. of Governors of the Fed. Reserve Sys. Historical Data, available at http://www.federalreserve.gov/releases/h15/data.html (last visited October 15, 2022). This specific link is no longer available as of the date of this Memorandum and thus Plaintiffs used the Bd. of Governors of the Fed. Reserve Sys. Historical Data presently found at the following link http://www.federalreserve.gov/datadownload accessed on November 6, 2022. The average prime rate for the 2022 year was not available and therefore the Plaintiffs used the prime rates published through November 6, 2022. Finally, the product of the multiplier and the proposed damages amount results in the proposed prejudgment interest award. The multiplier, in this case, is 3.63 and the underlying calculations are set forth in an Excel spreadsheet filed as **(Exhibit A)** to this motion.

# EXHIBIT A

## PROPOSED MULTIPLIER CALCULATIONS

## FOR PREJUDGMENT INTEREST

# PLAINTIFFS' PROPOSED MULTIPLIER CALCULATIONS

| Year | Average Annual Prime Rate Data from http://www.federalreserve.gov/datadownload accessed on November 6, 2022 | Multiplier Per Year Calculated as the product of Avg Annual Prime Rate and the cumulitive multiplier from the year before | Cumilitive Multiplier |
|---|---|---|---|
| 1997 | 8.44% | 0.08 | 1.08 |
| 1998 | 8.35% | 0.09 | 1.17 |
| 1999 | 8% | 0.09 | 1.27 |
| 2000 | 9.23% | 0.12 | 1.39 |
| 2001 | 6.91% | 0.10 | 1.48 |
| 2002 | 4.67% | 0.07 | 1.55 |
| 2003 | 4.12% | 0.06 | 1.61 |
| 2004 | 4.34% | 0.07 | 1.69 |
| 2005 | 6.19% | 0.10 | 1.79 |
| 2006 | 7.96% | 0.14 | 1.93 |
| 2007 | 8.05% | 0.16 | 2.09 |
| 2008 | 5.09% | 0.11 | 2.19 |
| 2009 | 3.25% | 0.07 | 2.26 |
| 2010 | 3.25% | 0.07 | 2.34 |
| 2011 | 3.25% | 0.08 | 2.41 |
| 2012 | 3.25% | 0.08 | 2.49 |
| 2013 | 3.25% | 0.08 | 2.57 |
| 2014 | 3.25% | 0.08 | 2.66 |
| 2015 | 3.26% | 0.09 | 2.74 |
| 2016 | 3.51% | 0.10 | 2.84 |
| 2017 | 4.10% | 0.12 | 2.96 |
| 2018 | 4.91% | 0.15 | 3.10 |
| 2019 | 5.28% | 0.16 | 3.27 |
| 2020 | 3.50% | 0.11 | 3.37 |
| 2021 | 3.25% | 0.10 | 3.48 |
| 2022* | 4.80% | 0.16 | 3.63 |

**Final Compound Multiplier**          3.63

*Through November 2, 2022