## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JONATHAN SCOTT GRATION, *et al.*, | |
| Plaintiffs, | Civil Action No. 21-cv-1859 (BAH) |
| v. | Judge Beryl A. Howell |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

This action arises out of the bombing on June 25, 1996, of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel. Pls.' Am. Complaint ("Compl.") at 4, ECF No. 23. The explosion killed nineteen American servicemembers and injured dozens of others including 26 servicemember plaintiffs in this case. *Id.* at 4, ¶ 141. The remaining plaintiffs are 53 immediate family members of servicemembers harmed in the attack, including the 26 servicemember plaintiffs in this lawsuit and four servicemembers who were plaintiffs in *Christie v. Islamic Republic of Iran*, No. 19-cv-1289 (BAH), 2020 WL 3606273 (D.D.C. July 2, 2020) (Howell, C.J.). *See* Compl. at 4. Plaintiffs allege that defendants, the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Iranian Ministry of Intelligence and Security, are liable under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for its material support of Hezbollah terrorists that bombed the Khobar Towers complex. *Id.* ¶¶ 1, 157. Although plaintiffs have complied with the FSIA's requirements for service on defendant, Iran has failed to enter an appearance or otherwise defend against this action. *See* 28 U.S.C. § 1608(a)(4); Return of Service/Affidavit of Summons and Complaint Executed, ECF No. 36; Clerk's Entry of Default,

ECF No. 38.  Plaintiffs now seek default judgment against defendants as to liability and

damages.  *See* Pls.' Mot. for Entry of Default J. as to Liability & Damages, to Take Judicial

Notice of Evidence in Related Prior Cases, and Request to Submit Documentary Evidence Under

Seal ("Pls.' Mot.") at 1, ECF No. 40.  For the reasons detailed below, plaintiffs' motion is

granted.

## I.    BACKGROUND

Eleven prior decisions of this Court have found defendants liable for the Khobar Towers

bombing:  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (Lamberth, J.);

*Est. of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229 (D.D.C. 2006)

(Lamberth, J.); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010)

(Lamberth, J.); *Akins v. Islamic Republic of Iran* ("*Akins I*"), 332 F. Supp. 3d 1 (D.D.C. 2018)

(Howell, C.J.); *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888

(D.D.C. June 27, 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH),

2020 WL 619925 (D.D.C. Feb. 7, 2020) (Howell, C.J.); *Christie*, 2020 WL 3606273; *Akins v.

Islamic Republic of Iran* ("*Akins II*"), 549 F. Supp. 3d 104 (D.D.C. July 16, 2021) (Howell, C.J.);

*Blank v. Islamic Republic of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17,

2021) (Howell, C.J.); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL

3354720 (D.D.C. Aug. 12, 2022) (Howell, C.J.); *Mustard v. Islamic Republic of Iran*, No. 21-cv-

163 (BAH), 2023 WL 1778193 (D.D.C. Feb. 6, 2023) (Howell, C.J.).

In *Blais* and *Heiser I*, the Court heard evidence and witness testimony.  *See Blais*, 459 F.

Supp. 2d at 46 n.4; *Heiser I*, 466 F. Supp. 2d at 250.  In *Heiser I* alone, the offering of evidence

took seventeen days, which included examination of witnesses, including seven expert witnesses.

*See* 466 F. Supp. 2d at 250.[1]  *Rimkus*, *Akins*, and *Schooley* concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus*, 750 F. Supp. 2d at 167; *Akins I*, 332 F. Supp. 3d at 10; *Schooley*, 2019 WL 2717888, at *2, and plaintiffs here "submit that prior related cases established overwhelmingly that the Iranian Defendants are liable for their conduct that caused the Attack and ask that this Court take judicial notice of those proceedings." Pls.' Amended Mem. in Supp. of Mot. to Take Judicial Notice for Default J. as to Liability & Damages and to Submit Documentary Evidence Under Seal ("Pls.' Mem.") at 9, ECF No. 41.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).[2]  Rule 201 is used frequently to notice judicially factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins I*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).  This avoids "the formality of having that evidence reproduced." *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011) (citing *Rimkus II*, 750 F. Supp. 2d at 172); *see also Oveissi v. Islamic Republic of Iran*

---

[1]    The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former Director of the Federal Bureau of Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism; (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former Deputy Counterterrorism Chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260–65; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *see id.* at 269–70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273–74.

[2]    "[A]djudicative facts are simply the facts of the particular case." *Nat'l Org. for Women, Wash., D.C. Chapter v. Soc. Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, C.J., concurring) (quoting FED. R. EVID. 201(a), Advisory Committee Note).  The Rule does not govern judicial notice of "legislative fact[s]," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d 727 at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

("*Oveissi II*"), 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent

related cases to rely upon the evidence presented in earlier litigation" (citation omitted)); *Est. of*

*Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (taking "judicial

notice of the evidence presented in the earlier cases").  Taking judicial notice of prior findings

"does not conclusively establish the facts found in those cases" in the later FSIA case.  *Foley*,

249 F. Supp. 3d at 191.  Rather, "based on judicial notice of the evidence presented in the earlier

cases[,] . . . courts may reach their own independent findings of fact."  *Anderson v. Islamic*

*Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *see also Rimkus*, 750 F. Supp. 2d at 172.

In fact, "courts in FSIA litigation have adopted a middle-ground approach that permits courts in

subsequent related cases to rely upon the evidence presented in earlier litigation—without

necessitating the formality of having that evidence reproduced—to reach their own, independent

findings of fact in the cases before them."  *Rimkus*, 750 F. Supp. 2d at 172.[3]

This Court is persuaded that this approach is both "efficient and sufficiently protective of

the absent defendant['s] interests," *Akins I*, 332 F. Supp. 3d at 11, and will therefore grant

plaintiffs' request to take judicial notice of the evidence presented in *Mustard*, 2023 WL

1778193; *Ackley*, 2022 WL 3354720; *Blank*, 2021 WL 3021450; *Akins II*, 549 F. Supp. 3d 104;

*Christie*, 2020 WL 3606273; *Aceto*, 2020 WL 619925; *Schooley*, 2019 WL 2717888; *Akins I*,

332 F. Supp. 3d 1; *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010)

(Lamberth, J.); *Rimkus*, 575 F. Supp. 2d at 181; *Heiser I*, 466 F. Supp. 2d 229; and *Blais*, 459 F.

Supp. 2d 40.  *See Akins I*, 332 F. Supp. 3d at 11 (stating that "factual evidence developed in other

---

[3]     The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases.  In *Han Kim v. Democratic People's Republic of Korea*, the D.C. Circuit held that plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice.  774 F.3d 1044, 1049 (D.C. Cir. 2014); *see also id.* 1051.

cases "involving the same conduct by the same defendants is admissible and may be relied upon in this case."). The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

## A. The Attack on Khobar Towers

The Khobar Towers residential complex in Dhahran, Saudi Arabia "housed the coalition forces," including the U.S. military forces, "charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47. Just before 10:00 p.m. on June 25, 1996, "a large gasoline tanker truck pulled up" and parked "alongside the perimeter wall of the Khobar Towers complex." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 138. Security guards near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," but the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 138. The blast "sheared off the face of Building 131," *Heiser I*, 466 F. Supp. 2d at 252, and "shattered windows in virtually every other structure in the compound and was felt 20 miles from the blast site," Compl. ¶ 141. Subsequent "investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT. The [U.S. Department of Defense] said that it was the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 140.

## B. Defendant Iran's Role

Iran "has been designated a state sponsor of terrorism" by the U.S. Department of State "since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47 (citation omitted); *see, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited June 15, 2023). Prior proceedings have found that Iran planned and supported the Khobar Towers

5

bombing.[4]  Both the Ayatollah Ali Khamenei, the Supreme Leader of Iran at the time, and the

Minister of Intelligence and Security "approved" the attack.  *Heiser I*, 466 F. Supp. 2d at 252.

The truck bomb used was "assembled" at a base in Lebanon's Bekaa Valley "jointly operated by

the [Iranian Revolutionary Guard Corps ('IRGC')] and by the terrorist organization known as

Hezbollah," with the individuals who carried out the bombing calling themselves "Saudi

Hezbollah."  *Id.*

  These conclusions are based in part on the testimony of four key expert witnesses in *Blais*

and *Heiser I*.  Louis Freeh, who was director of the FBI at the time of the bombing, and Dale

Watson, then deputy counterterrorism chief of the FBI, testified in *Heiser I* based on their

oversight of the FBI's "massive and thorough investigation of the attack, using over 250 agents."

*Id.*; *see also id.* at 260–62.  "Based on that investigation, an Alexandria, Virginia, grand jury

returned an indictment . . . against 13 identified members of the pro-Iran Saudi Hezbollah

organization."  *Id.* at 252.  During its investigation, the FBI interviewed six members of Saudi

Hezbollah who "admitted to the FBI their complicity in the attack on the Khobar Towers, and

admitted that senior officials in the Iranian government provided them with funding, planning,

training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers."  *Id.* at

253.  Both Freeh and Watson testified to their conclusions, based on information gathered in

their investigations, that "Iran, [the Ministry of Information and Security ('MOIS')], and IRGC

were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah."  *Id.* at 264.

  Further, Dr. Patrick Clawson provided expert testimony in *Heiser I* that "the government

of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi

Hezbollah carried out the attack under their direction."  *Id.* at 253.  This conclusion was "based

---

[4] Under the FSIA, Iran is "vicariously liable for the acts of its officials, employees, or agents."  28 U.S.C. § 1605A(c).

on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject." *Id.* Dr. Bruce Tefft, a former member of the CIA's counterterrorism bureau, supported Clawson's "expert opinion," based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA" that "the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on the Khobar Towers." *Id.* at 253–54.

### C. The Instant Plaintiffs

Plaintiffs in this action include 26 servicemembers who suffered from physical and psychological injuries as a result of the Khobar Towers bombing and 53 immediate family members of those servicemembers and four other servicemembers injured in the attack. *See* Compl. at 4. The servicemember plaintiffs and family-member plaintiffs are described below.[5]

#### 1. Jonathan Scott Gration and Two Family Members

On June 25, 1996, Amb. Jonathan Scott Gration Maj. Gen., USAF (Ret.) was serving as a Colonel and Commanding Officer of the 4404th Operations Group (Provisional), in the United States Air Force, stationed in Dhahran, Saudi Arabia and quartered in the Khobar Towers complex. Decl. of Amb. Jonathan Scott Gration, Maj. Gen., USAF (Ret.) (Apr. 28, 2022) ("Gration Decl.") ¶ 6, ECF No. 43-1. On the night of the attack, Gration was walking from the shower to his bed when a bright flash engulfed the room and he heard a "deafening boom." *Id.* ¶

---

[5] Every plaintiff in this case has submitted a sealed declaration, with supporting documentation containing sensitive personal information, and a redacted, public version. Otherwise sealed content referenced in this Memorandum Opinion is unsealed as necessary to explain the Court's reasoning. *See Christie v. Islamic Republic of Iran*, Civil Action No. 19-1289 (BAH), 2020 U.S. Dist. LEXIS 116378, at *9 n.7 (D.D.C. July 2, 2020) (citing *In re WP Co. LLC*, 201 F. Supp. 3d 109, 116 n.4 (D.D.C. 2016) (citing *United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009) and *United States v. Parnell*, 524 F.3d 166, 167 n.1 (2d Cir. 2008) (per curiam))).

7.  "The force of the blast shattered the windows and glass shards flew at [him], cutting the left side of [his] body and legs, causing them to bleed profusely."  *Id*.  He ran out of the room and down the stairs, banging on doors along the way looking for others who needed help, and instructing those who could to help evacuate injured people out of the building.  *Id.* ¶ 8.  He carried one Airman out of the building who was so severely injured that Gration did not believe he would survive, a memory he describes as "extremely traumatic."  *Id.* ¶ 9.  Gration played a leadership role in assisting the wounded immediately after the attack and thereafter eulogized each of the deceased servicemembers, the majority of whom were under his command.  *Id.* ¶¶ 17, 19.  He was awarded a Purple Heart for his injuries from the attack, *id.* ¶ 12; *see also id.*, Ex. D (Gration's Purple Heart Certificate), as well as the Air Force Commendation Medal with Valor Device and Meritorious Service Medal Fifth Oak Leaf Cluster, *id.* ¶¶ 17, 20; *see also id.*, Exs. E (Gration's Air Force Commendation Medal with Valor), F (Gration's Meritorious Service Medal Certificate).  For years after the Khobar Towers bombing, Gration suppressed the emotion of the trauma that he had experienced, but the images of wounded people are "seared in [his] brain." *Id.* ¶ 24.  He carries painful memories and emotional scars from the bombing with him every day and continues to suffer permanent injuries from the attack, including tinnitus, hearing loss that requires the use of hearing aids, hypertension, and congestive heart failure.  *Id*. ¶¶ 25–26, *see id.* Ex. G (Gration's Discharge Summary).  The Department of Veterans Affairs ("the VA") has rated him 100% disabled, including 100% for congestive heart failure with hypertension, from the bombing.  *Id.* ¶ 27; *see also id.*, Ex. H (Gration's VA Benefit Information).

Gration's wife, Judith Ellen Gration, learned about the attack while watching television, and was "so frightened" at the terrible damage, assuming the worst that her husband was not safe.  Decl. of Judith E. Gration (Apr. 20, 2022) ("Judith Gration Decl.") ¶¶  3, 6, ECF No. 43-1.

When Gration called informing Judith Gration that he was safe, she was relieved but very upset to know he had been injured.  *Id.* ¶ 7.  Following the attack, Judith Gration shared her husband's emotional pain as she witnessed him struggle with his injuries from the attack, *id.* ¶ 15, and she worked to maintain the family's functioning as the "shock absorber, caregiver, listener, and counselor" as her husband dealt with his responsibilities and health issues, *id.* ¶ 18.

Gration's son, Jonathan Scott Gration, Jr., learned about the attack when he was in boot camp for basic cadet training at the Air Force Academy and recieved a phone call from his father telling him that there had been a terrorist attack on his base.  Decl. of Jonathan Scott Gration, Jr. (Mar. 17, 2022) ("Jonathan Gration, Jr. Decl.") ¶¶ 3, 6, 8, ECF No. 43-1.  Jonathan Gration, Jr. was in shock and continued to think about the attack every day, and it caused him a lot of stress. *Id.* ¶¶ 8–9.  Although "thankful" that his father had survived, *id.* ¶ 9, after the attack, Jonathan Gration, Jr.'s relationship with his father was not the way it was before, with the two becoming very distant and disconnected, *id.* ¶¶ 14–15.  Jonathan Gration, Jr. has grown to understand somewhat the pain his father has endured, but feels that he "lost" his father as he knew him.  *Id.* ¶ 16.

### 2.  *Barry Gordon Brown and Two Family Members*

On June 25, 1996, Barry Gordon Brown was serving as a Staff Sergeant in the U.S. Air Force stationed in Dhahran, Saudi Arabia, and housed in the Khobar Towers Complex.  Decl. of Barry Gordon Brown (Dec. 27, 2021) ("B. Brown Decl.") ¶ 6, ECF No. 43-1.  On the day of the attack, Brown was exercising in the complex's fitness center when the "mirrors all around the gym exploded."  *Id.* ¶¶ 7–8.  He realized that a bomb had exploded, and he collected everyone from the gym and moved them to an attached parking garage.  *Id.* ¶¶ 8–9.  Upon returning to his dorm to retrieve clothes and shoes to assist in search and rescue, Brown observed his dorm room in complete destruction and he "was overcome with horror" that he would have been killed if he

was there at the time of the attack.  *Id.* ¶ 11.  Brown sustained a severe injury to his rotator cuff while assisting in search and recovery efforts that required cortisone injections and surgery to relieve the "excruciating pain and limited mobility."  *Id.* ¶ 12; *see also id.*, Ex. D (Brown's Shoulder and Arm Conditions Disability Benefits Questionnaire).  Brown remained at the Khobar Towers for more than three months after the attack where he searched for and removed remains of fellow servicemembers who had been killed.  *Id.* ¶ 15.  For his actions following the attack, Brown was awarded the Air Force Commendation Medal with Valor.  *Id.*; *see also id.*, Ex. E (Brown's Air Force Commendation Medal with Valor Certificate).  Every day since the attack, Brown has experienced an "overwhelming amount of stress and anxiety" which has taken a physical toll on him.  *Id.* ¶ 21.  His post-traumatic stress disorder eventually led to irritable bowel syndrome ("IBS") and hypertension with heart disease.  *Id.*; *see also id.*, Exs. F (Brown's PTSD Disability Benefits Questionnaire), G (Brown's IBS Treatment Record).  He continues to suffer from the physical injuries he sustained and has been diagnosed with tinnitus, significant pain in the right shoulder, and sleep apnea.  *Id.* ¶ 22.  The VA has rated Brown 100% disabled due to injuries caused by the attack.  *Id.* ¶ 22; *see also id.*, Ex. H (Brown's VA Benefits Letter).

Barry Brown's former spouse, Eva Ranee Graham, learned of the attack from a phone call from her then husband.  Decl. of Eva Ranee Graham (Dec. 27, 2021) ("E. Graham Decl.") ¶ 3, 9, ECF No. 43-1.  Several hours later, the commander of her husband's unit called stating that he did not know if her husband was dead or alive, which confused her and amounted to her "getting the shock of [her] life twice in one day."  *Id.* ¶ 10.  During the following week, Eva Ranee Graham experienced "feelings of intense fear, anger, and sorrow" and began having recurrent nightmares.  *Id.* ¶ 13.  The attack had a profound impact on her husband, and his injuries caused their family "extreme grief and distress."  *Id.* ¶ 17.  Unfortunately, the "emotional

anguish" she and her husband endured overcame their marriage and they divorced after the attack.  *Id.* ¶ 16.

Barry Brown's son, Corey Thomas Brown, was four years old at the time of the attack and he claims that his relationship with his father negatively suffered upon Barry Brown's return from Saudi Arabia.  Decl. of Corey Thomas Brown (Jan. 3, 2022) ("C. Brown Decl.") ¶¶ 3, 6, 12, ECF No. 43-1.  Corey Thomas Brown was unable to form a healthy relationship with his father, even feeling "relieved" when his parents divorced, *id.* ¶ 11, and that tumultuous bond resulted in Corey Thomas Brown suffering from low self-esteem and difficulty with relationships, *id.* ¶ 12.

### 3.  Angela Mashel Brown and One Family Member

On June 25, 1996, Angela Mashel Brown was serving as a Senior Airman, Services Specialist in the U.S. Air Force stationed in Dhahran, Saudi Arabia at the Khobar Towers complex.  Decl. of Angela Mashel Brown (Dec. 27, 2021) ("A. Brown Decl.") ¶ 6, ECF No. 43-1.  She was working in the Khobar Towers recreation center at the time of the attack and the blast of pressure from the explosion engulfed her.  *Id.* ¶ 7.  She was ordered to help with search and rescue and was "overwhelmed by the horrific devastation" as she "waded" through blood, body parts, and mangled people for several traumatizing hours.  *Id.* ¶ 10.  She remained at Khobar Towers for two months performing mortuary services for fallen servicemembers.  *Id.* ¶ 13.  For her actions following the attack, she was awarded the Air Force Achievement Medal. *Id.*; *see also id.*, Ex. D (Brown's Transmittal of and Entitlement to Awards).  Brown immediately began to have symptoms of PTSD and numerous major anxiety and panic attacks.  *Id.* ¶ 14.  She also suffered from depression and ultimately separated from the military because of the triggers of military life.  *Id.* ¶¶ 17–18; *see also id.*, Ex. E (Brown's Medical Records).  She is rated 80% disabled by the VA for PTSD, tinnitus, and sleep apnea connected to her service at the Khobar

Towers.  *Id.* ¶¶ 20–23; *see also id.*, Exs. F (Brown's VA Rating Decision Letter), G (Brown's

VA Rated Disabilities), H (Brown's VA Rating Decision Letter), I (Brown's VA Benefits

Letter).

Angela Brown's daughter, Alexis Nichole Wingate, learned about the attack from her

mother when she returned home from Saudi Arabia, Decl. of Alexis Nichole Wingate (Dec. 23,

2021) ("A. Wingate Decl.") ¶¶ 3, 8, ECF No. 43-1, and following the attack, life at home was not

the same because her mother's "entire demeanor had changed," *id.* ¶ 10.  Her mother became

hypersensitive, paranoid, and emotionally unavailable.  *Id.*  In the years since the attack, Alexis

Nichole Wingate assumed the role of parenting her mother, helping her with various

responsibilities and decisions, and her mother's physical and emotional absence caused her to

become depressed and develop low self-esteem.  *Id.* ¶ 13.

### 4.  *Steven Lee Byers and Three Family Members*

Steven Lee Byers was serving as an Airman First Class in the United States Air Force in

Dhahran, Saudi Arabia, and housed at the Khobar Towers complex.  Decl. of Steven Lee Byers

(Jan. 25, 2022) ("S. Byers Decl.") ¶ 6, ECF No. 43-1.  At the time of the attack, Byers was

sitting on the couch in the day room watching the news when an explosion ripped through the

glass patio door in front of him.  *Id.* ¶ 7.  The explosion threw him into the air and he slammed

against a wall across the room where he landed on his head and neck.  *Id.*  He managed to exit

the building with help from his roommate and another airman, and once outside, he collapsed in

exhaustion and was taken to the hospital where his injuries were treated.  *Id.* ¶¶ 8–11.  The

tendon in his left knee was exposed, and he had glass fragments in both knees.  *Id.* ¶ 10.  He

immediately began to exhibit symptoms of PTSD because he had to stay in the same dorm room

with no doors or windows because of the explosion.  *Id.* ¶ 14.  Byers's pain was so severe that

eight months after the attack he was forced to separate from the Air Force.  *Id.* ¶ 20.  He received

a Purple Heart for his injuries in the attack.  *Id.* ¶ 11; *see also id.*, Ex. D (Byers's Purple Heart Certificate).  He still suffers from lost feeling in his legs if he sits too long and agonizing pain in his back, legs, and knees.  *Id.* ¶ 20.  The VA has rated Byers as 80% disabled for injuries stemming from the bombing.  *Id.* ¶¶ 20–22; *see also id.*, Ex. G (Byers's VA Individual Ratings).

Byers's mother, Donna Lee Byers, was "shocked and terrified" when she learned about the attack from her husband and for many hours she did not know the exact status of her son.  Decl. of Donna Lee Byers (Feb. 8, 2022) ("D. Byers Decl.") ¶¶ 3, 6–9, ECF No. 43-1.  This was "torturous" and learning of her son's injuries made her feel "numb."  *Id.*  Since the attack, Donna Byers has noticed the change in her son, who became anxious, easily startled, distrustful, less social, isolated.  *Id.* ¶ 13.  To this day, she has stress about her son's well being and is extremely sad to see him suffer so greatly because of the attack.  *Id.* ¶¶ 14–15.

Byers's father, Rodney Lee Byers, learned about the attack on the radio while driving home from work, and waited anxiously for an update on his son while his "fears and worries only worsened."  Decl. of Rodney Lee Byers (Jan. 29, 2022) ("R. Byers Decl.") ¶¶ 3, 6–8, ECF No. 43-1.  When his son returned home with severe physical injuries and emotional scars, Rodney Byers was saddened to see these changes, which "ha[ve] taken [their] toll."  *Id.* ¶ 15.  While they maintain a good relationship, his son's suffering is still difficult to observe.  *Id.* ¶ 16.

Byers's brother, Joseph Eugene Byers, learned about the attack from his mother after his baseball game, and he was in "shock and disbelief."  Decl. of Joseph Eugene Byers (Feb. 5, 2022) ("J. Byers Decl.") ¶¶ 3, 6, ECF No. 43-1.  When his brother returned, Joseph Byers noticed the change in him and that behavior "rubbed off on [Joseph Byers]"—he became overly cautious of people and places and struggled to form relationships with peers and colleagues.  *Id.*

¶¶ 11–13.  The attack caused the brothers to lose the close relationship that they previously had. *Id.* ¶ 14.

### 5. *Timothy Gerard Fermanis*

Timothy Gerard Fermanis was serving as a Communications Technician Sergeant in the U.S. Air Force on June 25, 1996, stationed at the Khobar Towers.  Decl. of Timothy Gerard Fermanis (Jan. 25, 2022) ("T. Fermanis Decl.") ¶ 5, ECF No. 43-1.  At the time of the attack, he was on the first floor of a targeted building on the complex closing a window curtain.  *Id.* ¶ 6. The explosion shattered that window, which sent shards of glass into his body, threw him across the room into a wall, and knocked him unconscious.  *Id.*  He awoke to "excruciating pain" in his head and shoulder and had shrapnel wounds and blood coming from the tops of his feet, legs, and right knee.  *Id.* ¶ 7.  Fermanis received a Purple Heart for his injuries in the attack and the Air Force Achievement Medal Third Oak Leaf cluster for his actions after the attack.  *Id.* ¶¶ 15– 16; *see also id.*, Exs. D (Fermanis's Purple Heart Certificate), E (Fermanis's Air Force Achievement Medal Certificate).  When he retuned home, Fermanis immediately started to experience symptoms of PTSD.  *Id.* ¶ 19.  He started to feel "intense discomfort" in large crowds, which impacted his relationships because he did not like being in large gatherings and social settings.  *Id.* ¶ 20.  Fermanis is rated by the VA as 60% disabled for PTSD, knee injuries, and tinnitus caused by the attack.  *Id.* ¶¶ 21–22, Exs. F (Fermanis's VA Rated Disabilities), G (Fermanis's VA Medical Records).

### 6. *Kevin Richard Mall*

Kevin Richard Mall was serving as a Senior Airman Munitions Craftsman in the United States Air Force on June 25, 1996, stationed at the Khobar Towers.  Decl. of Kevin Richard Mall (Sept. 12, 2022) ("K. Mall Decl.") ¶ 5, ECF No. 43-1.  When the attack hit, he was in his dorm room lying on his bed when a "huge explosion" occurred and he was thrown from his bed into

the lockers across the room.  *Id.* ¶ 6.  Mall sustained abrasions to his hands and feet and his feet were bleeding from the glass shards in his boots.  *Id.* ¶ 8.  He assisted with rescue operations and helped injured personnel, for which he received the Air Force Achievement Medal.  *Id.* ¶ 11; *see also id.*, Ex. D (Mall's Air Force Achievement Medal Certificate).  He also assisted with recovery efforts in the weeks after the attack, retrieving bodies of fellow servicemembers and preparing caskets for return flights back to the United States, for which he received the Air Force Achievement Medal First Oak Leaf Cluster.  *Id.* ¶ 14; *see also id.*, Ex. E (Mall's Air Force Achievement Medal First Oak Leaf Cluster Certificate).  These duties caused Mall "severe emotional distress, horrifying nightmares, and paranoia."  *Id.* ¶ 15.  He was eventually diagnosed with PTSD, became verbally and emotionally abusive to his family, used alcohol to cope with his anger.  *Id.* ¶¶ 15, 22.  Mall is rated as 100% disabled by the VA due to his injuries from the attack and he still stuffers from PTSD, sleep apnea, anxiety, an irritable colon, and permanent laceration scars on his feet from the attack.  *Id.* ¶¶ 23–25; *see also id.*, Ex. I (Mall's VA Disability Rating).

### 7.  *John Charles Orlando, Jr. and One Family Member*

On June 25, 1996, John Charles Orlando, Jr. was serving as a Staff Sergeant in the Air Force and was housed at the Khobar Towers complex in Dhahran, Saudi Arabia.  Decl. of John Charles Orlando, Jr. (May 20, 2022) ("J. Orlando Decl.") ¶ 6, ECF No. 43-1.  On the night of the attack, he was watching television in a room on the first floor of a targeted building when he saw a "large flash of light" and heard a "loud explosion."  *Id.* ¶ 7.  He next remembers laying on the floor and his ears ringing.  *Id.* ¶¶ 7–8.  As he left the room and headed towards the dining hall, he noticed blood coming from his left calf and found a deep shrapnel wound.  *Id.* ¶¶ 9–10.  Orlando was awarded a Purple Heart for his injuries.  *Id.* ¶ 10; *see also id.*, Ex. D (Orlando's Purple Heart Certificate).  After his injuries were treated, a commander asked that he console members of his

unit. *Id.* ¶ 11.  The enormity of the task overwhelmed Orlando with grief and he "broke down crying uncontrollably." *Id.*  He then consoled and prayed with numerous people, for which he was awarded the Air Force Commendation Medal First Osak Leaf Cluster. *Id.* ¶ 12; *see also id.*, Ex. E (Orlando's Air Force Commendation Medal First Osak Leaf Cluster Certificate).  For the first six months after the attack, Orlando had "vivid flashbacks of the wounded people, broken items, shattered glass, and the desperation on everyone's face that night." *Id.* ¶ 17.  The injuries that he suffered changed him forever and negatively impact his quality of life. *Id.* ¶¶ 22–23.  He continues to suffer from nerve damage in his leg, which is agitated when his left leg comes into contact with anything, and resulted in his 10% disabled rating from the VA. *Id.* ¶ 22; *see also id.*, Ex. G (Orlando's VA Benefits Letter).

Orlando's spouse, Ursula Leona Orlando first learned about the attack when she returned home from work and saw the news on television, which "shocked, stunned, overwhelmed, and worried" her. *Id.* Decl. of Ursula Leona Orlando (May 20, 2022) ("U. Orlando Decl.") ¶¶ 3, 6, ECF No. 43-1.  She received a call from someone in her husband's unit to tell her that his whereabouts were unknown and she was "beside [herself], beyond distraught" until she finally heard from her husband the next day. *Id.* ¶¶ 7–8.  Ursula Orlando's worldview changed after the attack, and she has not felt as safe since. *Id.* ¶ 14.  She and her husband are more "guarded and cautious" and she "experienced a loss of innocence." *Id.*

### 8.  *Kenneth David Weaver and Five Family Members*

Kenneth David Weaver was serving as a Torpedo Mate 2nd Class Master-at-Arms in the U.S. Navy and was temporarily housed at the Khobar Towers complex on June 25, 1996, as he and his unit awaited the arrival of another naval ship.  Decl. of Kenneth David Weaver (Apr. 27, 2022) ("K. Weaver Decl.") ¶¶ 6, 8, ECF No. 43-1.  On the night of the attack, he was evacuating the building because a fire alarm had sounded minutes before the bombing. *Id.* ¶ 9.  The "force

16

of the blast knocked [him] off [his] feet" and threw him to the ground, which injured his back and head, and shards of shrapnel lacerated his body. *Id*. ¶ 10. Soon after the attack, Weaver began having sleep issues and nightmares about the bombing. *Id*. ¶ 16. When he returned to regular duty on his ship, his injuries began to impact his job performance, and he was often tense and anxious. *Id*. ¶ 20; *see also id.*, Ex. D (Weaver's Enlisted Evaluation Report). Due to his continual decline in job performance, Weaver's enlistment in the Navy was canceled. *Id*. ¶¶ 22–23. He still suffers from physical pain and trauma from the attack, and the VA has rated him as 40% disabled due to degenerative arthritis in his spine. *Id*. ¶¶ 26–29; *see also id.*, Ex. I (Weaver's VA Rated Disabilities).

Weaver's sister Susan Pauline Pomoransky, learned about the attack from her brother who heard on the news that the Khobar Towers had been attacked, and she was "very upset and worried." Decl. of Susan Pauline Pomoransky (Apr. 19, 2022) ("S. Pomoransky Decl.") ¶¶ 3, 6, ECF No. 43-1. Once she learned that her brother was safe, she was relieved, but still worried about him. *Id*. ¶ 7. Since the attack, the communication between Susan Pomoransky and her brother has decreased significantly, and he became distant. *Id*. ¶ 9. The attack negatively affected their relationship, and they have ultimately grown apart. *Id*. ¶ 15.

Weaver's other sister, Vickie Rena Weaver Anthony, learned about the attack from a phone call from her sister and was "shocked" and "felt sick to [her] stomach." Decl. of Vickie Rena Weaver Anthony (Apr. 19, 2022) ("V. Anthony Decl.") ¶¶ 3, 6, ECF No. 43-1. After some days, she finally learned that her brother was alive but injured, which was "terrifying" to her. *Id*. ¶ 8. When her brother returned home, Vickie Anthony felt like her brother became a stranger and the distance between them grew. *Id*. ¶ 12. Her brother's behavior worsened over the years and the strength of their relationship deteriorated. *Id*. ¶ 17.

Weaver's brother, Clinton Edward Weaver, learned about the attack from a brief phone call with one of his sisters and this left him "feeling very upset and with so many questions." Decl. of Clinton Edward Weaver (Oct. 27, 2022) ("C. Weaver Decl.") ¶¶ 3, 6, ECF No. 43-1. He was relieved to learn that his brother was safe, but when Clinton Weaver finally spoke to his brother, he could tell how traumatic the attack was. *Id.* ¶ 9. When his brother finally returned home, Clinton Weaver saw a change in his relationship with his brother; although they used to talk frequently, they communicated less after the attack and "[their] relationship became strained." *Id.* ¶ 14. Clinton Weaver has endured "great sadness" watching his brother suffer, and he mourns the toll the attack has taken on their relationship. *Id.* ¶¶ 15–16.

Weaver's brother, Donald Lee Heikes, received a call from a sister with news of the attacked while he was at work. Decl. of Donald Lee Heikes (Apr. 19, 2022) ("D. Heikes Decl.") ¶¶ 3, 6, ECF No. 43-1. Donald Heikes was "overwhelmed with various emotions" while he was waiting for more information about his brother's condition. *Id.* ¶ 8. Even though he eventually got to speak with his brother and assured himself that his brother was safe, his "worries about him continued" while he was away. *Id.* ¶ 9. Donald Heikes was close to his brother before the attack, but "nothing was ever the same again . . . after" due to his brother's short temper, difficulty sleeping, decreased communication, and need to get help. *Id.* ¶¶ 10, 13, 17.

Weaver's brother, Roger Dayle Heikes, learned about the attack from his sister several days after it occurred. Decl. of Roger Dayle Heikes (Oct. 27, 2022) ("R. Heikes Decl.") ¶¶ 3, 6, ECF No. 43-1. Although he learned that his brother was safe, he "continued to fear for his safety." *Id.* ¶¶ 6–7. After his brother was discharged from the Navy, their reunion was "disheartening and disappointing" because their once-close relationship changed due to his

brother's "emotional wall." *Id.* ¶¶ 12–13.  Roger Heikes is saddened by what the attack did to his brother, and he speaks with him much less frequently since then.  *Id.* ¶ 14.

### 9. *Ronald Scott Gering*

Ronald Scott Gering was serving as an electronics system switching specialist in the Air Force stationed at the Khobar Towers complex on June 25, 1996.  Decl. of Ronald Scott Gering (Jan. 25, 2022) ("R. Gering Decl.") ¶ 5, ECF No. 43-1.  On the day of the attack, he was in his dorm room and felt an "enormous explosion" that "knocked [him] to [his] knees."  *Id*. ¶ 6.  He quickly evacuated the building, while helping others similarly navigate over "layers of shattered glass," *id.* ¶ 7, and waited in an underground garage for approximately four hours in case of a second bombing, *id.* ¶¶ 9–10.  In the days after the attack, Gering worked to rebuild the complex's hospital computer system, which was desperately needed to order medical supplies, for which his efforts earned him an Air Force Achievement Medal with Valor.  *Id.* ¶¶ 11, 13; *see also id.*, Ex. E (Gering's Air Force Achievement Medal with Valor Certificate).  When he returned to the United States, he was relieved to be reunited with his family, but he still suffers from anxiety, hypervigilance, trouble sleeping, and difficulty maintaining relationships.  *Id.* ¶¶ 16–23.  Gering was later diagnosed with PTSD and tinnitus, leaving him 40% disabled according to the VA.  *Id.* ¶¶ 8, 17; *see also id.*, Exs. D (Gering's VA Rated Disabilities), F (Gering's Mental Health Consultation Notes), H (Gering's VA Benefits Letter).

### 10. *Aubree Brooke Staricka*

Aubree Brooke Staricka was serving as an Airman in the United States Air Force on June 25, 1996.  Decl. of Aubree Brooke Staricka (Mar. 29, 2022) ("A. Staricka Decl.") ¶ 5, ECF No. 43-1.  She was riding in a government vehicle returning to the Khobar Towers at the time of the attack when she "saw a huge flash of light and a massive explosion."  *Id*. ¶ 6.  She sprinted into the targeted buildings, attempting to find friends and aiding the injured, until she was ordered

back to her station away from the Towers in case of another bombing. *Id.* ¶¶ 7–11. The following day, she learned that her ex-boyfriend and ten friends died in the attack, and the realization that she could have been among them multiplied her grief. *Id.* ¶¶ 8, 10, 14. Staricka remained in a "state of depression and shock" even after returning home to Florida a week later. *Id.* ¶¶ 15. She was diagnosed with PTSD and sleep apnea following the attack, resulting in a 90% disabled rating by the VA. *Id.* ¶¶ 19–21; *see also id.*, Exs. G (Staricka's PTSD Diagnosis), H (Staricka's VA Rating Decision Letter), I (Staricka's Medical Record). She also suffers from "debilitating insomnia, constant anxiety, polarizing highs and lows, uncontrollable paranoia, and relentless survivor's guilt and depression." *Id.* ¶ 20.

### *11. Brent Alan Mullings and Four Family Members*

Brent Alan Mullings was serving as an Airman First Class in the Air Force on June 25, 1996. Decl. of Brent Allen Mullings (Aug. 5, 2022) ("B. Mullings Decl.") ¶ 6, ECF No. 43-1. Mullings was working at a security post in the Khobar Towers complex when he "saw a bright flash, heard a loud explosion, and felt the powerful blast wave painfully surge through [his] body." *Id.* ¶¶ 7–8. As chaos unfolded around him, Mullings kept to his assigned security post for the duration of his shift, "preparing to defend against the [a]ttack." *Id.* ¶ 10. He continued in that security patrol position in the days after the bombing, for which he earned the Armed Forces Expeditionary Medal. *Id.* ¶¶ 13–14; *see also id.*, Ex. D (Mullings's Armed Forces Expeditionary Medal Certificate). Mulling has suffered from nightmares, flashbacks, anxiety, depression, short-term memory loss, suicidal ideation, and difficulty maintaining relationships and employment. *Id.* ¶¶ 18–24. The VA rated him as 100% disabled from PTSD directly caused by the attack. *Id.* ¶ 26; *see also id.*, Exs. G (Mulling's PTSD Diagnosis Report), H (Mulling's VA Rating Decision Letter).

Mullings's spouse, Tina Marie Mullings, learned of the attack on the news and was "instantly scared and shocked."   Decl. of Tina Marie Mullings (Aug. 5, 2022) ("T. Mullings Decl.") ¶¶ 3, 6, ECF No. 43-1.  Her husband called hours later, which "relieved" her, but her lack of information about his continued safety made her "an emotional wreck."  *Id.* ¶ 7.  In the aftermath of the attack, Tina Mullings has struggled psychologically and has had to adapt to her husband's changed demeanor.  *Id.* ¶ 13.  To this day, she faces the daily challenges associated with her husband's injuries and anticipates it will continue for the rest of her life.  *Id.* ¶ 14.

Mullings's mother, Gloria Ann Mullings was told by her husband, who arrived unexpectedly at her job, about the bombing and she was "shocked" and "terribly frightened for [her] son."  Decl. of Gloria Ann Mullings (Aug. 16, 2022) ("G. Mullings Decl.") ¶¶ 3, 6–7, ECF No. 43-1.  When she found out her son was safe, she was happy but "heartbroken knowing that he was going through such a horrible situation across the world."  *Id.* ¶ 8.  Since the attack, the emotional needs of both her son and her husband, a Vietnam War veteran, have taken a toll on her physically and psychologically.  *Id.* ¶ 11, 15.

Mullings's father, Vernon Oscar Mullings learned about the attack from his daughter and he "was shak[en], scared, and devastated by the news."  Decl. of Vernon Oscar Mullings (Aug. 16, 2022) ("V. Mullings Decl.") ¶¶ 3, 6, ECF No. 43-1.  He was relieved when he heard from Tina Mullings about his son, but the lack of information about his son's continued safety caused him stress.  *Id.* ¶ 7.  In the years after the attack, watching his son struggle triggered Vernon Mullings's PTSD symptoms following his service in the Vietnam War, resulting in Vernon Mullings's wife leaving her job to care for him.  *Id.* ¶ 12.

Mullings's sister, Heather Maureen Hector, learned of the attack from a friend and the memory of her family's worry awaiting word on her brother's safety was devastating.  Decl. of

Heather Maureen Hector (Oct. 6, 2022) ("H. Hector Decl.") ¶¶ 3, 6–7, ECF No. 43-1.  She was

happy that her brother was safe, but she continued to worry until his return home.  *Id.* ¶¶ 7–8.

Since the attack, Heather Hector has suffered watching her brother cope with his physical and

psychological difficulties and her father's reignited PTSD.  *Id.* ¶¶ 16–19.

### 12. *Sy William Yost and One Family Member*

Sy William Yost was serving as a Major and Section Chief in the United States Air Force

on June 25, 1996, stationed at the Khobar Towers.  Decl. of Sy William Yost (June 11, 2022)

("S. Yost Decl.") ¶ 6, ECF No. 43-1.  At the time of the attack, he had returned to his room when

he started to feel the building shake and then a "blast surge[d] through the building."  *Id.* ¶ 7.

Yost was knocked unconscious, and when he awoke, he was covered in glass, his head and arm

were bleeding, and his ears were ringing.  *Id.*  After exiting the building, he assisted in the search

for survivors at the bomb site where one of his colleagues "died of his wounds in [his] arms."  *Id.*

¶ 9.  Yost eventually received stitches in his elbow, nose, and chin at the triage center, and he

had many bruises and scrapes all over his body, including a laceration on his scalp.  *Id.* ¶ 10.  He

was awarded a Purple Heart for his injuries, *id.* ¶ 10; *see also id.*, Ex. F. (Yost's Purple Heart

Certificate), as well as the Air Force Commendation Medal with Valor for his actions after the

attack, *id.* ¶ 9; *see also id.*, Ex. E (Yost's Air Force Commendation Medal with Valor

Certificate).  After the attack, Yost suffered from constant irritation, indifference, difficulty

socializing, and sleeping.  *Id.* ¶¶ 19–20.  He was diagnosed by the VA as 90% of the 100%

disabled with PTSD, sleep apnea, and tinnitus caused by the attack.  *Id.* ¶¶ 22–23; *see also id.*,

Exs. G (Yost's Medical Treatment Record for PTSD), H (Yost's Medical Treatment Record for

Tinnitus), I (Yost's VA Rated Disabilities).

Yost's then fiancée and now spouse, Maria Star Yost, learned of the attack while at work;

she "felt so distraught" and started crying.  Decl. of Maria Star Yost (June 11, 2022) ("M. Yost

Decl.") ¶¶ 3, 6–7, ECF No. 43-1.  She heard from her fiancée's parents that he was alive the next day, and when she finally spoke to him two days after the bombing, she was "very emotional." *Id.* ¶¶ 8–9.  When Yost returned home, he and Maria Yost finally married, but she noticed a change in her now-husband's behavior: "[he] wanted to be alone more often and did not want to go out to do anything."  *Id.* ¶¶ 6, 12–13.  She has also experienced "fatigue and emotional stress" in their marriage and has not had a "carefree day" since the attack.  *Id.* ¶ 18.

### *13. Three Family Members of Airman Clayton Omar Zook*

Clayton Omar Zook, an Airman in the United States Air Force quartered at the Khobar Towers at the time of the attack, was a plaintiff in *Christie*, 2020 WL 3606273, at *4.  He was awarded $7 million in damages as a result of his pain and suffering.  *Id.* at *24.  Zook's stepsisters, Serena Elizabeth Douglass and Sarah Grace Douglass, and stepfather, Steven Millard Douglass, are plaintiffs in this action.  Decl. of Serena Elizabeth Douglass (Dec. 27, 2021) ("S. Elizabeth Douglass Decl.") ¶¶ 3, 4, ECF No. 43-1; Decl. of Sarah Grace Douglass (Dec. 23, 2021) ("S. Grace Douglass Decl.") ¶¶ 3, 4, ECF No. 43-1; Decl. of Steven Millard Douglass (Jan. 3, 2022) ("S. Millard Douglass Decl.") ¶¶ 3, 4, ECF No. 43-1.

Serena Elizabeth Douglass learned about the attack at age fourteen from her father and stepmother and she was "instantly nervous" and unequipped to handle such a stressful and traumatic event.  S. Elizabeth Douglass Decl. ¶ 6.  She was relieved to hear that he was safe, but when he returned home, she noticed that her brother was more withdrawn and spent less time around her.  *Id.* ¶¶ 6, 12.  "Stress and fear have consumed [her] life", and she has sought professional help to deal with her depression and anxiety that have developed because of the attack.  *Id.* ¶ 13.

Sarah Grace Douglass learned about the attack from her parents and lived "in a constant state of anxiety" for days.  S. Grace Douglass Decl.¶¶ 6–7.  After the attack, the connection

between Sarah Douglass and her brother dissipated, and she started to "experience severe depression due to Clayton's rejection of [her]." *Id.* ¶¶ 11, 13.  She has sought professional help for her anxiety and depression, but her brother's injuries from the attack continue to impact her and her entire family. *Id.* ¶ 13.

Steven Millard Douglass learned about the attack after his wife answered a phone call from Clayton who told her about the attack.  S. Millard Douglass Decl. ¶ 8.  He felt "sick to [his] stomach" because he "knew something terrible must have happened." *Id.*  Their relationship never returned to normal after the attack, and he continues to mourn the loss of his son's detachment from him. *Id.* ¶ 10.

### 14. Joey Laurier Morrissette and Two Family Members

Joey Laurier Morrissette was serving as an Airman First Class in the Air Force on June 25, 1996, stationed at the Khobar Towers.  Decl. of Joey Laurier Morrissette (Oct. 19, 2022) ("J. Morrissette Decl.") ¶ 6, ECF No. 43-1.  When the attack happened, he was in his room when he "heard a loud explosion" and "felt a shockwave of pressure." *Id.* ¶ 7.  As he tried to escape the building without shoes, his feet were "getting shredded by the shards of shattered glass that covered the floor." *Id.* ¶ 9.  The fact that he was so close to the bomb site left him "in shock" and feeling "confused, tense, unsettled, worried, concerned, and nervous." *Id.* ¶ 12.  After the attack, he was tasked with clearing glass, debris, and blood, and he loaded injured servicemembers onto planes to Germany to seek treatment—actions that earned him the Air Force Achievement Medal, the Armed Forces Expeditionary Medal, and the Air Force Certification of Appreciation. *Id.* ¶ 17; *see also id.*, Exs. D (Morrissette's Air Force Achievement Medal Certificate), E (Morrissette's Armed Forces Expeditionary Medal Certificate), F (Morrissette's Air Force Certification of Appreciation Certificate).  For his injuries, he was offered a Purple Heart, but he declined it because he did not think he was

deserving.  *Id.* ¶ 13.  The chaos and horror that he witnessed during and right after the attack

"continue to haunt [him] today."  *Id.* ¶ 18.  He previously attempted suicide and spent a brief

time in a hospital psychiatric unit.  *Id.* ¶ 20.  He suffers from PTSD, leaving him 100% disabled,

as rated by the VA.  *Id.* ¶ 24; *see also id.*, Exs. G (Morrissette's VA Decision Letter), H

(Morrissette's PTSD Diagnosis).

 Morrissette's mother, Diane Theresa Morrissette, heard about the attack from a friend and

she felt "helpless, angry, and terrified."  Decl. of Diane Theresa Morrissette (June 19, 2022) ("D.

Morrissette Decl.") ¶¶ 3, 6, ECF No. 43-1.  When he returned from Saudi Arabia, Diana

Morrissette's son came to live with her and her husband and she "could really see the changes in

him" that caused him to "struggle[] emotionally and psychologically."  *Id.* ¶¶ 8, 11.  She is

"consumed with worry and anxiety about [her son] all the time" as it has been very difficult for

her and her family since the attack.  *Id.* ¶ 13.

 Morrissette's sister, Natasha Kami Morrissette, heard about the attack from her mother

and she "will never forget the horrible feeling that came over [her]."  Decl. of Natasha Kami

Morrissette (June 18, 2022) ("N. Morrissette Decl.") ¶¶ 3, 6, ECF No. 43-1.  She was very close

with her brother before the attack, but when he came home after the attack, he was very different.

*Id.* ¶¶ 9, 11.  She had to take time off from work to take care of her brother and this caused her a

"significant amount of anxiety and sleep issues."  *Id.* ¶ 12.

### 15. Nathan Elliott Wheat and One Family Member

 Nathan Elliott Wheat was serving as an Airman First Class in the United States Air Force

on June 25, 1996, stationed at the Khobar Towers.  Decl. of Nathan Elliott Wheat (Sept. 8, 2022)

("N. Wheat Decl.") ¶¶ 3, 6, ECF No. 43-2.  He was in a common area of one of the affected

building when an explosion "with a blast force so strong that it launched [him] into the air and

crashed [him] down onto the couch."  *Id.* ¶ 7.  He began to assist with the rescue efforts until

"severe pain in [his] knee and back" forced him to seek medical care—these injuries resulted in his award of a Purple Heart.  *Id.* ¶ 11; *see also id.*, Ex. D (Wheat's Purple Heart Certificate).  Following the bombing, Wheat assisted fellow servicemembers and returned to his post as a Security Police officer, earning an Armed Forces Expeditionary Medal.  *Id.* ¶ 15; *see also id.*, Ex. F (Wheat's Armed Forces Expeditionary Medal Certificate).  He was eventually medically discharged from the Air Force because he was not able to tolerate physical therapy and exercise to rehabilitate his injuries.  *Id.* ¶ 18; *see also id.*, Ex. G (Wheat's Recommendation for Correction of Military Records).  Wheat is rated by the VA as 40% disabled for his back injury, and he can no longer participate in many of the physical activities he used to enjoy.  *Id.* ¶ 21; *see also id.*, Exs. H (Wheat's VA Rated Disabilities), I (Wheat's VA Benefits Letter).

Wheat's father, Donald Allen Wheat, was "so scared and worried" when he found out about the attack from his wife.  Decl. of Donald Allen Wheat (Aug. 29, 2022) ("D. Wheat Decl.") ¶¶ 3, 6, ECF No. 43-2.  When he found out that his son was injured, the "pain, anguish, and helplessness" that he felt were "impossible to describe."  *Id*. ¶ 7.  After the attack, his son was "noticeably different" and they were not able to enjoy activities together as they did in the past.  *Id.* ¶ 18.  Seeing his son struggle has "taken a toll on [him]," and he has a lot of guilt for what his son experienced during the attack.  *Id.*

### 16. Vincent Gene Oliver and One Family Member

Vincent Gene Oliver was serving as a Staff Sergeant in the United States Air Force on June 25, 1996, stationed at the Khobar Towers.  Decl. of Vincent Gene Oliver (June 23, 2022) ("V. Oliver Decl.") ¶ 6, ECF No. 43-2.  He was dozing off in his suite when a loud explosion and "wall of high-pressure air" forced him awake; then the glass doors in front of him shattered and glass pierced his legs.  *Id*. ¶ 7.  Although he "was in shock," he made his way to a temporary triage center where the glass was removed from his legs and feet, leaving permanent scars.  *Id.*

¶¶ 7–8, 10.  In recognition of his injuries, Oliver was awarded a Purple Heart.  *Id.* ¶ 8; *see also id.*, Ex. D (Oliver's Purple Heart Certificate).  Following the attack, he was discharged from the military because he was "not psychologically capable of deploying."  *Id.* ¶ 17.  He then began seeing a therapist who diagnosed him with PTSD as a result of the attack.  *Id.* ¶ 18; *see also id.*, Ex. G (Oliver's Medical Records).  Oliver has been left with "a very distressed and anguished life."  *Id.* ¶ 19.  He continues to have ringing in his ears and is rated as 10% disabled by the VA for tinnitus.  *Id.* ¶ 9; *see also id.*, Ex. E (Oliver's VA Disabilities Record).

Oliver's spouse, Tamara Lee Oliver, learned about the attack on the news and then "fell to [her] knees crying hysterically" and began praying.  Decl. of Tamara Lee Oliver (June 16, 2022) ("T. Oliver Decl.") ¶¶ 3, 10, ECF No. 43-2.  Since the attack, her husband has struggled to maintain employment, which has been "psychologically and emotionally draining for [her]."  *Id.* ¶ 17.  Her life has become more complicated because of the negative impact that the attack has had on her husband.  *Id.*

### 17. Steven Lee Brodt and Three Family Members

Steven Lee Brodt served as a Senior Non-Commissioned Officer in the Air Force on June 25, 1996, stationed at the Khobar Towers.  Decl. of Steven Lee Brodt (Jan. 24, 2022) ("S. Brodt Decl.") ¶ 6, ECF No. 43-2.  He was watching television on the night of the attack when "glass shards from the nearby window blew across the room and tore through [his] body."  *Id*. ¶ 7.  He had a laceration on his right foot that was "bleeding profusely," and he struggled to leave the building quickly because of the pain in his foot.  *Id*. ¶¶ 7–9.  He self-treated his injuries because he thought it was more important for others to get help, and as a result, the laceration on his foot kept opening, leaving him with a scar; he was awarded a Purple Heart for his injuries.  *Id.* ¶ 10.  Even after returning home, Brodt continued to experience psychological issues including trouble sleeping, hypervigilance, and social isolation.  *Id.* ¶ 15.  His doctors diagnosed him with PTSD,

and his daily life is now "dominated by [] symptoms of PTSD." *Id.* ¶¶ 15, 17.  Brodt did not claim to be determined disabled by the VA.

Brodt's spouse, Un Suk Brodt, learned about the attack when her husband called to tell her what had happened and she was "struck with so many emotions" and "uncertain of what could happen next."  Decl. of Un Suk Brodt (Mar. 30, 2022) ("U. Brodt Decl.") ¶¶ 3, 6–7, ECF No. 43-2.  When her husband eventually returned home, she "was shocked" to see the severity of his injury.  *Id.* ¶ 9.  It has been "very distressing" to see such significant changes in her husband's demeanor, which have also changed the dynamics of their relationship.  *Id.* ¶¶ 13, 15.  She has "suffered the emotional loss of [her] husband" given his experience at Khobar Towers.  *Id.* ¶ 15.

Brodt's son, Steven Han Brodt, heard about the attack from his dad over the phone, and he "could not comprehend the scale of it back then."  Decl. of Steven Han Brodt (Mar. 17, 2022) ("S. Han Brodt Decl.") ¶¶ 3, 6–7, ECF No. 43-2.  After his father returned home from the attack, he came to notice that his father was not the same person anymore.  *Id.* ¶ 11.  His father was "always on high alert" and his "home environment became stressful."  *Id.* ¶ 12.  He felt like he became "the parent caring for the injured child" when he would console his father after he became distraught talking about the attack.  *Id.* ¶ 13.

Brodt's son, Samuel John Brodt, spoke to his father briefly after the attack and was "scared and worried."  Decl. of Samuel John Brodt (Apr. 14, 2022) ("S. John Brodt Decl.") ¶¶ 3, 6, ECF No. 43-2.  After the attack, his father "was acting strangely"—he would not want Samuel Brodt or other family members—to be out of his sight for fear that something would happen, which frustrated and angered Samuel Brodt.  *Id.* ¶ 13.  As he got older, Samuel Brodt "realize[d] how much of [his] dad [he] lost because of the [a]ttack."  *Id.* ¶ 15.

### 18. The Estate of Steven Peter Goff and Three Family Members

Steven Peter Goff was a Captain and flight surgeon in the Air Force in Dhahran, Saudi Arabia at the Khobar Towers complex on June 25, 1996.  Decl. of Shirley Ann Goff (Oct. 5, 2021) ("S. Goff Decl.") ¶ 7, ECF No. 43-2; *see also id.*, Ex. G (Goff's Military Discharge Certificate).  Goff has since passed away and his estate is represented by his mother Shirley Ann Goff, also a plaintiff in this action, and his father Gerald Goff.  *Id.* ¶¶ 3–4, 6.  Goff spent hours following the attack providing life-saving medical care to more than 200 people, for which he was awarded the Airman's Medal and the Meritorious Service Medal.  *Id.* ¶ 13; *see also id.*, Exs. J (Goff's Airman's Medal Certificate), K (Goff's Meritorious Service Medal Certificate).  He also sustained a "large shard of glass [that] had gored through his chest" as well as glass through his hands, feet, legs, and shoulders.  *Id.* ¶ 11; *see also id.*, Ex. O (Goff's Operation Report regarding a surgery on his left shoulder).  He received a Purple Heart for his injuries.  *Id.* ¶ 12; *see id.*, Ex. I (Goff's Purple Heart Certificate).  Goff was not the same person when he returned home; he was reserved, quiet, and withdrawn, *id.* ¶ 18, and he expressed suffering from difficulty sleeping and depression, *id.* ¶¶ 19, 23; *see id.*, Ex. P (Goff's Medical Records describing eye injury and depression from the attack).  Despite receiving psychological treatment, Goff "succumbed to the mental anguish and extreme emotional pain" from the attack and died by suicide ten years after the bombing.  *Id.* ¶ 24; *see also id.*, Ex. R. (Steven Peter Goff Casualty Report).

Goff's mother, Shirley Ann Goff, found out about the attack while at home with a neighbor who mentioned that something had happened at the Khobar Towers.  *Id.* ¶ 8.  She was "stressed and panicked" and "felt helpless" not knowing if her son was alive for two days until he was able to call her.  *Id.* ¶¶ 8–11.  After the attack, it became difficult for her to maintain a close relationship with her son because he "closed himself off emotionally," and witnessing

those drastic changes caused her depression for which she sought treatment.  *Id.* ¶ 19.  Her son

told her that "he was suffering from extreme emotional distress."  *Id.* ¶ 23.  Shirley Goff stated

that she "will never be the same after losing [her] son."  *Id.* ¶ 26.

Goff's sister, Antoinette Marie Hovel, learned about the attack when her parents phoned

her about news of the attack and she "was so scared and worried about [her] brother."  Decl. of

Antoinette Marie Hovel (Oct. 6, 2022) ("A. Hovel Decl.") ¶¶  3, 6, ECF No. 43-2.  When Goff

returned home from the attack, there "was little joy in [him]," and seeing him suffer "hurt

[Antoinette Hovel] terribly."  *Id.* ¶ 11.  She feels "an immense amount of guilt and sadness" that

she did not recognize the extent of her brother's struggles before he took his own life.  *Id.* ¶ 16.

Goff's sister, Kathryn Mary Ableidinger, was at work when she learned about the attack

on television, and she was "worried and panicked" that her brother was there.  Decl. of Kathryn

Mary Ableidinger (Sept. 28, 2022) ("K. Ableidinger Decl.") ¶¶ 3, 6, ECF No. 43-2.  When she

finally got to see him after the attack, she saw his wounds and "it made [her] very sad to think

about the pain he must have endured to have a wound that severe."  *Id.* ¶ 10.  Communication

between her and her brother decreased after the attack, and he became "withdrawn, quiet, and

emotionally pulled away from the family."  *Id.* ¶ 11.  She is "devastated" by her brother's

passing and "struggle[s] every day with guilt and sadness" for not being able to help him cope

with the pain he experienced from the attack.  *Id.* ¶ 16.

### *19. James Michael Silvi and Three Family Members*

James Michael Silvi served as a First Sergeant in the United States Air Force at the

Khobar Towers complex on June 25, 1996.  Decl. of James Michael Silvi (Dec. 30, 2021) ("J.

Silvi Decl.") ¶ 6, ECF No. 43-2; *see also id.*, Ex. C (Silvi's Military Discharge Certificate).

When the attack happened, he was reading on a couch when the curtains were sucked out of the

window, he saw a "flash of bright light," heard a loud boom, and was "catapulted from the couch

and slammed into a concrete wall" and left covered in body lacerations from shrapnel and glass. *Id*. ¶ 7.  The lacerations on his feet and injuries to his head were so severe that he "had to be carried out of the building by two men."  *Id.* ¶ 10.  Silvi received a Purple Heart for his injuries. *Id.* ¶ 12; *see also id.*, Ex. D (Silvi's Purple Heart Certificate).  Despite his injuries, Silvi "worked through the night" to account for personnel and contact their families as well as clear debris and help retrieve items for the servicemembers, actions that earned him the Air Force Achievement Medal Third Oak Leaf Cluster with Valor.  *Id.* ¶ 14; *see also id.*, Ex. E (Silvi's Air Force Achievement Medal Third Oak Leaf Cluster with Valor Certificate).  He also spent evenings conducting wellness checks on Airmen, which earned him the Air Force Commendation Medal First Oak Leaf Cluster.  *Id.* ¶ 17; *see also id.*, Ex. F (Silvi's Air Force Commendation Medal First Oak Leaf Cluster Certificate).  After the attack, he "felt [himself] shift into a different person," becoming more guarded and serious.  *Id.* ¶ 18.  Symptoms of PTSD, such as anxiety and hypervigilance, "still plague [him] today."  *Id.* ¶ 19; *see also id.*, Ex. G (Silvi's Medical Examination for PTSD).  He is rated as 90% disabled by the VA for the injuries he sustained during the attack, including residual scarring on his head and permanent nerve damage, plantar fasciitis in his right foot, tinnitus, PTSD, and sleep apnea.  *Id.* ¶ 21; *see also id.*, Exs. G (Silvi's Medical Examination for PTSD), H (Silvi's VA Rated Disabilities), I (Silvi's VA Benefits Letter).

Silvi's spouse, Jo Ann Silvi, was at home when her daughter told her that she saw a news report of a bombing at the Khobar Towers complex and upon seeing the report, Jo Ann Silvi "became hysterical."  Decl. of Jo Ann Silvi (Dec. 30, 2021) ("J. Ann Silvi Decl.") ¶¶ 3, 6, ECF No. 43-2.  When her husband returned home two weeks after the attack, he "instantly seemed different to [her]" because of his changed demeanor and "general appearance of sadness."  *Id*. ¶¶

13–14.  The attack "has had a lasting impact on [their] marriage" and their joy has been replaced with "feelings of guilt and sorrow."  *Id*. ¶ 18.

Silvi's daughter, Angela Christine Silvi, learned of the attack and "became extremely upset and worried that [her] father had been killed."  Decl. of Angela Christine Silvi (Dec. 30, 2021) ("A. Silvi Decl.") ¶¶  3, 8, ECF No. 43-2.  Upon his return, she noticed that he had a short temper and was very impatient with her.  *Id*. ¶ 12.  She had to learn how to "navigate around his new behavior to maintain [their] relationship."  *Id*. ¶ 13.  The attack ultimately "robbed [her] of the close relationship that [she] had with him."  *Id*. ¶ 14.

Silvi's daughter, Alison Elizabeth Silvi, learned about the attack when she saw it on the news and watching her mom panic "frightened [her] even more."  Decl. of Alison Elizabeth Silvi (Dec. 30, 2021) ("A. Elizabeth Silvi Decl.") ¶¶ 3, 6–7, ECF No. 43-2.  It was a "traumatizing day" at such a young age, and "[she] experienced emotions no 11-year-old should."  *Id.* ¶ 9.  When she reached a more mature age, her father explained to her what had happened on the day of the attack, and "it haunts [her] to this day . . . how scared [her] dad must have been."  *Id.* ¶ 14.  She has endured "a lot of confusion, fear, and stress because of the [a]ttack."  *Id.* ¶ 15.

### 20. David Anthony Toole and Two Family Members

David Anthony Toole served as an Airman First Class in the United States Air Force at the Khobar Towers complex on June 25, 1996.  Decl. of David Anthony Toole (Dec. 23, 2021) ("D. Toole Decl.") ¶ 6, ECF No. 43-2.  Before the attack, he was in his room when he "heard a loud explosion, and the doors in [his] room were blown off their hinges."  *Id*. ¶ 7.  He was "thrown across" the room and when he regained his senses, he realized that his ears were ringing and that he had lacerations on his head and back.  *Id.* ¶¶ 7–8.  When he made it to a triage center, he had the pieces of glass in his back removed and the wounds to his head sutured; he received a Purple Heart for these injuries.  *Id.* ¶ 11; *see also id.*, Ex. D (Toole's Purple Heart Certificate).

Once he returned home, he had terrible nightmares and "the thoughts of bombings and explosions consumed [him]." *Id.* ¶ 14.  He also suffered from severe psychological injuries from the attack,  *id.* ¶¶ 25, which led him to resign from the Air Force, yet he continued to suffer from "severe anxiety, memory loss, and sleep impairment," *id.* ¶¶ 27–28.  The attack "has been the biggest stressor in [his] life," and he still carries "the emotional scars of both the terror that [he] experienced and the horror that [he] witnessed." *Id.* ¶ 30.  The VA rated him as 60% disabled for PTSD and tinnitus.  *Id.* ¶ 29; *see also id.*, Ex. H (Toole's VA Decision Letter).

Toole's stepmother, Michele Ann Canchola, learned of the attack when Toole called to inform her of his safety, and she was "so scared at how he sounded."  Decl. of Michele Ann Canchola (Jan. 3, 2022) ("M. Canchola Decl.") ¶¶ 3, 5, ECF No. 43-2.  When he returned home, "he began to distance himself from [her] emotionally . . . which was heartbreaking." *Id.* ¶¶ 7–8.  She noticed a "shift in [their] relationship" after the attack and they did not communicate as regularly, which made Michele Canchola "feel depressed and anxious, [and] not sure how to help [her] son." *Id.* ¶ 17.  Her "family's quality of life has been severely diminished due to the [a]ttack and the trauma that resulted." *Id.* ¶ 20.

Toole's stepfather, Timothy Louis Canchola, who is married to Toole's stepmother, Michele Canchola, learned about the attack when Toole called to tell his stepmother that he was okay, which relieved Timothy Canchola, but he "felt very scared and nervous for David."  Decl. of Timothy Louis Canchola (Jan. 3, 2022) ("T. Canchola Decl.") ¶¶ 3, 6, ECF No. 43-2.  When Toole returned home, "[h]e could not fit back into the family like before, and [their] relationship suffered because of it." *Id.* ¶ 9.  Timothy Canchola is "overwhelmed with guilt" remembering that he is the one who encouraged David Toole to enlist in the military. *Id.* ¶ 16.  He is still

"filled with anxiety, depression, and internal conflict" knowing that his son will likely never recover from the pain caused by the attack.  *Id.* ¶ 17.

### 21. Franko James Ferguson

On June 25, 1996, Franko James Ferguson was an Airman First Class quartered in the Khobar Towers complex.  Decl. of Franko James Ferguson (Dec. 27, 2021) ("F. Ferguson Decl.") ¶ 5, ECF No. 43-2.  He was waking up for his shift when he "felt a huge shockwave, and everything went dark."  *Id.* ¶ 6.  He "laid in [his] bed, stunned, disoriented, covered in glass, and bleeding from lacerations."  *Id.* ¶ 7.  Once he made his way to the triage center, he treated the "deep lacerations on [his] feet and knees from the glass shrapnel."  *Id.* ¶ 13.  Though eligible, Ferguson declined a Purple Heart award for his injuries, since he felt undeserving given the deaths of his close friends from the bombing.  *Id.*  He returned home briefly for his father's funeral but was sent back to Saudi Arabia soon after.  *Id.* ¶ 17.  When he returned home once again, he "felt anxious and depressed" and "started drinking to self-medicate."  *Id.* ¶ 18.  He and his wife divorced shortly after his return as he was "no longer emotionally or mentally available."  *Id.* ¶ 19.  He eventually sought help for his psychological injuries and is rated by the VA as 30% disabled for PTSD.  *Id.* ¶ 21; *see also id.*, Ex. G (Ferguson's VA Decision Letter).

### 22. Six Family Members of Timothy Michael Schomaker

Timothy Michael Schomaker, a Senior Airman in the U.S. Air Force quartered at Khobar Towers at the time of the attack, was a plaintiff in *Christie*, 2020 WL 3606273, at *10.  He was awarded $6 million in damages as a result of his pain and suffering.  *Id.* at *24.  Six of his family members are plaintiffs in this action: Schomaker's wife, Christina Marie Schomaker; mother, Paula Gail Nott; stepfather, Preston Wade Nott; sister, Kristine Lynnette Schomaker; and stepsisters, Tanya Lea Nott and Rebecca Lamae Thurman.  Decl. of Christina Marie Schomaker (Sept. 6, 2022) ("C. Schomaker Decl.") ¶ 4, ECF No. 45; Decl. of Paula Gail Nott (Aug. 29,

2022) ("P. Nott Decl.") ¶¶ 3–4, ECF No. 43-2; Decl. of Preston Wade Nott (Aug. 29, 2022) ("P. Wade Nott Decl.") ¶ 4, ECF No. 43-2; Decl. of Kristine Lynnette Schomaker (Aug. 29, 2022) ("K. Schomaker Decl.") ¶¶ 3–4, ECF No. 43-2; Decl. of Tanya Lea Nott (Sept. 5, 2022) ("T. Nott Decl.") ¶ 4, ECF No. 43-2; Decl. of Rebecca Lamae Thurman (Aug. 29, 2022) ("R. Thurman Decl.") ¶¶ 3–4, ECF No. 43-2.

Schomaker's spouse, Christina Marie Schomaker, was in her dorm room at the Robins Air Force base on the day of the attack, when she received a phone call from Schomaker, her then-boyfriend, explaining what happened at the Khobar Towers complex, which "distress[ed] and sadden[ed]" Christina Schomaker. C. Schomaker Decl. ¶¶ 3, 6, 9. When Schomaker returned home, she had to "adapt[] to his new demeanor," so she did not trigger or heighten his emotions. *Id.* ¶ 13. The couple married on May 23, 1997, almost a year after the bombing. *Id.* Christina Schomaker is now "constantly [] mindful" of her husband's PTSD, and even though he attended therapy, they "have struggled to maintain a normal lifestyle." *Id.* ¶¶ 14–15.

Schomaker's mother, Paula Gail Nott, found out about the attack while she was at work, and she was then "in shock and worried sick." P. Nott Decl. ¶¶ 3, 6. Waiting to hear from her son was "agonizing." *Id.* ¶ 7. In the aftermath of the attack, she "worr[ies] so much more about Tim" and is "saddened to hear about the injuries that affect [her] son," which has caused her "anxiety, panic attacks, sleep issues, and depression" for which she has sought treatment and medication. *Id.* ¶¶ 11–12.

Schomaker's stepfather, Preston Wade Knott, learned about the attack from his wife and he was "worried about [the] well-being and safety" of his son. P. Wade Nott Decl. ¶¶ 3, 6. When Schomaker returned home, "[h]e was not the same person" and it "hurt [Preston Knott] to see him so distressed." *Id.* ¶ 8. Preston Knott was "very saddened and anxious" trying to figure

out how he could help Schomaker.  *Id.* ¶ 9.  He "feel[s] so guilty that [he] had encouraged him to

enlist" and is "saddened that [he] cannot help him overcome the severe emotional injuries that he

sustained" from the attack.  *Id.* ¶¶ 14–15.

Schomaker's sister, Kristine Lynnette Schomaker, learned about the attack when her

mother phoned and "[t]he thought of losing [her] brother was horrible and left [her] distraught."

K. Schomaker Decl. ¶¶ 3, 6.  She had been close to her brother, but when he came home after the

attack, "[her] eagerness for his return was met with indifference from him."  *Id.* ¶ 9.  Their

relationship "began to dissipate with no explanation and that caused [her] a great deal of

emotional distress."  *Id.* ¶ 12.  When she finally realized that her brother was struggling, she felt

"immense guilt . . . for not being there for him during this very challenging and difficult time."

*Id.* ¶ 13.

Schomaker's stepsister, Tanya Lea Nott, was seventeen years old at the time of the attack

and "did not understand the magnitude of what happened for a while."  T. Nott Decl. ¶¶ 3, 6.

When her brother returned home, she was unaware of the extent of his injuries; she "assumed

that he was no longer interested in [her], and that made [her] very sad."  *Id.* ¶ 11.  She "feel[s]

like [she] failed him" for not understanding his pain and trauma for many years.  *Id.* ¶ 13.

Schomaker's stepsister, Rebecca Lamae Thurman, was in high school at the time of the

attack and did not realize that her brother had been injured until later.  R. Thurman Decl. ¶¶ 3, 6.

After the attack, their relationship "became strained" and she "blamed [herself] for [their]

disconnect."  *Id.* ¶ 11.  She feels "great sorrow knowing that Tim suffered for so many years with

his trauma."  *Id.* ¶ 14.

### 23. Michael Harrington Weems and Three Family Members

Michael Harrington Weems served as Captain of the Aeromedical Evacuation Flight

Team in the Air Force on June 25, 1996, stationed at the Khobar Towers complex.  Decl. of

Michael Harrington Weems (July 14, 2022) ("M. Weems Decl.") ¶ 6, ECF No. 43-2.  At the time of the attack, he was returning to his room from the gym when he heard a "loud boom and felt the building shake" then was struck in the head by a piece of plywood, knocking him unconscious.  *Id.* ¶ 7.  When he awoke, his "head was bleeding, and [his] ears were ringing," but he ran into the hallway to check on his suitemates.  *Id.* ¶¶ 8–9.  He had cuts on the bottoms of his feet from broken glass that developed into severe blood blisters.  *Id.* ¶ 9.  Eventually, he got treatment for his injuries and was diagnosed with a traumatic brain injury and tinnitus, for which he was awarded a Purple Heart.  *Id.* ¶ 12; *see also id.*, Ex. D (Weems's Purple Heart Certificate).  In the weeks after the bombing, he compiled casualty reports and interacted with civilian facilities for the deceased, actions that earned him the Air Force Commendation Medal with Valor Device.  *Id.* ¶ 15; *see also id.*, Ex. F (Weems's Air Force Commendation Medal with Valor Device Certificate).  Since the attack, he continues to struggle with PTSD and sleep issues for which he takes medication.  *Id.* ¶ 13; *see also id.*, Ex. E (Weems's Prescription Medications).  Unfortunately, his "condition quickly deteriorated" and his injuries "forced [him] to medically retire from the Air Force."  *Id.* ¶¶ 16–17.  Weems is rated by the VA as 80% disabled for a traumatic brain injury, chronic post-concussion migraines, and PTSD.  *Id.* ¶ 18; *see also id.*, Exs. G (Weems's VA Benefits Letter), H (Weems's VA Rating Decision Letter).

Weems's mother, Nancy Robertson Weems, learned about the attack while she was on a camping trip, and she was "devast[ed] and incredibly frighten[ed] to hear [her son] was wounded."  Decl. of Nancy Robertson Weems (June 28, 2022) ("N. Weems Decl.") ¶¶ 3, 6–7, ECF No. 43-2.  When she first saw him after the attack, he was a different person and "[i]t was difficult for [her] to see [her] son this way and not know how to help."  *Id.* ¶ 10.  She constantly

worries about her son and "thinking about [his] health has started to affect [her] health" and quality of life. *Id.* ¶ 15.

Weems's father, John Harold Weems, learned about the attack and "[his] heart sank at that moment . . . and [he] began to think the worst. Decl. of John Harold Weems (June 28, 2022) ("J. Weems Decl.") ¶¶ 3, 6, ECF No. 43-2. He spoke with his son after the attack and "was very worried about him" because John Weems "did not like him being over there in such dreadful conditions." *Id.* ¶ 9. His son returned home as "not his usual self"—he was quiet, slept often, and largely kept to himself. *Id.* ¶ 10. It has been "devastating for [John Weems] to watch Michael suffer from his injuries," and he is "saddened by the negative effect that his injuries have had on [their] relationship." *Id.* ¶ 15.

Weems's brother, Richard Lawrence Weems, "panicked" when he heard about the attack and nervously awaited word of his brother's safety. Decl. of Richard Lawrence Weems (June 28, 2022) ("R. Weems Decl.") ¶¶ 3, 6, ECF No. 43-2. He did not reunite with his brother until two years after the attack and "an awkwardness developed between [them]." *Id.* ¶¶ 8, 10. His brother's injuries negatively impacted their relationship and communication between them has diminished. *Id.* ¶ 13. He feels like he "lost [his] brother in the [a]ttack." *Id.* ¶ 14.

### 24. Brian Christopher Stoneburner

Brian Christopher Stoneburner was a Senior Airman in the in the Air Force on June 25, 1996, stationed at the Khobar Towers complex. Decl. of Brian Christopher Stoneburner (Apr. 11, 2022) ("B. Stoneburner Decl.") ¶ 5, ECF No. 43-2. When the attack occurred, he was trying to sleep in his room when he suddenly felt "a gut-wrenching explosion." *Id*. ¶ 6. After losing consciousness for a few minutes, he lifted a metal locker off of his roommate and the two evacuated the building. *Id.* ¶¶ 6, 8–10. While exiting, he assisted in rescuing individuals from an elevator and administered first aid to them, resulting in his award of the Air Force

Commendation Medal with Valor. *Id.* ¶ 10; *see also id.*, Ex. D (Stoneburner's Air Force

Commendation Medal with Valor Certificate). He eventually sought treatment for a rash, burns

on his hands, and body lacerations for which he was awarded a Purple Heart. *Id.* ¶ 15; *see also*

*id.*, Ex. E (Stoneburner's Purple Heart Certificate). He stayed at the Khobar Towers for almost

seven weeks after the bombing and worked the night shift in the garage for three of these weeks,

which caused him to relive the night of the attack; he received an Armed Forces Expeditionary

Medal for his continued service. *Id.* ¶ 17; *see also id.*, Ex. F (Stoneburner's Armed Forces

Expeditionary Medal Certificate). After the attack, he "began having nightmares and

flashbacks" and "grew depressed." *Id.* ¶ 19. He was diagnosed with PTSD, and when his

symptoms eventually "became overwhelming," he separated from the military. *Id.* ¶¶ 19, 22.

The VA determined that he is 30% disabled due to PTSD, a spinal injury, and tinnitus. *Id.* ¶ 22;

*see also id.*, Exs. G (Stoneburner's Medical Board Report), H (Stoneburner's VA Rating

Decision Letter)

### 25. Scott Patrick Hill and One Family Member

Scott Patrick Hill was a Senior Airman in the United States Air Force on June 25, 1996

stationed at the Khobar Towers complex. Decl. of Scott Patrick Hill (July 25, 2022) ("S. Hill

Decl.") ¶ 6, ECF No. 43-2. On the night of the attack, he was awoken by a "huge explosion" and

was in "a state of complete shock and speechlessness." *Id.* ¶¶ 8–9. As he was evacuating the

building, his feet were cut by glass shards covering the ground. *Id.* ¶ 10. In the months after the

attack, while still at the Khobar Towers, Hill assisted in cleaning debris, enhancing existing

security measures, and searching for evidence of the bombing as well as helping severely injured

servicemembers board flights to Germany for medical care, actions that earned him the Air Force

Achievement Medal First Oak Leaf Cluster, the Armed Forces Expeditionary Medal, and a

Southwest Asia Service Medal. *Id.* ¶ 15; *see also id.*, Exs. D (Hill's Air Force Achievement

Medal First Oak Leaf Cluster Certificate), E (Hill's Armed Forces Expeditionary Medal Certificate).  Upon returning home, Hill became increasingly hypervigilant, suspicious, distrustful of others, quick-tempered, and depressed; he "tried to self-medicate with alcohol."  *Id.* ¶ 19.  He eventually sought treatment from the VA and was diagnosed as 100% disabled for injuries resulting from the attack.  *Id.* ¶¶ 19, 22; *see also id.*, Exs. F (Hill's Treatment Record), G (Hill's VA Rated Disabilities ), H (Hill's VA Benefits Letter).

Hill's spouse, Kimberlee Jo Hill, was midflight during the attack and learned from her uncle upon touching down at the airport that her husband was alive but injured from the bombing.  Decl. of Kimberlee Jo Hill (July 13, 2022) ("K. Hill Decl.") ¶¶ 3, 8, ECF No. 43-2.  She was "extremely anxious waiting to hear [her husband's] voice and to confirm that he really was okay."  *Id.* ¶ 9.  When her husband returned home, his "anxiety made him irritable and difficult to be around," and their relationship suffered.  *Id.* ¶ 12.  She experienced "sleep issues" from worrying about her husband and "the reality of what [their] relationship has become leaves [her] feeling neglected and depressed."  *Id.* ¶¶ 14–15.

### 26. Christopher Brian Lauderback

Christopher Brian Lauderback was serving as an Airman First Class in the Air Force on June 25, 1996 and stationed at the Khobar Towers complex.  Decl. of Christopher Brian Lauderback (May 2, 2022) ("C. Lauderback Decl.") ¶ 5, ECF No. 43-2.  He was watching television in the common room of his building when "a glass balcony window blew in and shards of shattered glass lacerated [his] whole body."  *Id*. ¶ 6.  He "was thrown across the room into a concrete wall, injuring [his] head, shoulder, and back."  *Id*.  Despite his injuries, he assisted in providing first aid and buddy care to others and, in the days and weeks following the attack, he cleaned debris and blood around the complex while aiding in the investigation of the truck bomb, actions that earned him the Air Force Achievement Medal.  *Id.* ¶¶ 10–12; *see also id.*, Ex. E

(Lauderback's Air Force Achievement Medal Certificate).  Upon returning home, Lauderback's "physical injuries from the [a]ttack continued to plague [him]."  *Id.* ¶ 15.  He also became hypervigilant, angry, distrustful, and prone to night terrors because of the bombing.  *Id.* Lauderback is rated by the VA as 100% disabled for migraines, chronic bicep tendonitis in his left shoulder, cubital tunnel syndrome in his left shoulder, PTSD, and tinnitus.  *Id.* ¶¶ 15–16; *see also id.*, Exs. F (Lauderback's VA Disability Letter), G (Lauderback's VA Rated Disabilities ), H (Lauderback's Medical Evaluation).

### 27. One Family Member of Christopher Pius Nagel

Christopher Pius Nagel, a Staff Sergeant in the Air Force quartered at Khobar Towers at the time of the attack, was a plaintiff in *Christie*, 2020 WL 3606273, at *6.  He was awarded $7 million in damages as a result of his pain and suffering.  *Id.* at *24.  Nagel's former spouse, Jacqueline Archuleta Quintana, is a plaintiff in this action.  Decl. of Jacqueline Archuleta Quintana (May 27, 2022) ("J. Quintana Decl.") ¶ 4, ECF No. 43-2.

When Jacqueline Archuleta Quintana learned of the attack, she became "extremely distraught" and waited nervously to hear from her then-husband.  *Id*. ¶¶ 3, 5, 8.  When her husband returned home, he was "noticeably different," unfriendly, hardened, strongly opinionated, unreasonable, and quick-tempered, and "it impacted [their] lives in the worst way."  *Id*. ¶¶ 11, 15.  Their "marriage quickly deteriorated due to Chris's demeanor," and they divorced in 1999.  *Id*. ¶¶ 16–17.  The attack "had a monumental impact on [her] family," and she "essentially lost [her] best friend."  *Id*. ¶ 18.

### 28. Two Family Members of Bryant Keith White

Bryant Keith White, a Senior Airman in the Air Force quartered at Khobar Towers at the time of the attack, was a plaintiff in *Christie*, 2020 WL 3606273, at *8.  He was awarded $7 million dollars in damages as a result of his pain and suffering.  *Id.* at *25.  White's mother,

Susan Lynn White, and father, Jerry White, are plaintiffs in this action.  Decl. of Susan Lynn White (July 14, 2022) ("S. White Decl.") ¶ 4, ECF No. 43-2; Decl. of Jerry White (July 14, 2022) ("J. White Decl.") ¶ 4, ECF No. 43-2.

When Susan Lynn White heard the news of the attack, her "heart sank and [she] started to shake."  S. White Decl. ¶ 6.  She was relieved when her son returned home, but the psychological changes she witnessed in him, such as his emotional distance and self-isolation, "made her fe[el] like [she] was losing [her] son," which caused her to experience depression, stress, and migraines.  Id. ¶¶ 9, 16.  The "reality of what the [a]ttack did to [her] son and [her] family is horrendous."  Id. ¶ 18.

When Jerry White heard about the attack, "[i]t was one of the most terrifying moments of [his] life."  J. White Decl. ¶ 6.  He was "so distressed that [he] needed to take time off work."  Id. ¶ 7.  When his son returned home after the attack, Jerry White's military service in the Vietnam War allowed him to easily recognize the psychological changes in his son; he was "very reserved and frightened down to the core."  Id. ¶ 10.  "It pains [Jerry White] a great deal that [his son] has to live the rest of his life with PTSD, anxiety, depression, and all the other injuries he still experiences because of the Khobar bombing."  Id. ¶ 13.  Jerry White has "gone through years of great sorrow, anguish, and worry about Bryant" and "will carry his [son's] injuries and his struggles with [him] each and every day."  Id. ¶ 14.

### 29. Jason Allen Bratton

Jason Allen Bratton was serving as a Senior Airman in the Air Force on June 25, 1996, stationed at the Khobar Towers complex.  Decl. of Jason Allen Bratton (May 19, 2022) ("J. Bratton Decl.") ¶ 5, ECF No. 43-2.  When the attack happened, he was asleep in his room until "a huge tremor from an explosion . . . blew [him] out of [his] bed."  Id. ¶ 6.  He was thrown to the floor and "covered in shards of glass" with lacerations all over his body.  Id. ¶ 7.  He

attempted to treat his bleeding finger himself, which "resulted in its permanent deformation." *Id.* ¶ 10.  Despite his injuries, he carried injured servicemembers to triage for medical assistance and, in the days and weeks following the attack, he helped search for the deceased, actions that earned him the Air Force Commendation Medal with Valor Device. *Id.* ¶¶ 11–12; *see also id.*, Ex. E (Bratton's Air Force Commendation Medal with Valor Device Certificate).  Shortly after the attack, Bratton began experiencing symptoms of PTSD but waited many years to seek treatment. *Id.* ¶¶ 19–21.  The VA ultimately determined that he is 70% disabled due to PTSD with major depressive disorder resulting from the attack. *Id.* ¶ 22; *see also id.*, Exs. G (Bratton's Psychological Evaluation), H (Bratton's VA Rating Decision Letter).

### 30. Kenneth Michael Kowalczyk and Three Family Members

Kenneth Michael Kowalczyk was serving as a Senior Airman and Aircraft Weapons Systems Specialist in the Air Force on June 25, 1996, stationed at the Khobar Towers complex. Decl. of Kenneth Michael Kowalczyk (July 26, 2022) ("K. Kowalczyk Decl.") ¶ 6, ECF No. 43-2.  He was watching television in the common room of his building when he "was ejected off the couch and into a concrete wall" and knocked unconscious. *Id*. ¶ 7.  When he awoke, he realized that he "had a deep laceration to [his] left thumb" and "[his] left pinky finger was partially severed and dangling from [his] hand by only a thin piece of skin." *Id.* ¶ 8.  He was also "profusely bleeding from numerous lacerations on [his] legs and upper torso." *Id*.  In recognition of his injuries, Kowalczyk was awarded a Purple Heart. *Id.* ¶ 16; *see also id.*, Ex. F (Kowalczyk's Purple Heart Certificate).  Despite his injuries, Kowalczyk assisted in search and rescue efforts, earning him the Airman's Medal. *Id.* ¶ 14; *see also id.*, Ex. D (Kowalczyk's Airman's Medal Certificate).  After the attack, the changes in his demeanor and zest for life caused him and his wife to divorce. *Id.* ¶ 26.  He is rated as 70% disabled by the VA for his

injuries that he sustained during the attack.  *Id.* ¶ 27; *see also id.*, Exs. G (Kowalczyk's VA

Benefits Letter), H (Kowalczyk's VA Rated Disabilities).

   Kowalczyk's mother, Patricia Mary Kowalczyk, experienced "indescribable" stress and

fear upon learning of the attack, Decl. of Patricia Mary Kowalczyk (July 25, 2022) ("P.

Kowalczyk Decl.") ¶¶ 3. 6, ECF No. 43-2, and she was "left in worrisome agony for days"

waiting to hear about her son's status, *id.* ¶ 7.  When Kowalczyk finally returned home and

Patricia Kowalczyk learned about what he experienced at the Khobar Towers complex, she saw

him become "distant, quiet, and withdrawn."  *Id.* ¶ 11.  She would "worry and stress every time

he was deployed after that," which caused her stress and led to "a minor breakdown."  *Id.* ¶ 16.

To this day, her "heart aches for [her] son and the ongoing injuries from which he still suffers"

due to the attack.  *Id.* ¶ 17.

   Kowalczyk's father, Kenneth Dale Kowalczyk, learned about the attack and was

immediately scared for his son and waiting to hear of his status was "painfully stressful."  Decl.

of Kenneth Dale Kowalczyk (July 25, 2022) ("K. Dale Kowalczyk Decl.") ¶¶ 3, 7, ECF No. 43-

2.  When his son finally returned home, he confided in Kenneth Kowalczyk about the details of

the attack, which was "disheartening," to know that his son had experienced such trauma.  *Id.* ¶

10.  Kenneth Kowalczyk also noticed the changes in his son's demeanor, which made his son

quiet, less social, and avoidant of crowds.  *Id.* ¶ 14.  This has been "difficult" for Kenneth

Kowalczyk, to see the changes in his son's demeanor and the "pain [he] feel[s] for him is never-

ending."  *Id.* ¶ 16.

   Kowalczyk's brother, Aaron Charles Kowalczyk, heard about the attack and "[n]othing

felt safe anymore and [he] felt a newfound sense of worry, fear, and concern for [his] brother."

Decl. of Aaron Charles Kowalczyk (July 25, 2022) ("A. Kowalczyk Decl.") ¶¶ 3, 7, ECF No. 43-

2.  His relationship with his brother "became strained" after the attack, and he started to feel as if his brother "resented" him.  *Id.* ¶¶ 12–13.  The attack "took [his] brother from [him]," and he is "sad and depressed" that he does not share a close relationship with his brother anymore.  *Id.* ¶ 16.

### D.  Procedural Background

Plaintiffs filed this lawsuit on July 12, 2021 as a related case to *Christie*.  *See* Complaint, ECF No. 1; Notice of Suit, ECF No. 2; Pls.' Notice of Related Case, ECF No. 3.  Plaintiffs' subsequent request to file plaintiffs' addresses under seal, *see* Pls.' Mot. for Leave to File Pls.' Addresses Under Seal, ECF No. 4, was granted on July 15, 2021, *see* Order Granting Pls. Leave to File, ECF No. 7, and plaintiffs then filed those addresses under seal on July 21, 2021, *see* Sealed Notice of Pls.' Addresses Filed Under Seal, ECF No. 10.

Plaintiffs filed their First Amended Complaint on August 12, 2021, ECF No. 12, and on December 2, 2021, were directed to provide updates every thirty days on their efforts to serve defendants.  *See* Min. Order (Dec. 2, 2021).  Plaintiffs then sought leave to file their Second Amended Complaint on December 15, 2021, arguing that additional plaintiffs sought to join this action since its initiation, *see* Pls.' Mot. for Leave to File a Second Amended Compl., ECF No. 21; Pls.' Mem. in Supp. of Pls.' Mot. for Leave to File a Second Amended Compl., ECF No. 22, which request was granted on January 3, 2022, *see* Min. Order (Jan. 3, 2022); Second Amended Compl. ("Compl."), ECF No. 23; *see also* Sealed Second Amended Notice of Pls.' Addresses Filed Under Seal, ECF No. 24; Second Amended Notice of Suit, ECF No. 25.

As discussed in Part III.B, Iran was properly served under the FSIA and, after failing to appear, the Clerk of the Court entered default against Iran on September 1, 2022.  *See* Clerk's Entry of Default, ECF No. 38.  Plaintiffs subsequently moved for judicial notice of prior related

cases and for default judgment as to liability and damages on November 17, 2022.  *See* Pls.'
Mot.[6]  The motion is now ripe for resolution.

Additionally, on January 31, 2023, plaintiffs moved for leave to file their unredacted
declarations and exhibits under seal, with a public version redacting plaintiffs' personally
identifying information redacted available.  *See* Pls.' Mot. for Leave to File Documentary
Evidence Under Seal, ECF No. 42.  Plaintiffs argued that sealing was necessary to protect
plaintiffs' identities from reprisal from Iran and to keep confidential plaintiffs' health and
medical information detailed in their exhibits.  Pls.' Mem. in Supp. of Mot. for Leave to File
Documentary Evidence Under Seal at 3–4, ECF No. 42-1.  Plaintiffs' motion was granted that
day, *see* Min. Order (Jan. 31, 2023), and plaintiffs accordingly filed their exhibits under seal, *see*
Pls.' Declarations Filed Under Seal, ECF No. 43, and in redacted form, *see* Pls.' Redacted
Declarations, ECF No. 44.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court to consider entering a default
judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  Nevertheless,
"strong policies favor resolution of disputes on their merits" and, therefore, "'[t]he default
judgment must normally be viewed as available only when the adversary process has been halted
because of an essentially unresponsive party.'"  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir.
1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691

---

[6]      Two minor procedural steps occurred before plaintiffs moved for default judgment.  First, on October 17,
2022, this Court directed plaintiffs, by November 17, 2022, to show cause why this case should not be dismissed for
failure to prosecute after plaintiffs failed to take action following the Clerk's entry of default six weeks prior.  *See*
Min. Order (Oct. 17, 2022).  Plaintiffs then filed their motion for default judgment according to that deadline.  *See*
Pls.' Mot.  Second, on November 16, 2021, plaintiffs filed a Notice of Voluntary Dismissal as to Plaintiffs Jimmy
Olen Weaver and Jerimiah Joe Morrissette, ECF No. 39, stating that those two plaintiffs voluntarily dismissed their
claims in this case without prejudice.  The Court duly dismissed those plaintiffs without prejudice according to
Federal Rule of Civil Procedure 41(a)(1)(A)(i).  *See* Min. Order (Nov. 17, 2022).

(D.C. Cir. 1970)).  Furthermore, "entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and thus the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.

When default judgment is sought under the FSIA, a claimant must also "establish[] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This requirement "provides foreign sovereigns a special protection akin to that assured the federal government by Fed. R. Civ. P. 55([d])."  *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under [R]ule 55([d])").  While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, FSIA's terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins."  *Han Kim v. People's Democratic Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019).  With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'"  *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (formatting modified).

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  Courts take uncontroverted factual allegations that are supported by admissible evidence as true.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)); *accord Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014); FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to properly address another party's assertion of fact").

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'"  *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory." *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785).  In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted." *Owens*, 864 F.3d at 785 (second alteration in original) (internal quotation marks omitted).

## III.    DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants,

and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages

they seek.  These requirements are satisfied here and addressed in order below.

### A.  Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a

foreign state" seeking "relief in personam with respect to which the foreign state is not entitled to

immunity either under sections 1605–1607 of this title."  28 U.S.C. § 1330(a).  Plaintiffs seek *in*

*personam* relief, raising the key question whether defendants are entitled to immunity under the

"state sponsor of terrorism" exception set forth in §1605A.[7]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the

jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13

(D.C. Cir. 2015) (citing 28 U.S.C. § 1604), but "that grant of immunity is subject to a number of

exceptions," *id.* at 13–14.  Plaintiffs assert jurisdiction based on the FSIA's terrorism exception.

28 U.S.C. § 1605A; *see* Compl. ¶ 1.  In relevant part, this exception abrogates a foreign state's

immunity in cases where a plaintiff seeks "money damages" for "personal injury or death that

was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the

provision of material support or resources for such an act" if "engaged in by an official,

employee, or agent of such foreign state."  28 U.S.C. § 1605A(a)(1).  The FSIA defines a

"foreign state" to include "a political subdivision of a foreign state or an agency or

instrumentality" thereof.  28 U.S.C. § 1603(a).  The exception also requires that "the foreign

country was designated a 'state sponsor of terrorism at the time [of] the act,'" *Mohammadi*, 782

---

[7]      This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism
exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and defendant
has "forfeited its affirmative defense . . . by failing to raise it in" this Court, *Owens*, 864 F.3d at 805; *see also*
*Maalouf*, 923 F.3d at 1115 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations
defense  under 28 U.S.C. § 1605A(b)).

F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)), and that, at that time, "the 'claimant or the

victim was' a 'national of the United States,'" *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or

was "a member of the armed forces," 28 U.S.C. § 1605A(a)(2)(A)(ii)(II).[8]

Plaintiffs satisfy each of the applicable elements here.  As stated above, Iran was

designated a state sponsor of terrorism in 1984, twelve years before the 1996 Khobar Towers

bombing.  All but one of the plaintiffs have averred in sworn declarations that they were U.S.

citizens at the time of the attack.[9]  The remaining plaintiff, Un Suk Brodt, did not become a U.S.

citizen until 1999, after the attack; however, she may recover under the FSIA where "the

claimant *or the victim*" was "a national of the United States" at the time of the attack, 28 U.S.C.

§ 1605A(a)(2)(A)(ii) (emphasis added); *see also La Reunion Aerienne v. Socialist People's

Libyan Arab Jamahiriya*, 533 F.3d 837, 844 (D.C. Cir. 2008) (interpreting the former version of

the terrorism exception to mean that "if either the claimant or the victim is a national of the

United States, then immunity is waived"), and Un Suk Brodt's husband, servicemember plaintiff

Steven Lee Brodt, was a U.S. citizen at the time of the attack, *see* U. Brodt Decl. ¶ 2, and

---

[8]        Finally, the provision requires proof that, "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. § 1605A(a)(2)(A)(iii), but the attack took place in Saudi Arabia, not Iran, so this requirement does not apply.

[9]        Gration Decl. ¶ 3; J. Gration Decl. ¶ 2; Jonathan Gration Decl. ¶ 2; B. Brown Decl. ¶ 3; E. Graham Decl. ¶ 2; C. Brown Decl. ¶ 2; A. Brown Decl. ¶ 3; A. Wingate Decl. ¶ 2; S. Byers Decl. ¶ 3; D. Byers Decl. ¶ 2; R. Byers Decl. ¶ 2; J. Byers Decl. ¶ 2; T. Fermanis Decl. ¶ 3; K. Mall Decl. ¶ 3; J. Orlando Decl. ¶ 3; U. Orlando Decl. ¶ 2; K. Weaver Decl. ¶ 3; S. Pomoransky Decl. ¶ 2; V. Anthony Decl. ¶ 2; C. Weaver Decl. ¶ 2; D. Heikes Decl. ¶ 2; R. Heikes Decl. ¶ 2; R. Gering Decl. ¶3; A. Staricka Decl. ¶ 3; B. Mullings Decl. ¶ 3; T. Mullings Decl. ¶ 2; G. Mullings Decl. ¶ 2; V. Mullings Decl. ¶ 2; H. Hector Decl. ¶ 2; S. Yost Decl. ¶ 3; M. Yost Decl. ¶ 2; S. Elizabeth Douglass Decl. ¶ 2; S. Grace Douglass Decl. ¶ 2; S. Millard Douglass Decl. ¶ 2; J. Morrissette Decl. ¶ 3; D. Morrissette Decl. ¶ 2; N. Morrissette Decl. ¶ 2; N. Wheat Decl. ¶ 3; D. Wheat Decl. ¶ 2; V. Oliver Decl. ¶ 3; T. Oliver Decl. ¶ 2; S. Brodt Decl. ¶ 3; S. Han Brodt Decl. ¶ 2; S. John Brodt Decl. ¶ 2; S. Goff Decl. ¶ 2; A. Hovel Decl. ¶ 2; K. Ableidinger Decl. ¶ 2; J. Silvi Decl. ¶ 3; J. Ann Silvi Decl. ¶ 2; A. Silvi Decl. ¶ 2; A. Elizabeth Silvi Decl. ¶ 2; D. Toole Decl. ¶ 3; M. Canchola Decl. ¶ 2; T. Canchola Decl. ¶ 2; F. Ferguson Decl. ¶ 3; C. Schomaker Decl. ¶ 2; P. Nott Decl. ¶ 2; P. Wade Nott Decl. ¶ 2; K. Schomaker Decl. ¶ 2; T. Nott Decl. ¶ 2; R. Thurman Decl. ¶ 2; M. Weems Decl. ¶ 3; N. Weems Decl. ¶ 2; J. Weems Decl. ¶ 2; R. Weems Decl. ¶ 2; B. Stoneburner Decl. ¶ 3; S. Hill Decl. ¶ 3; K. Hill Decl. ¶ 2; C. Lauderback Decl. ¶ 3; J. Quintana Decl. ¶ 2; S. White Decl. ¶ 2; J. White Decl. ¶ 2; J. Bratton Decl. ¶ 3; K. Kowalczyk Decl. ¶ 3; P. Kowalczyk Decl. ¶ 2; K. Dale Kowalczyk Decl. ¶ 2; A. Kowalczyk Decl. ¶ 2.

therefore provides a basis for jurisdiction over Un Suk Brodt's claim, *see Aceto*, 2020 WL 619925, at *13 n.9.

Finally, plaintiffs seek damages "for personal injury . . . that was caused by an . . . extrajudicial killing" for which defendants provided "material support or resources." 28 U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors").

More specifically, the truck bombing that plaintiffs allege caused their injuries was an "extrajudicial killing" resulting in the deaths of nineteen American military personnel. *See, e.g.*, *Rimkus*, 750 F. Supp. 2d at 182 ("The actions of defendant[] constituted both an extrajudicial killing and the provision of material support in satisfaction of the first element of liability."); *Akins I*, 332 F. Supp. 3d at 33 (same); *Aceto*, 2020 WL 619925 at *13 (same). The term "extrajudicial killing" in the FSIA's terrorism exception has the "meaning given" in "the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7), which defines the term as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)).

Furthermore, this Court takes judicial notice of the evidence presented in *Blais* and *Heiser I*, demonstrating that defendants provided "material support or resources" for this extrajudicial killing. As is clear from the evidence in those cases, described *supra* in Part I.A–B, defendants authorized, "organized and sponsored" the Khobar Towers attack. *Heiser I*, 466 F. Supp. 2d at 262. The evidence shows that defendants helped to recruit, train, fund, supply, and

direct Saudi Hezbollah.  This establishes that defendants' actions were "a 'substantial factor' in the sequence of events that led to the plaintiff[s'] injur[ies]" and that the injuries were "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's terrorism exception is proximate cause).

Accordingly, under 28 U.S.C. § 1605A, defendants are not immune from this suit, and subject-matter jurisdiction may be properly exercised.  *See* 28 U.S.C. § 1330(a).

### B.  Personal Jurisdiction under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]."  28 U.S.C. § 1330(b).  Here, service was ultimately made under § 1608(a)(4). Section 1608 first prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)–(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), as "defendant[] ha[s] neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

Plaintiffs attempted service under § 1608(a)(3) by sending two copies of the summons, second amended complaint, second amended notice of suit, the FSIA, plaintiffs' motion seeking to file addresses under seal and the corresponding order granting that request, and the notice of related case along with a translation of each into Iran's official language by certified or

registered mail to Iran's Ministry of Foreign Affairs.  *See* Aff. Requesting Foreign Mailing, ECF No. 17.[10]  Plaintiffs then transmitted the same documents under the cover of diplomatic notes, and Iran was thus served on July 15, 2022.  *See* Return of Service/Aff. of Summons and Complaint Executed, ECF No. 36.[11]  This Court has personal jurisdiction over Iran.

### C.  Defendants' Liability

Plaintiffs seek relief under FSIA § 1605A(c), which creates a "private right of action . . . for wrongful death, personal injury, and related torts," Compl. ¶ 2, and provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c); *see also* Compl. ¶¶ 147–157 (Count I).  Yet Section 1605A(c) does not set out guidance on the substantive bases for liability that determine plaintiffs' entitlement to damages.  Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)."  *Fraenkel*, 892 F.3d at 353; *see Heiser II*, 659 F. Supp. 2d at 24 (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi II*, 879 F. Supp. 2d at 54); *Worley*, 75 F. Supp. 3d at 335.  As such, defendants' liability is discussed in detail below, starting with the servicemember plaintiffs.

---

[10]    To clarify, on July 19, 2021, plaintiffs sought an order permitting service of process by diplomatic channels, under 28 U.S.C. § 1608(a)(4), *see* ECF No. 9, but that request was denied as premature because plaintiffs had not yet attempted to serve defendants through foreign mailing, pursuant to 28 U.S.C. § 1608(a)(3), so plaintiffs were directed to so comply before attempting service through diplomatic channels—the order of which steps the FSIA requires, *see* Min. Order (July 21, 2021).

[11]    Specifically, on July 25, 2022, the U.S. Department of State certified in an Affidavit of Service that it met the requirements for diplomatic service under § 1608(a)(4) by causing delivery of a Summons, Complaint, and Notice of Suit to Iran on July 15, 2022.  *See* Aff. of Service at 1.

### 1.  *Servicemember Plaintiffs*

Servicemember plaintiffs bring their claims under theories of assault, battery, and intentional infliction of emotional distress.[12]  As discussed in the damages section, these plaintiffs may recover under only one theory, *see, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude double recovery by an individual.'") (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980)), but each theory of liability is nevertheless evaluated.

### a.  *Assault and Battery*

Battery requires an act "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly results."  RESTATEMENT (SECOND) OF TORTS § 13.  "Harmful contact" causes a "physical impairment of the condition of another's body, or physical pain or illness."  *Id.* § 15; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010) (defining these terms). Iran acted with the intent to cause harmful contact with the residents of the Khobar Towers when it materially supported the truck bombing.  *See, e.g., Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as acts intending to cause harm).  Twenty-four servicemember plaintiffs were in the Khobar Towers complex at the time of the attack and suffered harmful physical contact resulting from the explosive force of the blast and therefore defendants are liable to them for battery.[13]

---

[12]     Plaintiff the Estate of Lt. Co. Steven Peter Goff noted its withdrawal of claims for wrongful death and survival, *see* Pls.' Mem. at 18–19; Compl. ¶¶ 185–189 (Count VI, wrongful death), 190–194 (Count VII survival claim), so those theories of liability are not addressed in this opinion.

[13]     J. Gration Decl. ¶¶ 7–8 (cuts to body from glass shards); B. Brown Decl. ¶ 12 (right shoulder injury); A. Brown Decl. ¶¶ 7–8 (pressure on body from explosion, ringing ears, inhaled smoke, dust, and toxic fumes); S. Byers Decl. ¶¶ 7–11 (slammed against wall, hit head and neck, ringing ears, glass shards in body); T. Fermanis Decl. ¶¶ 6–11 (thrown against wall and knocked unconscious, glass shards in body); K. Mall Decl. ¶¶ 6–8 (air conditioning unit fell on his head and knocked unconscious, glass shards in feet); J. Orlando Decl. ¶¶ 7–8 (knocked to ground, ringing ears, glass shards in leg); K. Weaver Decl. ¶¶ 9–10 (thrown to ground hitting back and head, glass shards in body,

Assault occurs where a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension."  RESTATEMENT (SECOND) OF TORTS § 21(1). "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs averred "that they did, in fact, fear such harm because of the attack," defendant may be held liable for assault.  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same).  Imminence is defined as being "so close to striking distance that [one] can reach the other almost at once." RESTATEMENT (SECOND) OF TORTS § 29 cmt. 2.  Twenty-five servicemember plaintiffs located at or in the immediate vicinity of the Khobar Towers at the time of the attack present valid claims for assault because they were within "striking distance" of the blast and therefore had an imminent apprehension of harm.  *Id.*[14]

---

debris and dust in mouth); R. Gering Decl. ¶¶ 6–8, 12 (knocked to knees, hurt back and ankle, ringing ears); S. Yost Decl. ¶¶ 7, 10 (blown out of chair, glass shards in body, bleeding head and arm, ringing ears, and cuts, scrapes, and bruises); J. Morrissette Decl. ¶¶ 7–9 (dust in eyes, pressure through body, glass shards in feet); N. Wheat Decl. ¶¶ 7–8 (blast launched him into the air and down on the floor hurting his back, glass shards in body, including left arm and head); S. Brodt Decl. ¶ 7 (laceration to right foot); S. Goff Decl. ¶ 11 (glass shard through chest, hands, feet, legs, and shoulders); J. Silvi Decl. ¶¶ 7–8 (thrown from couch, head injury, laceration to right foot and forehead); D. Toole Decl. ¶¶ 7–8 (thrown across room, head injury, ringing ears, lacerations to head and back); F. Ferguson Decl. ¶¶ 6–7 (lacerations from glass shards, ringing ears); M. Weems Decl. ¶¶ 7–8 (struck in head by debris, knocked unconscious, laceration to head, ringing ears); B. Stoneburner Decl. ¶¶ 6, 15 (toxic grime on hands leaving scars, body lacerations, headache, ringing ears); S. Hill Decl. ¶¶ 7–10 (dust in mouth and eyes, glass shards in feet, ringing ears); C. Lauderback Decl. ¶¶ 6–8 (thrown across room injuring head, shoulder and back, ringing ears, dust in mouth and eyes, glass shards in feet, lacerations on body); J. Bratton Decl. ¶¶ 6–7 (thrown from bed onto floor, body lacerations, severed tendon in finger); K. Kowalczyk Decl. ¶¶ 7–9, 15 (thrown into wall and knocked unconscious, glass shards in body, severed finger); V. Oliver Decl. ¶¶ 7–8 (glass shards embedded in legs and feet).

[14]      Twenty-three servicemember plaintiffs were inside one of the targeted buildings in the Khobar Towers. *See* J. Gration Decl. ¶ 7; A. Brown Decl. ¶ 7; S. Byers Decl. ¶ 7; T. Fermanis Decl. ¶ 6; K. Mall Decl. ¶ 6; J. Orlando Decl. ¶ 7; K. Weaver Decl. ¶ 10; R. Gering Decl. ¶ 6; S. Yost Decl. ¶ 7; J. Morrissette Decl. ¶ 7; N. Wheat Decl. ¶ 7; S. Brodt Decl. ¶ 7; S. Goff Decl. ¶ 11; J. Silvi Decl. ¶ 7; D. Toole Decl. ¶ 7; F. Ferguson Decl. ¶¶ 5–6; M. Weems Decl. ¶ 7; B. Stoneburner Decl. ¶ 6; S. Hill Decl. ¶ 8; C. Lauderback Decl. ¶ 6; J. Bratton Decl. ¶ 6; K. Kowalczyk Decl. ¶ 7; V. Oliver Decl. ¶ 7.  Two additional servicemember plaintiffs were located in close proximity to the blast site.  *See* B. Brown Decl. ¶ 7 (located in the complex's underground gym facility approximately 0.25 mile from the site); B. Mullings Decl. ¶¶ 7–8 (stationed at a security post at the Khobar Towers complex, saw the truck enter the parking lot near the blast site, and felt the pressure from the blast from his station).

b.    *Intentional Infliction of Emotional Distress*

"[O]ne who by extreme and outrageous conduct intentionally or recklessly cause[d]

severe emotional distress to" a plaintiff is liable for intentional infliction of emotional distress.

RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26.  "Acts of

terrorism are by their very definition extreme and outrageous and intended to cause the highest

degree of emotional distress."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C.

2009); *see also Valore*, 700 F. Supp. 2d at 77 (same).  All twenty-six servicemember plaintiffs

have demonstrated through their sworn statements that they suffered severe emotional and

psychological stress as a result of the attack.[15]  Additionally, twenty-one servicemember

plaintiffs have demonstrated, through their sworn declarations and corroborating submissions,

that they have formal PTSD diagnoses as a result of the attack.[16]  Defendants are liable to all

twenty-six servicemember plaintiffs for IIED.

2.    *Servicemember Victims' Family Members*

The remaining fifty-three plaintiffs—Judith Ellen Gration, Jonathan Scott Gration, Jr.,

Eva Ranee Graham, Corey Thomas Brown, Alexis Nichole Wingate, Donna Lee Byers, Rodney

Lee Byers, Joseph Eugene Byers, Ursula Leona Orlando, Susan Pauline Pomoransky, Vickie

Rena Anthony, Clinton Edward Weaver, Donald Lee Heikes, Roger Dayle Heikes, Tina Marie

Mullings, Gloria Ann Mullings, Vernon Oscar Mullings, Heather Mauren Hector, Maria Star

---

[15]     *See* Gration Decl. ¶ 24; B. Brown Decl. ¶ 21; A. Brown Decl. ¶ 23; S. Byers Decl. ¶ 18; T. Fermanis Decl. ¶ 21; K. Mall Decl. ¶ 22; J. Orlando Decl. ¶ 21; K. Weaver Decl. ¶ 27; R. Gering Decl. ¶¶ 17–19; A. Staricka Decl. ¶¶ 19–20; B. Mullings Decl. ¶¶ 19–22; S. Yost Decl. ¶¶ 19–21; J. Morrissette Decl. ¶ 25; N. Wheat Decl. ¶ 22; S. Brodt Decl. ¶ 15; S. Goff Decl. ¶ 23; J. Silvi Decl. ¶¶ 18–19; D. Toole Decl. ¶ 28; F. Ferguson Decl. ¶ 18; M. Weems Decl. ¶¶ 18, 20; B. Stoneburner Decl. ¶ 19; S. Hill Decl. ¶ 20; C. Lauderback Decl. ¶ 17; J. Bratton Decl. ¶ 19; K. Kowalczyk Decl. ¶ 25; V. Oliver Decl. ¶¶ 17–18.

[16]     *See* B. Brown Decl. ¶ 22; A. Brown Decl. ¶ 20; S. Byers Decl. ¶ 19; T. Fermanis Decl. ¶ 21; K. Mall Decl. ¶¶ 15, 24; R. Gering Decl. ¶ 17; A. Staricka Decl. ¶¶ 19–20; B. Mullings Decl. ¶ 24; S. Yost Decl. ¶¶ 22–23; J. Morrissette Decl. ¶ 24; S. Brodt Decl. ¶¶ 15–17; J. Silvi Decl. ¶¶ 19, 21; D. Toole Decl. ¶ 29; F. Ferguson Decl. ¶ 21; M. Weems Decl. ¶ 18; B. Stoneburner Decl. ¶¶ 19, 22; S. Hill Decl. ¶¶ 19, 22; C. Lauderback Decl. ¶ 16; J. Bratton Decl. ¶¶ 21–22; K. Kowalczyk Decl. ¶ 27; V. Oliver Decl. ¶ 18.

Yost, Serena Elizabeth Douglass, Sarah Grace Douglass, Steven Millard Douglass, Diane Theresa Morrissette, Natasha Kami Morrissette, Donald Allen Wheat, Tamara Lee Oliver, Un Suk Brodt, Steven Han Brodt, Samuel John Brodt, Shirley Ann Goff, Antoinette Marie Hovel, Kathryn Mary Ableidinger, Jo Ann Silvi, Angela Christine Silvi, Alison Elizabeth Silvi, Michele Ann Canchola, Timothy Louis Canchola, Christina Marie Schomaker, Paula Gail Nott, Preston Wade Nott, Kristine Lynnette Schomaker, Tanya Lee Nott, Rebecca Lamae Thurman, Nancy Robertson Weems, John Harold Weems, Richard Lawrence Weems, Kimberlee Jo Hill, Jacqueline Archuleta Quintana, Susan Lynn White, Jerry White, Patricia Mary Kowalczyk, Kenneth Dale Kowalczyk, and Aaron Charles Kowalczyk—seek to collect damages as family members of servicemember plaintiffs present in Saudi Arabia for the Khobar Towers bombing.

The family members' theory of liability is IIED.  Compl. ¶¶ 172–179 (Count IV).  The Restatement permits recovery for those who were not a direct target of a defendants' conduct if (1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present" and (2) the claimant is a member of a victim's immediate family, *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834 (2000)), or the functional equivalent of an immediate family member, *see Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FSIA for IIED to "members of the victim's household" who were also "viewed as the functional equivalents of immediate family members"); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. *l* (leaving "open the possibility of situations in which presence . . . may not be required").

Thirty-eight of the plaintiffs are immediate family members—parents, spouses, children, and siblings—of victims.  *See Fritz*, 324 F. Supp. 3d at 63 (observing that the "strict meaning" of

immediate family is "one's spouse, parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)).  Fifteen of the plaintiffs—Susan Pauline Pomoransky, Donald Lee Heikes, Roger Dayle Heikes, Eva Ranee Graham, Jacqueline Archuleta Quintana, Maria Star Yost, Christina Marie Schomaker, Serena Elizabeth Douglass, Sarah Grace Douglass, Tanya Lea Nott, Rebecca Lame Thurman, Steven Millard Douglass, Timothy Louis Canchola, Preston Wade Nott, and Michele Ann Canchola—do not fall neatly into these traditional categories but are the functional equivalents of immediate family members and are therefore able to maintain claims for IIED. *See Bettis*, 315 F.3d at 337.

Half-siblings like Susan Pauline Pomoransky, Donald Lee Heikes, and Roger Dayle Heikes "are presumed to recover" as full siblings would, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007)), and the evidence here supports application of that presumption: each attests to close bonds with their half siblings.[17]

Two of the plaintiffs—Eva Ranee Graham and Jacqueline Archuleta Quintana—are former spouses married to servicemember plaintiffs at the time of the attack.  E. Graham Decl. ¶¶ 5, 7; J. Quintana Decl. ¶¶ 3, 5.  A former spouse is considered a member of the victim's immediate family for the purposes of recovery in a claim for IIED.  *See Panahi v. Islamic Republic of Iran*, No. 19-0006 (ABJ), 2020 WL 6591425, at *9 (D.D.C. Oct. 10, 2020) (Jackson, A.B., J.) (finding that the former spouse of a tortured Iranian detainee was an immediate family member under the Restatement).  Relatedly, two of the plaintiffs—Maria Star Yost and Christina Marie Schomaker—were either dating or engaged to servicemember plaintiffs and thus not

---

[17]     Pomoransky "took care of [her half-brother] daily from the day he was born until [she] got married three years later."  S. Pomoransky Decl. ¶ 13.  Donald Lee Heikes was "very close" with his half-brother and they "lived in the same household and shared a bedroom for six years."  D. Heikes Decl. ¶ 10.  Roger Dayle Heikes was also "very close" with his half-brother; they "played sports together[,]. . . often went fishing[,] and talked about everything."  R. Heikes Decl. ¶ 13.

legally related to them at the time of the attack, but were the functional equivalent of spouses given that their "bond" with the relevant servicemember plaintiff "was the functional equivalent of marriage" at the time of the bombing.  *Bettis*, 315 F.3d at 337; *see also Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 270 (D.D.C. 2002) (holding woman who was not legally married to the victim, but had lived with the victim for over 20 years in "a bond that was the functional equivalent of a legal marriage" and was recognized by family and colleagues, could recover for IIED); *cf. Aceto*, 2020 WL 619925, at *16 (rejecting functional equivalent of spouse finding for couple that had met in "1994 or 1995" and had dated for less than two years before Khobar Towers bombing).[18]

Four of the plaintiffs—Serena Elizabeth Douglass, Sarah Grace Douglass, Tanya Lea Nott, and Rebecca Lamae Thurman—are step-siblings of servicemember plaintiffs.  Step-siblings may recover where they are "viewed as the functional equivalents of family members" based on a case-by-case analysis.  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 79 (D.D.C. 2010) (Lamberth, C.J.) (quotation marks omitted) (finding that a stepbrother "who remembers fishing and swimming with and was treated like a brother by [service-member], is the functional equivalent of a brother"); *see also Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2022 WL 168261, at *1–2 (D.D.C. Jan. 19, 2022).  These step-sibling plaintiffs attest to the fact that they were the functional equivalent of an immediate family member at the time of the bombing.[19]

---

[18]     *See* M. Yost Decl. ¶¶ 3, 6 (engaged to Sy Yost at the time of the attack after dating for two years and living together; they married upon his return approximately eight months after the Khobar Towers bombing); C. Schomaker Decl. ¶¶ 3, 6, 13 (dating Timothy Schomaker at the time of the attack after dating and living together on another military base; they married upon his return almost one year after the bombing).

[19]     Serena Elizabeth Douglass attests to having a "close relationship" with her stepbrother Clayton Omar Zook in which they would "play[] video games . . . [,] sit[] together listening to music," and discuss "deep topics, like religion, open-mindedness, and life choices."  S. Elizabeth Douglass Decl. ¶¶ 9–10.  Sarah Grace Douglass also attests to a "natural familial bond" with her stepbrother Clayton Zook in which he was a "consistent source of fun,

Additionally, four family member plaintiffs—Steven Millard Douglass, Timothy Louis

Canchola, Preston Wade Nott, and Michele Ann Canchola—are stepparents of servicemember

plaintiffs.  Stepparents may recover as natural parents where they adopt their stepchild or are

otherwise the "functional equivalents of family members." *Valore*, 700 F. Supp. 2d at

79 (finding that where a stepson "grew up" with his stepfather "as though they constituted a

natural family," the stepfather was the functional equivalent of a father, *id.* at 80).  Steven

Millard Douglass, the stepfather of servicemember plaintiff Clayton Omar Zook, lived with his

stepson and they "quickly bonded," with the former appreciating now having a son to work on

cars and do remodeling projects together.  S. Millard Douglass Decl. ¶ 6.  Timothy Louis

Canchola, David Anthony Toole's stepfather, also attests to having a "close and loving

relationship" with his stepson, whom he "thought of . . . as [his] own biological son."  T.

Canchola Decl. ¶¶ 10–11.  Michele Ann Canchola raised servicemember plaintiff David

Anthony Toole "as if he were [her] biological son."  M. Canchola Decl. ¶ 9.  She

"wholeheartedly took on the role of his mother," and they "did all the things that mothers and

sons do together."  *Id.* ¶¶ 10–11.  Preston Wade Knott similarly attests to a close relationship

with his stepson Timothy Michael Schomaker in which they "engaged in father-son activities

such as camping, off-roading, and attending baseball games."  P. Wade Nott Decl. ¶¶ 3, 11.

These plaintiffs are accordingly entitled to recover for IIED as the functional equivalent of a

family member at the time of the attack.

---

stability, and love in [her] life" such that "it felt like he had been [her] brother forever."  S. Grace Douglass Decl. ¶ 9.  Tanya Lee Nott recalls that she and her stepbrother Timothy Michael Schomaker "played together as siblings do" growing up; she "always wanted to hang out" with him, they never argued, and she saw him as her "cool older brother."  T. Nott Decl. ¶ 8.  Rebecca Lamae Thurman also recalls her "good relationship" with Timothy Schomaker in which they "bonded" during shared activities, and Timothy Schomaker was "very protective" of her and "always had [her] back."  R. Thurman Decl. ¶¶ 7–8.

As just outlined, the servicemember plaintiffs and the immediate-family member plaintiffs have established the defendants' liability under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress.

### D. Damages

Turning to the allowable damages, servicemember plaintiffs seek damages for pain and suffering, under 28 U.S.C. § 1605A(c) and the family member plaintiffs seek solatium damages, under 28 U.S.C. § 1605A(c).  Compl., Prayer for Relief ¶ A.  Plaintiffs also request pre- and post-judgment interest and punitive damages.  *Id.* ¶¶ B–C.  Thus, the damage award to which each plaintiff is entitled is described below.

#### 1. Legal Standard for Damages Under Section 1605A(c)

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering and punitive damages."  28 U.S.C. § 1605A(c).  To recover, plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate."  *Roth*, 78 F. Supp. 3d at 402 (internal quotation marks omitted); *see also Fraenkel*, 892 F.3d at 353 (stating the same).  Courts may look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate.  *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).  The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion."  *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that plaintiffs' injuries were reasonably

certain and were the intended consequences of defendants' material support of Saudi Hezbollah.
*See Schooley*, 2019 WL 2717888, at *74 (concluding the same); *Akins*, 332 F. Supp. 3d at 39
(same).  Having concluded this, whether plaintiffs have shown the amount of pain and suffering,
solatium, and punitive damages by a reasonable estimate will be considered next.[20]

## 2.   *Pain and Suffering*

As discussed, defendants are liable to servicemember plaintiffs for battery and intentional
infliction of emotional distress, but the bar on multiple recoveries allows these plaintiffs to
recover only under one theory, for the single underlying harm.  *See, e.g.*, *Valore*, 700 F. Supp. 2d
at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may
recover under only one of any such theories, as multiple recovery is prohibited.").  Within this
single-recovery framework, the "baseline assumption," *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27,
35 (D.D.C. 2016), applied in previous cases under the FSIA's terrorism exception is that
"persons suffering injuries in terrorist attacks are entitled to $5 million in damages."  *Id.* (quoting
*Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)).  The baseline may be
adjusted either upward or downward.  An upward departure would be warranted "in the presence
of 'severe instances of physical and psychological pain, such as where victims suffered relatively

---

[20]     The FSIA's private right of action permits plaintiffs to seek "economic damages."  28 U.S.C. § 1605A(c).
Plaintiffs, however, broadly request "[c]ompensatory damages including, but not limited to, . . . past and future
economic losses, including medical expenses and lost income and earning capacity . . . in amounts determined by
the Court," Compl., Prayer for Relief ¶ A, without any documentation of medical bills or payments or any evidence
of economic injury.  Plaintiffs have thus failed to allege, let alone prove, the amount of economic or medical
expenses damages by a reasonable estimate, and so they cannot recover for economic damages.  *See Moradi v.
Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015) (concluding the same where plaintiff had estimated
his economic loss without documentation); *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 41 (D.D.C. 2016) (denying
economic damages where plaintiff did not provide documents "lending credence" to his claims of lost income);
*Akins*, 332 F. Supp. 3d at 39–40 (denying economic losses for failure to support claims with sufficient evidence).
"Unlike damages for pain and suffering, lost earnings" and any incurred medical expenses "are not hard to quantify,
and the Court will not excuse plaintiffs' failure to support the claim for lost earnings" and medical expenses "with
competent evidence."  *Moradi*, 77 F. Supp. 3d at 71.  *See also Mustard*, 2023 WL 1778193, at *12 n.13 (finding the
same); *Ackley*, 2022 WL 3354720, at * 50 (same); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL
619925, at *18 (same); *Schooley*, 2019 WL 2717888, at *74 (same); *Akins I*, 332 F. Supp. 3d at 39–40 (same).

more numerous and severe injuries, were rendered quadriplegic . . . or were mistaken for dead.'"
*Id.* at 35–36 (quoting *Valore*, 700 F. Supp. 2d at 84).  A downward departure would be warranted
"in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'"  *Id.* at 36 (quoting
*Valore*, 700 F. Supp. 2d at 84).

   Pain and suffering damages are by their nature difficult to quantify.  In *Schooley*, this
Court relied in part on an "objective metric"—the VA disability rating—to "determin[e] the
relative degree of injury suffered by each servicemember plaintiff."  *Schooley*, 2019 WL
2717888, at *74.  That rating is the "agency's official determination regarding the extent of
disabling injury sustained by service members in connection with military service."  *Id.* (internal
quotation marks omitted).  As *Schooley* explained, "[t]he VA disability rating, which includes
both mental and physical injuries in a single number, facilitates an approach to awarding
damages that is generally agnostic to the mental or physical nature of the injury and further
provides" an effective way of comparing injuries to ensure that similar injuries yield similar
awards.  *Id.*; *cf. Peterson*, 515 F. Supp. 2d at 54 (in calculating damages, "the Court must take
pains to ensure that individuals with similar injuries receive similar awards").  *Schooley*'s basic
rubric is adopted in this case for the twenty-four servicemember plaintiffs with relevant VA
disability ratings.  *See Ackley*, 2022 WL 3354720, at *51 (using *Schooley*'s "basic rubric" of VA
disability ratings to calculate damages amounts); *Christie*, 2020 WL 3606273, at *23 (same);
*Aceto*, 2020 WL 619925, at *18 (same).  Thus, servicemember plaintiffs rated by the VA up to
30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40–60% disabled by the
VA will receive an upward departure, for a total award of $6,000,000; and servicemember
plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total

of $7,000,000.  *See Ackley*, 2022 WL 3354720, at *51 (using this approach); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same).

Two servicemember plaintiffs did not receive VA disability ratings: Steven Lee Brodt and the Estate of Steven Peter Goff.  Nonetheless, review of these plaintiffs' "uncontroverted factual allegations" in their affidavits, *Roth*, 78 F. Supp. 3d at 386, and, where available, exhibits, demonstrates that they each suffered severe injuries and chronic psychological pain. *See Valore*, 700 F. Supp. 2d at 83–84; *see also* S. Lee Brodt Decl. ¶¶ 7–10, 15, 17 (describing "a deep laceration" in his right foot from glass shards, for which he received a Purple Heart, and describing psychological symptoms); S. Goff Decl. ¶¶ 11–12, 19, 23–25 (describing "a large shard of glass [that] had gored through his chest, and shards of glass pierced his hands, feet, legs, and shoulders," for which he received a Purple Heart, and psychological symptoms that unfortunately resulted in his death).  Thus, these plaintiffs are entitled to awards of $5,000,000 for the cuts and lacerations they received in the bombing and the psychological symptoms they have suffered since.

The following four servicemember plaintiffs who received VA disability ratings of up to 30% are each entitled to recover $5,000,000: John Charles Orlando, Jr., Vincent Gene Oliver, Franko James Ferguson, and Brian Christopher Stoneburner.  This finding is supported by the following:

1. John Charles Orlando, Jr. received a 10% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  J. Orlando Decl. ¶ 22; *see id.*, Ex. G (VA Rating Decision).

2. Vincent Gene Oliver received a 10% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  V. Oliver Decl. ¶ 9; *see id.*, Ex. E (VA Disabilities Record).

3. Franko James Ferguson received a 30% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  F. Ferguson Decl. ¶ 21; *see id.*, Ex. G (VA Decision Letter).

4. Brian Christopher Stoneburner received a 20% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  B. Stoneburner Decl. ¶ 22; *see id.*, Ex. H (VA Decision Letter).

Five servicemember plaintiffs are entitled to recover in the 40–60% disabled category: Timothy Gerard Fermanis, Kenneth David Weaver, Ronald Scott Gering, Nathan Elliot Wheat, and David Anthony Toole.  This finding is supported by the following:

1. Timothy Gerard Fermanis received a 60% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  T. Fermanis Decl. ¶¶ 21–22; *see id.*, Ex. F (VA Rated Disabilities).

2. Kenneth David Weaver received a 40% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  K. Weaver Decl. ¶ 29; *see id.*, Ex. I (VA Rated Disabilities).

3. Ronald Scott Gering received a 40% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  R. Gering Decl. ¶¶ 8, 12, 17, 25; *see id.*, Exs. D (VA Rated Disabilities), H (VA Benefits Letter).

4. Nathan Elliot Wheat received a 40% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  N. Wheat Decl. ¶ 21; *see id.*, Exs. H (VA Rated Disabilities), I (VA Benefits Letter).

5. David Anthony Toole received a 60% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  D. Toole Decl. ¶ 29; *see id.*, Ex. H (VA Decision Letter).

These five servicemember plaintiffs are each entitled to an upward departure from the baseline award for a total award to each of $6,000,000 for their pain and suffering as survivors of the bombing.

Finally, fifteen of the servicemember plaintiffs are entitled to recover in the 70–100% disabled category: Jonathan Scott Gration, Barry Gordon Brown, Angela Mashel Brown, Steven Lee Byers, Kevin Richard Mall, Aubree Brooke Staricka, Brent Alan Mullings, Sy William Yost, Joey Laurier Morrissette, James Michael Silvi, Michael Harrington Weems, Scott Patrick Hill, Christopher Brian Lauderback, Jason Allen Bratton, and Kenneth Michael Kowalczyk. This finding is supporting by the following:

1. Jonathan Scott Gration received a 100% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  J. Gration Decl. ¶¶ 26–27; *see id.*, Ex. H (VA Benefit Information).

2. Barry Gordon Brown received a 100% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  B. Brown Decl. ¶ 22; *see id.*, Ex. I (VA Rated Disabilities).

3. Angela Mashel Brown received a 80% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  A. Brown Decl. ¶¶ 20–23; *see id.*,

Exs. F (VA Rating Decision Letter), G (VA Rated Disabilities), H (VA Rating Decision Letter), I (VA Benefits Letter).

4.  Steven Lee Byers received a 80% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  S. Byers Decl. ¶¶ 18–22; *see id.*, Exs. F (VA Benefits Letter), G (VA Individual Ratings).

5.  Kevin Richard Mall received a 100% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  K. Mall Decl. ¶¶ 23–24; *see id.*, Exs. H (VA Benefits Letter), I (VA Disability Rating).

6.  Aubree Brooke Staricka received a 90% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  A. Staricka Decl. ¶ 20; *see id.*, Ex. H (VA Rating Decision Letter).

7.  Brent Alan Mullings received a 100% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  B. Mullings Decl. ¶ 26; *see id.*, Ex. H (VA Rating Decision Letter).

8.  Sy William Yost received a 90% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  S. Yost Decl. ¶¶ 22–23; *see id.*, Ex. I (VA Rated Disabilities).

9.  Joey Laurier Morrissette received a 100% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  J. Morrissette Decl. ¶ 24; *see id.*, Ex. G (VA Decision Letter).

10. James Michael Silvi received a 90% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  J. Silvi Decl. ¶ 21; *see id.*, Exs. H (VA Rated Disabilities), I (VA Benefit Letters).

11. Michael Harrington Weems received a 80% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  M. Weems Decl. ¶ 18; *see id.*, Exs. G (VA Benefits Letter), H (VA Rating Decision Letter).

12. Scott Patrick Hill received a 100% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  S. Hill Decl. ¶ 22; *see id.*, Exs. G (VA Rated Disabilities), H (VA Benefits Letter).

13. Christopher Brian Lauderback received a 100% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  C. Lauderback Decl. ¶¶ 15–16; *see id.*, Exs. F (VA Disability Letter), G (VA Rated Disabilities).

14. Jason Allen Bratton received a 70% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  J. Bratton Decl. ¶ 22; *see id.*, Ex. H (VA Rating Decision Letter).

15. Kenneth Michael Kowalczyk received a 70% disability rating from the VA for injuries he avers resulted from the Khobar Towers bombing.  K. Kowalczyk Decl. ¶ 27; *see id.*, Exs. G (VA Benefits Letter), H (VA Rated Disabilities).

These fifteen servicemember plaintiffs are thus each entitled to an upward departure from the baseline award, for a total award to each of $7,000,000 for their pain and suffering as survivors of the bombing.

### 3.  *Solatium*

The remaining plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of servicemember victims.  *See* Compl. ¶¶ 180–84 (Count V, solatium, consortium, pain and suffering).  "[S]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society," *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic*

*of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)), but solatium damages have also been awarded to compensate for the emotional distress of the family members of surviving victims, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (explaining that "in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where awards are valued at half of the awards to family members of the deceased" (internal quotation marks omitted)); *see also Valore*, 700 F. Supp. 2d at 85 ("Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased."). "Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015) (Contreras, J.); *see also Fraenkel*, 892 F.3d at 357. Damages recoverable on immediate-family member plaintiffs' claims of IIED thus will be discussed as a claim for solatium damages.

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356–57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

Commonly accepted in this Court is *Heiser I*'s standardized framework for solatium damages. *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)). Although not mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted." (emphasis in original)), the *Heiser* framework is adopted here for

consistency, *see also Akins*, 332 F. Supp. 3d at 43 (adopting the *Heiser* framework for awarding

solatium damages); *Schooley*, 2019 WL 2717888, at *77 (same).

The *Heiser* framework, as a baseline, awards spouses of deceased victims $8,000,0000,

parents and children of deceased victims $5,000,000, and siblings of deceased victims

$2,500,000.  *Valencia*, 774 F. Supp. 2d at 15.  "[F]amilies of victims who have died are typically

awarded greater damages than families of victims who remain alive," *Heiser I*, 466 F. Supp. 2d

at 269 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 56, 75 (D.D.C. 2006)), and so

the courts have awarded family members of surviving victims approximately half the baseline

awards for family members of the deceased, *see Wultz*, 864 F. Supp. 2d at 39; *Valore*, 700 F.

Supp. 2d at 85.  Here, then, the applicable baseline solatium awards are $4,000,000 to spouses of

surviving victims and $2,500,000 to parents of surviving victims, *see Wultz*, 864 F. Supp. 2d at

39; "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer v. Islamic*

*Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014), and siblings of surviving victims receive

$1,250,000, *see Valore*, 700 F. Supp. 2d at 85.

These numbers serve only as an anchor from which the Court should deviate to

compensate for specific circumstances.  *See Fraenkel*, 892 F.3d at 362 ("While past solatium

awards from comparable cases are appropriate sources of guidance for district courts, different

plaintiffs (even under [the] FSIA) will prove different facts that may well (and should) result in

different damage awards." (internal quotation marks omitted)).  "Decisions to deviate from the

starting points provided by the *Heiser* framework are committed to the discretion of the

particular court in each case."  *Oveissi v. Islamic Republic of Iran* ("*Oveissi I*"), 768 F. Supp. 2d

16, 26 (D.D.C. 2011); *see also Fraenkel*, 892 F.3d at 351 ("District Court judges have

discretion . . . to grant solatium awards based on the particular facts of each case, subject to

abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning.").

Damages for plaintiff spouses are addressed first, followed by parents, children, and siblings.

### a.   *Spouses*

Eleven of the immediate family member plaintiffs were spouses or the functional equivalent of spouses of service-member plaintiffs at the time of the bombing: Maria Star Yost, Christina Marie Schomaker, Eva Ranee Graham, Jacqueline Archuleta Quintana, Judith Ellen Gration, Ursula Leona Orlando, Tina Maria Mullings, Tamara Lee Oliver, Un Suk Brodt, Jo Ann Silvi, and Kimberlee Jo Hill.  As detailed above, each spouse describes fear for her spouse's physical well-being in the immediate aftermath of the bombing and the toll that the bombing has taken since on their sense of safety, on their spouses, or on their marriages.[21]

The *Heiser* framework awards spouses of surviving victims $4,000,000.  Maria Star Yost, Christina Marie Schomaker, Judith Ellen Gration, Ursula Leona Orlando, Tina Maria Mullings, Tamara Lee Oliver, Un Suk Brodt, Jo Ann Silvi, and Kimberlee Jo Hill all have surviving servicemember spouses.  As such, each is awarded the full amount given to spouses of surviving victims: $4,000,000.

Where attenuation in a relationship has occurred, such as spouses divorcing or siblings losing touch, a downward departure is appropriate.  *See Valore*, 700 F. Supp. 2d at 87.  Where evidence indicates, however, that, for example, a couple eventually divorced but remained married for years following the attack and the spouse "suffered compensable emotional trauma,"

---

[21]        *See* M. Yost Decl. ¶¶ 7–9, 12–15; C. Schomaker Decl. ¶¶ 9–12; E. Graham Decl. ¶¶ 9–12; J. Quintana Decl. ¶¶ 6–8, 15–18; J. Gration Decl. ¶¶ 6–7, 13–18; U. Orlando Decl. ¶¶ 6–8, 11–14; T. Mullings Decl. ¶¶ 6–7, 10–14; T. Oliver Decl. ¶¶ 10–12, 15–17; U. Brodt Decl. ¶¶ 6–7, 12–15; J. Ann Silvi Decl. ¶¶ 6–8, 13–18; K. Hill Decl. ¶¶ 8–10, 12–15.

the *Heiser* solatium framework may still be applied.  *Spencer*, 71 F. Supp. 3d at 28–29.  Two spouses have, in the intervening period dating from the attack, divorced from their servicemember spouses who were injured from the bombing.  Eva Ranee Graham and Jacqueline Archuleta Quintana are former spouses of injured servicemembers, Barry Gordon Brown and Christopher Pius Nagel, respectively.  Eva Graham remained married  after the bombing, during which period she avers that the "emotional anguish" she endured after Brown returned from Saudi Arabia with a "new demeanor" made her an "emotional wreck[]" and destroyed their marriage.  E. Graham Decl. ¶¶ 16–17.  Similarly, Jacqueline Archuleta Quintana and Christopher Pius Nagel remained married for three years after the bombing, during which period she claims that Nagel's changed personality "constantly left [her] feeling hurt and embarrassed" and Nagel's resistance to receiving mental health services ultimately led to their divorce.  J. Quintana Decl. ¶¶ 11–18.  Each of these divorced spouses will accordingly receive the full solatium award of $4,000,000 as the former spouses of Barry Gordon Brown and Christopher Pius Nagel, respectively, despite their divorces.

### b.  *Parents*

Eighteen of the immediate-family member plaintiffs will receive awards as parents of servicemembers who were stationed at the Khobar Towers at the time of the bombing: Donna Lee Byers, Rodney Lee Byers, Gloria Ann Mullings, Vernon Oscar Mullings, Steven Millard Douglass, Diane Theresa Morrissette, Donald Allen Wheat, Shirley Ann Goff, Michele Ann Canchola, Timothy Louis Canchola, Paula Gail Nott, Preston Wade Nott, Nancy Robertson Weems, John Harold Weems, Susan Lynn White, Jerry White, Patricia Mary Kowalczyk, and

Kenneth Dale Kowalczyk.  Their harms are consistent with those suffered by many parents of victims of terrorism.  *See Valencia*, 774 F. Supp. 2d at 16.[22]

The parents of the injured service-members are each entitled to a baseline award of $2,500,000.  *See Akins I*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service-members).  Here, eighteen parent and stepparent plaintiffs, whose children were awarded between $5,000,000 and $7,000,000, will receive awards of $2,500,000: Donna Lee Byers, Rodney Lee Byers, Gloria Ann Mullings, Vernon Oscar Mullings, Steven Millard Douglass, Diane Theresa Morrissette, Donald Allen Wheat, Shirley Ann Goff, Michele Ann Canchola, Timothy Louis Canchola, Paula Gail Nott, Preston Wade Nott, Nancy Robertson Weems, John Harold Weems, Susan Lynn White, Jerry White, Patricia Mary Kowalczyk, and Kenneth Dale Kowalczyk.

### c.   *Children*

Seven plaintiffs are children of servicemembers injured in the bombing and each describes confusion or fear in the immediate aftermath of the attack or attribute difficult relationships with their servicemember parents, at least in part, to the psychological mark the attack had on their parents: Jonathan Scott Gration, Jr., Corey Thomas Brown, Alexis Nichole Wingate, Steven Han Brodt, Samuel John Brodt, Angela Christine Silvi, and Alison Elizabeth Silvi.[23]  Although at least four of the children were too young at the time of the bombing to

---

[22]     D. Byers Decl. ¶¶ 6–8, 13–15; R. Byers Decl. ¶¶ 6–8, 13–16; G. Mullings Decl. ¶¶ 6–8, 12–15; V. Mullings Decl. ¶¶ 6–8, 12–13; S. Millard Douglass Decl. ¶¶ 8–10; D. Morrissette Decl. ¶¶ 6–7, 11–13; D. Wheat Decl. ¶¶ 6–8, 18; S. Goff Decl. ¶¶ 8–11, 18–26; M. Canchola Decl. ¶¶ 5–6, 16–20; T. Canchola Decl. ¶¶ 6–10, 16–17; P. Gail Nott Decl. ¶¶ 6–8, 11–12; P. Wade Nott Decl. ¶¶ 6–9, 13–15; N. Weems Decl. ¶¶ 6–8, 12–15; J. Weems Decl. ¶¶ 6–8, 14–16; S. White Decl. ¶¶ 6–8, 16–18; J. White Decl. ¶¶ 6–7, 13–14; P. Kowalczyk Decl. ¶¶ 6–7, 16–17; K. Dale Kowalczyk Decl. ¶¶ 6–7, 14–16.

[23]     J. Scott Gration, Jr. Decl. ¶¶ 6–9, 13–16; C. Brown Decl. ¶¶ 6–13; A. Nichole Wingate Decl. ¶¶ 8–16; S. Han Brodt Decl. ¶¶ 6–7, 10–16; S. John Brodt Decl. ¶¶ 6, 12–15; A. Christine Silvi Decl. ¶¶ 8–14; A. Elizabeth Silvi Decl. ¶¶ 6–9, 12–15.

comprehend that their parents were harmed or had been in danger, this lessened awareness does not lessen the distress they each experienced growing up with parents suffering from psychological symptoms from the attack.  *See* n.22; *see also Schooley*, 2019 WL 2717888, at *78 (same).

As stated, "[c]hildren of a surviving victim receive $1.5 million on average" under the *Heiser* framework.  *Spencer*, 71 F. Supp. 3d at 28; *Aceto*, 2020 WL 619925, at *11, 22 (awarding $1,500,000 to Kaylee Ziegler, whose father, Eric Dale Ziegler, received an award of $5,000,000 in *Akins I*, 332 F. Supp. 3d at 47).  All plaintiff children's parents received awards between $5,000,000 and $7,000,000, and as such, each child plaintiff will recover $1,500,000.

### d.   *Siblings*

Seventeen of the immediate family member plaintiffs are siblings, stepsiblings, or half-siblings of servicemember plaintiffs: Joseph Eugene Byers, Susan Pauline Pomoransky, Vickie Rena Anthony, Clinton Edward Weaver, Donald Lee Heikes, Roger Dayle Heikes, Heather Maureen Hector, Serena Elizabeth Douglass, Sarah Grace Douglass, Natasha Kami Morrissette, Antoinette Marie Hovel, Kathryn Mary Ableidinger, Kristine Lynnette Schomaker, Tanya Lea Nott, Rebecca Lamae Thurman, Richard Lawrence Weems, and Aaron Charles Kowalczyk. Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[24]  These harms are consistent with those suffered by many siblings of victims of terrorism.  *See Valencia*, 774 F. Supp. 2d at 15. Within the *Heiser* framework, siblings of injured servicemembers awarded between $5,000,000

---

[24]     J. Byers Decl. ¶¶ 6–7, 11–15; S. Pomoransky Decl. ¶¶ 6–7, 10–16; V. Anthony Decl. ¶¶ 6–8, 12–13, 17–18; C. Weaver Decl. ¶¶ 6–7, 10–11, 14–16; D. Heikes Decl. ¶¶ 6–8, 13–17; R. Heikes Decl. ¶¶ 6–7, 9–14; H. Hector Decl. ¶¶ 6–7, 9–13, 16–19; S. Elizabeth Douglass Decl. ¶¶ 6–7, 12–14; S. Grace Douglass Decl. ¶¶ 6–7, 11–13; N. Morrissette Decl. ¶¶ 6–8, 11–13; A. Hovel Decl. ¶¶ 6–8, 11–12, 15–16; K. Ableidinger Decl. ¶¶ 6–8, 14–16; K. Schomaker Decl. ¶¶ 6–9, 13–14; T. Nott Decl. ¶¶ 6, 10–13; R. Thurman Decl. ¶¶ 6, 10–14; R. Weems Decl. ¶¶ 6–7, 9–10, 13–14; A. Kowalczyk Decl. ¶¶ 6–7, 12–16.

and $7,000,000 are each entitled to an award of $1,250,000, with no downward departure for

proportionality required.  *See Akins I*, 332 F. Supp. 3d at 45 (awarding a baseline amount of

$1,250,000 to siblings of injured service-members).

### E.  Punitive Damages

In addition to compensatory damages, plaintiffs seek punitive damages under 28 U.S.C. §

1605A(c).  *See* Compl. ¶¶ 195–99 (Count VIII); *id.*, Prayer for Relief ¶ B.  The Supreme Court

has laid out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of

reprehensibility of the defendants' misconduct; (2) the disparity between the actual or potential

harm suffered by the plaintiff and the punitive damages award; and (3) the difference between

the punitive damages awarded by the jury and the civil penalties authorized or imposed in

comparable cases."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)

(citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).  In addition, in *Philip Morris*

*USA v. Williams*, the Supreme Court announced that "the Constitution's Due Process Clause

forbids . . . use [of] a punitive damages award to punish a defendant for injury that it inflicts

upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who

are, essentially, strangers to the litigation."  549 U.S. 346, 353 (2007).

Weighing this precedent, *Christie* awarded "[p]unitive damages equal to compensatory

damages" in light of the "identified flaws in the [other] methods" for determining punitive

damages. 2020 WL 3606273, at *27.  Specifically, *Christie* determined that this method avoided

"a singular focus on deterrence," *id.* at *28, as well as "elevat[ing] superficial similarities over

meaningful ones" and "skim[ing] over analysis of the plaintiffs' precise harms," and does not

"yield an excessive award," *id.*  Awarding punitive damages equal to compensatory damages,

*Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial

compensatory awards," *id.*, "'the compensatory damages for the injury suffered' . . . [were] 'based on a component which' would be 'duplicated in the punitive award,'" *id.* (quoting *State Farm*, 538 U.S. at 426), and "[a]dding hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by Iran] . . . [was] not likely to have a meaningful deterrent effect," *id.* at *29.

Given that *Christie* reached this conclusion based on the same event at issue in the present case, the *Christie* punitive damages approach analysis, which was likewise applied in *Blank*, 2021 WL 3021450, at *10, will also be applied here.  Plaintiffs urge no alternative approach.  *See* Pls.' Mem. at 46.  Accordingly, a punitive damages award equal to compensatory damages is most appropriate.  Plaintiffs are entitled to a total punitive damages award of $285,750,000 to be apportioned among plaintiffs according to their compensatory damages.  *See also Valore*, 700 F. Supp. 2d at 90 (apportioning in the same fashion).

## F.  Prejudgment Interest

Plaintiffs next seek prejudgment interest "at the maximum rates allowable by law." Compl., Prayer for Relief ¶ C; *see also* Pls.' Mem. at 40–44.  "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi II*, 879 F. Supp. 2d at 58.  At the same time, the majority of Judges on this Court confronted with this issue have concluded—as this Court did in *Akins I*—that "pain and suffering and solatium damages are both designed to be fully compensatory" and prejudgment interest is therefore unwarranted.  *See Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (Contreras, J.) (quoting *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012)); *see Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) (Friedrich, J.) (denying prejudgment interest because the

award "in *today's dollars* fully compensates the crew members and their estates for their time

spent in captivity" (emphasis in original)); *Bathiard v. Islamic Republic of Iran*, Case No. 16-cv-

1549 (CRC), 2020 WL 1975672, at *8 (D.D.C. Apr. 24, 2020) (Cooper, J.) (holding

"prejudgment interest is not appropriate for nonpecuniary damages already designed to provide

complete compensation"); *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB),

2019 WL 3037868, at *10 (D.D.C. Jul. 11, 2019) (Boasberg, J.) (denying prejudgment interest

because "direct-injury and solatium awards [are] to be fully compensatory" already); *Maupin v.*

*Syrian Arab Republic*, 405 F. Supp. 3d 79, 94, 99 (D.D.C. 2019) (Spec. Master Report), *adopted*

*by Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75 (D.D.C. 2019) (Kollar-Kotelly, J.);

*Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 54–55 (D.D.C. 2016) (Howell, J.).

Thus, the overarching tide of persuasive precedent in this District plainly weighs against

awarding prejudgment interest, and is even less warranted considering punitive damages are

permissible in § 1605A cases, as prejudgment interest "does not apply to punitive damages

because 'prejudgment interest is an element of complete compensation' and punitive damages

are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at

42).

Consistent with this persuasive precedent, this Court concludes plaintiffs are not entitled

to prejudgment interest on their compensatory or punitive damages.  When denying prejudgment

interest on compensatory damages in *Oveissi I*, Judge Lamberth explained that "[i]n adopting the

*Heiser* framework, this Court determined that the values set by that scale represent the

appropriate level of compensation, regardless of the timing of the attack."  *Oveissi I*, 768 F.

Supp. 2d at 30 n.12; *see also Maupin*, 405 F. Supp. 3d at 94; *Thuneibat*, 167 F. Supp. 3d at 54.

Indeed, nonpecuniary damages for pain and suffering and solatium "do not typically require

prejudgment interest because they are 'designed to be fully compensatory.'" *Id.* (quoting *Wyatt*, 908 F. Supp. 2d at 232). As in *Oveissi I*, where "the Court s[aw] no reason to deviate from its standard practice" of relying on "the values set by th[at] [*Heiser*] scale[, which] represent the appropriate level of compensation" and award prejudgment interest, *Oveissi I*, 768 F. Supp. 2d at 30 n.12, the instant plaintiffs "have not provided any reason why awards under [the *Heiser*] framework are insufficient to provide 'complete compensation,'" *Akins I*, 332 F. Supp. 3d at 46 (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)). Plaintiffs are likewise not entitled to prejudgment interest on their punitive damages. "[P]rejudgment interest does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42). Accordingly, plaintiffs are awarded monetary damages in the amounts established above without prejudgment interest.

### G. Post-Judgment Interest

Finally, plaintiffs request post-judgment interest. *See* Compl., Prayer for Relief ¶ C; Pls.' Mem. at 44–45. Postjudgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g.*, *Winternitz v. Syrian Arab Republic*, No. 17-cv-2104 (TJK), 2022 WL 971328, at *12 (D.D.C. Mar. 31, 2022) (awarding postjudgment interest because "[a]pplication of section 1961(a) is mandatory, not discretionary") (quoting *Schooley*, 2019 WL 2717888, at *79); *Doe A-1*, 2021 WL 723257, at *9; *Flanagan*, 87 F. Supp. 3d at 127; *Lanny J. Davis & Assocs. v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013); *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005). By federal statute, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court[,]" and that "[s]uch interest shall be calculated from the date of the entry of judgment." 28

U.S.C. § 1961(a).  Application of section 1961(a) is mandatory, not discretionary.  *See Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs.*, 962 F. Supp. 2d at 165.  The Court will therefore award post-judgment interest at the statutory rate.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' motion is granted.  Defendants are liable for the pain and suffering inflicted on the twenty-six service-member plaintiffs, for the emotional distress inflicted on the fifty-three immediate family member plaintiffs of these and other servicemember plaintiffs, and for punitive damages equal to compensatory damages.

Plaintiffs are awarded monetary damages in the following amounts:

1.     Servicemember plaintiffs Jonathan Scott Gration, Barry Gordon Brown, Angela Mashel Brown, Steven Lee Byers, Kevin Richard Mall, Aubree Brooke Staricka, Brent Alan Mullings, Sy William Yost, Joey Laurier Morrissette, James Michael Silvi, Michael Harrington Weems, Scott Patrick Hill, Christopher Brian Lauderback, Jason Allen Bratton, and Kenneth Michael Kowalczyk, who each suffered injuries resulting in a VA disability rating at or above 70%, are each entitled to $7,000,000 in pain and suffering damages and $7,000,000 in punitive damages;

2.     Servicemember plaintiffs Timothy Gerard Fermanis, Kenneth David Weaver, Ronald Scott Gering, Nathan Elliot Wheat, and David Anthony Toole, who each suffered injuries resulting in a 40–60% VA disability rating, are each entitled to $6,000,000 in pain and suffering damages and $6,000,000 in punitive damages;

3.     Servicemember plaintiffs John Charles Orlando, Jr., Vincent Gene Oliver, Franko James Ferguson, and Brian Christopher Stoneburner, who each suffered injuries

resulting in a 30% or lower VA disability rating, are each entitled to $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages;

4.  Servicemember plaintiffs Steven Lee Brodt and the Estate of Steven Peter Goff, who each suffered severe injuries, are each entitled to $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages;

5.  Plaintiff spouses Maria Star Yost, Christina Marie Schomaker, Eva Ranee Graham, Jacqueline Archuleta Quintana, Judith Ellen Gration, Ursula Leona Orlando, Tina Maria Mullings, Tamara Lee Oliver, Un Suk Brodt, Jo Ann Silvi, and Kimberlee Jo Hill are each entitled to $2,000,000 in solatium damages and $2,000,000 in punitive damages;

6.  Plaintiff parents and stepparents Donna Lee Byers, Rodney Lee Byers, Gloria Ann Mullings, Vernon Oscar Mullings, Steven Millard Douglass, Diane Theresa Morrissette, Donald Allen Wheat, Shirley Ann Goff, Michele Ann Canchola, Timothy Louis Canchola, Paula Gail Nott, Preston Wade Nott, Nancy Robertson Weems, John Harold Weems, Susan Lynn White, Jerry White, Patricia Mary Kowalczyk, and Kenneth Dale Kowalczyk are each entitled to $2,000,000 in solatium damages and $2,000,000 in punitive damages;

7.  Plaintiff children Jonathan Scott Gration, Jr., Corey Thomas Brown, Alexis Nichole Wingate, Steven Han Brodt, Samuel John Brodt, Angela Christine Silvi, and Alison Elizabeth Silvi are each entitled to $2,000,000 in solatium damages and $2,000,000 in punitive damages;

8.  Plaintiff siblings and step-siblings Joseph Eugene Byers, Susan Pauline Pomoransky, Vickie Rena Anthony, Clinton Edward Weaver, Donald Lee Heikes, Roger Dayle

Heikes, Heather Maureen Hector, Serena Elizabeth Douglass, Sarah Grace Douglass, Natasha Kami Morrissette, Antoinette Marie Hovel, Kathryn Mary Ableidinger, Kristine Lynnette Schomaker, Tanya Lea Nott, Rebecca Lamae Thurman, Richard Lawrence Weems, and Aaron Charles Kowalczyk are each entitled to $2,000,000 in solatium damages and $2,000,000 in punitive damages.

Thus, the total damages award is $571,500,000.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

DATE:  August 15, 2023

_____
BERYL A. HOWELL
United States District Judge